JUDGE LEISURE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

E. S. ORIGINALS, INC.,

      Plaintiff,

-v-

TOTES ISOTONER CORPORATION,
      Defendant.

Civil Action No.

08 CV 1945

COMPLAINT



      Plaintiff E.S. Originals, Inc. ("Plaintiff" or "ESO"), by way of Complaint against Defendant Totes Isotoner Corporation ("Defendant" or "TIC"), hereby alleges as follows:

### NATURE OF THE ACTION

      1.    This is an action to compel Defendant to comply with its contractual obligations to provide Plaintiff with access to its books and records, as required by the terms of an Asset Purchase Agreement between the parties dated as of October 6, 2006 (the "Agreement"). As more fully described below, as a result of Defendant's disregard of its crystal-clear obligations under the Agreement, Plaintiff is being denied access to information concerning its right to receive certain "earn-out payments" under the Agreement that total in excess of $3,375,000. As a result of Defendant's refusal to comply with the Agreement, Plaintiff is being denied the benefit of the rights it specifically bargained for in the Agreement. In addition, Defendant's conduct has caused (and is continuing to cause) Plaintiff to incur substantial losses, fees, costs, and expenses -- all of which Defendant is required to pay under the Agreement.

## PARTIES

2. Plaintiff ESO is a New York corporation with its principal place of business located in New York, New York. ESO was originally founded in 1954 and is the largest privately held footwear importer in the world. ESO sells footwear on a wholesale basis, primarily to department stores, mass merchants, and specialty footwear retailers.

3. Defendant TIC is an Ohio corporation with its principal place of business located in Cincinnati, Ohio. TIC claims to trace its roots back to 1910, and describes itself as the world's largest marketer of umbrellas, gloves, rainwear, rubber overshoes, and other weather-related accessories.

## JURISDICTION AND VENUE

4. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of New York, and Defendant is a citizen of Ohio. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and the terms of the Agreement, in that (a) Defendant is subject to in personam jurisdiction in this District; (b) a substantial part of the events or omissions giving rise to this action occurred in this District; and (c) pursuant to paragraph 12.14 of the Agreement, Defendant irrevocably agreed and consented to the jurisdiction of, and venue located in, the United States District Court for the Southern District of New York.

## SUBSTANTIVE ALLEGATIONS

6. Pursuant to the terms of the Agreement, ESO agreed to sell, and TIC agreed to purchase, certain of ESO's business and proprietary assets, goodwill and other rights, as more fully described in the Agreement.

7. TIC agreed to purchase these assets from ESO for various types of consideration, including the (a) assumption of certain of ESO's liabilities, (b) payment of

$20,275,000 to ESO, (c) payment of an additional $350,000 for an affiliate of ESO based in Hong Kong, and (d) various "earn-out" payments.

A.  **The Earn-Out Payments**

8.  The first set of the possible earn-out payments that was required to be made to ESO pursuant to the Agreement was based on the sold business' financial performance during the one-year period of September 30, 2006 through September 30, 2007 (the "First Earn-Out Period"). Three possible types of earn-out payments could be due ESO for this period: (a) the "First Earn-Out Payment," (b) a "Federated Earn-Out Payment," and (c) a "Direct Import Earn-Out Payment."

9.  The First Earn-Out Payment was to be $3,375,000, and was to be payable to ESO no later than November 29, 2007 if two criteria were met: (a) "Net Sales" for the First Earn-Out Period must have equaled or exceeded $60,800,000, and (b) "Landed Net Sales" for that same period must have equaled or exceeded $29,200,000.

10. For purposes of the Agreement and the First Earn-Out Payment, "Net Sales" means, "with respect to any Earn-Out Period covered by a Net Sales Statement, the Landed Net Sales and Direct Import Net Sales."

11. "Landed Net Sales" means, under the Agreement: "Gross Sales from the Subject Products both (i) sold to customers other than Federated and (ii) imported back into the United States by buyer as the importer of record, less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."

12. "Direct Import Net Sales" is defined in the Agreement as: "Gross Sales from the Subject Products sold to each of the Direct Import Customers less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."

13. Thus, under the terms of the Agreement, for the purpose of calculating both Net Sales and Landed Net Sales (both of which are elements of the First Earn-Out

Payment), "Customer Charge-backs" (as that term is defined in the Agreement) can only be deducted to the extent that they have been "*paid, credited or accepted* in the ordinary course of business" of TIC on account of damaged goods, returns and allowances.

14. ESO was also entitled to receive the Federated Earn-Out Payment -- a payment of 5% of the Net Sales to one of ESO's customers, Federated Department Stores, Inc., for the First Earn-Out Period. Like the First Earn-Out Payment, the Federated Earn-Out Payment was to be payable to ESO no later than November 29, 2007.

15. The third type of payment that ESO stood to receive under the Agreement for the First Earn-Out Period was the Direct Import Earn-Out Payment. The Direct Import Earn-Out Payment was to be a payment of 3% of certain sales to certain customers specified in the Agreement, and was conditioned upon satisfaction of the criteria for payment by TIC of the First Earn-Out Payment.

**B.    ESO's Right to Information Concerning Earn-Out Payments**

16. Paragraph 2.7 of the Agreement required TIC to deliver a "Net Sales Statement" to ESO within 60 days following the last day of the First Earn-Out Period. The Net Sales Statement was supposed to set forth TIC's calculation of Net Sales for the First Earn-Out Period, as well as "a reasonably detailed calculation of Net Sales to Federated, Landed Net Sales (which amount shall also be the amount used for purposes of calculating Seller eligibility for the First Earn-Out Payment and/or the Second Earn-Out Payment) and Direct Import Net Sales."

17. The Net Sales Statement was, in effect, required to be TIC's calculation of whether or not the criteria for payment of the First Earn-Out Payment, Federated Earn-Out Payment and Direct Import Earn-Out Payment had been satisfied. Paragraph 2.7 of the Agreement also set forth a methodology for ESO to verify and/or dispute the amounts reflected on any Net Sales Statement from TIC.

18. In particular, pursuant to paragraph 2.7(c) of the Agreement, to the extent that the net effect of any dispute could "reasonably be expected to affect the calculation of Net Sales by more than $250,000," ESO was entitled to deliver written notice of its disputes to TIC.

The Agreement requires that such notice set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute." If such notice was not delivered to TIC within 45 days of TIC's delivery of the Net Sales Statement to ESO, the Net Sales Statement could be deemed "final, binding and conclusive on the parties."

19. Upon delivery of a notice satisfying the requirements of paragraph 2.7(c), the parties are thereafter required to endeavor to resolve their disputes over a period of 20 business days. If still unable to resolve all or any portion of their disputes, the parties agreed to submit any disputed items for resolution by an "Independent Accounting Firm" (as defined in the Agreement).

20. After the business and assets were sold to TIC, ESO no longer had any direct access to the underlying books, records, and information necessary to calculate Net Sales, Landed Net Sales, Direct Import Net Sales, or Net Sales to Federated. Accordingly, without access to those books, records and information, ESO would be unable to verify or dispute amounts reflected on any Net Sales Statement -- let alone set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute," as required by the Agreement.

21. Accordingly, ESO bargained for, and TIC agreed to, certain contractual protections that were *critical* to ESO's rights in connection with the earn-out payments, and a necessary precondition to the disputed provisions of paragraph 2.7(c): access to TIC's books, records, and other information relative to, among other things, the First Earn-Out Payment.

22. In particular, ESO bargained for, and TIC agreed to provide ESO, the right to access all of the books, records, and other information necessary to calculate any earn-out payments that may be due to ESO and analyze any Net Sales, Landed Net Sales, Direct Import Net Sales, Net Sales to Federated, and Net Sales Statements. Pursuant to paragraph 2.7(e) of the Agreement, the parties agreed as follows:

> For purposes of complying with the terms and conditions set forth in this Section 2.7, Buyer [i.e., TIC] shall, and shall cause its

Affiliates and Buyer's Accountants to, reasonably cooperate with Seller and Seller's Accountants and afford reasonable access to all information, records, invoices, data and auditors' working papers of Buyer and Buyer's Accountants as may be required in connection with the analysis of any Net Sales Statement, calculation of any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, and resolution of any dispute covered by Section 2.7(c).

23. Further, for the avoidance of any doubt as to the importance of ESO having access to this information, the parties also included a similar provision in Article IX of the Agreement. In particular, paragraph 9.1(a) of the Agreement requires TIC, "[d]uring the five (5)-year period following the Closing Date in the case of the Subject Business" to "cooperate with and make available to" ESO "upon reasonable advance notice and during normal business hours, reasonable access to all books and records, tax returns and records, Contracts, information and employees (without substantial disruption of employment) . . . which are necessary and useful in connection with any litigation, insurance matter, financial reporting requirement or obligation, Tax inquiry, audit, investigation or dispute, or any other matter requiring any such books and records, information or employees for any reasonable business purpose relating to the Subject Business or the Ancillary Business, as the case may be."

C. **The November Statement**

24. On or about November 7, 2007, TIC delivered to ESO a purported Net Sales Statement with respect to the First Earn-Out Period (the "November Statement"). According to TIC's calculations as set forth in the November Statement, Net Sales were $63,988,387 and Landed Net Sales were $27,650,450.

25. Thus, according to TIC's calculations, although Net Sales concededly exceeded $60,800,000, TIC claimed ESO was not entitled to the First Earn-Out Payment because Landed Net Sales, supposedly, were less than $29,200,000. Further, according to TIC, because the criteria for the First Earn-Out Payment allegedly had not been satisfied due to the purported $1,549,500 shortfall in Landed Net Sales, ESO was not entitled to the Direct Import Earn-Out Payment.

26. Based upon its initial review of the November Statement, there immediately appeared to ESO to be various omissions, inaccuracies, and miscalculations set forth in the November Statement. ESO therefore endeavored to exercise its rights under the Agreement and take the necessary steps to verify and/or dispute the accuracy of the November Statement.

27. ESO sought TIC's cooperation with respect to accessing the books, records, and other information necessary to analyze the November Statement and its right to receive the First Earn-Out Payment and Direct Import Earn-Out Payment as required by the Agreement. ESO, however, received very limited cooperation from TIC. And with the expiration of the period of 45 days from the date of delivery of the November Statement quickly approaching, ESO was compelled to preserve its rights by notifying TIC, by letter dated December 19, 2007, of certain of its disputes with the November Statement and with TIC's position regarding the First Earn-Out Payment and Direct Import Earn-Out Payment.

28. ESO also demanded, in its December 19, 2007 letter, that TIC immediately comply with its contractual obligations to provide ESO with access to the documents and information necessary to analyze the November Statement further, so that it could identify, as the Agreement requires, "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute." TIC's failure to cooperate with ESO and TIC's disregard of its contractual obligations had prevented ESO from doing so.

29. After ESO delivered its December 19, 2007 notice to TIC, TIC began going through the motions of cooperation. In particular, representatives of ESO's accounting firm, Weiser, LLP ("Weiser"), were permitted to visit TIC's offices located in Cincinnati, Ohio on December 10-14, 2007 and again on January 3-4, 2008 for the purpose of accessing and reviewing various documents and information, including with respect to TIC's operations, account balances, and accounting procedures relative to the November Statement, the First Earn-Out Payment, and the Direct Import Earn-Out Payment. Both in advance of and during Weiser's

visits to TIC's offices, Weiser made several specific requests to TIC for access to particular documents, records, and other information maintained by TIC.

30. Weiser could not, of course, review all of TIC's books, records, and other information concerning the November Statement over the course of their visit to TIC's offices. Accordingly, Weiser was forced to target its initial review to a limited sampling of certain of TIC's books and records.

31. Far from complying with its obligations, however, TIC made Weiser's initial review and analysis as difficult and burdensome as possible. For example, TIC required, as a condition to allowing Weiser to access its books and records, that Weiser execute a Confidentiality Agreement dated as of December 10, 2007 (the "Confidentiality Agreement") -- even though the Agreement required no such agreement as a condition to accessing TIC's books, records, and information.

32. TIC also refused to allow Weiser to make copies of any of TIC's information and records. TIC's refusal to allow Weiser to make any copies not only hindered its analysis significantly, but was particularly curious in light of the fact that it was bound by the terms of the Confidentiality Agreement.

33. During Weiser's December 2007 and January 2008 visits, TIC also did not provide access to several requested categories of documents and information that were necessary for Weiser to conduct a complete analysis of its sampling of TIC's books and records.

34. Nevertheless, based upon its initial, limited review of TIC's books and records, Weiser identified numerous, unexplained discrepancies and issues regarding TIC's various books and records relating to the November Statement, the First Earn-Out Payment and the Direct Import Earn-Out Payment.

35. For example, Weiser identified several discrepancies among TIC's records suggesting that the ship dates for customer purchases (or at least the records of the ship dates for the purchases) were *intentionally* delayed, so that the corresponding sales would not be included in determining ESO's right to the First Earn-Out Payment.

36. Moreover, TIC improperly calculated Customer Charge-backs -- again, in an apparent effort to deprive ESO of its right to the First Earn-Out Payment and Direct Import Earn-Out Payment. As set forth above, under the Agreement, for the purpose of calculating Net Sales and Landed Net Sales in connection with the First Earn-Out Payment, Customer Charge-backs can only be deducted to the extent that they were *paid, credited or accepted* by TIC. TIC, however, disregarded the plain language of the Agreement and calculated Customer Charge-backs on an *accrual* basis, ostensibly due to GAAP. Thus, the amounts of the charge-backs were estimated and those estimated amounts were credited, instead of crediting the amounts that were actually "*paid, credited or accepted*" as required by the Agreement.

37. These discrepancies and issues associated with the November Statement impacted the calculation of Net Sales and Landed Net Sales by in excess *$1.6 million* -- meaning that the criteria associated with the First Earn-Out Payment and Direct Import Earn-Out Payment would have been easily satisfied, and ESO would be entitled to receive the First Earn-Out Payment of $3,375,000 plus the Direct Import Earn-Out Payment.

38. Even the inconsistencies and inaccuracies identified in connection with Weiser's limited review so far were, at a minimum, sufficient to raise serious questions -- and call into dispute the accuracy of the November Statement in its entirety. Indeed, as set forth above, these $1.6 million in discrepancies were just based upon a limited sampling of TIC's books and records.

**D.     TIC's Refusal to Comply With the Agreement**

39. In light of the issues identified in connection with Weiser's initial, limited review of the information underlying the November Statement, ESO wrote to TIC on January 18, 2008, in order to further detail and expand upon its disputes with the November Statement. ESO also requested that TIC comply with its obligations under the Agreement to provide ESO with access to the outstanding information it had previously requested that was necessary to complete its analysis of the November Statement, but which had not been provided.

40. In response, TIC wrote to ESO in January 21, 2008 disputing in general terms certain of the discrepancies and issues identified by ESO in its January 18, 2008 letter, and requesting further details from ESO as to the nature of its disputes. TIC also set forth a carefully-worded denial of the existence of certain of the specific documents and records requested by ESO in connection with its review -- while refusing outright to provide ESO with other requested information.

41. ESO, therefore, wrote again to TIC on January 30, 2008 and explained in detail the nature of the disputes with the November Statement that it had been able to identify in connection with the December 2007 and January 2008 reviews. ESO also requested from TIC the documentary support for its general claims and responses (in TIC's January 21, 2008 letter) to the discrepancies and issues that ESO had identified. Finally, ESO reiterated its requests for access to the other outstanding information from TIC pursuant to the terms of the Agreement.

42. Indeed, although TIC had, in its carefully-worded January 21, 2008 letter, indicated that certain specific documents and records allegedly did not exist, TIC did not assert (perhaps because it could not) that the *information* requested by ESO was not available. In fact, TIC's own controller, John Eberhart, had previously confirmed that the underlying information requested by ESO could be generated by TIC -- but that TIC would not, despite its obligations under the Agreement, expend any of its time or resources doing so.

43. TIC responded to ESO on February 10, 2008. TIC persisted in its general denials of the disputes with the November Statement that had been identified by ESO, but offered no support for its position in the form of existing, contemporaneous records maintained by TIC in the ordinary course of business. Instead, TIC offered a chart that it had created for purposes of responding to ESO, which simply provided a more detailed but still unsupported version of its positions. TIC failed to provide any of the support for its claims that was requested by ESO, and required to be provided by TIC, pursuant to the Agreement.

44. Further, TIC suddenly performed a complete about-face from its previous position that the outstanding information requested by ESO in its January 18 and 30, 2008 letters

did not exist. For example, TIC specifically conceded -- despite its previous denials -- that certain specific documents did in fact exist, and that certain other information allegedly "has already been made available to" ESO. Moreover, in yet another carefully-worded response, TIC tacitly confirmed that other outstanding information that ESO had been requesting for several months was in fact available and/or could be accessed by TIC -- but that TIC still refused to provide ESO with the requested information.

45. TIC's conduct, including its continuing refusal to provide ESO with access to the requested books, records, and other information, is in violation of the Agreement, and has precluded ESO from concluding its analysis of the November Statement. TIC had done so in a blatant attempt to withhold the evidence that confirm's ESO's right to receive the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

46. TIC's conduct has also prevented ESO from getting all the documents and information relating to ESO's disputes regarding the November Statement. ESO has thus been precluded from engaging in any meaningful efforts to reconcile its disputes with TIC as contemplated by the Agreement or to submit them to an "Independent Accounting Firm." This is all because a necessary condition precedent -- *i.e.*, access to TIC's books and records -- has not been satisfied by TIC.

## **REQUESTS FOR RELIEF**

### FIRST CAUSE OF ACTION
### (Express Breach of Contract)

47. ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

48. The Agreement is a valid and binding contract, and ESO has performed all of its duties and obligations under the Agreement. ESO has exercised its contractual rights and demanded that TIC comply with its contractual duties and obligations, but TIC has thus far failed and refused to do so.

49. TIC has violated its contractual duties and obligations under the Agreement by refusing to comply with its obligations to provide ESO with access to the books, records, and other information necessary for ESO to analyze the November Statement and the calculation of the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

50. The failure of TIC to abide by its duties and obligations to ESO constitutes a material breach of Agreement that has directly and foreseeably caused harm to ESO.

51. As a direct and proximate result of the conduct of TIC, ESO has been precluded from exercising its contractual rights under the Agreement.

52. ESO remains willing and able to perform its remaining obligations under the Agreement, and is without an adequate remedy at law as a result of TIC's breaches of the Agreement. TIC is able to perform its obligations under the Agreement.

53. ESO's only adequate remedy is an equitable decree of specific performance and therefore seeks specific performance of TIC's duties and obligations under the Agreement.

54. Alternatively, as a direct and proximate result of the conduct of TIC, ESO has been damaged, and continues to be damaged.

## SECOND CAUSE OF ACTION
### (Implied Covenant of Good Faith and Fair Dealing)

55. ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

56. Implicit in the Agreement is a covenant of good faith and fair dealing in the course of the parties' performance thereunder, prohibiting TIC from engaging in conduct that would have the effect of destroying or injuring the rights of ESO to receive the fruits of the Agreement.

57. On information and belief, by virtue of the conduct described above, TIC has acted in bad faith and in willful disregard of the rights of ESO under the Agreement.

58. In particular, on information and belief, TIC, among other things, manipulated TIC's books, records, and other information relative to the November Statement, First Earn-Out Payment, Direct Import Earn-Out Payment, and Federated Earn-Out Payment for the purpose of precluding ESO from receiving the entirety of the amounts to which it is entitled under the Agreement.

59. By reason of the foregoing wrongful acts, TIC's conduct constitutes breaches of the implied covenant of good faith and fair dealing that is implicit in the Agreement.

60. As a direct and proximate result of the conduct of TIC, ESO has been damaged, and continues to be damaged.

### THIRD CAUSE OF ACTION
### (Indemnification)

61. ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

62. Pursuant to Article XI, paragraph 11.2 of the Agreement, TIC is required to indemnify ESO from and against any and all expenses arising or resulting from, *inter alia*, any breach or any covenant or obligation of TIC contained in the Agreement.

63. By reason of the conduct of TIC as described above, TIC has violated its contractual duties and obligations under the Agreement by refusing to comply with its obligations to provide ESO with access to the books, records, and other information necessary for ESO to analyze the November Statement and the calculation of the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

64. ESO, therefore, is entitled to be indemnified by TIC from and against any and all expenses it has incurred as a result of TIC's breaches of the Agreement.

**WHEREFORE,** Plaintiff ESO respectfully requests the entry of judgment in its favor, and against Defendant TIC, as follows:

(A) Entering a decree of specific performance and compelling TIC to comply

with its contractual obligations pursuant to, *inter alia*, paragraphs 2.7(e) and 9.1 of the Agreement;

(B) Awarding ESO compensatory, incidental, and consequential damages in an amount to be proven at trial;

(C) Awarding ESO pre-judgment interest (from the earliest ascertainable date the cause of action may have arisen) and post-judgment interest;

(D) Awarding ESO all of its expenses arising or resulting from TIC's breaches of its obligations under the Agreement, including (but not limited to) costs of suit, attorneys' fees and costs, and other professional fees and costs; and

(E) Awarding ESO such other and further relief as the Court may deem just and proper.

Dated: February 27, 2008
      New York, NY

LOWENSTEIN SANDLER PC
1251 Avenue of the Americas
18th Floor
New York, NY 10020
Tel. 212.262.6700
Fax 212.262.7402
Attorneys for Plaintiff E. S. Originals Inc.

By: _____
Jeffrey J. Wild (JW 7557)
Stephen M. Plotnick (SP 2702)