UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

|  |  |  |
|---|---|---|
| E. S. ORIGINALS INC., | : | **ECF CASE** |
|  | : |  |
| Plaintiff, | : |  |
|  | : | Civil Action No. 08 CV 1945 (PKL) |
|  | : |  |
| - v - | : | **AFFIRMATION OF DANIEL H. TABAK IN SUPPORT OF DEFENDANT'S MOTION TO** |
|  | : |  |
|  | : |  |
| TOTES ISOTONER CORPORATION, | : | **DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, TO** |
|  | : |  |
| Defendant. | : | **STAY THE ACTION PENDING ARBITRATION** |
|  | : |  |

-------------------------------------------------------------x

Daniel H. Tabak, Esq., an attorney admitted to practice law in the State of New York, affirms the following under penalty of perjury:

1.    I am associated with the law firm Cohen & Gresser LLP, counsel for Defendant totes Isotoner Corporation ("totes") in this action.  I make this affirmation in support of totes's Motion to Dismiss the Complaint or, in the Alternative, to Stay the Action Pending Arbitration.  I am personally familiar with the facts described in this affirmation.

2.    Annexed hereto as Exhibit A is a true and correct copy of the Complaint filed by E.S. Originals Inc. in this action, dated February 27, 2008.

3.    Annexed hereto as Exhibit B is a true and correct copy of the Asset Purchase Agreement, dated October 6, 2006, and entered into by and between Plaintiff E.S. Originals Inc. ("ESO") and Defendant totes.

4.      Annexed hereto as Exhibit C is a true and correct copy of a letter dated

December 19, 2007 from Steven Siesser of the law firm Lowenstein Sandler P.C.,

counsel to Defendant ESO, to Doug Gernert of totes.

Dated: April 18, 2008
       New York, New York

_____/s/_____
                 Daniel H. Tabak

# EXHIBIT A



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



FEB 2 7 2008

U.S.D.C. S.D.N.Y.
CASHIERS

---

E. S. ORIGINALS, INC.,

        Plaintiff,

        -v-

TOTES ISOTONER CORPORATION,

        Defendant.

Civil Action No.

**08 CV 1945**

**COMPLAINT**

---

Plaintiff E.S. Originals, Inc. ("Plaintiff" or "ESO"), by way of Complaint against Defendant Totes Isotoner Corporation ("Defendant" or "TIC"), hereby alleges as follows:

### NATURE OF THE ACTION

1.    This is an action to compel Defendant to comply with its contractual obligations to provide Plaintiff with access to its books and records, as required by the terms of an Asset Purchase Agreement between the parties dated as of October 6, 2006 (the "Agreement"). As more fully described below, as a result of Defendant's disregard of its crystal-clear obligations under the Agreement, Plaintiff is being denied access to information concerning its right to receive certain "earn-out payments" under the Agreement that total in excess of $3,375,000. As a result of Defendant's refusal to comply with the Agreement, Plaintiff is being denied the benefit of the rights it specifically bargained for in the Agreement. In addition, Defendant's conduct has caused (and is continuing to cause) Plaintiff to incur substantial losses, fees, costs, and expenses -- all of which Defendant is required to pay under the Agreement.

## PARTIES

2.    Plaintiff ESO is a New York corporation with its principal place of business located in New York, New York. ESO was originally founded in 1954 and is the largest privately held footwear importer in the world. ESO sells footwear on a wholesale basis, primarily to department stores, mass merchants, and specialty footwear retailers.

3.    Defendant TIC is an Ohio corporation with its principal place of business located in Cincinnati, Ohio. TIC claims to trace its roots back to 1910, and describes itself as the world's largest marketer of umbrellas, gloves, rainwear, rubber overshoes, and other weather-related accessories.

## JURISDICTION AND VENUE

4.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of New York, and Defendant is a citizen of Ohio. The amount in controversy in this action exceeds $75,000, exclusive of interest and costs.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and the terms of the Agreement, in that (a) Defendant is subject to in personam jurisdiction in this District; (b) a substantial part of the events or omissions giving rise to this action occurred in this District; and (c) pursuant to paragraph 12.14 of the Agreement, Defendant irrevocably agreed and consented to the jurisdiction of, and venue located in, the United States District Court for the Southern District of New York.

## SUBSTANTIVE ALLEGATIONS

6.    Pursuant to the terms of the Agreement, ESO agreed to sell, and TIC agreed to purchase, certain of ESO's business and proprietary assets, goodwill and other rights, as more fully described in the Agreement.

7.    TIC agreed to purchase these assets from ESO for various types of consideration, including the (a) assumption of certain of ESO's liabilities, (b) payment of

-2-

$20,275,000 to ESO, (c) payment of an additional $350,000 for an affiliate of ESO based in Hong Kong, and (d) various "earn-out" payments.

**A.    The Earn-Out Payments**

8.    The first set of the possible earn-out payments that was required to be made to ESO pursuant to the Agreement was based on the sold business' financial performance during the one-year period of September 30, 2006 through September 30, 2007 (the "First Earn-Out Period"). Three possible types of earn-out payments could be due ESO for this period: (a) the "First Earn-Out Payment," (b) a "Federated Earn-Out Payment," and (c) a "Direct Import Earn-Out Payment."

9.    The First Earn-Out Payment was to be $3,375,000, and was to be payable to ESO no later than November 29, 2007 if two criteria were met: (a) "Net Sales" for the First Earn-Out Period must have equaled or exceeded $60,800,000, and (b) "Landed Net Sales" for that same period must have equaled or exceeded $29,200,000.

10.    For purposes of the Agreement and the First Earn-Out Payment, "Net Sales" means, "with respect to any Earn-Out Period covered by a Net Sales Statement, the Landed Net Sales and Direct Import Net Sales."

11.    "Landed Net Sales" means, under the Agreement: "Gross Sales from the Subject Products both (i) sold to customers other than Federated and (ii) imported back into the United States by buyer as the importer of record, less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."

12.    "Direct Import Net Sales" is defined in the Agreement as: "Gross Sales from the Subject Products sold to each of the Direct Import Customers less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."

13.    Thus, under the terms of the Agreement, for the purpose of calculating both Net Sales and Landed Net Sales (both of which are elements of the First Earn-Out

-3-

Payment), "Customer Charge-backs" (as that term is defined in the Agreement) can only be deducted to the extent that they have been "*paid, credited or accepted* in the ordinary course of business" of TIC on account of damaged goods, returns and allowances.

14.    ESO was also entitled to receive the Federated Earn-Out Payment -- a payment of 5% of the Net Sales to one of ESO's customers, Federated Department Stores, Inc., for the First Earn-Out Period.  Like the First Earn-Out Payment, the Federated Earn-Out Payment was to be payable to ESO no later than November 29, 2007.

15.    The third type of payment that ESO stood to receive under the Agreement for the First Earn-Out Period was the Direct Import Earn-Out Payment.  The Direct Import Earn-Out Payment was to be a payment of 3% of certain sales to certain customers specified in the Agreement, and was conditioned upon satisfaction of the criteria for payment by TIC of the First Earn-Out Payment.

**B.    ESO's Right to Information Concerning Earn-Out Payments**

16.    Paragraph 2.7 of the Agreement required TIC to deliver a "Net Sales Statement" to ESO within 60 days following the last day of the First Earn-Out Period.  The Net Sales Statement was supposed to set forth TIC's calculation of Net Sales for the First Earn-Out Period, as well as "a reasonably detailed calculation of Net Sales to Federated, Landed Net Sales (which amount shall also be the amount used for purposes of calculating Seller eligibility for the First Earn-Out Payment and/or the Second Earn-Out Payment) and Direct Import Net Sales."

17.    The Net Sales Statement was, in effect, required to be TIC's calculation of whether or not the criteria for payment of the First Earn-Out Payment, Federated Earn-Out Payment and Direct Import Earn-Out Payment had been satisfied.  Paragraph 2.7 of the Agreement also set forth a methodology for ESO to verify and/or dispute the amounts reflected on any Net Sales Statement from TIC.

18.    In particular, pursuant to paragraph 2.7(c) of the Agreement, to the extent that the net effect of any dispute could "reasonably be expected to affect the calculation of Net Sales by more than $250,000," ESO was entitled to deliver written notice of its disputes to TIC.

-4-

The Agreement requires that such notice set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute." If such notice was not delivered to TIC within 45 days of TIC's delivery of the Net Sales Statement to ESO, the Net Sales Statement could be deemed "final, binding and conclusive on the parties."

19.    Upon delivery of a notice satisfying the requirements of paragraph 2.7(c), the parties are thereafter required to endeavor to resolve their disputes over a period of 20 business days. If still unable to resolve all or any portion of their disputes, the parties agreed to submit any disputed items for resolution by an "Independent Accounting Firm" (as defined in the Agreement).

20.    After the business and assets were sold to TIC, ESO no longer had any direct access to the underlying books, records, and information necessary to calculate Net Sales, Landed Net Sales, Direct Import Net Sales, or Net Sales to Federated. Accordingly, without access to those books, records and information, ESO would be unable to verify or dispute amounts reflected on any Net Sales Statement -- let alone set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute," as required by the Agreement.

21.    Accordingly, ESO bargained for, and TIC agreed to, certain contractual protections that were *critical* to ESO's rights in connection with the earn-out payments, and a necessary precondition to the disputed provisions of paragraph 2.7(c): access to TIC's books, records, and other information relative to, among other things, the First Earn-Out Payment.

22.    In particular, ESO bargained for, and TIC agreed to provide ESO, the right to access all of the books, records, and other information necessary to calculate any earn-out payments that may be due to ESO and analyze any Net Sales, Landed Net Sales, Direct Import Net Sales, Net Sales to Federated, and Net Sales Statements. Pursuant to paragraph 2.7(e) of the Agreement, the parties agreed as follows:

> For purposes of complying with the terms and conditions set forth
> in this Section 2.7, Buyer [i.e., TIC] shall, and shall cause its

Affiliates and Buyer's Accountants to, reasonably cooperate with Seller and Seller's Accountants and afford reasonable access to all information, records, invoices, data and auditors' working papers of Buyer and Buyer's Accountants as may be required in connection with the analysis of any Net Sales Statement, calculation of any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, and resolution of any dispute covered by Section 2.7(c).

23.    Further, for the avoidance of any doubt as to the importance of ESO having access to this information, the parties also included a similar provision in Article IX of the Agreement. In particular, paragraph 9.1(a) of the Agreement requires TIC, "[d]uring the five (5)-year period following the Closing Date in the case of the Subject Business" to "cooperate with and make available to" ESO "upon reasonable advance notice and during normal business hours, reasonable access to all books and records, tax returns and records, Contracts, information and employees (without substantial disruption of employment) . . . which are necessary and useful in connection with any litigation, insurance matter, financial reporting requirement or obligation, Tax inquiry, audit, investigation or dispute, or any other matter requiring any such books and records, information or employees for any reasonable business purpose relating to the Subject Business or the Ancillary Business, as the case may be."

## C.    The November Statement

24.    On or about November 7, 2007, TIC delivered to ESO a purported Net Sales Statement with respect to the First Earn-Out Period (the "November Statement"). According to TIC's calculations as set forth in the November Statement, Net Sales were $63,988,387 and Landed Net Sales were $27,650,450.

25.    Thus, according to TIC's calculations, although Net Sales concededly exceeded $60,800,000, TIC claimed ESO was not entitled to the First Earn-Out Payment because Landed Net Sales, supposedly, were less than $29,200,000. Further, according to TIC, because the criteria for the First Earn-Out Payment allegedly had not been satisfied due to the purported $1,549,500 shortfall in Landed Net Sales, ESO was not entitled to the Direct Import Earn-Out Payment.

26.     Based upon its initial review of the November Statement, there immediately appeared to ESO to be various omissions, inaccuracies, and miscalculations set forth in the November Statement. ESO therefore endeavored to exercise its rights under the Agreement and take the necessary steps to verify and/or dispute the accuracy of the November Statement.

27.     ESO sought TIC's cooperation with respect to accessing the books, records, and other information necessary to analyze the November Statement and its right to receive the First Earn-Out Payment and Direct Import Earn-Out Payment as required by the Agreement. ESO, however, received very limited cooperation from TIC. And with the expiration of the period of 45 days from the date of delivery of the November Statement quickly approaching, ESO was compelled to preserve its rights by notifying TIC, by letter dated December 19, 2007, of certain of its disputes with the November Statement and with TIC's position regarding the First Earn-Out Payment·and Direct Import Earn-Out Payment.

28.     ESO also demanded, in its December 19, 2007 letter, that TIC immediately comply with its contractual obligations to provide ESO with access to the documents and information necessary to analyze the November Statement further, so that it could identify, as the Agreement requires, "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute." TIC's failure to cooperate with ESO and TIC's disregard of its contractual obligations had prevented ESO from doing so.

29.     After ESO delivered its December 19, 2007 notice to TIC, TIC began going through the motions of cooperation. In particular, representatives of ESO's accounting firm, Weiser, LLP ("Weiser"), were permitted to visit TIC's offices located in Cincinnati, Ohio on December 10-14, 2007 and again on January 3-4, 2008 for the purpose of accessing and reviewing various documents and information, including with respect to TIC's operations, account balances, and accounting procedures relative to the November Statement, the First Earn-Out Payment, and the Direct Import Earn-Out Payment. Both in advance of and during Weiser's

visits to TIC's offices, Weiser made several specific requests to TIC for access to particular documents, records, and other information maintained by TIC.

30.    Weiser could not, of course, review all of TIC's books, records, and other information concerning the November Statement over the course of their visit to TIC's offices. Accordingly, Weiser was forced to target its initial review to a limited sampling of certain of TIC's books and records.

31.    Far from complying with its obligations, however, TIC made Weiser's initial review and analysis as difficult and burdensome as possible. For example, TIC required, as a condition to allowing Weiser to access its books and records, that Weiser execute a Confidentiality Agreement dated as of December 10, 2007 (the "Confidentiality Agreement") -- even though the Agreement required no such agreement as a condition to accessing TIC's books, records, and information.

32.    TIC also refused to allow Weiser to make copies of any of TIC's information and records. TIC's refusal to allow Weiser to make any copies not only hindered its analysis significantly, but was particularly curious in light of the fact that it was bound by the terms of the Confidentiality Agreement.

33.    During Weiser's December 2007 and January 2008 visits, TIC also did not provide access to several requested categories of documents and information that were necessary for Weiser to conduct a complete analysis of its sampling of TIC's books and records.

34.    Nevertheless, based upon its initial, limited review of TIC's books and records, Weiser identified numerous, unexplained discrepancies and issues regarding TIC's various books and records relating to the November Statement, the First Earn-Out Payment and the Direct Import Earn-Out Payment.

35.    For example, Weiser identified several discrepancies among TIC's records suggesting that the ship dates for customer purchases (or at least the records of the ship dates for the purchases) were *intentionally* delayed, so that the corresponding sales would not be included in determining ESO's right to the First Earn-Out Payment.

-8-

36.    Moreover, TIC improperly calculated Customer Charge-backs -- again, in an apparent effort to deprive ESO of its right to the First Earn-Out Payment and Direct Import Earn-Out Payment. As set forth above, under the Agreement, for the purpose of calculating Net Sales and Landed Net Sales in connection with the First Earn-Out Payment, Customer Charge-backs can only be deducted to the extent that they were *paid, credited or accepted* by TIC. TIC, however, disregarded the plain language of the Agreement and calculated Customer Charge-backs on an *accrual* basis, ostensibly due to GAAP. Thus, the amounts of the charge-backs were estimated and those estimated amounts were credited, instead of crediting the amounts that were actually *"paid, credited or accepted"* as required by the Agreement.

37.    These discrepancies and issues associated with the November Statement impacted the calculation of Net Sales and Landed Net Sales by in excess *$1.6 million* -- meaning that the criteria associated with the First Earn-Out Payment and Direct Import Earn-Out Payment would have been easily satisfied, and ESO would be entitled to receive the First Earn-Out Payment of $3,375,000 plus the Direct Import Earn-Out Payment.

38.    Even the inconsistencies and inaccuracies identified in connection with Weiser's limited review so far were, at a minimum, sufficient to raise serious questions -- and call into dispute the accuracy of the November Statement in its entirety. Indeed, as set forth above, these $1.6 million in discrepancies were just based upon a limited sampling of TIC's books and records.

**D.    TIC's Refusal to Comply With the Agreement**

39.    In light of the issues identified in connection with Weiser's initial, limited review of the information underlying the November Statement, ESO wrote to TIC on January 18, 2008, in order to further detail and expand upon its disputes with the November Statement. ESO also requested that TIC comply with its obligations under the Agreement to provide ESO with access to the outstanding information it had previously requested that was necessary to complete its analysis of the November Statement, but which had not been provided.

40.    In response, TIC wrote to ESO in January 21, 2008 disputing in general terms certain of the discrepancies and issues identified by ESO in its January 18, 2008 letter, and requesting further details from ESO as to the nature of its disputes.  TIC also set forth a carefully-worded denial of the existence of certain of the specific documents and records requested by ESO in connection with its review -- while refusing outright to provide ESO with other requested information.

41.    ESO, therefore, wrote again to TIC on January 30, 2008 and explained in detail the nature of the disputes with the November Statement that it had been able to identify in connection with the December 2007 and January 2008 reviews.  ESO also requested from TIC the documentary support for its general claims and responses (in TIC's January 21, 2008 letter) to the discrepancies and issues that ESO had identified.  Finally, ESO reiterated its requests for access to the other outstanding information from TIC pursuant to the terms of the Agreement.

42.    Indeed, although TIC had, in its carefully-worded January 21, 2008 letter, indicated that certain specific documents and records allegedly did not exist, TIC did not assert (perhaps because it could not) that the *information* requested by ESO was not available.  In fact, TIC's own controller, John Eberhart, had previously confirmed that the underlying information requested by ESO could be generated by TIC -- but that TIC would not, despite its obligations under the Agreement, expend any of its time or resources doing so.

43.    TIC responded to ESO on February 10, 2008.  TIC persisted in its general denials of the disputes with the November Statement that had been identified by ESO, but offered no support for its position in the form of existing, contemporaneous records maintained by TIC in the ordinary course of business.  Instead, TIC offered a chart that it had created for purposes of responding to ESO, which simply provided a more detailed but still unsupported version of its positions.  TIC failed to provide any of the support for its claims that was requested by ESO, and required to be provided by TIC, pursuant to the Agreement.

44.    Further, TIC suddenly performed a complete about-face from its previous position that the outstanding information requested by ESO in its January 18 and 30, 2008 letters

did not exist. For example, TIC specifically conceded -- despite its previous denials -- that certain specific documents did in fact exist, and that certain other information allegedly "has already been made available to" ESO. Moreover, in yet another carefully-worded response, TIC tacitly confirmed that other outstanding information that ESO had been requesting for several months was in fact available and/or could be accessed by TIC -- but that TIC still refused to provide ESO with the requested information.

45. TIC's conduct, including its continuing refusal to provide ESO with access to the requested books, records, and other information, is in violation of the Agreement, and has precluded ESO from concluding its analysis of the November Statement. TIC had done so in a blatant attempt to withhold the evidence that confirm's ESO's right to receive the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

46. TIC's conduct has also prevented ESO from getting all the documents and information relating to ESO's disputes regarding the November Statement. ESO has thus been precluded from engaging in any meaningful efforts to reconcile its disputes with TIC as contemplated by the Agreement or to submit them to an "Independent Accounting Firm." This is all because a necessary condition precedent -- *i.e.,* access to TIC's books and records -- has not been satisfied by TIC.

## REQUESTS FOR RELIEF

### FIRST CAUSE OF ACTION
### (Express Breach of Contract)

47. ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

48. The Agreement is a valid and binding contract, and ESO has performed all of its duties and obligations under the Agreement. ESO has exercised its contractual rights and demanded that TIC comply with its contractual duties and obligations, but TIC has thus far failed and refused to do so.

49.     TIC has violated its contractual duties and obligations under the Agreement by refusing to comply with its obligations to provide ESO with access to the books, records, and other information necessary for ESO to analyze the November Statement and the calculation of the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

50.     The failure of TIC to abide by its duties and obligations to ESO constitutes a material breach of Agreement that has directly and foreseeably caused harm to ESO.

51.     As a direct and proximate result of the conduct of TIC, ESO has been precluded from exercising its contractual rights under the Agreement.

52.     ESO remains willing and able to perform its remaining obligations under the Agreement, and is without an adequate remedy at law as a result of TIC's breaches of the Agreement. TIC is able to perform its obligations under the Agreement.

53.     ESO's only adequate remedy is an equitable decree of specific performance and therefore seeks specific performance of TIC's duties and obligations under the Agreement.

54.     Alternatively, as a direct and proximate result of the conduct of TIC, ESO has been damaged, and continues to be damaged.

### SECOND CAUSE OF ACTION
### (Implied Covenant of Good Faith and Fair Dealing)

55.     ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

56.     Implicit in the Agreement is a covenant of good faith and fair dealing in the course of the parties' performance thereunder, prohibiting TIC from engaging in conduct that would have the effect of destroying or injuring the rights of ESO to receive the fruits of the Agreement.

57.     On information and belief, by virtue of the conduct described above, TIC has acted in bad faith and in willful disregard of the rights of ESO under the Agreement.

-12-

58.     In particular, on information and belief, TIC, among other things, manipulated TIC's books, records, and other information relative to the November Statement, First Earn-Out Payment, Direct Import Earn-Out Payment, and Federated Earn-Out Payment for the purpose of precluding ESO from receiving the entirety of the amounts to which it is entitled under the Agreement.

59.     By reason of the foregoing wrongful acts, TIC's conduct constitutes breaches of the implied covenant of good faith and fair dealing that is implicit in the Agreement.

60.     As a direct and proximate result of the conduct of TIC, ESO has been damaged, and continues to be damaged.

### THIRD CAUSE OF ACTION
### (Indemnification)

61.     ESO repeats and realleges each of the allegations contained in the preceding paragraphs as though set forth at length herein.

62.     Pursuant to Article XI, paragraph 11.2 of the Agreement, TIC is required to indemnify ESO from and against any and all expenses arising or resulting from, *inter alia*, any breach or any covenant or obligation of TIC contained in the Agreement.

63.     By reason of the conduct of TIC as described above, TIC has violated its contractual duties and obligations under the Agreement by refusing to comply with its obligations to provide ESO with access to the books, records, and other information necessary for ESO to analyze the November Statement and the calculation of the First Earn-Out Payment, Direct Import Earn-Out Payment and Federated Earn-Out Payment.

64.     ESO, therefore, is entitled to be indemnified by TIC from and against any and all expenses it has incurred as a result of TIC's breaches of the Agreement.

**WHEREFORE,** Plaintiff ESO respectfully requests the entry of judgment in its favor, and against Defendant TIC, as follows:

(A)     Entering a decree of specific performance and compelling TIC to comply

-13-

with its contractual obligations pursuant to, *inter alia*, paragraphs 2.7(e) and 9.1 of the Agreement;

(B)     Awarding ESO compensatory, incidental, and consequential damages in an amount to be proven at trial;

(C)     Awarding ESO pre-judgment interest (from the earliest ascertainable date the cause of action may have arisen) and post-judgment interest;

(D)     Awarding ESO all of its expenses arising or resulting from TIC's breaches of its obligations under the Agreement, including (but not limited to) costs of suit, attorneys' fees and costs, and other professional fees and costs; and

(E)     Awarding ESO such other and further relief as the Court may deem just and proper.

Dated: February 27, 2008
     New York, NY

LOWENSTEIN SANDLER P C
1251 Avenue of the Americas
18th Floor
New York, NY  10020
Tel. 212.262.6700
Fax 212.262.7402
Attorneys for Plaintiff E. S. Originals Inc.

By: _____
     Jeffrey J. Wild (JW 7557)
     Stephen M. Plotnick (SP 2702)

# EXHIBIT B

## (PART 1 OF 2)

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and between

E. S. Originals Inc.,
a New York corporation,

and

totes Isotoner Corporation,
an Ohio corporation

Dated as of October 6, 2006

12951785.5.BUSINESS

# TABLE OF CONTENTS

Page

ARTICLE I.     DEFINITIONS .................................................................................. 1

   1.1.     Defined Terms ................................................................................................. 1

ARTICLE II.     PURCHASE AND SALE OF ASSETS ........................................... 12

   2.1.     Purchased Assets ............................................................................................ 12
   2.2.     Excluded Assets ............................................................................................. 13
   2.3.     Assumption of Liabilities ............................................................................... 14
   2.4.     Excluded Liabilities ....................................................................................... 15
   2.5.     Purchase Price ................................................................................................ 17
   2.6.     Adjustment of Purchase Price ........................................................................ 18
   2.7.     Earn-Out Payments; Direct Import Earn-Out Payments; Federated Earn-Out
           Payments ........................................................................................................ 20
   2.8.     Transfer Taxes ............................................................................................... 22
   2.9.     Third Party Consents ...................................................................................... 23

ARTICLE III.     CLOSING .......................................................................................... 23

   3.1.     Closing ........................................................................................................... 23
   3.2.     Deliveries at Closing ...................................................................................... 23
   3.3.     Risk of Loss ................................................................................................... 25

ARTICLE IV.     REPRESENTATIONS AND WARRANTIES OF SELLER ......................... 26

   4.1.     Organization ................................................................................................... 26
   4.2.     Subsidiaries .................................................................................................... 26
   4.3.     Authority; Execution and Delivery; Enforceability ....................................... 27
   4.4.     No Conflicts or Violations; No Consents or Approvals Required ................... 27
   4.5.     Compliance with Laws; Permits .................................................................... 27
   4.6.     Records of Seller ............................................................................................ 28
   4.7.     Working Capital Statement ............................................................................ 28
   4.8.     Absence of Certain Changes or Events .......................................................... 28
   4.9.     Purchased Assets ............................................................................................ 29
   4.10.    Taxes .............................................................................................................. 29
   4.11.    Proceedings .................................................................................................... 29
   4.12.    Certain Transferred Employees ...................................................................... 29
   4.13.    No Brokers ..................................................................................................... 30
   4.14.    Labor and Employment .................................................................................. 30
   4.15.    ERISA and Employee Benefits Matters ......................................................... 30
   4.16.    Contracts; Compliance ................................................................................... 30
   4.17.    Intellectual Property ....................................................................................... 31
   4.18.    Related Party Transactions ............................................................................. 33
   4.19.    Customers and Suppliers; Rebates ................................................................. 33
   4.20.    Inventory ........................................................................................................ 34
   4.21.    Accounts Payable ........................................................................................... 34

## TABLE OF CONTENTS
(continued)

Page

| 4.22. | Environmental Matters | 34 |

| ARTICLE V. | REPRESENTATIONS AND WARRANTIES OF BUYER | 35 |
| 5.1. | Organization of Buyer | 35 |
| 5.2. | Authority; Execution and Delivery; Enforceability | 36 |
| 5.3. | No Conflict or Violations, No Consents or Approvals Required | 36 |
| 5.4. | Records of Buyer | 36 |
| 5.5. | Proceedings | 36 |
| 5.6. | No Brokers | 36 |
| 5.7. | Accredited Investor Status | 37 |

| ARTICLE VI. | COVENANTS | 38 |
| 6.1. | Cooperation by Seller | 38 |
| 6.2. | Conduct of the Subject Business and of Asiacom Pending Closing | 38 |
| 6.3. | Access | 39 |
| 6.4. | Fulfillment of Agreements | 39 |
| 6.5. | Insurance | 40 |
| 6.6. | Exclusivity | 40 |
| 6.7. | Confidentiality | 40 |
| 6.8. | Commercially Reasonable Efforts | 41 |
| 6.9. | Employment Matters | 41 |
| 6.10. | IPO | 43 |
| 6.11. | Domain Name | 43 |
| 6.12. | Customer Notification | 43 |
| 6.13. | Transfer Notice | 43 |
| 6.14. | Osh Kosh License | 44 |
| 6.15. | Expat Taxes | 44 |
| 6.16. | Purchase Orders | 44 |

| ARTICLE VII. | CONDITIONS TO BUYER'S OBLIGATIONS | 45 |
| 7.1. | Representations and Warranties True and Correct | 45 |
| 7.2. | Covenants and Agreements Performed | 45 |
| 7.3. | Seller's Closing Certificate | 45 |
| 7.4. | No Prohibition or Proceedings | 46 |
| 7.5. | Consents | 46 |
| 7.6. | Opinion | 46 |
| 7.7. | Escrow Agreements | 46 |
| 7.8. | Business Material Adverse Effect | 46 |
| 7.9. | Refinancing | 46 |
| 7.10. | Execution and Delivery of Other Agreements | 46 |
| 7.11. | Due Diligence, Schedules | 46 |
| 7.12. | Dechert Due Diligence Request List | 46 |

-ii-

**TABLE OF CONTENTS**
(continued)

Page

7.13.   Domain Name ................................................................................................ 46
7.14.   Intentionally Omitted .................................................................................... 47
7.15.   Conditions Precedent to Buyer's Obligation to Pay the Asiacom Closing Cash
        Payment ........................................................................................................ 47

ARTICLE VIII.    CONDITIONS TO SELLER'S OBLIGATIONS ............................................ 47

8.1.    Representations and Warranties True and Correct ...................................... 47
8.2.    Covenants and Agreements Performed ........................................................ 48
8.3.    Buyer's Closing Certificate .......................................................................... 48
8.4.    No Prohibition or Proceedings ..................................................................... 48
8.5.    Escrow Agreements ...................................................................................... 48
8.6.    Execution and Delivery of Other Agreements ............................................. 48
8.7.    Asiacom Employee Letters ........................................................................... 48

ARTICLE IX.    ACTIONS BY SELLER AND BUYER AFTER THE CLOSING ............... 48

9.1.    Books and Records ....................................................................................... 49
9.2.    Refunds and Remittances .............................................................................. 49
9.3.    Treatment of Merchandise Orders ................................................................ 49
9.4.    Further Assurances ....................................................................................... 49
9.5.    Minimum Purchases ...................................................................................... 49
9.6.    No Use of Certain Names .............................................................................. 51
9.7.    Non-Competition .......................................................................................... 51
9.8.    Audit ............................................................................................................. 52
9.9.    Payables ........................................................................................................ 52
9.10.   Disposition of Excluded Inventory .............................................................. 53

ARTICLE X.    TERMINATION PRIOR TO CLOSING ...................................................... 54

10.1.   Termination ................................................................................................... 54
10.2.   Effect of Termination .................................................................................... 54

ARTICLE XI.    INDEMNIFICATION ............................................................................... 55

11.1.   Indemnification by Seller .............................................................................. 55
11.2.   Indemnification by Buyer .............................................................................. 56
11.3.   Indemnification Procedures .......................................................................... 56
11.4.   Limitations on Indemnification ..................................................................... 58
11.5.   Calculation of Indemnity Payments ............................................................. 59
11.6.   Tax Treatment of Indemnification ................................................................ 59
11.7.   Survival ......................................................................................................... 59
11.8.   Exception to Limitations ............................................................................... 59
11.9.   No Effect of Investigation ............................................................................. 59

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE XII.    MISCELLANEOUS ............................................................................. 60

12.1.    Publicity ............................................................................................ 60
12.2.    Bulk Transfer Laws ........................................................................... 60
12.3.    Assignment ....................................................................................... 60
12.4.    No Third-Party Beneficiaries ............................................................ 60
12.5.    Exculpated Persons ........................................................................... 61
12.6.    Expenses ........................................................................................... 61
12.7.    Notices .............................................................................................. 61
12.8.    Headings ........................................................................................... 62
12.9.    Variations in Pronouns ..................................................................... 62
12.10.   Counterparts ...................................................................................... 62
12.11.   No Presumption ................................................................................. 62
12.12.   Integrated Contract; Exhibits and Schedules .................................... 62
12.13.   Severability; Enforcement ................................................................ 63
12.14.   Governing Law .................................................................................. 63
12.15.   Jurisdiction ........................................................................................ 63
12.16.   Service of Process ............................................................................. 63
12.17.   WAIVER OF JURY TRIAL .............................................................. 63
12.18.   Amendments and Waivers ................................................................. 64
12.19.   License of Seller's Intellectual Property ............................................ 64

## EXHIBITS

Exhibit A – Form of Assumption Agreement
Exhibit B – Form of Transition Services Agreement
Exhibit C – Form of General Escrow Agreement
Exhibit D – Form of Audit Escrow Agreement
Exhibit E – Form of Seller Certification/Dechert Due Diligence Request List
Exhibit F – Form of License Agreement
Exhibit G – Form of Non-Competition Agreement
Exhibit H – Form of Letters for Asiacom Employees
Exhibit I – Form of Transfer Notice

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Accounting Principles |
| Schedule 1.1(b) | Direct Import Customers |
| Schedule 2.1 | Purchased Assets |
| Schedule 2.1(a)(ii)(A) | Transferred Intellectual Property |
| Schedule 2.1(a)(ii)(B) | Licensed Intellectual Property |
| Schedule 2.1(a)(iii) | Transferred Contracts |
| Schedule 2.1(a)(iv) | Transferred Permits |
| Schedule 2.1(a)(ix) | Transferred Computer Equipment |
| Schedule 2.1(b) | Ancillary Assets |
| Schedule 2.2(iii) | Excluded Security Deposits |
| Schedule 2.2(iv) | Excluded Insurance Policies |
| Schedule 2.2(vi) | Excluded Contracts |
| Schedule 2.2(vii) | Excluded Permits |
| Schedule 2.2(xi) | General Ledger Records |
| Schedule 2.2(xiii) | Excluded Computer Equipment |
| Schedule 2.2(xvi) | Excluded Inventory |
| Schedule 2.3(a)(iv) | Assumed Advertising Commitments |
| Schedule 2.3(a)(v) | Assumed Liabilities |
| Schedule 2.5(d) | Purchase Price Allocation |
| Schedule 4.1 | Organization |
| Schedule 4.4 | Consents |
| Schedule 4.5 | Compliance with Laws |
| Schedule 4.7 | Reference Inventory Statement |
| Schedule 4.8 | Certain Changes or Events |
| Schedule 4.9 | Permitted Liens |
| Schedule 4.10 | Taxes |
| Schedule 4.11 | Proceedings |
| Schedule 4.12 | Certain Transferred Employees |
| Schedule 4.15(a) | Seller Plans |
| Schedule 4.16 | Contracts |
| Schedule 4.18 | Related Party Transactions |

i

Schedule 4.19(a)          Customers
Schedule 4.19(b)          Suppliers
Schedule 4.19(c)          Customer Charge-backs
Schedule 4.20             Inventory
Schedule 4.21             Accounts Payable
Schedule 4.22             Environmental Matters
Schedule 6.9              Eligible Employees
Schedule 9.8              Audit
Schedule 9.10             Excluded Inventory Orders

### ASSET PURCHASE AGREEMENT

Asset Purchase Agreement dated as of October 6, 2006 (this "Agreement") by and between E.S. Originals Inc., a New York corporation ("Seller") and totes Isotoner Corporation, an Ohio corporation ("Buyer").

### RECITALS

WHEREAS, Seller wholesales private label and branded (i.e., ESNY™) casual footwear (including sandals sold on a retail basis in accessory departments (as opposed to shoe departments), EVA thongs, flip-flops, slippers and vulcanized rubber shoes) to department stores, mass merchants and specialty footwear retailers (the "Subject Business");

WHEREAS, ES Asiacom Limited, a Hong Kong limited liability company ("Asiacom"), currently provides quality inspection services to Seller which are ancillary to Seller's conduct of the Subject Business (the "Ancillary Business");

WHEREAS, Seller desires to sell to Buyer, and Buyer wishes to purchase from Seller, the Purchased Assets (as defined herein) included within the Subject Business, upon the terms and conditions set forth herein;

WHEREAS, Seller desires to transfer to Buyer, and Buyer is willing to assume from Seller, the Assumed Liabilities (as defined herein), upon the terms and conditions set forth herein; and

WHEREAS, the stockholders of Seller desire Seller to cause Asiacom to sell to Buyer, and Buyer wishes to purchase from Asiacom, the Ancillary Assets (as defined herein), upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the respective covenants, representations and warranties, and agreements of the parties hereto hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

1.1.    Defined Terms.

(a)    For purposes of this Agreement, the terms set forth below shall have the following meanings:

"Accounting Principles" means the accounting principles set forth on Schedule 1.1(a).

"Acquisition" means the sale and purchase of the Purchased Assets and the Ancillary Assets, and the assumption of the Assumed Liabilities.

"Affiliate" of any party means any Person controlling, controlled by or under common control with such party.

"Asiacom Employees" means all of those individuals who are employed by Asiacom as of the date of this Agreement, including for the avoidance of doubt any director employed under a contract of service and non-executive directors whether or not employed under a contract of service, but excluding anyone whose employment has terminated or is terminated between the date hereof and the Closing Date.

"Assumption Agreement" means the Assumption Agreement dated as of the Closing Date by and between Seller and Buyer substantially in the form of Exhibit A annexed hereto.

"Business Day" means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in New York City.

"Business Material Adverse Effect" means a material adverse effect on (a) the financial condition or results of operations of the Subject Business and the Ancillary Business taken together or (b) the ability of Seller to consummate the Acquisition.

"Buyer Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA) sponsored by Buyer for the benefit of its current employees.

"Buyer's Accountants" means the Cincinnati, Ohio office of PricewaterhouseCoopers LLP.

"Closing Date" means the date on which the Closing occurs.

"Closing Date Products" means all lines of casual footwear included in the Subject Business on the Closing Date.

"Closing Inventory Statement" means the inventory statement dated as of the Closing Date prepared pursuant to Section 2.6(a) setting forth the Inventory Value as of the close of business on the Closing Date.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means the confidentiality agreement dated as of June 21, 2005 by and between Seller and Bruckmann, Rosser, Sherrill & Co., Inc., on behalf of Buyer.

"Continuation Products" means, with respect to the Closing Date Products, all modifications and improvements of sandals, vulcanized shoes, flip-flops and EVA thongs included within the Purchased Assets.

"Contract" means any legally binding agreement, contract, lease, sublease, indenture, purchase order, invoice, commitment, warranty, guarantee, bid, quotation, proposal, contractual license, contractual instrument or other document, whether written or verbal.

2

"Control" (including, with correlative meanings, "controlling," "controlled by" or "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"Designated Amount" means Ten Thousand Dollars ($10,000).

"Determination Date" means the last day of each Earn-Out Period.

"Direct Import Customers" means (i) the customers of the Subject Business listed on Schedule 1.1(b) (including any line of business which is divested from any such customer listed on Schedule 1.1(b) and which line of business continues to be a customer of the Subject Business immediately after the occurrence of such divestiture) and (ii) any increase or expansion of such customer's business arising from or relating to an acquisition, investment, joint venture, merger, consolidation or similar event with (a) any customer of Seller as of the date of this Agreement or (b) any customer that is not currently, or has not within the past twelve (12) months been, a customer of Buyer or its Affiliates. For the avoidance of doubt, any increase or expansion of such customer's business arising from or relating to an acquisition, investment, joint venture, merger, consolidation or similar event with an entity that is not a customer as described in clause (a) or (b) of the definition of "Direct Import Customers," and any Gross Sales to such customer's increased or expanded business, shall be excluded from any calculations of Gross Sales, Net Sales, Direct Import Net Sales, Landed Net Sales and/or Earn-Out Payments pursuant to this Agreement.

"Direct Import Earn-Out Net Sales" means Direct Import Net Sales minus Excluded Direct Import Net Sales.

"Direct Import Earn-Out Payments" means, with respect to any Earn-Out Period covered by a Net Sales Statement, the product obtained by multiplying Direct Import Earn-Out Net Sales by three percent (3%); provided, however, that no Direct Import Earn-Out Payment shall be due and payable by Buyer to Seller in relation to the Earn-Out Period commencing on September 30, 2006 and ending on September 30, 2007 unless the First Earn-Out Payment shall also be due and payable as the direct result of satisfaction of the Earn-Out Criteria.

"Direct Import Gross Sales" means Gross Sales from Subject Products sold to each of the Direct Import Customers.

"Direct Import Net Sales" means Gross Sales from Subject Products sold to each of the Direct Import Customers less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances.

"Direct Import Adjusted Gross Profit" means the amount of Gross Profit (as defined below) solely attributable to Direct Import Gross Sales (excluding sales to Target Corporation or any Affiliate); provided, however, that for purposes of this definition, "Gross Profit" shall be the gross profit as determined by Buyer in accordance with GAAP on a basis consistent with Buyer's financial statements; and provided further, however, that for the avoidance of doubt, there shall be no carryover of Direct Import Adjusted Gross Profit from one Earn-Out Period to

3

any other Earn-Out Period for purposes of calculating Direct Import Earn-Out Net Sales and/or of determining the amount (if any) of any Direct Import Earn-Out Payment.

"Earn-Out Payments" means, with respect to any Earn-Out Period covered by Net Sales Statements, Three Million Three Hundred Seventy-Five Thousand Dollars ($3,375,000), payable sixty (60) calendar days after the end of the First Earn-Out Period by Buyer to Seller (the "First Earn-Out Payment"), and One Million Dollars ($1,000,000), payable sixty (60) calendar days after the end of the Second Earn-Out Period by Buyer to Seller (the "Second Earn-Out Payment"); provided, however, that the First Earn-Out Payment shall only be due and payable to Seller by Buyer if during the First Earn-Out Period, and the Second Earn-Out Payment shall only be due and payable to Seller by Buyer if during the Second Earn-Out Period, (a) Net Sales shall have equaled or exceeded Sixty Million Eight Hundred Thousand Dollars ($60,800,000) during such Earn-Out Period and (b) Landed Net Sales shall have equaled or exceeded Twenty Nine Million Two Hundred Thousand Dollars ($29,200,000) during such Earn-Out Period ((a) and (b) together, the "Earn-Out Criteria"). For the avoidance of doubt, there shall be no carryover of Net Sales from the First Earn-Out Period to the Second Earn-Out Period for purposes of determining if Seller is entitled to the Second Earn-Out Payment.

"Earn-Out Periods" means (i) (a) in the case of the First Earn-Out Payment, the time period on account of which the First Earn-Out Payment is eligible to be made under Section 2.7, which time period shall commence on September 30, 2006 and end on September 30, 2007 (the "First Earn-Out Period") and (b) in the case of the Second Earn-Out Payment, the time period on account of which the Second Earn-Out Payment is eligible to be made under Section 2.7, which time period shall commence on September 30, 2007 and end on September 30, 2008 (the "Second Earn-Out Period") and (ii) in the case of any Federated Earn-Out Payments and/or any Direct Import Earn-Out Payments, the five (5) time periods on account of which such earn-out payments are eligible to be made under Section 2.7; such periods consisting of an initial period commencing on September 30, 2006 and ending on September 30, 2007, followed by four (4) consecutive annual periods ending on September 30, 2008, September 30, 2009, September 30, 2010 and September 30, 2011, respectively.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means the Seller and any other employer that is, or at any time for which any relevant statute of limitations remains open was, together with the Seller, treated as a "single employer" under Section 414(b), 414(c) or 414(m) of the Code.

"Excluded Direct Import Net Sales" means the amount of Direct Import Net Sales (excluding sales to Target Corporation or any Affiliate) which generated the initial Direct Import Adjusted Gross Profit equal to One Million Eight Hundred Thousand Dollars ($1,800,000) for any Earn-Out Period and as determined by Buyer.

"Federated" means (i) Federated Department Stores, Inc., a Delaware corporation (as well as any line of business which is divested from Federated and which line of business continues to be a customer of the Subject Business immediately after the occurrence of such divestiture), and (ii) any increase or expansion of Federated's business arising from or relating to an acquisition, investment, joint venture, merger, consolidation or similar event with any

customer that is not currently, or has not within the past twelve (12) months been, a customer of Seller or Buyer or their respective Affiliates. For the avoidance of doubt, any increase or expansion of Federated's business arising from or relating to an acquisition, investment, joint venture, merger, consolidation or similar event with an entity that is not a customer as described in this definition of "Federated," and any Gross Sales to Federated's increased or expanded business, shall be excluded from any calculations of Gross Sales, Net Sales, Direct Import Net Sales, Landed Net Sales and Earn-Out Payments pursuant to this Agreement.

"Federated Earn-Out Payments" means, with respect to any Earn-Out Period covered by a Net Sales Statement, the product obtained by multiplying Net Sales to Federated by five percent (5%).

"GAAP" means United States generally accepted accounting principles and practices in effect from time to time and applied consistently throughout the period(s) involved.

"Governmental Entity" means any foreign, Federal, state or local (i) court, tribunal or arbitral body of competent jurisdiction, (ii) government or governmental agency, authority, commission or instrumentality or (iii) regulatory body, authority, agency or commission.

"Gross Sales" means the gross invoiced price from sales of the Subject Products by Buyer and its Affiliates to non-Affiliated third parties.

"Hong Kong Premises" means the premises situated at Unit 4, 12th Floor, Star Centre 443-451, Castle Peak Road, Kwai Chung, New Territories, Hong Kong.

"Intellectual Property" means any and all of the following used in, or relating to, the Subject Business or the Ancillary Business: (i) inventions or developments, whether or not patentable, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications, (ii) ideas and conceptions of potentially patentable subject matter, including, without limitation, any patent disclosures, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications, (iii) national (including the United States) and multinational statutory invention registrations, patents, patent registrations and patent applications (including all reissues, divisions, continuations, continuations in part, extensions and reexaminations) and all rights therein provided by international treaties or conventions and all improvements to the inventions disclosed in each such registration, patent or application, (iv) trademarks, service marks, trade dress, logos, trade names and corporate names, whether or not registered, including all common law rights, and registrations and applications for registration thereof and all goodwill associated therewith, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the Trademark Offices of the states and territories of the United States of America, and the Trademark Offices of other nations throughout the world, and all rights therein provided by international treaties or conventions, (v) copyrights (registered or otherwise) and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (vi) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others, (vii) computer software, including, without limitation, source code, operating systems and specifications, data, data bases, files, documentation and other materials related thereto, (viii) trade secrets and confidential, technical

5

and business information (including ideas, formulas, compositions, inventions, and conceptions of inventions whether patentable or unpatentable and whether or not reduced to practice), (ix) whether or not confidential, technology (including know how and show how), manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals, technical data, copyrightable works, domain names (including www.esnyfootwear.com), financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (x) copies and tangible embodiments of all the foregoing, in whatever form or medium, (xi) all rights to obtain and rights to apply for patents, and to register trademarks and copyrights and (xii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"Interest Rate" means the fluctuating rate of interest equal to the "Prime Rate" appearing on the "Market Data: Rates & Bonds" screen page on www.Bloomberg.com, or if such rate is not available, then the fluctuating rate of interest equal to the "Prime Rate" as published in the "Money Rates" section of The Wall Street Journal (Eastern Edition) plus one percent (1%). Any change in the Interest Rate shall take effect on the effective date as indicated on www.Bloomberg.com or in The Wall Street Journal (Eastern Edition), as applicable.

"Inventory Value" means, with respect to any date of determination, the value of the Transferred Inventory less trade accounts payable; provided that all calculations shall be prepared in accordance with the Accounting Principles applied consistently.

"Landed Net Sales" means Gross Sales from Subject Products both (i) sold to customers other than Federated and (ii) imported into the United States by Buyer as the importer of record, less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances.

"License Agreement" means the License Agreement dated as of the Closing Date by and between Seller and Buyer substantially in the form of Exhibit F annexed hereto.

"Lien" means any mortgage, lien, charge, security interest, easement, pledge, adverse claim or other encumbrance of any kind.

"MPF Plan" means the Mandatory Provident Fund Schemes Plan to which Asiacom contributes in respect of the Asiacom Employees as required under the Mandatory Provident Fund Schemes Ordinance (Chapter 485 of the Laws of Hong Kong).

"Names" means E.S. Originals Inc. and any variations and derivatives thereof not included in the Purchased Assets or the Ancillary Assets.

"Net Sales" means, with respect to any Earn-Out Period covered by a Net Sales Statement, the Landed Net Sales and Direct Import Net Sales.

"Net Sales Statement" means the statement prepared in conformity with GAAP on a consistent basis with Buyer's financial statements which is required to be delivered by Buyer to Seller in accordance with Section 2.7(b) stating the Net Sales for the Earn-Out Period covered thereby together with a reasonably detailed calculation of Net Sales to Federated, Landed Net

6

Sales (which amount shall also be the amount used for purposes of calculating Seller eligibility for the First Earn-Out Payment and/or the Second Earn-Out Payment) and Direct Import Net Sales amounts set forth therein.

"Non-Competition Agreement" means the Non-Competition, Non-Solicitation and Confidential Information Agreement dated as of the Closing Date by and between the Buyer and the Executive (as defined therein) substantially in the form of Exhibit G attached hereto.

"Permit" means any permit, consent, approval, franchise or authorization from any Governmental Entity.

"Person" means any individual, firm, corporation, partnership, limited liability company, trust, joint venture, Governmental Entity or other entity.

"Pre-Closing Tax Period" means all taxable periods ending on or before the Closing Date and the portion ending on the Closing Date of any taxable period that includes, but does not end on the Closing Date.

"Reference Date" means August 31, 2006.

"Relevant Asiacom Employee" means any individual who is as of the Closing Date, or who has been at any time previously, employed by Asiacom.

"Restricted Period" means the five (5)-year period immediately following the Closing Date.

"Seller Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA) sponsored by Seller for the benefit of its current employees.

"Seller's Accountants" means Weiser LLP.

"Subject Products" means the Closing Date Products and Continuation Products.

"Tax" means all forms of taxation imposed by any foreign, Federal, state, local or other Taxing Authority, including, but not limited to, income, franchise, property, sales, use, excise, employment, unemployment, payroll, social security, estimated, value added, ad valorem, transfer, recapture, withholding, health and other taxes of any kind, including, without limitation, any interest, penalties and additions thereto.

"Taxing Authority" means any foreign, Federal, state or local government, any subdivision, agency, commission or authority thereof or any domestic quasi-governmental body exercising Tax regulatory authority.

"Tax Return" means any report, return, document, declaration or other information or filing required to be supplied to any Taxing Authority with respect to Taxes, including any amendment made with respect thereto.

7

"Transferred Employees" means those Eligible Employees which accept Buyer's offer of employment made pursuant to Section 6.9.

"Transfer Notice" means the joint notice of transfer in the form of Exhibit I attached hereto and complying in all respects with the Transfer Ordinance.

"Transfer Ordinance" means the Transfer of Business (Protection of Creditors) Ordinance (Chapter 49 of the Laws of Hong Kong).

"Transfer Taxes" means all sales (including bulk sales), use, transfer, registration, recording, ad valorem, privilege, documentary, gross receipts, registration, conveyance, excise, license, stamp or similar Taxes and fees arising out of, in connection with or attributable to the transactions effected pursuant to this Agreement, and any deficiency, interest or penalty asserted with respect thereto.

"Transition Services Agreement" means the Transition Services Agreement dated as of the Closing Date by and between Seller and Buyer substantially in the form of Exhibit B annexed hereto.

(b)     Each of the following capitalized terms shall have the meaning ascribed thereto in the Section or other location within this Agreement set forth across from such term:

| | |
|---|---|
| "Ancillary Agreements" | Section 4.3 |
| "Ancillary Assets" | Section 2.1(b) |
| "Ancillary Business" | 2nd WHEREAS Clause |
| "Arbiter" | Section 9.5(b) |
| "Asiacom Closing" | Section 3.1 |
| "Asiacom Closing Cash Payment" | Section 2.5(c) |
| "Asiacom Closing Cash Purchase Price" | Section 2.5(a) |
| "Assumed Liabilities" | Section 2.3(a) |
| "Audit Delivery Date" | Section 9.8 |
| "Audit Documents" | Section 9.8 |
| "Audited Statements" | Section 9.8 |
| "Audit Escrow" | Section 2.5(c) |
| "Audit Escrow Agreement" | Section 2.5(c) |
| "Audit Escrow Amount" | Section 2.5(c) |

8

"Buyer Business"                          Section 2.7(h)

"Buyer Indemnitees"                       Section 11.1

"Closing"                                 Section 3.1

"Closing Cash Payment"                    Section 2.5(c)

"Closing Cash Purchase Price"             Section 2.5(a)

"COBRA"                                   Section 6.9(b)

"Commission Deficiency"                   Section 9.5(a)

"Competing Business"                      Section 9.7(a)

"Consent"                                 Section 4.4

"Covered Product"                         Section 9.7(a)

"Customer Charge-backs"                   Section 2.4(k)

"Downward Adjustment Amount"              Section 2.6(d)(i)

"Eligible Employees"                      Section 6.9(a)

"Estimated Inventory Value"               Section 2.5(b)

"Excluded Assets"                         Section 2.2

"Excluded Inventory"                      Section 2.2(xvii)

"Excluded Liability"                      Section 2.4

"Exculpated Person"                       Section 12.5

"Expats"                                  Section 7.15

"Financial Statements"                    Section 4.7

"General Escrow"                          Section 2.5(c)

"General Escrow Agreement"                Section 2.5(c)

"General Escrow Amount"                   Section 2.5(c)

"Indemnified Party"                       Section 11.3(a)

"Indemnifying Party"                      Section 11.3(a)

9

"Independent Accounting Firm"           Section 2.6(c)

"IPO"                                   Section 6.10

"Licensed Intellectual Property"        Section 2.1(a)(ii)

"Listed Purchase Orders"                Section 6.16

"Losses"                                Section 11.1

"Major Customers"                       Section 4.19(a)

"Major Suppliers"                       Section 4.19(b)

"Material Contracts"                    Section 4.16

"Minimum Annual Amount"                 Section 9.5(a)

"Minimum Purchase Period"               Section 9.5(a)

"Minimum Purchase Products"             Section 9.5(a)

"Negative Adjustment Amount"            Section 2.7(g)

"Non-Listed Purchase Orders"            Section 6.16

"Osh Kosh License"                      Section 4.17(h)

"Parent"                                Section 7.9

"Permitted Liens"                       Section 4.9

"Preferred Stock"                       Section 7.9

"Proceeding"                            Section 6.13(b)

"Product Objection Notice"              Section 9.5(b)

"Protected Employee"                    Section 9.7(a)

"Purchased Assets"                      Section 2.1(a)

"Purchase Orders"                       Section 6.16

"Purchase Price"                        Section 2.5(a)

"Reference Inventory Statement"         Section 4.7

"Related Party"                         Section 4.18

"Response Notice"                           Section 11.3(b)

"Response Period"                           Section 11.3(b)

"Retainer Refund"                           Section 9.5(a)

"SEC"                                       Section 6.10

"Seller Certification"                      Section 7.12

"Seller Indemnitees"                        Section 11.2

"Subject Business"                          1st WHEREAS Clause

"Third Party Claim"                         Section 11.3(a)

"Transferred Computer Equipment"            Section 2.1(a)(ix)

"Transferred Contracts"                     Section 2.1(a)(iii)

"Transferred Employees"                     Section 6.9(a)

"Transferred Intellectual Property"         Section 2.1(a)(ii)

"Transferred Inventory"                     Section 2.1(a)(i)

"Transferred Permits"                       Section 2.1(a)(iv)

"Yearly Retainer"                           Section 9.5(a)

## ARTICLE II.

### PURCHASE AND SALE OF ASSETS

2.1.    Purchased Assets and Ancillary Assets.

(a)    Subject to Section 2.2, Seller shall sell, transfer, assign and deliver to Buyer at the Closing, free and clear of all Liens, except for Permitted Liens, of every kind, nature and description, and Buyer shall purchase, acquire and accept from Seller, the Purchased Assets and the goodwill relating thereto, and shall cause Asiacom to sell, transfer, assign and deliver to Buyer within forty-five (45) days after the Closing Date, free and clear of all Liens, except for Permitted Liens, of every kind, nature and description, and Buyer shall purchase, acquire and accept from Asiacom, the Ancillary Assets and the goodwill relating thereto. "Purchased Assets" means all of the Seller's business, properties, assets, goodwill and rights of every kind, nature and description existing on the Closing Date, constituting, primarily related to, primarily used in or otherwise necessary or material to the conduct of the Subject Business, wherever such assets are located and whether real, personal or mixed, tangible or intangible, including without limitation, all of Seller's right, title and interest in and to the following, as the same may exist on the Closing Date to the extent constituting, primarily related to, primarily used in or otherwise necessary or material to the conduct of the Subject Business:

(i)    all inventories of Closing Date Products, including raw materials, supplies, packaging, parts, work-in-process, finished goods and goods in transit from suppliers or manufacturers except for the inventory expressly set forth on Schedule 2.2(xvi) (collectively, the "Transferred Inventory");

(ii)    all Intellectual Property including the Intellectual Property set forth on Schedule 2.1(a)(ii)(A) (collectively, the "Transferred Intellectual Property") and the licenses of the Seller's Intellectual Property contained and set forth in Schedule 2.1(a)(ii)(B) (the "Licensed Intellectual Property");

(iii)    subject to Section 2.9, all rights of Seller in, to and under any Contracts including, without limitation, the Contracts set forth on Schedule 2.1(a)(iii) (collectively, the "Transferred Contracts");

(iv)    subject to Section 2.9, all Permits, including, without limitation, the Permits set forth on Schedule 2.1(a)(iv) (collectively, the "Transferred Permits");

(v)    subject to Sections 2.2(iii) and 2.2(iv), all prepaid items and expenses, advance payments, security or similar deposits, deferred charges or claims for refund;

(vi)    all books and records (including, without limitation, customer and supplier lists) manuals, documents, books of account, correspondence, sales and credit reports, customer lists and mailing lists maintained by Seller relating to the operation of the Subject Business;

(vii)    all catalogs, brochures and other sales and promotional literature;

12

(viii)    all product samples and related showroom display materials;

(ix)    all equipment, machinery, supplies, furniture, fixtures and improvements, including without limitation computers, computer equipment, accessories and other hardware set forth on Schedule 2.1(a)(ix) (collectively, the "Transferred Computer Equipment");

(x)    to the extent assignable, all guarantees, warranties, indemnities and similar rights with respect to any and all Purchased Assets and all related claims, credits, rights of recovery and set off; and

(xi)    all of Sellers' claims, choses in action, causes of action and judgments relating to the Purchased Assets or the operation of the Subject Business.

Without limiting the inclusiveness of the foregoing definition of "Purchased Assets", and solely for the convenience of Buyer, Seller has set forth a materially complete listing of all of the tangible Purchased Assets (other than those covered in clauses (i) through (xi) above) on Schedule 2.1(a).

(b)    "Ancillary Assets" means all of Asiacom's business, properties, assets, goodwill and rights of every kind, nature and description existing immediately prior to their purchase in their entirety by Seller, wherever such assets are located and whether real, personal or mixed, tangible or intangible, including but not limited to the tangible Ancillary Assets set forth on Schedule 2.1(b). For the avoidance of doubt, the Ancillary Assets shall be transferred to Buyer in accordance with Section 2.1(a) regardless of whether the Asiacom Closing Cash Payment is made.

2.2.    Excluded Assets.

(a)    Notwithstanding anything to the contrary contained in this Agreement, the Purchased Assets shall not include and shall expressly exclude the following assets and rights of Seller (collectively, the "Excluded Assets"), which shall not be sold, transferred, assigned or delivered to Buyer:

(i)    all cash, cash equivalents, cash reserves, certificates of deposit, bank accounts, bank deposits, letters of credit and marketable securities whether on hand or in accounts;

(ii)    all accounts receivable;

(iii)    all security deposits together with any interest or other amounts accrued thereon, claims for security deposits or rights to receive security deposits paid by Seller with respect to the Subject Business and which are set forth on Schedule 2.2(a)(iii);

(iv)    all insurance policies and any prepaid insurance premiums which are set forth on Schedule 2.2(a)(iv);

(v)    [INTENTIONALLY OMITTED]

13

(vi)    all Contracts set forth on Schedule 2.2(a)(vi);

(vii)    all Permits set forth on Schedule 2.2(a)(vii);

(viii)    all refunds or credits, claims for refunds or credits, or rights to receive refunds or credits with respect to any Tax or other amount paid or to be paid by Seller;

(ix)    all records related to Taxes paid or payable by Seller;

(x)    all records, documents and drafts received or prepared in connection with the planning of the sale of the Purchased Assets, including bids received from third parties and analyses relating to the Subject Business;

(xi)    copies of records relating to the Subject Business that form a part of Seller's general ledger and that are listed on Schedule 2.2(a)(xi);

(xii)    all owned and leased real estate used in or relating to the Subject Business;

(xiii)    all computers, computer equipment, accessories and other hardware listed on Schedule 2.2(a)(xiii), and accounts with any Internet access provider;

(xiv)    the corporate seals, certificates of incorporation, by-laws, minute books, stock books and other similar books and records having to do with the corporate organization of Seller and its Affiliates;

(xv)    all shares of capital stock of Seller or any of its Affiliates;

(xvi)    all rights, claims and causes of action of any kind to the extent pertaining to, arising out of or inuring to the benefit Seller or any of its Affiliates relating to Excluded Assets and Excluded Liabilities;

(xvii)    all inventory of Closing Date Products set forth on Schedule 2.2(a)(xvi) (the "Excluded Inventory"); and

(xviii)    the rights that accrue or will accrue to Seller under this Agreement and any other agreement, certificate or instrument relating to the sale of the Purchased Assets or otherwise delivered in connection with this Agreement.

(b)    Except as explicitly listed on Schedule 2.1(b), and for the avoidance of doubt, "Ancillary Assets" shall not include and shall expressly exclude all liabilities, obligations or commitments of Asiacom or the Ancillary Business whatsoever, as well as all liabilities, obligations or commitments of Seller or any Affiliate in respect of Asiacom or the Ancillary Business, whether contingent or otherwise, fixed or absolute, known or unknown, matured or unmatured, present, future or otherwise, all of which shall be retained by Asiacom, Seller or any such Affiliate, as the case may be.

2.3.    Assumption of Liabilities.

14

(a)     In partial payment of the Purchase Price, Buyer shall assume, and hereby covenants and agrees to timely perform, pay or discharge, as of the Closing the following (collectively, the "Assumed Liabilities"):

(i)     [INTENTIONALLY OMITTED];

(ii)    all obligations, liabilities and commitments of the Seller under the Transferred Contracts (to the extent such Contracts are set forth on Schedule 2.1(a)(iii) or, if any such Contracts are oral, to the extent the material terms and conditions of such oral Contracts are set forth on Schedule 2.1(a)(iii)) and Transferred Permits, in each case, to the extent such obligations, liabilities and commitments arise after the Closing (other than such obligations, liabilities and commitments arising from or relating to a breach or default occurring prior to the Closing);

(iii)   all obligations, liabilities and commitments assumed by Buyer pursuant to Section 6.9;

(iv)    all obligations, liabilities and commitments arising under or in respect of advertising commitments and trade promotions planned or committed to on or before the Closing in respect of any and all products and merchandise included within the Purchased Assets sold by Buyer from and after Closing and specified on Schedule 2.3(a)(iv); and

(v)     all obligations, liabilities and commitments specified on Schedule 2.3(a)(v).

Except with respect to the Assumed Liabilities, Buyer does not hereby and shall not assume or in any way undertake to pay, perform, satisfy or discharge any liabilities or obligations of the Seller or any of its Affiliates, including, without limitation, the Excluded Liabilities.

(b)     In order to effectuate the assumption and transfer of the Assumed Liabilities contemplated by this Section 2.3, Buyer shall execute and deliver to Seller at the Closing the Assumption Agreement and all other instruments of assumption and other documents reasonably requested by Seller to confirm Buyer's obligation to duly assume and timely pay, perform and discharge the Assumed Liabilities.

2.4.    Excluded Liabilities. Other than the Assumed Liabilities, Seller shall retain and Buyer shall not assume or be liable for any liabilities, obligations or commitments of Seller (all of such liabilities, obligations and commitments not so assumed being herein called the "Excluded Liabilities"), including without limitation the following:

(a)     any obligation, liability or commitment for any amount payable by Seller to any of its Affiliates;

(b)     all Taxes of Seller or for which Seller may become liable by contract, tax sharing agreement or otherwise, whether or not arising out of, relating to or in respect of the Subject Business imposed upon Seller or any of its Affiliates;

15

(c)    all obligations, liabilities and commitments of Seller or any of its Affiliates to the extent arising out of, relating to or in respect of the Excluded Assets;

(d)    all obligations, liabilities and commitments expressly retained by Seller pursuant to Section 6.9;

(e)    all obligations, liabilities and commitments of Seller or any of its Affiliates to the extent arising out of, relating to or in respect of any pending suit, action or proceeding directly or indirectly arising out of, or relating to, the operation of the Subject Business or the Ancillary Business, or ownership of the Purchased Assets or the Ancillary Assets, before the Closing Date;

(f)    all obligations, liabilities and commitments under environmental laws to the extent arising out of, relating to or in respect of the operation or conduct of the Subject Business or the Ancillary Business, or the use or ownership of the assets of the Subject Business or the Ancillary Business, in each case before the Closing Date;

(g)    all obligations, liabilities and commitments under all owned and leased real estate used in or relating to the Subject Business or the Ancillary Business;

(h)    all obligations, liabilities and commitments arising out of or with respect to the (i) the Seller Plans; (ii) the employment, failure to employ or termination of the employment of, any individual (whether or not an Eligible Employee as defined in Section 6.9 hereof) on or before the Closing Date, including, without limitation, all claims for wages or employee benefits; and (iii) any alleged violations of any applicable laws relating to employment, employment practices, terms and conditions of employment and wages and hours;

(i)    all obligations, liabilities and commitments of Seller to the extent arising out of, relating to or in respect of the negotiation and preparation of this Agreement and the consummation and performance of the transactions contemplated hereby, including the fees and expenses of Carl Marks Advisory Group LLC;

(j)    any liabilities or obligations of Seller under or arising out of this Agreement;

(k)    any liabilities or obligations payable or owing to customers of the Seller or the Subject Business relating to or arising from charge-backs, returns, credits, mark-down allowances (collectively, "Customer Charge-backs") for any products sold or distributed or services provided by Seller prior to the Closing;

(l)    any liabilities or obligations of Seller to indemnify its officers, directors, employees or agents, or of Seller or Asiacom to indemnify Asiacom's officers, directors, employees or agents;

(m)    any product warranty, product liability, service warranty, service liability or liquidated damages liability of any nature in respect of products of the Subject Business or Ancillary Business manufactured, sold or distributed or services provided prior to the Closing;

16

(n)    any liabilities of obligations of Seller or Asiacom, contingent or otherwise, for any indebtedness or capital leases;

(o)    notwithstanding the provisions of any consent to assignment of an Assumed Contract, any liability or obligation of Seller under any Transferred Contract to the extent such liability or obligation relates to any period prior to the Closing, including any liability or obligation for any breach of or default under any Transferred Contract by any Seller which liability or obligation relates to any such breach or default occurring prior to the Closing;

(p)    any other liability or obligation of Seller including any liability or obligation directly or indirectly arising out of, or relating to, the operation of the Subject Business or the Ancillary Business, or ownership of the Purchased Assets or the Ancillary Assets, prior to or on the Closing Date, whether contingent or otherwise, fixed or absolute, known or unknown, matured or unmatured, present, future or otherwise; and

(q)    subject to Section 6.16 hereof, all obligations, liabilities and commitments of Seller or any of its Affiliates to the extent arising out of, relating to or in respect of any purchase orders, including without limitation the purchase orders set forth on Schedule 2.2(a)(vi).

2.5.    Purchase Price.

(a)    Purchase Price. Subject to adjustments as set forth in Section 2.5(c) and Section 2.6, the aggregate purchase price (the "Purchase Price") for the Purchased Assets and the Ancillary Assets shall be the (i) assumption by Buyer of the Assumed Liabilities on the Closing Date; (ii) payment of Twenty Million Two Hundred Seventy-Five Thousand Dollars ($20,275,000) (the "Closing Cash Purchase Price") by Buyer to Seller; (iii) payment of Three Thousand Fifty Thousand Dollars ($350,000) (the "Asiacom Closing Cash Purchase Price") by Buyer to Seller subject to satisfaction of all of the payment conditions set forth in Section 7.15; and (iv) Earn-Out Payments, Direct Import Earn-Out Payments and Federated Earn-Out Payments, if any, provided for in Section 2.7.

(b)    Estimated Inventory Value. Seller hereby delivers to Buyer a good-faith estimate that the Inventory Value ("Estimated Inventory Value") as of the end of business on the Closing Date is $1,120,023. Seller has made such calculation in good faith in accordance with this Section 2.5(b) and the Accounting Principles. For purposes of calculating Estimated Inventory Value and Closing Inventory Value, the cost of (i) 2006 inventory (all seasons) included in the Transferred Inventory has not been discounted; (ii) 2005 inventory (all seasons) included in the Transferred Inventory is discounted by thirty percent (30%); (iii) 2004 inventory (all seasons) included in the Transferred Inventory is discounted by fifty percent (50%); and (iv) 2003 inventory (all seasons) and any older inventory included in the Transferred Inventory is discounted by one hundred percent (100%).

(c)    At the Closing, Buyer shall pay (i) to Seller (x) Sixteen Million Two Hundred Seventy-Five Thousand Dollars ($16,275,000) less (y) the amount by which Estimated Inventory Value (which is $1,120,023) is less than the Inventory Value set forth on the Reference Inventory Statement (which is $3,628,314) less (z) the aggregate amount of Customer

17

Charge-backs set forth on Schedule 4.19(c) (which is $0) (collectively, the "Closing Cash Payment", or $13,766,709), (ii) Three Million Five Hundred Thousand Dollars ($3,500,000) (the "General Escrow Amount") into escrow (the "General Escrow") with The Bank of New York Trust Company, N.A. (the "Escrow Agent") and (iii) Five Hundred Thousand Dollars ($500,000) (the "Audit Escrow Amount") into escrow (the "Audit Escrow") with the Escrow Agent. The General Escrow Amount shall be distributed in accordance with the terms and conditions of the General Escrow Agreement annexed hereto Exhibit C (the "General Escrow Agreement"). The Audit Escrow Amount shall be distributed in accordance with the terms and conditions of the Audit Escrow Agreement annexed hereto as Exhibit D (the "Audit Escrow Agreement"). The General Escrow Amount and the Audit Escrow Amount will be available to satisfy any amounts owed by the Seller to the Buyer under this Agreement in accordance with the terms of the General Escrow Agreement and the Audit Escrow Agreement, respectively. All disbursements from the General Escrow Agreement and the Audit Escrow Agreement shall be made in accordance with the General Escrow Agreement and the Audit Escrow Agreement, respectively. Subject to satisfaction of all of the conditions set forth in Section 7.15 and the occurrence of the Asiacom Closing in accordance with this Agreement, Buyer shall pay to Seller Five Hundred Thousand Dollars ($350,000) (the "Asiacom Closing Cash Payment").

(d)     Within 90 days of the Closing Date, Buyer shall prepare an allocation of the Purchase Price (and all other capitalized costs) and the amount of the Assumed Liabilities among the Purchased Assets and the Ancillary Assets consistent with Section 1060 of the Code and the Treasury Regulations promulgated thereunder prior to Closing, which allocation shall be attached hereto as Schedule 2.5(d). The allocation required by this Section 2.5(d) shall be revised (if at all, in accordance with principles set forth on Schedule 2.5(d)) at any time an adjustment to the Purchase Price is required, including, without limitation, pursuant to Section 2.6, Section 2.7 or Article XI). Each of Buyer and Seller shall report the transactions contemplated by this Agreement for Tax purposes in a manner consistent with the allocation determined pursuant to this Section 2.5(d). Each of Buyer and Seller shall file Internal Revenue Service Form 8594, and all Federal, state and local Tax Returns, in accordance with any such agreed allocation as adjusted as provided herein. Each of Buyer and Seller shall promptly provide the other with any information required to complete Internal Revenue Service Form 8594. Buyer and Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding any allocation of the Purchase Price determined pursuant to this Section 2.5(d). Except as required by applicable law, Buyer and Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with such allocation.

2.6.     Adjustment of Purchase Price. The Purchase Price shall be subject to adjustment after the Closing as specified in this Section 2.6.

(a)     As promptly as practicable, but in any event within sixty (60) calendar days following the Closing Date, Seller shall deliver to Buyer the Closing Inventory Statement, together with a report thereon of Seller's Accountants stating that the Closing Inventory Statement fairly presents the Inventory Value as at the Closing Date in conformity with Section 2.5(b) and the Accounting Principles applied on a basis consistent with the preparation of the Reference Inventory Statement, except that the Closing Inventory Statement shall only cover the Inventory Value of the Transferred Inventory.

18

(b)    Subject to Section 2.6(c), the Closing Inventory Statement delivered by Seller to Buyer shall be final, binding and conclusive on the parties hereto.

(c)    Seller shall provide to Buyer and its employees, agents and accountants with reasonable access to its books, records, employees, agents and accountants used by Seller in the preparation of the Closing Inventory Statement. Buyer may dispute one or more amounts reflected on the Closing Inventory Statement to the extent the net effect of such disputed amounts in the aggregate would reasonably be expected to affect the Inventory Value reflected on the Closing Inventory Statement by more than the Designated Amount; provided, however, that unless Buyer shall have notified Seller and Seller's Accountants in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within forty-five (45) days of Seller's delivery of the Closing Inventory Statement to Buyer, the Closing Inventory Statement shall be final, binding and conclusive on the parties hereto. In the event of such a dispute, Seller and Buyer shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive. If any such resolution by Seller and Buyer leaves in dispute amounts, the net effect of which in the aggregate would not exceed the Designated Amount, all such amounts remaining in dispute shall then be resolved in favor of the Closing Inventory Statement delivered by Seller to Buyer. If Seller and Buyer are unable to reach a resolution with respect to one or more disputed amounts within twenty (20) Business Days after receipt by Seller of Buyer's written notice of dispute, Seller and Buyer shall submit the item(s) remaining in dispute for resolution to Deloitte & Touche LLP (or, if such firm shall decline to act to another independent accounting firm mutually acceptable to Seller and Buyer) (either Deloitte & Touche LLP or such other accounting firm being referred to herein as the "Independent Accounting Firm"), which shall, within thirty (30) Business Days after such submission, determine and report to Seller and Buyer upon such remaining disputed item(s), and such report shall be final, binding and conclusive on the parties hereto, absent manifest error. The fees and disbursements of the Independent Accounting Firm shall be allocated between Seller and Buyer in the same proportion that the aggregate amount of such remaining disputed item(s) so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed item(s) so submitted. The fees and disbursements of Seller's Accountants incurred in connection with Seller's activities pursuant to this Section 2.6 shall be the obligation of the Seller and the fees and disbursements of Buyer's Accountants incurred in connection with Buyer's activities pursuant to this Section 2.6 shall be the obligation of the Buyer.

(d)    The Closing Inventory Statement shall be final for the purposes of this Section 2.6 upon the earliest of the (i) failure of Buyer to notify Seller of a dispute within forty-five (45) days of Seller's delivery of the Closing Inventory Statement to Buyer, (ii) resolution of all disputes, pursuant to Section 2.6(c), by Seller and Buyer and (iii) resolution of all disputes, pursuant to Section 2.6(c), by the Independent Accounting Firm. Upon the Closing Inventory Statement having become final under this Section 2.6(d), a Purchase Price adjustment shall be made as follows:

(i)    In the event that the Estimated Inventory Value exceeds the Inventory Value reflected on the Closing Inventory Statement by at least the Designated Amount, then the Purchase Price shall be adjusted downward in an amount (the "Downward

<u>Adjustment Amount</u>") equal to such excess over the Designated Amount and Seller shall, within five (5) Business Days of such determination, pay the amount of such excess to Buyer by wire transfer of immediately available funds to such account as Buyer shall have designated in writing to Seller; provided, that the first $500,000 of any such payment shall be funded by a distribution to Buyer from the General Escrow and any portion of such payment not otherwise satisfied by such escrow shall be paid by Seller to Buyer as specified above.

(ii)     In the event that the Inventory Value reflected on the Closing Inventory Statement exceeds the Estimated Inventory Value by at least the Designated Amount, then the Purchase Price shall be adjusted upward in an amount equal to such excess over the Designated Amount and Buyer shall, within five (5) Business Days of such determination, pay the amount of such excess to Seller by wire transfer of immediately available funds to such account as Seller shall have designated in writing to Buyer.

(iii)     For purposes of complying with the terms and conditions set forth in this Section 2.6, (i) Seller shall, and shall cause Seller's Accountants to, (A) reasonably cooperate with Buyer and Buyer's Accountants and afford reasonable access to all information, records, invoices, data and auditors' working papers and (B) afford access to personnel of Seller and Seller's Accountants, in each case as may be required in connection with the analysis of any Closing Inventory Statement, calculation of the Closing Inventory Value and resolution of any dispute covered by Section 2.6(c) and (ii) Buyer shall, and shall cause Buyer's Accountants to, reasonably cooperate with Seller and Seller's Accountants and afford reasonable access to all information, records, invoices, data and auditors' working papers of Buyer and Buyer's Accountants as may be required in connection with the analysis of any resolution of any dispute covered by Section 2.6(c).

2.7.    <u>Earn-Out Payments; Direct Import Earn-Out Payments; Federated Earn-Out Payments</u>.  Buyer shall make Earn-Out Payments, Direct Import Earn-Out Payments and/or Federated Earn-Out Payments, to the extent any such payments have in fact been earned, to Seller in accordance with this Section 2.7.

(a)     As promptly as practicable, but in any event within sixty (60) calendar days following each Determination Date, Buyer shall deliver to Seller a Net Sales Statement presenting Buyer's calculation of the Net Sales for the Earn-Out Period ending on such Determination Date in accordance with GAAP applied consistently with Buyer's financial statements. Concurrently with the delivery of each Net Sales Statement, Buyer shall make the Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, to the extent any such payment has in fact been earned, based on the Net Sales set forth in such statement to Seller by wire transfer of immediately available funds to such account as Seller shall have designated in writing to Buyer; it being understood that Seller's receipt of any such Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment shall be without prejudice to Seller's right to contest Net Sales amounts pursuant to Section 2.7(c).

(b)     Subject to Section 2.7(c) and Section 2.7(g), the Net Sales Statement delivered by Buyer to Seller shall be final, binding and conclusive on the parties hereto.

(c)    Seller may dispute one or more amounts reflected on any Net Sales Statement (other than Excluded Direct Import Net Sales, Gross Profit or any amount derived therefrom to the extent such dispute originated from the determination of Excluded Direct Import Net Sales or Gross Profit) to the extent the net effect of such disputed amounts in the aggregate would reasonably be expected to affect the calculation of Net Sales by more than $250,000, by delivery of written notice to Buyer and Buyer's Accountants; provided, however, that unless Seller shall have notified Buyer in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within forty-five (45) days of Seller's delivery of the Net Sales Statement to Seller, the Net Sales Statement shall be final, binding and conclusive on the parties hereto. In the event of such a dispute, Seller and Buyer shall attempt to reconcile their differences and any resolution by them as to any disputed amounts shall be final, binding and conclusive. If Seller and Buyer are unable to reach a resolution with respect to one or more disputed amounts within twenty (20) Business Days after receipt by Buyer of Seller's written notice of dispute, Seller and Buyer shall submit the item(s) remaining in dispute for resolution to the Independent Accounting Firm, which shall, within thirty (30) Business Days after such submission, determine and report to Seller and Buyer upon such remaining disputed item(s), and such report shall be final, binding and conclusive on the parties hereto, absent manifest error, and subject to any adjustments that occur pursuant to Section 2.7(g) hereof. The fees and disbursements of the Independent Accounting Firm shall be allocated between Seller and Buyer in the same proportion that the aggregate amount of such remaining disputed item(s) so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed item(s) so submitted. The fees and disbursements of Seller's Accountants incurred in connection with Seller's activities pursuant to this Section 2.7 shall be the obligation of Seller and the fees and disbursements of Buyer's Accountants incurred in connection with Buyer's activities pursuant to this Section 2.7 shall be the obligation of Buyer.

(d)    Upon resolution of all disputes with respect to a Net Sales Statement, an Earn-Out Payment adjustment, a Direct Import Earn-Out Payment adjustment and/or a Federated Earn-Out Payment adjustment, if any is required to be made, shall be made as follows:

(i)    If any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment paid to Seller under Section 2.7(a) is/are less than the payment amount(s) that should have been made if such amount(s) had been based on Net Sales as determined under Section 2.7(c), then Buyer shall, within five (5) Business Days of such determination, pay the amount of any such deficiencies, together with interest thereon from the end of the Earn-Out Period to which any such deficiency relates until the date payment is made under this Section 2.7(d)(i), calculated by using a per annum interest rate equal to the lesser of the (a) Interest Rate or (b) maximum interest rate allowable under applicable usury law, to Seller by wire transfer of immediately available funds to such account as Seller shall have designated in writing to Buyer.

(ii)    If any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment paid to Seller under Section 2.7(a) exceed(s) the payment amount(s) that should have been made if such amount(s) had been based on Net Sales as determined under Section 2.7(c), then Seller shall, within five (5) Business Days of such

determination, pay the amount of any such deficiency to Buyer by wire transfer of immediately available funds to such account as Buyer shall have designated in writing to Seller.

(e)     For purposes of complying with the terms and conditions set forth in this Section 2.7, Buyer shall, and shall cause its Affiliates and Buyer's Accountants to, reasonably cooperate with Seller and Seller's Accountants and afford reasonable access to all information, records, invoices, data and auditors' working papers of Buyer and Buyer's Accountants as may be required in connection with the analysis of any Net Sales Statement, calculation of any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, and resolution of any dispute covered by Section 2.7(c).

(f)     Notwithstanding either the foregoing provisions of this Section 2.7 or anything else to the contrary in this Agreement, Buyer's obligation to make Direct Import Earn-Out Payments and/or Federated Earn-Out Payments to Seller shall be limited to Five Million Dollars ($5,000,000) in the aggregate, and after such dollar threshold has been reached, Buyer shall have no obligation whatsoever to make any additional Direct Import Earn-Out Payments and/or Federated Earn-Out Payments to Seller.

(g)     In the event that any liabilities or obligations payable or owing to customers of the Buyer relating to or arising from Customer Charge-backs for any products whose sales have been included within the calculation of Net Sales in any Earn-Out Period would have reduced any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment for such corresponding Earn-Out Period had such Customer Charge-backs been determined at the time of the calculation of the applicable Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, as the case may be, then there shall be a corresponding negative adjustment to the amount of the future Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, if any, otherwise due from Buyer under this Section 2.7 ("Negative Adjustment Amount").  Buyer may apply a Negative Adjustment Amount, if any, to and accordingly reduce any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment due to Seller in any subsequent Earn-Out Period under this Section 2.7 provided that Seller is provided with a reasonably detailed calculation of such Negative Adjustment Amount.

(h)     Seller hereby acknowledges and agrees that any Earn-Out Payments, Direct Import Earn-Out Payments and/or Federated Earn-Out Payments under this Agreement are contingent on the performance of the business of Buyer (the "Buyer Business") following the Closing and there are no guaranteed minimum Earn-Out Payments, Direct Import Earn-Out Payments and/or Federated Earn-Out Payments hereunder.  Notwithstanding anything to the contrary contained in this Agreement, Buyer and its Affiliates will be free to operate the Buyer Business and the Subject Business as Buyer deems appropriate in its sole discretion (including with respect to pricing, distribution, continuation or non-continuation of products and operations) and shall have no fiduciary duty or other obligation whatsoever to act in any manner in an attempt to maximize all or any Earn-Out Payments, Direct Import Earn-Out Payments and/or Federated Earn-Out Payments to Seller.

2.8.    Transfer Taxes.  Each of Seller and Buyer shall pay fifty percent (50%) of all Transfer Taxes; provided, however, that Seller shall use reasonable efforts to avail itself of any

available exemptions from any such Transfer Taxes, and to cooperate with Buyer in providing any information and documentation that may be necessary to obtain such exemption. Seller and Buyer shall cooperate in timely making all filings, returns, reports and forms as may be required in connection with Buyer's payment of the Transfer Taxes.

      2.9.   Third Party Consents.

      (a)   Notwithstanding anything to the contrary contained herein, this Agreement shall not constitute an agreement to assign any Transferred Contract or Transferred Permit or any claim, right or benefit arising under or resulting from such Transferred Contract or Transferred Permit if an attempted assignment thereof, without the consent of a third party, would constitute a breach, default, violation or other contravention of the rights of such third party. If any transfer or assignment by Seller to, or any assumption by Buyer of, any interest in, or obligation, liability or commitment under, any Transferred Contract or Transferred Permit or claim, right or benefit arising under or resulting from such Transferred Contract or Transferred Permit requires the consent of a third party, then such transfer, assignment or assumption shall be made subject to such consent being obtained.

      (b)   If any such consent is not obtained prior to the Closing, the Closing shall nonetheless take place on the terms set forth herein. Seller shall provide all commercially reasonable assistance to Buyer (not including the payment of any consideration) reasonably requested by Buyer to secure such consent after the Closing or cooperate with Buyer (at Buyer's expense) in any lawful and commercially reasonable arrangement reasonably proposed by Buyer under which (i) Buyer shall obtain (without infringing upon the legal rights of such third party or violating any applicable law) the economic claims, rights and benefits under the Purchased Asset at issue or claim, right or benefit arising under or resulting from such Purchased Asset with respect to which the consent has not been obtained in accordance with this Agreement and (ii) Buyer shall assume any related economic burden with respect to such Purchased Asset or claim, right or benefit arising under or resulting from such Purchased Asset to the extent arising from and after the Closing with respect to which the consent has not been obtained in accordance with this Agreement.

### ARTICLE III.

### CLOSING

      3.1.   Closing. The execution of this Agreement shall take place at the offices of Dechert LLP, 30 Rockefeller Plaza, New York, New York at noon on October 6, 2006. The closing ("Closing") of the Acquisition shall take place at the offices of Dechert LLP, 30 Rockefeller Plaza, New York, New York, at 2 p.m. on the Closing Date. The Closing shall be deemed to be effective as of 11:59 p.m. (New York City time) on the Closing Date. The closing of the purchase by Buyer of the Ancillary Assets (the "Asiacom Closing") shall take place on the date which is two (2) Business Days following the date on which the Transfer Notice (as defined herein) shall become completed (within the meaning of Section 4 of the Transfer Ordinance), or such other date as is mutually agreed by Buyer and Seller.

      3.2.   Deliveries at Closing.

(a)     Deliveries by Seller. At the Closing, Seller shall cause to be delivered to Buyer the following:

(i)     all such bills of sale, assignments, and other instruments and documents reasonably requested by Buyer, and in form and substance reasonably satisfactory to Seller, as may be necessary to evidence the sale of the Purchased Assets and the Ancillary Assets to Buyer; it being understood that (A) such bills of sale, assignments, and other instruments and documents shall not require Seller or any of its Affiliates to make any additional representations, warranties or covenants, express or implied, not expressly contained in this Agreement and (B) the sale of the Ancillary Assets will not be final until the date on which the Transfer Notice (as defined herein) shall become completed (within the meaning of Section 4 of the Transfer Ordinance) and Buyer shall receive legal ownership of the Ancillary Assets;

(ii)     the Assumption Agreement duly executed by Seller;

(iii)     the Transition Services Agreement duly executed by Seller;

(iv)     a non-foreign affidavit (in form and substance reasonably satisfactory to Buyer) that satisfies the requirements of Treasury Regulation Section 1.1445-2(b)(2);

(v)     a certified copy of a joint unanimous written consent of the board of directors of Seller and the stockholders of Seller approving the transactions contemplated herein and resolving to enter into this Agreement and the Ancillary Agreements;

(vi)     power of attorney to Buyer to endorse all checks made payable to Seller related to trade and other notes and accounts receivable of the Subject Business to the extent arising following the Closing;

(vii)     an opinion of Herrick, Feinstein LLP, dated as of the Closing Date in a form reasonably satisfactory to Buyer;

(viii)     Lien releases in respect of the Purchased Assets and the Ancillary Assets;

(ix)     all consents in respect of the Ancillary Business or the Ancillary Assets];

(x)     except as otherwise set forth in this Agreement, all deliveries required in relation to the sale and purchase of the Ancillary Assets, including but not limited to (A) letters to all Asiacom Employees, each in the form of Exhibit H attached hereto, executed by all Asiacom Employees and (B) a certified copy of the resolution of the board of Asiacom in a form reasonably satisfactory to Buyer approving the transfer of the Ancillary Business and the Ancillary Assets (including entering into all agreements relating thereto and consummating all transactions contemplated by such agreements);

(xi)     the License Agreement duly executed by Seller;

24

(xii)   the Non-Competition Agreement duly executed by the Executive (as defined in the Non-Competition Agreement);

(xiii)   the General Escrow Agreement duly executed by Seller;

(xiv)   the Audit Escrow Agreement duly executed by Seller;

(xv)   Seller Certification (as defined herein); and

(xvi)   Seller's Closing Certificate (as defined herein).

(b)   Deliveries by Buyer.  At the Closing, Buyer shall cause to be delivered to Seller the following:

(i)   the agreements, instruments and other documents covered by Section 3.2(a)(i) to which Buyer is a signatory duly executed by Buyer;

(ii)   the Assumption Agreement duly executed by Buyer and all other instruments of assumption and other documents reasonably requested by Seller to confirm Buyer's obligation to duly assume and timely pay, perform and discharge the Assumed Liabilities;

(iii)   the Transition Services Agreement duly executed by Buyer;

(iv)   payment of the Closing Cash Payment by wire transfer of immediately available funds to such account(s) as Seller shall have designated in writing to Buyer prior to the Closing;

(v)   the General Escrow Agreement duly executed by Buyer, together with payment of the General Escrow Amount by wire transfer of immediately available funds to the Escrow Agent;

(vi)   the Audit Escrow Agreement duly executed by Buyer, together with payment of the Audit Escrow Amount by wire transfer of immediately available funds to the Escrow Agent;

(vii)   the License Agreement duly executed by Buyer;

(viii)   the Non-Competition Agreement duly executed by Buyer;

(ix)   an executed unanimous written consent of the board of directors of Buyer approving the transactions contemplated herein and resolving to enter into this Agreement and the Ancillary Agreements; and

(x)   Buyer's Closing Certificate (as defined herein).

3.3.   Post-Closing Deliveries by Seller.  Within thirty (30) days after the Closing Date, Seller shall cause to be delivered to Buyer (A) either a duly executed assignment of the Hong Kong Premises or a replacement lease of the Hong Kong Premises, in either case in a form

reasonably satisfactory to Buyer, (B) the original rental agreement in respect of the Hong Kong Premises and (C) all original financial and accounting books and records of the Ancillary Business.

3.4.    Post-Closing Delivery by Buyer.    Subject to satisfaction of all of the payment conditions set forth in Section 7.15, Buyer shall cause to be delivered to Seller payment of the that portion of the Asiacom Closing Cash Payment to which Seller is entitled under Section 7.15, by wire transfer of immediately available funds to such account(s) as Seller shall have designated in writing to Buyer prior to such date.

3.5.    Risk of Loss.    Seller shall bear the risk of loss with respect to the Purchased Assets and the Ancillary Assets until the Closing.  Risk of loss with respect to the Purchased Assets and the Ancillary Assets shall pass to Buyer immediately after the Closing.

## ARTICLE IV.

### REPRESENTATIONS AND WARRANTIES OF SELLER

Seller makes the following representations and warranties to Buyer subject to and qualified by any fact or facts disclosed in the Schedules hereto that are provided to Buyer as required in this Agreement.  Disclosure of an item in a Schedule corresponding to a particular Section in this Agreement, shall, should the existence of the item or its contents be reasonably apparent on its face from the reading of such disclosure to any other Section, be deemed to be disclosed in that other Section whether or not an explicit cross-reference appears.  For purposes of this Agreement, the phrases "to Seller's knowledge" and "the knowledge of Seller," in each case, means, in addition to what is specified in Section 4.19(c) and Section 4.19(d) of this Agreement, the knowledge, after due inquiry, of Joseph Safdeye, Morris Shalom, Richard Bacall and Michael Stein.  Buyer hereby acknowledges and confirms that none of Messrs. Safdeye, Shalom, Bacall or Stein shall be personally liable for the representations and warranties made in this Article IV.  For the avoidance of doubt, with respect to Asiacom, the Ancillary Business and/or the Ancillary Assets, "due inquiry" shall include inquiry of Randall Flores, as well as such other Asiacom employees as may be necessary given the subject matter of such inquiry.

4.1.    Organization.    Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New York with full corporate power and authority to conduct the Subject Business as presently being conducted and to own and lease its properties and assets.  Seller is duly qualified and in good standing as a foreign corporation and duly authorized to do business with respect to the Subject Business in the jurisdictions set forth on Schedule 4.1, and such jurisdictions are the only jurisdictions wherein the character of the Purchased Assets and the Ancillary Assets, or the conduct of the Subject Business and the Ancillary Business, make such qualification necessary.

4.2.    Subsidiaries; Shareholder Control of Asiacom.

(a)    Seller does not, directly or indirectly, own or have the power to vote, or to exercise a controlling influence with respect to, fifty percent (50%) or more of the securities or

26

other equity interests of any corporation, partnership, limited liability company, joint venture, association or other entity.

(b)    The shareholders of Seller own a majority of the voting capital stock of Asiacom and have the power and authority to cause Asiacom to take all actions, or omit to take any actions, as contemplated by this Agreement.

4.3.    Authority; Execution and Delivery; Enforceability.    Seller has full corporate power and authority to execute this Agreement and the other agreements (including, without limitation, the Assumption Agreement and Transition Services Agreement) and instruments to be executed and delivered in connection with this Agreement (the "Ancillary Agreements") to which it is a party and to consummate the transactions contemplated by this Agreement and such Ancillary Agreements.    Seller has taken all corporate action required by its Certificate of Incorporation and By-laws, in each case, as amended to date, to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and to authorize the consummation of the Acquisition and the other transactions contemplated hereby and thereby. Seller has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is a party, and this Agreement constitutes, and each Ancillary Agreement to which it is a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' rights generally and to general equitable principles (whether considered in an action at law or in equity).

4.4.    No Conflicts or Violations; No Consents or Approvals Required.    Except as set forth on Schedule 4.4, no consent, approval, authorization or similar type of action ("Consent") of, or registration, declaration or filing with, or notification of any Governmental Entity is required to be obtained or made by or with respect to Seller in connection with the execution, delivery and performance of this Agreement, the Ancillary Agreements to which Seller is a party or the consummation of the Acquisition. Assuming all Consents described in Schedule 4.4 have been obtained and all registrations, declarations, filings and notifications listed in the Schedule 4.4 have been made, the execution and delivery by Seller of this Agreement does not, and each Ancillary Agreement to which it is a party will not, and the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements will not conflict with or violate, or result in any breach of or constitute a default under, or give rise to any right of termination, acceleration or modification under or the loss of any right under, or result in the creation of any Lien (other than Permitted Liens or Liens caused by Buyer) upon any of the Purchased Assets or the Ancillary Assets under, any provision of (x) Seller's Certificate of Incorporation or By-laws, or other organizational documents, in each case, as amended to date; (y) except as set forth on Schedule 4.4, any Contract to which Seller is a party or by which any of the Purchased Assets or the Ancillary Assets is bound; or (z) any judgment, order or decree, or statute, law, ordinance, rule or regulation applicable to Seller, any of the Purchased Assets or any of the Ancillary Assets.

4.5.    Compliance with Laws; Permits.    Except as set forth on Schedule 4.5, Seller is in compliance in all material respects with all applicable laws, statutes, ordinances, codes, rules regulations and requirements of any federal, state, local or foreign government or agency thereof

relating to the Subject Business or the Purchased Assets, or to the Ancillary Business or the Ancillary Assets, and has not received any written notice or communication from any Governmental Entity that there exists with respect to the Subject Business or the Purchased Assets, or the Ancillary Business or the Ancillary Assets, any condition that violates any law, rule or regulation. Schedule 4.5 contains a list of all Permits used in the conduct of the Subject Business and the Ancillary Business. Seller owns or possesses all right, title and interest in and to all of the Permits that are necessary to own and operate the Subject Business and the Ancillary Business as each is presently conducted. Seller is in compliance in all material respects with the terms and conditions of such Permits and has not received any notices that it is in violation of any of the terms or conditions of such Permits. All of such Permits are in full force and effect and no action or claim is pending, or the Seller's knowledge, threatened to revoke, suspend, adversely modify or terminate any such Permit or declare such Permit invalid. No notice has been received by Seller with respect to any failure to have any Permit in respect of either the Subject Business or the Ancillary Business.

4.6.     Records of Seller. The copies of Seller's Certificate of Incorporation and By-laws, and any other organizational documents, in each case, as amended to date, and of all resolutions adopted by Seller's Board of Directors relating to the Acquisition, all of which have been delivered to Buyer, are true, correct and complete.

4.7.     Reference Inventory Statement. The unaudited statement (the "Reference Inventory Statement"), dated as of the Reference Date, a copy of which is annexed hereto as Schedule 4.7, fairly presents in accordance with the Accounting Principles the average monthly value of the Transferred Inventory and Excluded Inventory for the twelve (12)-month period ended August 31, 2006, after utilizing the inventory valuation standards set forth in Section 2.5(b) to determine the value of the Transferred Inventory and Excluded Inventory set forth on such Schedule. The books of account and related records of Seller for the Subject Business are correct and complete and fairly present in reasonable detail its assets, liabilities and transactions relating to the Subject Business in accordance with the Accounting Principles consistently applied. The Weiser Agreed-Upon Procedures Report for 2004-5 (the "Financial Statements") annexed to Schedule 4.7 has been compiled from, and is in accordance with, Seller's books and records, fairly presents in all material respects the financial condition, assets and liabilities of the Subject Business as of such date and the results of operations of the Subject Business for the respective period then ended, in each case, as if the Subject Business had been conducted as an independent entity and was not Affiliated with any other entity or business, and has been prepared in accordance with the Accounting Principles. Asiacom has no assets or liabilities other than as reflected on the Asiacom financial statements previously delivered to Buyer.

4.8.     Absence of Certain Changes or Events. Except as set forth on Schedule 4.8, since December 31, 2005: (i) there have been no changes made by Seller to the level of compensation of any of the employees of Seller, and there have been no changes made to the level of compensation of any of the employees of Asiacom; (ii) there have occurred no Customer Charge-backs or allowances out of the ordinary course of Seller's business consistent with Seller's past practice; (iii) Seller has operated the Subject Business in the ordinary course consistent with its past practice, and the Ancillary Business has been operated in the ordinary course consistent with its past practice; and (iv) there has not been a Business Material Adverse Effect.

28

4.9.    Purchased Assets; Ancillary Assets.    Seller has good and valid title to all Purchased Assets, and Asiacom has good and valid title to all Ancillary Assets, in each case free and clear of all Liens, except (i) such Liens as are set forth on Schedule 4.9; (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business; (iii) Liens and interests of third-party lessors and licensors in leased or licensed assets entered into in the ordinary course of business; (iv) Liens for Taxes and other governmental charges that are not due and payable or that are being contested in good faith by appropriate proceedings; (v) pledges and deposits made in the ordinary course of business; and (vi) other imperfections of title, licenses or encumbrances, if any, which do not materially impair the continued use and operation of the assets to which they relate in the conduct of the Subject Business or the Ancillary Business as presently conducted (the Liens described in clauses (i) through (vi) above are referred to collectively as "Permitted Liens")). All of the Subject Assets and the Ancillary Assets are in good working order, condition and repair, reasonable wear and tear excepted. The Purchased Assets and the Ancillary Assets represent all assets and rights (other than Excluded Assets) that are used by Seller, Asiacom or any of their respective Affiliates in the operation of the Subject Business and the Ancillary Business.

4.10.    Taxes.

(a)    Except as set forth on Schedule 4.10, (i) all material Tax Returns required to be filed by the Code or by applicable state or local Tax laws with respect to the Purchased Assets and the Ancillary Assets for Pre-Closing Tax Periods have been timely filed or will be timely filed; (ii) all material Taxes due with respect to such Tax Returns have been paid in full or will be paid in full by the due date thereof; (iii) no claims are being asserted in writing with respect to any such Taxes; (iv) no Tax Liens with respect to the Purchased Assets or the Ancillary Assets have been filed; (v) no audit of any Tax Return is in progress; (vi) no extension of time with respect to any date on which any Tax Return was or is to be filed is in force; and (vii) no waiver or agreement is in force for the extension of time for the assessment or payment of any Tax.

(b)    Seller is not a "foreign person" within the meaning of Section 1445 of the Code. None of the Purchased Assets or the Ancillary Assets to be transferred pursuant to this Agreement constitutes a "United States real property interest" within the meaning of Section 897(c)(1) of the Code.

4.11.    Proceedings.    Schedule 4.11 sets forth a list as of the date of this Agreement of each pending, or to Seller's or Asiacom's knowledge, threatened, suit, action or proceeding against Seller, Asiacom or any of their respective Affiliates which relates to the Subject Business, the Ancillary Business, the Purchased Assets, the Ancillary Assets or the Assumed Liabilities. Seller is not subject to any judgment, order or decree of any court or governmental agency with respect to the Subject Business, Purchased Assets or Assumed Liabilities, and neither Seller nor Asiacom is subject to any judgment, order or decree of any court or governmental agency with respect to the Ancillary Business or the Ancillary Assets.

4.12.    Certain Transferred Employees.    Schedule 4.12 sets forth the name and total compensation of each Transferred Employee whose annual rate of compensation (including bonuses and commissions) exceeds One Hundred Thousand Dollars ($100,000).

29

# EXHIBIT B

(PART 2 OF 2)

4.13.  No Brokers.  Except for Carl Marks Advisory Group LLC (whose fees and expenses will be the sole responsibility of Seller), no broker, finder, agent or similar intermediary has acted for or on behalf of Seller, Asiacom or any of their respective Affiliates in connection with this Agreement or the Acquisition, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement, arrangement or understanding with Seller, Asiacom or any of their respective Affiliates, or any action taken by Seller, Asiacom or any of their respective Affiliates.

4.14.  Labor and Employment.  Except as could not reasonably be expected to give rise to any liability to Buyer, or to impose any lien or other security interest on any asset to be acquired by Buyer hereunder, each of Seller and Asiacom (i) is in compliance in all material respects with all applicable laws relating to employment and employment practices, terms and conditions of employment and wages and hours; (ii) is not engaged in any unfair labor practice; and (iii) is not subject to any unfair labor practice charge or complaint pending before the National Labor Relations Board (or, in the case of Asiacom, any similar labor board).  There is no labor strike, representation campaign or work stoppage actually pending or, to the knowledge of Seller, threatened, against or affecting Seller or Asiacom.  None of the employees of Seller or Asiacom who could reasonably be expected to become Eligible Employees (i) is covered by any collective bargaining agreement or (ii) has engaged in any material work stoppage.

4.15.  ERISA and Employee Benefits Matters.

(a)  Schedule 4.15(a) contains a correct and complete list of the Seller Plans in which any individual who could reasonably be expected to become an Eligible Employee is entitled to participate or under which such individual has accrued any benefits.  Seller has provided Buyer with a current copy of each Seller Plan.

(b)  Except as could not reasonably be expected to become a liability of Buyer or any of its Affiliates, or to subject any Purchased Asset to any Lien:

(i)  Seller and, with respect to the Seller Plans each ERISA Affiliate, and each of the Seller Plans, are in compliance in all material respects with the applicable provisions of ERISA, and those provisions of the Code applicable to the Seller Plans.

(ii)  Neither Seller nor any ERISA Affiliate has incurred any liability under Section 4062, 4063, 4064 or 4069 of ERISA.

(iii)  Neither Seller nor any ERISA Affiliate has incurred any withdrawal liability, within the meaning of Section 4201 of ERISA, or any contingent withdrawal liability under Section 4204 of ERISA, to any multiemployer pension plan, which liability has not been fully paid as of the date hereof.  All contributions which Seller or any ERISA Affiliate are required to have made to any such multiemployer plan have been timely made.

4.16.  Contracts; Compliance.  Schedule 4.16 contains a complete and correct list of all outstanding written and oral Contracts (including, with respect to any oral Contract, a written summary of the material terms and conditions of any such Contract) to which Seller or Asiacom

is a party or by which Seller or Asiacom is bound included in the Subject Business, the Ancillary Business, the Purchased Assets, the Ancillary Assets or the Assumed Liabilities: (i) which have unexpired terms of more than one (1) year and cannot be terminated by Seller or Asiacom without penalty or payment on thirty (30) days notice or less; (ii) which would require over the full term thereof payments by or to Seller or Asiacom of more than $10,000; (iii) pursuant to which there were payments by or to Seller or Asiacom of more than $10,000 for the twelve (12)-month period ended August 31, 2006; (iv) which provide for the sale of goods or services by Seller or Asiacom and which have annual payments in excess of $10,000; (v) which relate to employment or severance arrangements; (vi) which are license agreements; (vii) which are customer purchase orders; (viii) which are agreements with dealers, distributors or sale representatives; (ix) which relate to marketing, sale, advertising or promotion of the Subject Business or the Ancillary Business; (x) which contain non-competition, non-solicitation or no-hire provisions or exclusive grants of rights which could, after the Closing, restrict Buyer, Asiacom or any of their respective Affiliates from engaging in or competing with any line of business in any geographic area; (xi) which were entered into out of the ordinary course of business of the Subject Business or the Ancillary Business; or (xii) which are otherwise material to the Subject Business or Ancillary Business (collectively the "Material Contracts"). Seller has delivered to Buyer (x) true and correct copies of the written Contracts listed in Schedule 4.16 and (y) a written summary of the material terms of each oral Contract listed in Schedule 4.16. Each of the Material Contracts is valid, binding, and enforceable against Seller or Asiacom, as applicable, and, to the knowledge of Seller, the other parties thereto, in accordance with its terms and is in full force and effect, except as such enforcement may be limited by applicable statute of frauds laws or by bankruptcy, solvency, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity. Each of Seller and Asiacom has and, to the knowledge of Seller, each of the other parties to the Material Contracts have performed all material obligations required to be performed by them under, and are not in material default under, any of the Material Contracts and no event has occurred which, with notice or lapse of time, or both, would constitute such a default by Seller or Asiacom, or to the Seller's knowledge, the other parties thereto. Neither Seller nor Asiacom has received any written claim from any other party to any Material Contracts that Seller or Asiacom has breached any obligations to be performed by such party thereunder, or is otherwise in default or delinquent in performance thereunder. There are no agreements not to compete which adversely affect or restrict the conduct of the Subject Business or the Ancillary Business, or could reasonably be expected to adversely affect or restrict the conduct of the Subject Business or Ancillary Business by Buyer after the Closing.

4.17.  Intellectual Property.

(a)  Seller or Asiacom owns or has the right to use pursuant to ownership, license, sublicense, agreement or permission all Intellectual Property necessary for the operation of the Subject Business and the Ancillary Business as each are presently conducted and as each are presently proposed to be conducted up to the Closing. Seller has taken, and has caused Asiacom to take, reasonable actions to maintain and protect the rights in each item of Intellectual Property that Seller or Asiacom owns or uses with respect to the Subject Business or the Ancillary Business, and the confidentiality of each such item to the extent Seller or Asiacom owns such item and such item is confidential in nature.

31

(b)    To Seller's knowledge, none of the Subject Products, nor any actions taken by Seller or Asiacom in designing, developing, producing, advertising, promoting, selling or distributing the Subject Products or in operating the Subject Business or the Ancillary Business, has infringed upon, misappropriated, or otherwise violated any Intellectual Property rights of third parties.  To Seller's knowledge, neither Seller nor Asiacom has received any charge, complaint, claim, demand, or notice alleging any such infringement, misappropriation, or violation of any Person's Intellectual Property rights (including any claim that Seller or Asiacom must license or refrain from using any Intellectual Property rights of any third party with respect to the Subject Products, the Subject Business or the Ancillary Business).  To Seller's knowledge, no third party is infringing upon, misappropriating, or otherwise violating any Intellectual Property rights of Seller or Asiacom relating to the Subject Products, the Subject Business or the Ancillary Business.

(c)    Schedules 2.1(a)(ii)(A) and (B) identify each patent, registered copyright, tradedress, registered trademark or service mark, or other registration which has been issued to Seller or Asiacom with respect to any of its Intellectual Property pertaining to the Subject Products, the Subject Business and the Ancillary Business that is either being purchased by and transferred to, or is being licensed to, Buyer as part of the Purchased Assets or the Ancillary Assets. Each of Seller and Asiacom has delivered to Buyer correct and complete copies of all registrations for such trademarks, service marks, and applications (as amended to date) and has made available to the Buyer correct and complete copies of all other written documentation evidencing ownership and prosecution (if applicable) of each such item.  Schedule 2.1(a)(ii)(B) identifies the patent license and limited database access and copyright license being granted hereby by Seller to Buyer as the Licensed Intellectual Property.  With respect to each item of Transferred Intellectual Property and Licensed Intellectual Property:

(i)    Except as otherwise provided on Schedule 4.9, Seller or Asiacom possesses all right, title, and interest in and to the item, free and clear of any Encumbrance, license, other restriction, or viable claims of ownership by any Person;

(ii)    the item is not subject to any binding outstanding injunction, judgment, order, decree, or other ruling of any court or government entity of competent jurisdiction;

(iii)    no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand has been initiated (with notice to Seller or Asiacom) is pending or, to Seller's knowledge, is threatened which challenges the legality, validity, enforceability, use, or ownership of the item; and

(iv)    neither Seller nor Asiacom has any currently binding agreement to indemnify any Person for or against any infringement, misappropriation, or other violation with respect to the item, except for agreements entered into with suppliers or customers in the ordinary course of business.

(d)    There is no item of Intellectual Property that any third party owns and that Seller or Asiacom uses pursuant to license, sublicense, agreement, or permission (other than off-the-shelf software with a purchase or license price of less than $5,000).

(e)    To Seller's knowledge, neither Seller nor Asiacom will infringe upon, misappropriate, or otherwise violate any Intellectual Property rights of third parties as a result of the continued operation of its businesses as presently conducted and as presently proposed to be conducted up to Closing.

(f)    Each of Seller and Asiacom agrees to, and agrees to ensure that its employees and former employees, communicate to Buyer, its successors, legal representatives and assigns, any facts known to Seller or Asiacom respecting any Intellectual Property, and testify in any legal proceeding, sign all lawful papers, execute all divisional, continuing, reissue, reexamination and foreign applications, make all rightful oaths, and generally do everything possible to aid Buyer, its successors, legal representatives and assigns, to obtain and enforce proper protection for said Intellectual Property in all countries.

(g)    The Transferred Intellectual Property and the Licensed Intellectual Property are sufficient to permit Buyer to operate the Subject Business and the Ancillary Business.

(h)    The Children's Footwear License Agreement, dated September 14, 2000, by and between Osh Kosh B'Gosh, Inc. and Seller (the "Osh Kosh License"), including without limitation each license contained therein, is currently valid and binding and in full force and effect. No default or event of default exists (or has ever existed) under the Osh Kosh License. Up to the date hereof, each Renewal Minimum Sales Requirement (as defined therein) has been satisfied by the Seller.

4.18.    Related Party Transactions. Except as disclosed in Schedule 4.18, no Related Party (i) has any contractual or other claim, express or implied, or of any kind whatsoever relating to the Subject Business, the Ancillary Business, or any of the Purchased Assets or Ancillary Assets; (ii) has any interest in any of the Purchased Assets or the Ancillary Assets; or (iii) is engaged in any other transaction with the Seller with respect to the Subject Business or the Ancillary Business. As used herein, "Related Party" means Seller, Asiacom, any of their respective Affiliates, any officer or director of Seller or Asiacom or any such Affiliate, or any of their respective officers or directors, any relative (whether by blood, adoption or marriage) or any Affiliate of any the foregoing.

4.19.    Customers and Suppliers; Rebates.

(a)    Schedule 4.19(a) contains a list of the customers of Seller with respect to the Subject Business to whom Seller has had more than $100,000 in gross sales for the twelve (12)-month period ended August 31, 2006 (the "Major Customers"). Since August 1, 2005, neither Seller, Asiacom nor any of their respective Affiliates has received any notice or other indication from any Major Customer to the effect that such Major Customer will stop or materially reduce its purchases from or business with the Subject Business or the Ancillary Business.

(b)    Schedule 4.19(b) contains a list of the suppliers of Seller with respect to the Subject Business to whom Seller has purchased more than $100,000 in products or services for the twelve (12)-month period ended August 31, 2006 (the "Major Suppliers"). Since August

33

1, 2005, neither Seller, Asiacom nor any of their respective Affiliates has received any notice or other indication from any Major Customer to the effect that such Major Customer will stop or materially modify the volume or pricing of materials, products or services with respect to the Subject Business or the Ancillary Business.

(c)   To Seller's knowledge (based, without limitation, upon Seller's consultation with each relevant Seller sales representative to confirm that this representation is true, correct and complete in all respects), Schedule 4.19(c) contains a list of all Customer Charge-backs to which the Subject Business is obligated as of the Closing Date and which have not otherwise been satisfied prior to the Closing Date; including the name of the customer and the amount of any such Customer Charge-back.

(d)   To Seller's knowledge (based, without limitation, upon Seller's consultation with each relevant Seller sales representative to confirm that this representation is true, correct and complete in all respects), Schedule 4.19(d) contains a list of all rebates, credits, commitments or benefits to which the Subject Business is obligated as of the Closing Date and which have not otherwise been satisfied prior to the Closing Date; including the name of the customer and the amount of any such rebate, credit commitment or other benefit.

(e)   As of the date hereof, Dollar General Corporation has submitted worksheets and written purchase orders to Seller for Closing Date Products (for shipment before March 2007) with the Subject Business which will generate Gross Sales of $1,961,000 and a gross margin of 22% (such gross margin to be calculated using a method consistent with Seller's past practices for measuring its own gross margins in its financial statements), and Wal-Mart Stores, Inc. has submitted written purchase orders to Seller for Closing Date Products (for shipment before March 2007) with the Subject Business which will generate Gross Sales of $2,800,000 and a gross margin of 13.2% (such gross margin to be calculated using a method consistent with Seller's past practices for measuring its own gross margins in its financial statements). These orders are included in their entirety as part of the Purchased Assets.

4.20.   Inventory.  Schedule 4.20 contains a complete and accurate list of all Transferred Inventory of the Subject Business separately listing inventory by season. All inventory included within the Purchased Assets is carried on Seller's books and records at not in excess of the lower of market price or standard cost determined in accordance with the Accounting Principles. Seller has provided for adequate reserves in accordance with the Accounting Principles with respect to slow moving and obsolete inventory. The Transferred Inventory is of good and merchantable quality, saleable in the ordinary course of business.

4.21.   Accounts Payable.  Schedule 4.21 contains a complete and accurate list of all trade accounts payable relating to the Subject Business and the Ancillary Business, and a complete and accurate list of all liabilities or obligations relating to the Subject Business and the Ancillary Business arising from, or related to, Customer Charge-backs payable or owing by Seller or Asiacom as of the Closing.

4.22.   Environmental Matters.  Except as described in Schedule 4.22: (a) neither the Seller, AsiaCom nor (to the Seller's knowledge) any other party is in violation of, or is liable for any violation under, any Environmental Law applicable to any of them in respect of the Subject

Business or the Ancillary Business; (b) none of the properties currently or formerly owned, leased or operated by the Seller or Asiacom (or, to the Seller's knowledge, any Affiliate or agent acting on such party's behalf) in respect of the Subject Business or the Ancillary Business (including, without limitation, soils and surfaces and ground waters) are contaminated with any Hazardous Substance; (c) neither the Seller, Asiacom nor (to the Seller's knowledge) any other party is liable for any off-site contamination by Hazardous Substances in relation to the Subject Business or the Ancillary Business; (d) all permits, licenses and other authorizations required under any Environmental Law ("Environmental Permits") in relation to the Subject Business or the Ancillary Business have been included as part of the Purchased Assets or the Ancillary Assets, and the Seller and Asiacom (and, to the Seller's knowledge, any Affiliate or agent acting on such party's behalf) are each in compliance in all material respects with all Environmental Permits; and (e) neither the execution of this Agreement nor the consummation of the transactions contemplated herein will require any investigation, remediation or other action with respect to Hazardous Substances, or any notice to or consent of Governmental Entities or third parties, pursuant to any applicable Environmental Law or Environmental Permit relating to the Subject Business or the Ancillary Business. None of the Seller, Asiacom nor (to the Seller's knowledge) any other party has received notice of a violation of, or any liability under, any Environmental Law (whether with respect to properties presently or previously owned or used) in relation to the Subject Business or the Ancillary Business. The Seller has made available to Buyer all environmental audits, reports and other material environmental documents relating to its properties, facilities or operations in respect of the Subject Business and the Ancillary Business which are in its or Asiacom's possession or control. "Environmental Laws" means any common law or foreign, federal, state or local law, statute, rule, regulation, ordinance, code , judgment or order relating to the protection of, or imposes liability with respect to, the environment or human health and safety and includes, but is not limited to, the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") (42 U.S.C. §§ 9601, et seq.), the Clean Water Act (33 U.S.C. §§ 1251 et seq.), the Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.), the Toxic Substances Control Act (15 U.S.C. §§ 2601 et seq.), the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.) and the Oil Pollution Act of 1990 (33 U.S.C. §§ 2701 et seq.), each as has been or may be amended and the regulations promulgated pursuant thereto. "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes with respect to which liability or standards of conduct are imposed under any Environmental Laws, including, without limitation, petroleum and petroleum-related substances, products, by-products and wastes, asbestos, urea formaldehyde and lead-based paint, noise and odors.

## ARTICLE V.

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller as follows:

5.1.    Organization of Buyer. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Ohio with full corporate power and authority and possesses all governmental franchises, licenses, permits, authorizations and approvals necessary to enable it to own, lease or otherwise hold its properties and assets and to carry on its business as presently conducted.

35

5.2.    Authority; Execution and Delivery; Enforceability.    Buyer has full corporate power and authority to execute this Agreement and the Ancillary Agreements to which it is a party and to consummate the Acquisition and the other transactions contemplated hereby and thereby. Buyer has taken all corporate action required by its Articles of Incorporation and bylaws, in each case, as amended to date, to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and to authorize the consummation of the Acquisition and the other transactions contemplated hereby and thereby. Buyer has duly executed and delivered this Agreement and prior to the Closing will have duly executed and delivered each Ancillary Agreement to which it is a party, and this Agreement constitutes, and each Ancillary Agreement to which it is a party will after the Closing constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization or similar laws affecting creditors' right generally and to general equitable principles (whether considered in an action at law or in equity).

5.3.    No Conflict or Violations, No Consents or Approvals Required.    No Consent of, or registration, declaration or filing with, or notification of any Governmental Entity is required to be obtained or made by or with respect to Buyer in connection with the execution, delivery and performance of this Agreement, the Ancillary Agreements to which it is a party or the consummation of the Acquisition, other than those that may be required solely by reason of Seller's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated hereby and by the Ancillary Agreements. Except as may result from facts or circumstances relating to Seller, the execution and delivery by Buyer of this Agreement do not, and each Ancillary Agreement to which it is a party will not, and the consummation of the transactions contemplated by this Agreement and such Ancillary Agreements will not conflict with, or result in any breach of or constitute a default under, result in the creation of any Lien upon any of the properties or assets of Buyer under, or require consent under any provision of (x) Buyer's Articles of Incorporation and Code of Regulations, in each case, as amended to date; (y) any Contract to which Buyer is a party or by which any of its properties or assets is bound; or (z) any judgment, order or decree, or statute, law, ordinance, rule or regulation applicable to Buyer or any of its properties or assets, other than, in the case of clauses (x), (y) and (z) above, any such items that would not have a material adverse effect on the ability of Buyer to consummate the Acquisition (a "Buyer Material Adverse Effect").

5.4.    Records of Buyer.    The copies of Buyer's Articles of Incorporation and Code of Regulations, in each case, as amended to date, and all resolutions adopted by Buyer's board of directors relating to the Acquisition, all of which have been delivered to Seller, are true, correct and complete.

5.5.    Proceedings.    There is not any (i) outstanding judgment, order or decree against Buyer or any of its Affiliates; (ii) suit, action or proceeding pending, or to the knowledge of Buyer, threatened against Buyer or any of its Affiliates; or (iii) investigations by any Governmental Entity that are pending or threatened against Buyer or any of its Affiliates that, in any such case, would have a Buyer Material Adverse Effect.

5.6.    No Brokers.    No broker, finder, agent or similar intermediary has acted for or on behalf of Buyer or any of its Affiliates in connection with this Agreement or the Acquisition, and

no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or commission in connection therewith based on any agreement, arrangement or understanding with Buyer or any of its Affiliates, or any action taken by Buyer.

5.7.    Disclaimer.

(a)    Buyer is purchasing and acquiring the Purchased Assets, except to the extent expressly provided otherwise in this Agreement or in any document or certificate delivered pursuant hereto, on an **"AS-IS," WHERE-IS"** and **"WITH ALL FAULTS" BASIS.** Other than the representations and warranties of Seller specifically contained in this Agreement or in any document or certificate delivered pursuant hereto, none of Seller, any of its Affiliates or any other Person has made any representation or warranty (including, without limitation, as to merchantability, suitability or fitness for a particular purpose, or quality as to the Purchased Assets or as to the condition or workmanship thereof, or the absence of any defects therein, whether latent or patent) either expressed or implied (i) with respect to the Subject Business, Ancillary Business, Purchased Assets, Ancillary Assets, Assumed Liabilities or transactions contemplated hereby or (ii) as to the accuracy or completeness of any information regarding the Subject Business, Ancillary Business, Purchased Assets, Ancillary Assets Assumed Liabilities or transactions contemplated hereby furnished or made available to Buyer and its representatives. Without limiting the generality of the foregoing, other than the representations and warranties of Seller specifically contained in this Agreement or in any document or certificate delivered pursuant hereto, none of Seller, any of its Affiliates or any other Person has made any representation or warranty relating to the maintenance, repair, condition, design, performance or marketability of any Purchased Asset or Ancillary Asset, including merchantability or fitness for a particular purpose. Other than the representations and warranties of Seller specifically contained in this Agreement or in any document or certificate delivered pursuant hereto, none of Seller or any of its Affiliates, agents, employees or representatives has made any representations or statements, whether written or oral, to Buyer concerning the investment potential, operation or resale of the Subject Business or the Ancillary Business at any future date, at a profit or otherwise, and, other than the representations and warranties of Seller specifically contained in this Agreement or in any document or certificate delivered pursuant hereto none of Seller or any of its Affiliates, agents, employees or representatives has rendered any advice or expressed any opinion to Buyer regarding any Tax consequences of ownership of the Purchased Assets or the Ancillary Assets.

(b)    Except in the case of fraud, gross negligence or willful misconduct, Buyer shall have no claim or right to indemnification pursuant to Article XI and none of Seller, any of its Affiliates or any of their respective officers, directors, employees or agents shall have or be subject to any liability to Buyer or any other Person with respect to any information, documents or materials furnished by Seller, any of its Affiliates or any of their respective officers, directors, employees, agents or advisors to Buyer, including the Confidential Memorandum dated June 22, 2005 prepared by Carl Marks Capital Advisors LLC and any information, documents or material made available to Buyer and its representatives in certain "data rooms," "virtual data rooms," management presentations or any other form in expectation of the transactions contemplated hereby, other than any information, documents or materials contained in this Agreement, the Schedules or in any exhibit or agreement delivered in connection therewith.

(c)    Notwithstanding the foregoing, nothing contained in this Section 5.7 shall apply in the case of fraud, gross negligence or intentional or knowing misconduct by Seller or any of its Affiliates.

### ARTICLE VI.

### COVENANTS

6.1.    Cooperation by Seller.

(a)    From and after the date hereof until the Closing and the Asiacom Closing have both occurred, Seller will use its best efforts, and will fully cooperate with Buyer in all respects, to secure all necessary consents, approvals, authorizations, exemptions and waivers from third parties (including, without limitation, all necessary consents, approvals, authorizations, exemptions and waivers from third parties relating to the Transfer Notice or other otherwise consummation the Asiacom Closing), as shall be required in order to enable Seller to effect the transactions contemplated hereby, and will otherwise use its best efforts to cause the consummation of such transactions, in accordance with the terms and conditions hereof.

(b)    From and after the date hereof until the conclusion of the Refinancing, Seller will use its commercially reasonable best efforts, and will fully cooperate with Buyer in all respects, in connection with arranging, and negotiating agreements with respect to, the Refinancing (as defined below), including without limitation (i) by making available to any potential financing sources (including their agents and other representatives) the personnel, documents and information of Seller and the Subject Business, and of Asiacom and the Ancillary Business, as may be requested by any such financing sources, (ii) if applicable, by cooperating with any potential financing sources in achieving a timely offering and/or syndication of the funding for such debt financing satisfactory to Buyer and such financing sources, (iii) by using its commercially reasonable best efforts to cause Seller's independent accountants to provide any reports, documents, consents and comfort letters requested in connection with the Refinancing and (iv) by making available its attorneys, accountants, and other advisors and representatives at reasonable times and locations upon reasonable notice by Buyer.

6.2.    Conduct of the Subject Business Pending Closing and of Asiacom Pending the Asiacom Closing. From and after the date hereof until the Closing in the case of the Subject Business, and until the Asiacom Closing in the case of the Ancillary Business, except as set forth in the Schedules attached hereto or unless Buyer shall otherwise consent in writing, Seller shall (and, where applicable, shall also cause Asiacom to): (a) carry on the Subject Business and the Ancillary Business in the ordinary and normal course in substantially the same manner in which each such business previously has been conducted, and use best efforts to preserve intact such businesses' present business organizations, to keep available in all respects the services of their present officers and employees, and to preserve for their businesses the goodwill of the customers, suppliers, employees and others having business relations with them; (b) not adopt a plan of liquidation or dissolution with respect to the Subject Business or the Ancillary Business, and not merge or consolidate the Subject Business or the Ancillary Business with any other Person, or sell any portion of the assets of the Subject Business or of the Ancillary Business other than the sale of inventory in the ordinary course; (c) not take any action or omit to take any

actions which action or omission would result in a breach or inaccuracy of any of the representations and warranties contained herein by Seller in any respect at, or as of any time prior to, the Closing; (d) maintain its and Asiacom's books of account and records in each such entity's usual, regular and ordinary manner, consistent with its past practice; (e) not take any action or omit to take any action which will (or which would be reasonably likely to) result in a violation of any applicable law or cause a material breach of any agreements, contracts or commitments relating either to the Subject Business or the Ancillary Business; (f) not make any changes to any insurance policy relating to the Subject Business or the Ancillary without the prior written consent of the Buyer; (g) not enter into, amend or terminate any Material Contract, or any other contract, agreement or understanding material to the Subject Business, the Ancillary Business, the Purchased Assets the Ancillary Asset or the Assumed Liabilities; (h) (a) not increase or otherwise materially change the compensation (including, without limitation, bonus) or benefits of any director, officer or employee of Seller or Asiacom, and (b) not grant any severance or termination pay or enter into or amend any employment, consulting or severance agreement or arrangement with any present or former director, officer or employee; (i) not subject any of the Purchased Assets or the Ancillary Assets to any Lien (other than Permitted Liens); (j) not change or modify any existing accounting principles, policies or methods, inventory management or credit, collection or payment policies, procedures and practices with respect to accounts receivable or accounts payable; (k) not make or commit to make any capital expenditures in connection with the Subject Business or the Ancillary Business other than capital expenditures disclosed on Schedule 6.2(k); (l) not license, transfer, dispose of or permit to lapse any rights relating to material Intellectual Property, or dispose of or disclose (except as necessary in the conduct of business in the ordinary course) to any Person, other than representatives of Buyer, any trade secret, formula, process or know-how not a matter of public knowledge prior to such disclosure; (m) not agree or commit to do any of the foregoing referred to in clauses (a)-(l), and (n) immediately advise Buyer of any fact, condition, occurrence or change known to the Seller that would (or would be reasonably likely to) cause a breach of this Section 6.2 or would (or would be reasonably likely to) have a Business Material Adverse Effect.

    6.3.    Access. From and after the date hereof until the Closing in respect of the Seller and the Subject Business, and until the Asiacom Closing in the case of Asiacom and the Ancillary Business, Seller shall, and shall cause Asiacom to, provide Buyer with such information as Buyer, as well as any lender providing financing or refinancing in connection with the transactions contemplated hereby and their authorized representatives (including, without limitation, employees, accountants, legal counsel, agents, environmental or other consultants, and other representatives) (the "Accessing Parties"), from time to time may reasonably request with respect to the Subject Business and the Ancillary Business, and shall provide (and shall cause Asiacom to provide) the Accessing Parties full access (during regular business hours and upon advance notice) to their respective properties, books and records, officers, employees, accountants, advisors and other representatives as Buyer from time to time may request, so that Buyer may have full opportunity to make such investigation as it shall desire to make of the management, business, properties and affairs relating to the Subject Business and the Ancillary Business.

    6.4.    Fulfillment of Agreements. Seller shall use, and shall cause Asiacom to use, its best efforts to cause all of the conditions to the obligations of Buyer under Article VII (other than Section 7.15) of this Agreement to be satisfied on or prior to the Closing in the case of the

39

Subject Business, and to cause all of the conditions of the obligations of Buyer under Section 7.15 of this Agreement to be satisfied as set forth in Section 7.15. Seller shall promptly notify Buyer of any change, event or fact coming to Seller's or Asiacom's attention prior to Closing in the case of the Subject Business, and prior to the Asiacom Closing in the case of the Ancillary Business, which (i) causes any of its representations, warranties, covenants or agreements contained under this Agreement (whether or not they are qualified by materiality limitations) to be inaccurate or incomplete in any respect or (ii) adversely impacts its ability to satisfy in any respect the conditions to the consummation of the transactions contemplated hereby. Seller shall, and shall cause Asiacom to, use its best efforts to cure before the Closing in respect of any event, transaction or circumstance occurring after the date of this Agreement that causes, will cause or could reasonably be expected to cause any such covenant or agreement under this Agreement to be breached or that renders, will render or could reasonably be expected to render inaccurate any such representation or warranty contained in this Agreement. No notice given pursuant to this Section 6.4 shall have any effect on (i) the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining the satisfaction of any condition contained herein or (ii) any right to indemnification hereunder.

6.5.    Insurance. Seller shall, and shall cause Asiacom to, maintain in full force and effect the policies of insurance listed on Schedule 2.2(iv), subject only to variations required by the ordinary operations of the Subject Business or the Ancillary Business, or else will obtain, prior to the lapse of any such policy, the same or, if not available upon commercially reasonable economic terms and conditions, substantially similar coverage with insurers of recognized standing and approved in writing in advance by Buyer. Seller shall, and shall cause Asiacom to, immediately advise Buyer in advance in writing of any change of insurer or type of coverage in respect of the policies listed on Schedule 2.2(iv).

6.6.    Exclusivity. Neither Seller, Asiacom, nor any of their respective officers, directors, employees, affiliates, agents or representatives will, directly or indirectly, encourage, initiate or solicit offers for, continue any previously or currently existing discussion with, furnish information regarding or engage in any negotiations, meetings or other communications with any third party concerning, or enter into any agreements with respect to, any acquisition of the Subject Business, the Ancillary Business or all or any significant portion of the assets relating thereto, by any party other than Buyer, and in the event that during such period any offers are received, Seller will immediately communicate to Buyer their existence and terms, and the identity of the party making such offer.

6.7.    Confidentiality. Buyer acknowledges and confirms that the information provided to it in connection with the Acquisition and other transactions contemplated by this Agreement is subject to (and shall be deemed confidential information pursuant to) the terms and conditions of the Confidentiality Agreement, the terms and conditions of which are incorporated herein by reference. Effective upon, and only upon, the Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Subject Business, and effective upon, and only upon, the Asiacom Closing, the Confidentiality Agreement shall terminate with respect to information relating solely to the Ancillary Business; provided, however, that Buyer further acknowledges and confirms that any and all other information provided to it by Seller or any of Seller's Affiliates or representatives concerning Seller and its Affiliates which does not relate to the Subject Business, the Ancillary Business, the Purchased Assets, the Ancillary Assets or the

40

Assumed Liabilities shall remain subject to (and shall be deemed confidential information pursuant to) the terms and conditions of the Confidentiality Agreement after the Closing Date in respect of the Subject Business, and after the Asiacom Closing in the case of the Ancillary Assets.

6.8.    Commercially Reasonable Efforts.  On the terms and subject to the conditions of this Agreement, Seller and Buyer shall use their commercially reasonable efforts to cause the Closing and the Asiacom Closing to occur, including (i) taking all reasonable actions necessary to comply promptly with all legal requirements that may be imposed on it or any of its Affiliates (including, without limitation, Asiacom) with respect to the Closing and the Asiacom Closing and (ii) if any governmental entity having jurisdiction over any party issues or otherwise promulgates any injunction, decree or similar order prior to the Closing with respect to the Subject Business, or prior to the Asiacom Closing with respect to the Ancillary Business, that prohibits the consummation of the transactions contemplated hereby, using all reasonable efforts to have such injunction dissolved or otherwise eliminated as promptly as possible and, prior to or after the Closing with respect to the Subject Business, and prior to or after the Asiacom Closing with respect to the Ancillary Business, to pursue the underlying litigation diligently and in good faith.

6.9.    Employment Matters.

(a)    Prior to the Closing Date, but conditioned on Closing, Buyer shall extend full-time offers of employment to those employees of Seller or its Affiliates set forth on Schedule 6.9 (such employees are hereinafter referred to as the "Eligible Employees").  Such employment offers shall be on terms and conditions substantially similar to those made available by Buyer to its similarly situated employees.  Eligible Employees who accept such offers of employment shall be considered "Transferred Employees."

(b)    Seller or its Affiliates shall terminate the employment of all Transferred Employees immediately prior to the Closing.  Except as provided in Section 2.4 and this Section 6.9, following the Closing, Seller shall have no further liability with respect to any Transferred Employee.  Seller and its Affiliates shall retain all liabilities with respect to the Eligible Employees arising out of, or incurred in connection with, their employment or the termination of their employment by Seller, including, without limitation, (i) honoring all vacation, personal and sick days earned or accrued prior to the Closing Date and (ii) providing health care continuation coverage, as required by Section 601 of ERISA and Section 4980B of the Code ("COBRA"), or any similar applicable provision of state law, with respect to any Eligible Employee, or any dependent or beneficiary thereof, who has a COBRA qualifying event on or before the Closing Date.

(c)    On and after the Closing Date, Buyer shall give the Transferred Employees full credit for purposes of eligibility to participate, early retirement eligibility and vesting under any employee benefit plans or arrangements maintained by Buyer or its Affiliates for the Transferred Employees' service with Seller and its Affiliates to the same extent recognized by Seller and its Affiliates immediately prior to the Closing Date.

(d)    From and after the Closing Date, all Transferred Employees shall be eligible to participate in the Buyer Plans on the same basis as similarly situated employees of Buyer and its Affiliates. In furtherance of the foregoing Buyer shall, and shall cause its Affiliates to, (i) comply with regulations of the Health Insurance Portability and Accountability Act of 1996, as amended, with respect to any preexisting condition, waiting periods and actively at work requirements under the Buyer Plans and (ii) cause the Buyer Plans to honor any expenses incurred by the Transferred Employees and their beneficiaries under the Seller Plans during the portion of the 2006 calendar year preceding the Closing Date for purposes of satisfying applicable deductible, co-insurance and maximum out-of-pocket expenses.

(e)    Buyer shall pay and be liable for any obligation or liability that may arise from the termination of employment of any Transferred Employee by Buyer or its Affiliates on or after the Closing Date. Seller and Buyer intend that the transactions contemplated by this Agreement shall not constitute a severance of employment of any Transferred Employee prior to or upon the consummation of the transactions contemplated hereby, and that such employees will have continuous and uninterrupted employment immediately before and immediately after the Closing.

(f)    Following the date of this Agreement, Seller and Buyer shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by this Section 6.9, including exchanging information and data relating to workers compensation, employee benefits and employee benefit plan coverages, and in obtaining any governmental approvals required hereunder.

(g)    Buyer and Seller shall follow the alternative procedure for employment tax withholding as provided in Rev. Proc. 2004-53, 2004-34 IRB 320. Accordingly, Seller shall have no employment tax reporting responsibilities, and Buyer shall have full employment tax reporting responsibilities, for Transferred Employees following the close of business on the Closing Date.

(h)    Buyer agrees that the Asiacom Employees shall be offered employment with Buyer effective the Closing Date on terms and subject to conditions no less favorable than those previously enjoyed by such Asiacom Employees when they were employed by Asiacom.

(i)    Prior to the Closing Date (or before such notification date as may be required under any contract of employment), Seller shall cause Asiacom to inform all of the Asiacom Employees in writing of the sale of the Ancillary Business and will issue letters in the form of Exhibit H hereto with respect to all Asiacom Employees giving each such person notice of termination of such person's employment with Asiacom, and including an offer by Buyer (to be provided to Seller) of employment of such Asiacom Employee on terms and subject to conditions no less favorable than such person previously enjoyed when employed by Asiacom.

(j)    Seller shall cause Asiacom to use its best efforts to persuade each Asiacom Employee to accept Buyer's offer of employment.

(k)    Without the prior written consent of Buyer, Seller shall cause Asiacom not to terminate the employment, or to make any variation in the terms of employment, of any of the

Asiacom Employees (whether immediate, conditional or prospective) at any time prior to the Asiacom Closing.

(l)    If so requested by an Asiacom Employee, Seller shall cause Asiacom to use its best efforts to transfer as promptly as is practicable all of the benefits in the MPF Plan accrued for the benefit of such Asiacom Employee to the MPF Plan established or maintained (or to be established or maintained) by Buyer, for the benefit of such Asiacom Employee.

6.10.   IPO. If Parent, Buyer or any Affiliate of either of them proceeds with an initial public offering of any class of either such entity's capital stock (an "IPO") between the date hereof and the date five (5) years after the date hereof, including without limitation filing a S-1 (as defined herein) in respect thereof, then Seller shall use its best efforts to provide any cooperation requested of it by either Parent or Buyer in order for Parent or Buyer, as the case may be, to effectuate the IPO (or any stage thereof, such as (x) responding to any questions, comments or requests for information by the Securities and Exchange Commission (the "SEC") or (y) obtaining a SEC waiver with respect to inclusion of historical or pro forma financial information relating to the Subject Business in connection with Regulation S-X, the preparation of a S-1 (as defined herein) or otherwise), including without limitation (i) making available to Parent or Buyer (including their agents and other representatives) any personnel, documents and/or information as may be requested, (ii) by using its best efforts to cause Seller's independent accountants to provide any reports, documents, consents or comfort letters requested in connection with the IPO or the Audit Documents and (iii) by making available its attorneys, accountants, and other advisors and representatives at reasonable times and locations upon reasonable notice by Parent or Buyer.

6.11.   Domain Name. Within five (5) days after the Closing Date, Seller shall legally transfer the domain name www.esnyfootwear.com to Buyer.

6.12.   Customer Notification. Within thirty (30) days after the Closing in the case of the Subject Business and after the Asiacom Closing in the case of the Ancillary Business, Seller shall provide written notification to all of the customers of the Subject Business and the Ancillary Business, respectively, that the Acquisition has occurred, which written notification shall include contact information for Buyer.

6.13.   Transfer Notice.

(a)    Prior to the Closing, Seller shall cause Asiacom to execute, and Buyer shall execute, a Transfer Notice in the form of Exhibit I attached hereto. Seller shall cause Asiacom to arrange for the publication of the Transfer Notice in the Hong Kong Government Gazette, two (2) Chinese-language newspapers circulating in Hong Kong and one (1) English language newspaper circulating in Hong Kong, each in accordance with the Transfer Ordinance, on the first available publication date after the execution of this Agreement and the Transfer Notice (within the meaning of Section 4 of the Transfer Ordinance). The costs of the preparation, execution and publication of the Transfer Notice shall be borne equally by Seller and Buyer.

43

(b)     Seller shall cause Asiacom to promptly notify Buyer in writing if any proceeding or claim has been made or instituted against Asiacom, Seller and/or Buyer by any party under the provisions of the Transfer Ordinance (a "Proceeding") prior to the date on which the Transfer Notice shall have become completed (within the meaning of Section 4 of the Transfer Ordinance). If any Proceeding has been instituted prior to the Transfer Notice being deemed to become complete, then the Transfer Notice shall not be deemed to be complete until, in addition to the satisfaction of all other requirements under the Transfer Ordinance, and Seller shall use, and shall cause Asiacom to use, its best efforts to ensure that (a) any such Proceeding has been settled or otherwise discharged by Seller and/or Asiacom; (b) each claimant in any Proceeding has released Buyer, which release shall be in form and substance reasonably satisfactory to Buyer, from every claim by such claimant in any such Proceeding; and (c) Asiacom has released Buyer, which release shall be in form and substance reasonably satisfactory to Buyer, from every claim in connection with any such Proceeding. If a Proceeding has been made or instituted, Seller shall cause Asiacom to assist Buyer to take, including in the name of Asiacom, (x) any such action as Buyer deems appropriate in its sole discretion to avoid, resist, dispute, defend, compromise or appeal any Proceeding, (y) to provide Buyer with all documents and information requested by Buyer for such purposes and (z) to provide Buyer with any other assistance Buyer shall request of Asiacom. Unless Buyer has already consented to such action in writing, Seller shall cause Asiacom not to admit, settle or discharge any Proceeding.

6.14.   Osh Kosh License.   Seller shall use its commercially reasonable best efforts to provide Buyer with a valid and enforceable sublicense under the Osh Kosh License from the Closing Date until the expiration date of the Osh Kosh License; provided, however, that for any period(s) of time between the Closing Date and the expiration date of the Osh Kosh License during which Seller is unable to provide Buyer with such a sublicense despite using its commercially reasonable best efforts to do so, Buyer shall be designated by Seller as a "Source" (as defined in the Osh Kosh License).

6.15.   Expat Taxes.   Upon any notice from any Governmental Entity or Taxing Authority in the People's Republic of China, or in the event that Buyer reasonably believes that any Governmental Entity or Taxing Authority in the People's Republic of China will send a notice to, or will otherwise assess, Buyer, Seller or any of the Expats (as defined in Section 7.15) or any of their respective Affiliates relating to an Expat Tax Issue, then Seller agrees to pay to Buyer the amount of any Tax Deficiency within 30 days of the receipt of notice from Buyer of the Expat Tax Issue. As used herein, "Expat Tax Issue" means any issue, event or circumstance with respect to any liability or obligation relating to Taxes owing to any Governmental Entity or Taxing Authority in the People's Republic of China by any of Buyer, any of the Expats or any of their respective Affiliates arising out of or relating to any period prior to Closing; and "Tax Deficiency" means all Taxes that may become the responsibility and obligation of either Buyer, any of the Expats or any of their respective Affiliates arising out of or relating to any period prior to Closing and are payable to a Governmental Entity or Taxing Authority in the People's Republic of China.

6.16.   Purchase Orders.   Buyer and Seller hereby acknowledge and agree that, for a period from the Closing until the date that is twenty-one (21) days after the later of (a) the Closing Date or (b) the date upon which all of the purchase orders on the Purchase Orders List

44

attached to Schedule 2(a)(vi) (the "Listed Purchase Orders") and all of the purchase orders anticipated by Buyer to have appeared on the Purchase Orders List attached to Schedule 2(a)(vi) at the Closing but not listed thereon (the "Non-Listed Purchase Orders" and, together with the Listed Purchase Orders, the "Purchase Orders") have been provided to Buyer in a form satisfactory to Buyer, Buyer shall have the right to review the Purchase Orders and may, at its sole election and in its sole discretion, select all or any portion of the Purchase Orders to be deemed (retroactively to the Closing Date) a Purchased Asset and an Assumed Liability under this Agreement. For the avoidance of doubt, each Purchase Order not selected by Buyer to be deemed a Purchased Asset and an Assumed Liability pursuant to the preceding sentence shall remain both an Excluded Asset and an Excluded Liability. Seller hereby agrees that it shall promptly deliver to Buyer all of the Non-Listed Purchase Orders, together with (i) all background or supporting documents or other information requested by Buyer relating to the Purchase Orders and (ii) access to Seller personnel upon reasonable advance notice, in the case of both (i) and (ii) for the purpose of facilitating Buyer's selection of those Purchase Orders (if any) to be deemed Purchased Assets and Assumed Liabilities.

## ARTICLE VII.

### CONDITIONS TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction (or waiver) on or prior to the Closing Date of all of the following conditions except for the conditions contained in Section 7.15 hereof. With respect to Section 7.15, the obligation of Buyer to pay the Asiacom Closing Cash Payment shall be subject to the satisfaction (or waiver) within forty-five (45) days after the Closing Date of all of the conditions set forth therein:

7.1.    Representations and Warranties True and Correct. All of the representations and warranties of Seller contained in this Agreement, in any Ancillary Agreement or in any written certificate delivered pursuant to this Agreement, shall be true and correct on the date of this Agreement, such Ancillary Agreement or such certificate, as the case may be, and shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date (except for representations and warranties that expressly relate to a date earlier than the Closing Date, which shall continue to be true and correct as of the specified date and except for representations and warranties that contain materiality qualifications, which shall be true and correct in all respects).

7.2.    Covenants and Agreements Performed. Seller shall have (or, to the extent applicable, shall have caused Asiacom to have) performed or complied with in all material respects, or delivered, all covenants, agreements, conditions or documents required by this Agreement to be performed, complied with, or delivered by Seller or Asiacom prior to or on the Closing Date.

7.3.    Seller's Closing Certificate. Buyer shall have been furnished with a certificate executed by Seller, dated the Closing Date, certifying that the conditions set forth in Sections 7.1 and 7.2 of this Agreement have been fulfilled, and that no event or circumstance as described in Section 7.8 has occurred.

7.4.    No Prohibition or Proceedings.    No statute, rule or regulation, or order or injunction of any court or administrative agency shall be in effect, and no action or proceeding shall be pending or threatened, that prohibits Buyer from consummating the transactions contemplated hereby or the ability of the Subject Business or the Ancillary Business to be conducted in the same or a substantially similar manner that each such business was being conducted prior to the Closing.

7.5.    Consents.    All consents, approvals, authorizations, exemptions, and waivers from governmental agencies, if any, that shall be required in order to consummate the transactions contemplated hereby, shall have been obtained. Seller shall have received the consents from third parties, if any, set forth on Schedule 4.4 in forms reasonably acceptable to Buyer and such other consents as are necessary to enable the Subject Business to be conducted after Closing in all material respects as each such business was conducted prior to the Closing, and the Ancillary Business to be conducted after the Asiacom Closing in all material respects as such business was conducted prior to the Asiacom Closing (all such consents of which are listed on Schedule 4.4).

7.6.    Opinion.    Buyer shall have received an opinion of Herrick, Feinstein LLP, dated as of the Closing Date, in a form reasonably satisfactory to Buyer

7.7.    Escrow Agreements.    The General Escrow Agreement and the Audit Escrow Agreement shall have been duly executed and delivered by all parties thereto.

7.8.    Business Material Adverse Effect.    Between the date hereof and the Closing Date, no event or circumstance shall have occurred that has had, will have, or is reasonably likely to have a Business Material Adverse Effect.

7.9.    Refinancing.    Buyer and/or totes Isotoner Holdings Corp. ("Parent") shall have received the proceeds of the debt financing necessary for funding the Acquisition, for the repayment of senior debt, for the redemption of all of the shares of Series A 13% Cumulative Compounding Preferred Stock (the "Preferred Stock") (including accrued dividends) of the Parent and the cash-out of all of its Preferred Stock options, and for working capital financing needs and other general corporate business purposes, on terms and conditions and in amounts satisfactory to Buyer in its sole discretion (the "Refinancing").

7.10.    Execution and Delivery of Other Agreements.    At the Closing, Seller shall have delivered to Buyer all other items required by Section 3.2(a) of this Agreement.

7.11.    Due Diligence, Schedules.    At the Closing, Buyer shall have provided notice to Seller that it is satisfied (in its sole discretion) with the results of Buyer's remaining business and legal due diligence to be conducted between the date hereof and the Closing Date.

7.12.    Dechert Due Diligence Request List.    At the Closing, Buyer shall have duly executed and delivered the Seller Certification (the "Seller Certification") to be attached to the Dechert Due Diligence Request List, the form of each of which are attached hereto as Exhibit E.

7.13.    Domain Name.    Within five (5) days after the Closing Date, Seller shall have legally transferred the domain name www.csnyfootwear.com to Buyer.

46

7.14.   [INTENTIONALLY OMITTED]

7.15.   <u>Conditions Precedent to Buyer's Obligation to Pay the Asiacom Closing Cash Payment</u>. Notwithstanding anything to the contrary set forth in this Agreement, Buyer shall not be obligated to pay all or any portion of the Asiacom Closing Cash Payment to Seller unless (a) Buyer shall have received executed letters, each in the form of <u>Exhibit H</u> attached hereto, on or prior to the Closing from all of the Asiacom Employees located in Hong Kong, and none of such Asiacom Employees shall have terminated their employment with Buyer within forty-five (45) days after the Closing Date (or, if one (1) employee has terminated its employment with Buyer within such forty-five (45) day period, Seller shall have identified a suitable replacement employee reasonably acceptable to Buyer within such forty-five (45) day period and shall have paid all employee severance payments, if any, owing with respect to such employee); (b) Randall Flores, John Oliphant and Michael Kuykendall (collectively, the "<u>Expats</u>") shall have each executed employment agreements with Buyer in form and substance reasonably satisfactory to Buyer within ten (10) days after the Closing Date, and each such employment agreement shall have remained in full force and effect and shall not have been terminated or rescinded by any such employee (nor shall any such employee have provided Buyer, Seller or Asiacom with notice of termination of, or of such employee's intent either to terminate or not to commence, employment with Buyer) within forty-five (45) days after the Closing Date; (c) the Transfer Notice shall have become completed (within the meaning of Section 4 of the Transfer Ordinance), and Buyer shall have received legal ownership of the Ancillary Assets concurrently therewith, within forty-five (45) days after the Closing Date; and (d) one-half or more of the Asiacom Employees (other than the Expats and the Asiacom Employees located in Hong Kong) shall have accepted employment with Buyer on the same terms and conditions as they enjoyed while employed by Asiacom, and shall not have terminated their employment with Buyer within forty-five (45) days after the Closing Date; provided, however, that with respect to (a) above, if two (2) employees have terminated their employment with Buyer within such forty-five (45) day period, and if Seller shall have identified two (2) suitable replacement employees reasonably acceptable to Buyer within such forty-five (45) day period and shall have paid all employee severance payments, if any, owing with respect to such employees, then Seller shall be entitled to receive fifty percent (50%) of the Asiacom Closing Cash Payment from Buyer.

### ARTICLE VIII.

### CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction (or waiver) on or prior to the Closing Date of all of the following conditions:

8.1.   <u>Representations and Warranties True and Correct</u>. All of the representations and warranties of Buyer contained in this Agreement, in any Ancillary Agreement or in any written certificate delivered pursuant to this Agreement, shall be true and correct on the date of this Agreement, such Ancillary Agreement or such certificate, as the case may be, and shall be true and correct in all material respects on and as of the Closing Date as if made on and as of the Closing Date (except for representations and warranties that expressly relate to a date earlier than the Closing Date which shall continue to be true and correct as of the specified date and except

47

for representations and warranties that contain materiality qualifications, which shall be true and correct in all respects).

8.2.    Covenants and Agreements Performed.  Buyer shall have performed or complied with in all material respects, or delivered, all covenants, agreements, conditions or documents required by this Agreement to be performed, complied with, or delivered by Buyer prior to or on the Closing Date.

8.3.    Buyer's Closing Certificate.  Seller shall have been furnished with a certificate executed by Buyer, dated the Closing Date, certifying that the conditions set forth in Sections 8.1 and 8.2 of this Agreement have been fulfilled.

8.4.    No Prohibition or Proceedings.  No statute, rule or regulation, or order or injunction of any court or administrative agency shall be in effect, and no action or proceeding shall be pending or threatened, that prohibits Seller from consummating the transactions contemplated hereby.

8.5.    Escrow Agreements.  The General Escrow Agreement and the Audit Escrow Agreement shall have been duly executed and delivered by all parties thereto.

8.6.    Execution and Delivery of Other Agreements.  At the Closing, Buyer shall have delivered to Seller all other items required by Section 3.2(b) of this Agreement.

8.7.    Asiacom Employee Letters.  Buyer shall have received executed letters, each in the form of Exhibit H attached hereto, from all Asiacom Employees located in Hong Kong.

## ARTICLE IX.

## ACTIONS BY SELLER AND BUYER
## AFTER THE CLOSING

9.1.    Books and Records.

(a)    During the five (5)-year period following the Closing Date in the case of the Subject Business and following the date of the Asiacom Closing in the case of the Ancillary Business, each party hereto shall cooperate with and make available to the other party, upon reasonable advance notice and during normal business hours, reasonable access to all books and records, tax returns and records, Contracts, information and employees (without substantial disruption of employment) retained and remaining in existence after the Closing or the Asiacom Closing, as the case may be, which are necessary or useful in connection with any litigation, insurance matter, financial reporting requirement or obligation, Tax inquiry, audit, investigation or dispute, or any other matter requiring any such books and records, information or employees for any reasonable business purpose relating to the Subject Business or the Ancillary Business, as the case may be.  The party requesting any such books and records, tax returns and records, Contracts, information or employees shall bear all of the out-of-pocket costs and expenses (including, without limitation, attorneys' fees, but excluding reimbursement for salaries and employee benefits) reasonably incurred in connection with providing such books and records, information or employees.

(b)    Buyer shall retain all records relating to the finances of, and Taxes with respect to, the Purchased Assets and the Ancillary Assets for all Pre-Closing Tax Periods until the expiration of the statutes of limitation (including any extensions thereof) for the Tax period(s) to which such records relate. Buyer and Seller shall provide each other with such information and assistance as is reasonably necessary, including access to records and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with an audit or otherwise.

9.2.    Refunds and Remittances. From and after the Closing in the case of the Subject Business and the Asiacom Closing in the case of the Ancillary Business, if Buyer or any of its Affiliates receives any refund, security deposit or other amount which is an Excluded Asset, Buyer promptly shall cause such amount to be remitted to Seller at the address set forth in Section 12.7. From and after the Closing in the case of the Subject Business and the Asiacom Closing in the case of the Ancillary Business, if Seller or any of its Affiliates receives any refund, security deposit or other amount which is a Purchased Asset or Ancillary Asset or to which Buyer is otherwise entitled pursuant to this Agreement, Seller promptly shall cause such amount to be remitted to Buyer at the address set forth in Section 12.7.

9.3.    Treatment of Merchandise Orders. From and after the Closing, Buyer shall pay for all merchandise orders for the Subject Business placed by Seller on or prior to the Closing Date by paying for such merchandise on normal payment terms and conditions (including but not limited to receipt by Buyer of all such merchandise).

9.4.    Further Assurances. On the terms and subject to the conditions contained herein, Buyer and Seller shall after the Closing (i) use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements; (ii) execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder or thereunder; and (iii) cooperate with each other in connection with the foregoing.

9.5.    Minimum Purchases.

(a)    During each twelve (12)-month period included within the five (5)-year period beginning on October 1, 2006 ending on September 30, 2011 (each twelve (12)-month period, a "Minimum Purchase Period" and collectively, the "Purchase Period"), Seller shall (i) pay a yearly retainer (the "Yearly Retainer"), which shall equal $300,000 (subject to downward adjustment for the remaining Minimum Purchase Periods during the Purchase Period pursuant to the next sentence in this paragraph), to Buyer (which Yearly Retainer shall be payable in equal quarterly installments on the first day of each of Seller's four fiscal quarters during each such Minimum Purchase Period) in respect of design and procurement services to be provided by Buyer to Seller during each such Minimum Purchase Period and (ii) purchase one or more types of Minimum Purchase Products from Buyer in such amount which will generate aggregate agent commissions payable to Buyer from Seller of no less than $500,000 for each such Minimum Purchase Period (the "Minimum Annual Amount") (such arrangement covering the Purchase Period hereinafter referred to as the "Minimum Purchase Arrangement"). In respect of (i) above,

on the last day of each Minimum Purchase Period, Buyer shall refund to Seller, by wire transfer of immediately available funds to an account designated in advance by Seller, the amount (if any) by which Buyer's costs (determined by Buyer in its discretion) to provide the services referred to in (i) above during such Minimum Purchase Period are less than the amount of the Yearly Retainer for such Minimum Purchase Period (the "Retainer Refund"); provided, that for all subsequent Minimum Purchase Periods after such Minimum Purchase Period until the end of the Purchase Period, the Yearly Retainer shall equal the amount of the Yearly Retainer for the Minimum Purchase Period immediately preceding the payment of the Retainer Refund minus the amount of the Retainer Refund. In respect of (ii) above, the amount of agent commissions generated for and payable to Buyer from Seller shall be equal to the product obtained from multiplying (A) the aggregate amount paid by Seller for the Minimum Purchase Product(s) during the applicable Minimum Purchase Period (which amount shall be certified in writing for both Buyer and Seller by Seller's Accountants on the last day of Seller's last fiscal quarter for each Minimum Purchase Period, and which certification shall be final, conclusive and binding among the parties absent manifest error) by (B) five percent (5%), and shall be payable to Buyer in equal quarterly installments of $125,000 on the first day of each of Seller's four fiscal quarters during each such Minimum Purchase Period; provided, that at the end of the last fiscal quarter of each such Minimum Purchase Period, if the amount of agent commissions for such Minimum Purchase Period exceeds $500,000, then Seller shall pay such remaining amount (which, for the avoidance of doubt, shall equal the total amount of agent commissions payable to Buyer for such entire Minimum Purchase Period minus $500,000, which shall have already been paid to Buyer during such Minimum Purchase Period as set forth above) to Buyer on the last day of Seller's last fiscal quarter for such Minimum Purchase Period. If Seller fails to purchase one or more types of Minimum Purchase Products in such an amount as to generate aggregate agent commissions to Buyer equal to or greater than the Minimum Annual Amount in any Minimum Purchase Period, Buyer shall deliver a notice to Seller following the end of such Minimum Purchase Period notifying Seller of such event and the amount of the deficiency of agent commissions relative to the Minimum Annual Amount (the "Commission Deficiency"). Upon delivery of such notice, Seller shall be obligated to make a payment in cash to Buyer within five (5) Business Days of receipt of such notice in an amount equal to the Commission Deficiency subject to Section 9.5(b) below. The individual price(s) for the Minimum Purchase Products for which Seller is obligated to purchase under this Section 9.5 shall be determined by Buyer consistent with past practice and current market conditions. As used herein, the term "Minimum Purchase Products" means all footwear and footwear-related products offered for sale from time to time by Buyer or any of its Affiliates. The Minimum Purchase Arrangement shall be renewable at the option of Buyer or Seller on terms and conditions mutually agreeable to both parties in the sole discretion of each such party.

(b)     Notwithstanding the provisions of Section 9.5(a) above, in the event that Seller, in good faith, objects to Buyer's pricing of any Minimum Purchase Products which Seller has not previously purchased in any Minimum Purchase Period, Seller may deliver a written notice (a "Product Objection Notice") to Buyer setting forth the basis for such objection in reasonable detail and including (i) a list of each Minimum Purchase Product pricing to which Seller is objecting and (ii) the price at which Seller believes such Minimum Purchase Product should be sold. Upon receipt of a Product Objection Notice, Seller and Buyer shall attempt to reconcile their differences and any resolution by them as to any disputed amounts shall be final, binding and conclusive. If Seller and Buyer are unable to reach a resolution with respect to one

or more disputed amounts within twenty (20) Business Days after receipt by Buyer of Seller's Product Objection Notice, Seller and Buyer shall submit the item(s) remaining in dispute for resolution to the American Arbitration Association (the "Arbiter"), which shall, within thirty (30) Business Days after such submission, determine and report to Seller and Buyer upon such remaining disputed item(s), and such report shall be final, binding and conclusive on the parties hereto. If (x) the prices ascribed by Buyer to any Minimum Purchase Products in dispute are less than or equal to ten percent (10%) higher than the prices ascribed to such Minimum Purchase Products by the Arbiter, then no adjustment shall be made and Seller shall be obligated to remit to Buyer the entire amount of such Commission Deficiency or (y) the prices ascribed by Buyer to such Minimum Purchase Products in dispute are greater than ten percent (10%) higher than the prices ascribed to such Minimum Purchase Products by the Arbiter, then Seller shall not have to pay Buyer the portion of the Commission Deficiency related to such disputed Minimum Purchase Products. The fees and disbursements of the Arbiter shall be borne by the party whose aggregate Minimum Purchase Product prices were further from the value ascribed to such disputed items by the Arbiter.

9.6.   No Use of Certain Names. From and after the Closing, all advertising and promotional activities and materials, product labeling or other communications (including, without limitation, any Internet or other electronic communications medium or vehicle) to customers, suppliers and vendors, the public or the trade shall clearly identify Buyer as owner of the Subject Products, and any use of, or reference to, the Name shall not be made without the prior written consent of Seller.

9.7.   Non-Competition.

(a)   During the five (5)-year period following the Closing Date, Seller, its Affiliates and stockholders shall not, directly or indirectly, (i) own, manage, operate, join, control or participate in the ownership, management, operation or control of, or be connected as an officer, director, employee, stockholder, member or partner with, any Competing Business or sell any Covered Product within North America or Europe; (ii) solicit, interfere with or attempt to entice away from Buyer and its Affiliates, any Person which has been during the two-year period ending on the Closing Date or is a customer of Buyer or Seller in connection with the Subject Business or the Ancillary Business; or (iii) solicit, interfere with, attempt to entice away or hire from Buyer or its Affiliates, any Protected Employee. As used herein, the term "Covered Product" means (i) indoor/outdoor slippers, (ii) vulcanized rubber shoes up to a retail price of $20, (iii) sandals offered for sale in any accessory, seasonal or beach department (or similar retail point of sale) and (iv) flip-flops and EVA thongs; provided, however, that under no circumstances shall any illuminated or children's licensed character footwear be, or be deemed to be, a Covered Product; it being the express understanding of the parties hereto that the Covered Product restrictions set forth in this Section 9.7(a) shall not apply in any respect to any action or inaction taken by Seller, its Affiliates and stockholders to the extent relating solely to any such illuminated or children's licensed character footwear and (y) under no circumstances this provision be interpreted to prevent Seller from disposing of Excluded Inventory pursuant to the terms and conditions of Section 9.10 hereof. As used here, "Competing Business" means any business manufacturing, supplying, distributing or selling any of the Covered Products; and "Protected Employee" means any current or former employee of the Subject Business or Buyer during the period in which the covenants set forth in this Section 9.7 are in effect, but excluding

51

persons who have not been employed by the Subject Business or Buyer during the six (6)-month period preceding the date on which a determination is made regarding whether a person is a Protected Employee.

(b)     The length of time for which the covenants contained in Section 9.7(a) shall be in force shall not include any period of violation (as determined by a court, arbitrator or as otherwise agreed to by the parties) or, provided that Buyer is the prevailing party in such litigation or arbitration, any other period required for litigation or arbitration during which Buyer seeks to enforce this Section 9.7. In the event the covenants contained in this Section 9.7 shall be determined by any court of competent jurisdiction to be unenforceable by reason of its extending for too long a period of time or over too large a geographical area or by reason of its being too extensive in any other respect, it shall be interpreted to extend only over the longest period of time for which it may be enforceable, and/or over the largest geographical areas as to which it may be enforceable and/or to the maximum extent (not to exceed the extent specified herein) in all other aspects to which it may be enforceable, all as determined by such court in such action.

(c)     From and after the Closing, Seller shall, and shall cause its Affiliates and representatives to, keep confidential and not disclose to any other Person or use for their own benefit any confidential or proprietary information in their possession or control regarding the Subject Business, the Ancillary Business, the Purchased Assets or the Ancillary Assets.

(d)     Each of the restrictive covenants contained in this Section 9.7 is independent of any other provision of this Agreement, and the existence of any claim which Seller may allege against Buyer, whether based on this Agreement or otherwise, shall not prevent the enforcement of such restrictive covenant. Seller acknowledges that the restrictive covenants contained in this Section 9.7 are essential to the protection of Buyer's investment in the Subject Business, the Ancillary Business, the Purchased Assets and the Ancillary Assets and that Buyer would not purchase the Purchased Assets or the Ancillary Assets but for these restrictive covenants. Seller agrees that a breach of any of the restrictive covenants of this Section 9.7 shall cause irreparable harm to Buyer, the Subject Business and the Ancillary Business, and that Buyer's remedies at law for any breach or threat of breach of the provisions of this Section 9.7 shall be inadequate, and that Buyer shall be entitled to an injunction or injunctions to prevent breaches of this Section 9.7 and to enforce specifically such restrictive covenants, in addition to any other remedy to which Buyer may be entitled at law or in equity.

9.8.    Audit. On or before February 28, 2007 (the "Audit Delivery Date"), Buyer shall receive audited financial statements (the "Audited Statements") for the Subject Business and the Ancillary Business which in Buyer's opinion satisfy the Regulation S-X rules for a S-1 Registration Statement (a "S-1"), together with such other appropriate documents to allow for use of the Audited Statements in a S-1 (all as set forth on Schedule 9.8) (collectively with the Audited Statements, the "Audit Documents"). If all of the Audit Documents are delivered to Buyer in form and substance satisfactory to Buyer on or before the Audit Delivery Date, then Buyer shall (in coordination with Seller) timely deliver a Joint Certificate (as defined in the Audit Escrow Agreement) to the Escrow Agent entitling Seller to receive payment in full of the Audit Escrow Amount. In the event that either (i) Buyer does not receive all of the Audit Documents on or prior to the Audit Delivery Date or (ii) any of the Audit Documents received

by Buyer is not in form and substance satisfactory to Buyer, then Buyer shall be entitled to submit to the Escrow Agent an Audit Claim Notice (as defined in the Audit Escrow Agreement) entitling Buyer to receive payment in full of the Audit Escrow Amount, which Audit Claim Notice (including, without limitation, the submission thereof) shall not be challenged by Seller in any respect; provided, however, that in the event that all of the Audit Documents are delivered to Buyer in form and substance satisfactory to Buyer within ninety (90) days after the Audit Delivery Date, then Buyer shall promptly remit to Seller the Audit Escrow Amount. In the event that the Audited Statements are, or are required to be, restated, modified or amended in any respect, or any other Audit Documents are required to be restated, modified or amended in any material respect, then Seller shall use its best efforts to promptly effectuate any such restatement, modification or amendment, and shall pay all costs (including, without limitation, fees and expenses) incurred by Buyer or any Affiliate in relation to such restatement, modification or amendment in order for the Audit Documents to be includible in a S-1.

  9.9. Payables. Following the Closing, Seller agrees to (i) pay all accounts payable of the Subject Business which is an Excluded Liability in accordance with the payment terms of such accounts payable and (ii) pay any liability or obligation payable or owing to customers of the Seller or the Subject Business (or following the Closing, the Buyer) arising from or related to Customer Charge-backs and other similar amounts for any products sold or distributed or services provided by Seller prior to the Closing which are not disclosed on Schedule 4.19(c) and deducted from the Closing Cash Payment; provided, that Seller shall have ninety (90) days from the date it is provided notice of such unpaid Customer Charge-back to negotiate and settle such amount with the customer (provided that Seller's actions to negotiate and/or settle do not adversely affect Buyer's ongoing commercial relationship with such customer) prior to Buyer seeking recovery from the General Escrow or any other means of recourse as Buyer may have available to it; provided, however, if Seller is unable to satisfy such Customer Charge-back amount within such ninety (90) day period, such amount shall be deemed due and owing to Buyer and Buyer shall have the right, but not the obligation, to automatically deduct such amount from the General Escrow or otherwise set off against any amounts due Seller.

  9.10. Disposition of Excluded Inventory. Following Closing, Seller agrees to dispose of the Excluded Inventory as follows: (a) with respect to Excluded Inventory set forth on Schedule 9.10 for which Seller has a customer order, in accordance with such customer order; (b) with respect to Excluded Inventory which is not set forth on Schedule 9.10, Seller shall have the right to seek to sell such Excluded Inventory to any customer (other than a customer of Buyer prior to the Closing) with the prior written consent (not to be unreasonably withheld, conditioned or delayed) of Buyer (provided, however, that for any individual sale of Excluded Inventory of less than 900 product units, no prior written consent of Buyer shall be required so long as Seller notifies Buyer in writing of any such sale within five (5) Business Days after such sale has been completed); or (c) with respect to Excluded Inventory which has not been sold or subject to a purchase order pursuant to clause (a) or (b) of this Section 9.10 prior to six (6) months after the Closing Date, Seller shall destroy such Excluded Inventory. Seller shall certify in writing to Buyer that all of the Excluded Inventory has been disposed in accordance with this Section 9.10 no later than six (6) months after the Closing Date.

## ARTICLE X.

### TERMINATION PRIOR TO CLOSING

10.1.    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Buyer and Seller;

(b)    by Buyer, upon written notice to Seller, if there has been a material violation or breach by Seller of any covenant, representation or warranty contained in this Agreement that would give rise to the failure to satisfy any condition to the obligations of Buyer at the Closing and such violation or breach has not been waived by Buyer or, if curable, cured by Seller within ten (10) business days after receipt by Seller of written notice thereof from Buyer;

(c)    by Seller, upon written notice to Buyer, if there has been a material violation or breach by Buyer of any covenant, representation or warranty contained in this Agreement that would give rise to the failure to satisfy any condition to the obligations of Seller at the Closing and such violation or breach has not been waived by Seller or, if curable, cured by the Buyer within ten (10) business days after receipt by Buyer of written notice thereof from Seller;

(d)    by Buyer, upon written notice to Seller, if the transactions contemplated hereby have not been consummated on or before November 1, 2006, so long as no act or omission by Buyer shall have been the primary reason that the transactions contemplated hereby have not been consummated on or before such date;

(e)    by Seller, upon written notice to Buyer, if the transactions contemplated hereby have not been consummated on or before November 1, 2006, so long as no act or omission by Seller shall have been the primary reason that the transactions contemplated hereby have not been consummated on or before such date; or

(f)    by Buyer, upon written notice to Seller, if either Seller discloses or Buyer otherwise becomes aware of any event or circumstance that has had or would reasonably be expected to have a Business Material Adverse Effect and, if curable, the event or circumstance that gave rise to, or is giving rise to, such Business Material Adverse Effect has not been cured (whether by Seller or otherwise) within ten (10) business days after the earlier of Seller's disclosure of such event or circumstance, or Seller's receipt of written notification from Buyer that Buyer has become aware of such event or circumstance.

10.2.    Effect of Termination.  In the event this Agreement is terminated by either Buyer on the one hand, or Seller on the other hand, as provided above, the provisions of this Agreement shall immediately become void and of no further force and effect (other than this Section 10.2, and Articles XI and XII hereof which shall survive the termination of this Agreement), and there shall be no liability on the part of Buyer on the one hand or Seller on the other hand, to one another, except for breaches of this Agreement prior to the time of such termination.

## ARTICLE XI.

### INDEMNIFICATION

11.1.    Indemnification by Seller.  Subject to the limitations set forth in Section 11.4, from and after the Closing, Seller shall indemnify, defend and hold harmless Buyer and its Affiliates, and each of their respective officers, directors, employees, stockholders, members, agents and representatives (collectively, the "Buyer Indemnitees") from and against any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses and other professional and advisor fees and disbursements (collectively, "Losses"), to the extent arising or resulting from any of the following:

(i)    any breach of any representation or warranty of Seller contained in this Agreement or in any Schedule or Exhibit annexed hereto, or in any other statement, certificate or document furnished or to be furnished to Buyer pursuant hereto or in connection with the transactions contemplated hereby (it being understood and agreed that under this Article XI, for purposes of determining whether there has been any breach of any representation or warranty and for purposes of calculating the amount of any Losses arising therefrom, the representations and warranties of Seller shall be deemed not to be qualified by any concept of "material," "materiality," "Material Adverse Effect" or similar qualification);

(ii)    any breach of any covenant or obligation of Seller contained in this Agreement;

(iii)    any Excluded Liability;

(iv)    any fees, expenses or other payments incurred or owed by Seller or its Affiliates to any agent, broker, investment banker or other Person retained or employed by Seller or its Affiliates in connection with the transactions contemplated by this Agreement;

(v)    the failure of Seller to comply with applicable bulk sales laws;

(vi)    any claims, damages, demands, expenses, liabilities, actions, proceedings or costs (x) relating to Asiacom, the Ancillary Business or the Ancillary Assets and (y) arising, resulting from or otherwise relating to acts, omissions to act, events, occurrences or circumstances prior to the Asiacom Closing;

(vii)    any claims, damages, demands, expenses, liabilities, actions, proceedings or costs relating to any Proceeding;

(viii)    the failure of the Transfer Notice to have become completed (within the meaning of Section 4 of the Transfer Ordinance) within forty-five (45) days of the Closing;

(ix)    any claims, damages, demands, expenses, liabilities, actions, proceedings or costs (x) relating to any Asiacom Employee or Relevant Asiacom Employee and (y) arising, resulting from or otherwise relating to acts, omissions to act, events, occurrences or circumstances prior to the Asiacom Closing, including without limitation:  (A) any breach by

55

Seller or Asiacom of any obligation under or in connection with the contract of employment of any Asiacom Employee, (B) any breach by Seller or Asiacom of any other obligation or any duty (whether statutory or otherwise) owed by Seller or Asiacom to any Asiacom Employee, or to any trade union(s) or employee representatives in respect of any Asiacom Employee, (C) any claim brought by any Asiacom Employee under the Sex Discrimination Ordinance, the Disability Discrimination Ordinance or the Family Status Discrimination Ordinance or any other Hong Kong laws conferring protection against discrimination harassment, victimization or vilification by reason of age, gender, race, religion, family circumstances or disability, insofar as such claims relate either in whole or in part to the period when such Asiacom Employee was employed by Asiacom (or any predecessor of Asiacom) or (D) any claim made by any Relevant Asiacom Employee, other than those who accept employment with Buyer, including any claim arising out of such person's terms of employment or services or under the Employment Ordinance (Chapter 57 of the Laws of Hong Kong), or any claim arising from the termination of such person's employment; or

        (x)    the enforcement by any Buyer Indemnitee of its rights to indemnification under this Agreement.

In the event that Seller shall become obligated under this Article XI to make a payment to one or more Buyer Indemnitees, Seller shall make such payment by promptly effecting a wire transfer of immediately available funds in the amount of such payment to such account(s) as such Buyer Indemnitee(s) shall have designated in writing to Seller. Buyer may withhold in good faith any amounts due to Seller under this Agreement or any other agreement between Buyer and Seller, whether now or hereafter existing, to satisfy any amounts due from Seller to any Buyer Indemnitees under this Section 11.1.

    11.2.   Indemnification by Buyer. From and after the Closing, Buyer shall indemnify, defend and hold harmless Seller and each of its Affiliates and each of their respective officers, directors, employees, stockholders, members, agents and representatives (the "Seller Indemnitees") from and against any and all Losses, to the extent arising or resulting from any of the following:

        (i)    any breach of any representation or warranty of Buyer contained in this Agreement;

        (ii)    any breach of any covenant or obligation of Buyer contained in this Agreement;

        (iii)    any Assumed Liability;

        (iv)    any fees, expenses or other payments incurred or owed by Buyer or its Affiliates to any agent, broker, investment banker or other Person retained or employed by Buyer or its Affiliates in connection with the transactions contemplated by this Agreement; or

        (v)    the enforcement by any Seller Indemnitee of its rights to indemnification under this Agreement.

    11.3.   Indemnification Procedures.

56

(a)    <u>Procedures Relating to Indemnification of Third Party Claims</u>.  If any Buyer Indemnitee or Seller Indemnitee (the "<u>Indemnified Party</u>") receives written notice of the commencement of any action or proceeding or the assertion of any claim by a third party or the imposition of any penalty or assessment for which indemnity may be sought under Section 11.1 or Section 11.2 (a "<u>Third Party Claim</u>"), and such Indemnified Party intends to seek indemnity pursuant to this Article XI, the Indemnified Party shall promptly provide the other party (the "<u>Indemnifying Party</u>") with written notice of such Third Party Claim, stating the nature, basis and the amount thereof, to the extent known, along with copies of the relevant documents evidencing such Third Party Claim and the basis for indemnification sought.  Failure of the Indemnified Party to give such notice will not relieve the Indemnifying Party from liability on account of this indemnification, except if and to the extent that the Indemnifying Party is actually prejudiced thereby.  The Indemnifying Party will have forty-five (45) days from receipt of any such notice of a Third Party Claim to give notice to assume the defense thereof.  If notice to the effect set forth in the immediately preceding sentence is given by the Indemnifying Party, the Indemnifying Party will have the right to assume the defense of the Indemnified Party against the Third Party Claim with counsel of its choice; <u>provided</u>, that the Indemnifying Party shall only be entitled to assume such defense if (x) the Third Party Claim involves solely monetary damages, (y) the Indemnifying Party shall have expressly agreed in writing that, as between the Indemnifying Party and the Indemnified Party, the Indemnifying Party shall be solely obligated to satisfy and discharge such Third Party Claim; and (z) if reasonably requested to do so by the Indemnified Party, the Indemnifying Party shall have made reasonably adequate provision to ensure the Indemnified Party of the financial ability of the Indemnifying Party to satisfy the full amount of any adverse monetary judgment that may result from such Third Party Claim.  So long as the Indemnifying Party has assumed the defense of the Third Party Claim in accordance herewith, (i) the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third Party Claim (provided, that the costs and expenses incurred by the Indemnified Party until the Indemnifying Party assumed the defense will be the responsibility of the Indemnifying Party) and (ii) the Indemnified Party will not file any papers or consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party; <u>provided</u>, that in the event that the Indemnifying Party does not assume the defense of the Third Party Claim or counsel for the Indemnified Party advises in writing that there are bona fide issues that raise conflicts of interest between the Indemnified Party and the Indemnifying Party, the Indemnified Party may retain one counsel and the Indemnifying Party shall pay all reasonable fees and expenses of such counsel as statements therefor are received.  The parties will also reasonably cooperate in any such defense and give each other reasonable access to all information relevant thereto.  Whether or not the Indemnifying Party has assumed the defense, such Indemnifying Party will not be obligated to indemnify the Indemnified Party hereunder for any settlement entered into or any judgment that was consented to without the Indemnifying Party's prior written consent (which consent will not be unreasonably withheld, delayed or conditioned).  The Indemnifying Party shall have the right, with the consent of the Indemnified Party, which consent shall not be unreasonably withheld, delayed or conditioned, to settle all indemnifiable matters related to Third Party Claims to the extent that the Indemnified Party has properly assumed the defense of the Third Party Claim in accordance with this Section 11.3(a).

(b)    <u>Procedures for Non-Third Party Claims</u>.  The Indemnified Party will notify the Indemnifying Party in writing promptly of its discovery of any matter that does not

involve a Third Party Claim being asserted against or sought to be collected from the Indemnified Party, giving rise to the claim of indemnity pursuant hereto. The failure so to notify the Indemnifying Party shall not relieve the Indemnifying Party from liability on account of this indemnification, except only to the extent that the Indemnifying Party is actually prejudiced thereby. The Indemnifying Party will have thirty (30) days (the "Response Period") from receipt of any such notice to give notice of dispute of the claim to the Indemnified Party (the "Response Notice"). The failure of any Indemnifying Party to give such Response Notice shall mean that such Indemnifying Party shall be deemed to not dispute such claim. If any Indemnifying Party does not give a Response Notice, then the amount of the claim shall be conclusively deemed to be an obligation of the Indemnifying Party. If any Indemnifying Party shall be obligated to indemnify an Indemnitee hereunder, such Indemnifying Party shall pay to such Indemnified Party within forty-five (45) days after (i) the last day of the applicable Response Period the amount of liquidated and undisputed Losses to which such Indemnified Party shall be entitled or (ii) if the matter relates to Losses that have not been liquidated or are disputed as of the date, the date on which such Losses have become liquidated and determined; provided, that if any Indemnifying Party fails to pay all or any part of any indemnification obligation on or before the expiration of such forty-five (45) day period, then the Indemnifying Party shall also be obligated to pay to the Indemnified Party interest on the unpaid amount for each day during which the obligation remains unpaid at a rate per annum equal to the Interest Rate calculated on the basis of a year of 365 days and the actual number of days elapsed. The Indemnified Party shall reasonably cooperate and assist the Indemnifying Party in determining the validity of any matter covered by this Section 11.3(b) and in otherwise resolving such matter. Such assistance and cooperation shall include, without limitation, providing reasonable access to and copies of information, records and documents relating to such matter.

11.4. Limitations on Indemnification.

(a)    Notwithstanding the foregoing provisions of this Article XI, (i) Seller shall not be responsible pursuant to Section 11.1(i) for any indemnifiable Losses suffered by any Buyer Indemnitee arising out of a breach of any representation or warranty of Seller herein unless a claim therefor is asserted in writing within fifteen (15) months after the Closing Date; provided that (A) any claim based on a breach of any representation or warranty contained in Sections 4.1, 4.2, 4.3, 4.6, 4.9 and 4.11 may be asserted indefinitely, (B) any claim based on a breach of any representation or warranty contained in Sections 4.10 or 4.15 may be asserted at any time on or before the 60th day following the running of the statute of limitations applicable to the liability giving rise to such breach, and (C) such obligations to indemnify and hold harmless shall not terminate or expire with respect to any item as to which a Buyer Indemnified Party shall have, before the expiration of the applicable period, previously made a claim by delivering written notice thereof to Seller; (ii) Seller shall not be liable, pursuant to Section 11.1(i) for (y) any Losses suffered by any Buyer Indemnitee (other than with respect to a claim based on a breach of any representation or warranty contained in Sections 4.1, 4.2, 4.3, 4.6, 4.9, 4.11, 4.19(c), 4.19(d) and 4.19(e)) unless the aggregate of all Losses suffered by the Buyer Indemnitees thereunder exceeds, on a cumulative basis, an amount equal to Two Hundred Fifty Thousand Dollars ($250,000), and then only to the extent of any such excess or (z) individual items or series of related items where the aggregate Loss relating thereto is less than Five Thousand Dollars ($5,000), which items shall not be aggregated for purposes of the immediately preceding clause (y); and (iii) the aggregate liability of Seller pursuant to Section 11.1(i), for

58

Losses suffered by the Buyer Indemnitees under Section 11.1(i) shall in no event exceed Five Million Dollars ($5,000,000).

(b)    Buyer and Seller hereby acknowledge and confirm that, should the Closing occur, the sole and exclusive remedy of Buyer and Seller with respect to any and all claims relating to this Agreement, the Subject Business, the Ancillary Business, the Purchased Assets, the Ancillary Assets, the Excluded Assets, the Assumed Liabilities, the Excluded Liabilities or the transactions contemplated hereby (other than claims of, or causes of action arising from, fraud or intentional misrepresentation) shall be pursuant to the indemnification provisions set forth in this Article XI; provided, that nothing stated in this Agreement shall in any way limit or foreclose the availability to the parties of specific performance or other equity remedies. In furtherance of the foregoing, each party hereto hereby waives and releases, from and after the Closing, any and all rights, claims and causes of action (other than claims of, or causes of action arising from, fraud or intentional misrepresentation) such party may have against the other party hereto or any of its Affiliates or any of their respective directors, officers employees, stockholders, members agents and representatives arising under or based upon any Federal, state or local statute, law, ordinance, rule or regulation or otherwise (except pursuant to the indemnification provisions set forth in this Article XI and except with respect to specific performance or other equitable remedies).

11.5.    Calculation of Indemnity Payments.    The amount of any Loss for which indemnification is provided under this Article XI shall be net of any amounts actually recovered by the Indemnified Party under insurance policies or other indemnification arrangements with an unaffiliated third party with respect to such Loss.

11.6.    Tax Treatment of Indemnification.    For all Tax purposes, Buyer and Seller agree to treat (and shall cause each of their respective Affiliates to treat) any indemnity payment under this Agreement as an adjustment to the Purchase Price unless a final determination (which shall include the execution of an Internal Revenue Service Form 870-AD or successor form) provides otherwise.

11.7.    Survival. Subject to Section 11.4(a), the respective rights, duties, obligations and responsibilities of Seller and Buyer under the agreements, covenants, undertakings and other understandings contained in this Agreement shall survive the Closing and remain in full force and effect until the expiration of the terms or periods specified therein or, in the case of any such agreement, covenant, undertaking or other understanding that has no specified term or period, indefinitely.

11.8.    Exception to Limitations.    Notwithstanding the foregoing, the limitations of liability contained in this Article XI shall not apply to any claim for fraud or intentional or knowing breach of a representation or warranty of Buyer or Seller or to any claim relating to the gross negligence or willful misconduct of Buyer or Seller.

11.9.    No Effect of Investigation.    Subject to Section 11.4, the representations, warranties, covenants and agreements of Buyer and Seller contained in this Agreement or in any schedule, exhibit, document or certificate furnished or to be furnished in connection with or as contemplated by this Agreement shall survive the Closing and shall remain in full force and

effect, regardless of any investigation made or information or knowledge obtained by or on behalf of the Buyer or Seller, at any time. Seller acknowledges and agrees that no right of indemnification on the part of Buyer or any other Buyer Indemnitee shall be limited, restricted or waived in any way by reason of any investigation or audit conducted prior to the Closing or the knowledge of Buyer or any of its Affiliates or representatives at any time prior to Closing of any breach of any representation, warranty, covenant or agreement of Seller, or the decision of Buyer to complete the Closing. Notwithstanding anything to the contrary contained herein, Buyer shall have the right, irrespective of any such knowledge or investigation or any decision by the Buyer to complete the Closing, to rely fully on the representations, warranties, covenants and agreements of Seller contained in this Agreement or any schedule, exhibit, document or certificate furnished or to be furnished in connection with or as contemplated by this Agreement.

## ARTICLE XII.

### MISCELLANEOUS

12.1.  Publicity.  From the date hereof through the Closing Date, no public release or announcement concerning the transactions contemplated hereby shall be issued by Buyer (or its Affiliates) or Seller (or its Affiliates) without the prior written consent of the other party hereto (which consent may be withheld in such other party's sole discretion); provided, however, that each of Buyer, Seller and their respective Affiliates may make (i) internal announcements to its respective employees that are consistent with the parties' prior public disclosures regarding the transactions contemplated hereby and (ii) such public releases, announcements or other disclosures as are required by law including, without limitation, pursuant to Federal or state securities laws, rules and regulations.

12.2.  Bulk Transfer Laws.  Buyer hereby waives compliance by Seller with the provisions of any so-called "bulk transfer laws" of any jurisdiction in connection with the sale of the Purchased Assets to Buyer.

12.3.  Assignment.  Neither this Agreement nor any of the rights and obligations of the parties hereunder may be assigned by either party without the prior written consent of the other party hereto, except that no consent shall be required for an assignment by Buyer to any of its Affiliates or for a collateral assignment by Buyer or Seller of the Agreement to any of its financing sources; provided, however, that no such assignment shall change the rights and obligations of the parties hereto including, without limitation, with respect to any rights of setoff contained in this Agreement. Subject to the first sentence of this Section 12.3, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any rights, obligations or benefits hereunder. Any attempted assignment or transfer in violation of this Section 12.3 shall be null and void ab initio.

12.4.  No Third-Party Beneficiaries. Except as provided in Article XI, this Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such assigns, any legal or equitable rights hereunder.

12.5.  Exculpated Persons.  No general or limited partner, shareholder, director, officer, member, manager, other controlling person or entity, trustee, investor, beneficiary, employee, attorney, agent or independent contractor of either Seller or Buyer (each an "Exculpated Person") shall be personally liable for any obligation or liability of Seller or Buyer under this Agreement and (ii) all obligations and liabilities of either Seller or Buyer under this Agreement are enforceable solely against such party and such party's assets, and not against any Exculpated Person or the assets of any Exculpated Person.

12.6.  Expenses.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, except as otherwise expressly provided herein, each of the parties hereto shall be responsible for the payment of its own respective costs and expenses incurred in connection with the negotiations leading up to and the performance of its respective obligations pursuant to this Agreement and the Ancillary Agreements including the fees of any attorneys, accountants, brokers or advisors employed or retained by or on behalf of such party.

12.7.  Notices.  All notices, requests, permissions, waivers, claims, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) five (5) Business Days following sending by registered or certified mail, postage prepaid, (ii) when sent, if sent by facsimile; provided that the facsimile transmission is promptly confirmed by telephone, (iii) when delivered, if delivered personally to the intended recipient and (iv) one (1) Business Day after sending by overnight delivery via a national courier service that provides proof of delivery and, in each case, addressed to a party at the following address for such party:

If to Seller, addressed to:

> E.S. Originals Inc.
> 450 West 33rd Street
> New York, New York 10001
> Telecopier No.: 212-563-6725
> Attention: Joseph Safdeye and Morris Shalom

With a copy to:

> Herrick, Feinstein LLP
> 2 Park Avenue
> New York, New York 10016
> Attention: Daniel A. Etna
> Telecopier No.: 212.545.3322

If to Buyer, addressed to:

> totes Isotoner Corporation
> 9655 International Boulevard
> Cincinnati, Ohio 45246
> Telecopier No.: 513-682-8611
> Attention: Doug Gernert

With a copy to:

> Dechert LLP
> Cira Centre
> 2929 Arch Street
> Philadelphia, Pennsylvania 19104
> Telecopier No.: 215.992.2222
> Attention: R. Craig Smith

or to such other address(es) as shall be furnished in writing by any such party to the other party hereto in accordance with the provisions of this Section 12.7.

12.8.  Headings.  The descriptive headings of the several Articles and Sections of this Agreement and the Schedules and Table of Contents to this Agreement are inserted for convenience only, do not constitute a part of this Agreement and shall not affect in any way the meaning or interpretation of this Agreement. All references herein to "Articles", "Sections", "Exhibits" or "Schedules" shall be deemed to be references to Articles or Sections hereof or Exhibits or Schedules hereto unless otherwise indicated.

12.9.  Variations in Pronouns.  All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require.

12.10.  Counterparts.  This Agreement may be executed in counterparts, both of which shall be considered one and the same agreement, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered, in person or by telecopier, receipt acknowledged, to the other party hereto. This Agreement may be executed and delivered by the parties hereto via telecopier machine, PDF or other means of electronic delivery, which shall be deemed for all purposes as an original.

12.11.  No Presumption.  This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party which drafted or caused this Agreement to be drafted.

12.12.  Integrated Contract; Exhibits and Schedules.  This Agreement, including the Schedules and Exhibits hereto, any written amendments to the foregoing satisfying the requirements of Section 12.18, the Confidentiality Agreement and the Ancillary Agreements, including the schedules and exhibits thereto, constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede any previous agreements and understandings between the parties with respect to such matters. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement. There are no restrictions, promises, representations, warranties, agreements or undertakings of either party hereto with respect to the transactions contemplated by this Agreement, the Confidentiality Agreement or the Ancillary Agreements other than those set forth herein or therein or in any other document required to be executed and delivered hereunder or thereunder. In the event of

any conflict between the provisions of this Agreement (including the Schedules and Exhibits hereto), on the one hand, and the provisions of the Confidentiality Agreement or the Ancillary Agreements (including the schedules and exhibits thereto), on the other hand, the provisions of this Agreement shall control.

12.13. <u>Severability; Enforcement</u>. Any term, condition or provision of this Agreement which is invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without rendering invalid, illegal or unenforceable the remaining terms, conditions and provisions of this Agreement or affecting the validity or enforceability of any of the terms, conditions or provisions of this Agreement in any other jurisdiction.

12.14. <u>Governing Law</u>. This Agreement and any disputes arising under or related thereto (whether for breach of contract, tortious conduct or otherwise) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, without reference to its conflicts of law principles.

12.15. <u>Jurisdiction</u>. Each party hereto irrevocably agrees that any legal action, suit or proceeding against them arising out of or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, the state courts of New York located in New York County and hereby irrevocably accepts and submits to the exclusive jurisdiction and venue of the aforesaid courts in personam, with respect to any such action, suit or proceeding, and waives any claim that such forum is inconvenient or any similar claim.

12.16. <u>Service of Process</u>. Each of the parties hereto hereby acknowledges and confirms that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any action, suit or proceeding in New York with respect to any matters for which it has submitted to jurisdiction pursuant to Section 12.15.

12.17. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR DISPUTES RELATING HERETO.    EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.17.

12.18. <u>Amendments and Waivers</u>.   This Agreement may be amended, modified, superseded or canceled and any of the terms, covenants, representations, warranties or conditions hereof may be waived only by an instrument in writing signed by each of the parties hereto or, in the case of a waiver, by or on behalf of the party waiving compliance.  No delay on the part of any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of any party of any right, power or privilege hereunder, nor any single or partial exercise of any right, power or privilege hereunder, preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder.

12.19. <u>License of Seller's Intellectual Property</u>.  For the avoidance of doubt, Seller grants the licenses of the Licensed Intellectual Property contained in <u>Schedule 2.1(a)(ii)(B)</u>.

*[Remainder of page intentionally left blank.*

*Next page is signature page.]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective officers thereunto duly authorized, all as of the day and year first set forth above.

**E.S. ORIGINALS INC.**

By: _____

Name: Morris Shalem
Title: Chief Operating Officer

**totes Isotoner Corporation**

By: _____

Name: Douglas P. Garnert
Title: President

## EXHIBIT H

### LETTER FROM ASIACOM INFORMING EMPLOYEES OF SALE OF BUSINESS

### [On letterhead of Asiacom]

[Date] 2006

[Name]

(By Hand)

Dear [name]

**Transfer of business to totes Isotoner Corporation**

As you know, E.S. Originals Inc. has entered into an agreement with totes Isotoner Corporation ("totes") under which the quality inspection business of ES Asiacom Limited (the "Business") will be transferred to totes. This transfer is intended to take place with effect from October 6, 2006. The Business carried on by ES Asiacom Limited will then be continued by totes from that date. totes will offer you a new contract of employment on terms which is the same or no less favourable than those of your existing contract of employment with ES Asiacom Limited.

The purpose of this letter is to inform you that, conditional upon the transfer of Business, your employment with ES Asiacom Limited will end on October 6, 2006 or such date as the transfer of Business takes effect.

This letter also serves as an offer of employment to you with totes conditional on completion of the transfer of Business as noted above, effective October 6, 2006 or such later date upon which the transfer of Business is complete, on terms which is the same or no less favourable than those of your existing contract of employment with ES Asiacom Limited. Please note that if you agree to accept the offer of employment with totes, then full account will be taken of your period of employment with ES Asiacom Limited in respect of seniority and any service-related benefits including any benefits to which you may become entitled in future under the Employment Ordinance (Chapter 57 of the Laws of Hong Kong) or your contract of employment and no severance payment will be paid to you by ES Asiacom Limited pursuant to the Employment Ordinance (Chapter 57 of the Laws of Hong Kong).

Would you please sign and return the duplicate[s] of this letter to Randall Flores on or before October 6, 2006, to indicate your agreement to, upon transfer of the Business, the termination of your employment with ES Asiacom Limited and the acceptance of the offer of employment from totes as detailed in this letter.

If you have any questions about the contents of this letter, please do not hesitate to contact Randall Flores.

We would like to thank you for your hard work and loyalty in the past. We hope that you choose to remain with the Business, with totes as your new employer.

Yours sincerely

_____

[name]

[position]

for and on behalf of ES Asiacom Limited

_____

[name]

[position]

for and on behalf of totes Isotoner
Corporation

I acknowledge receipt of the original of this letter dated October 6, 2006 terminating my
employment as stated above and offering me new employment with totes Isotoner Corporation
on terms which is the same or no less favourable than those of my existing contract of
employment with ES Asiacom Limited. In consideration of totes Isotoner Corporation having
procured the offer of employment on terms the same as my present employment, I hereby release
ES Asiacom Limited from any claim whatsoever which I may have in relation to the termination
of my employment with it other than in respect of accrued and outstanding salary (if any) up to
the date of the transfer of Business.

_____

[Name]

_____ 2006

## EXHIBIT I

### NOTICE OF TRANSFER OF BUSINESS

———————

In pursuance of Sections 4 and 5 of the
Transfer of Businesses (Protection of Creditors) Ordinance
(Chapter 49 of the Laws of Hong Kong)

**NOTICE** is hereby given that ES Asiacom Limited of Room 1204, Start Centre, 443-451 Castle Peak Road, Kwai Chung, New Territories, Hong Kong (the "Transferor") which carried on the business of, inter alia, quality inspection services (the "Business"), transferred certain assets and liabilities in connection with the Business to totes Isotoner Corporation of 9655 International Boulevard, Cincinnati, Ohio 45246, U.S.A. (the "Transferee") with effect on the transfer date, which is expected to be on or around October 6, 2006 (the "Transfer Date") (or such later date as the Transferor and the Transferee may agree). The Business has principally been carried out at Room 1204, Start Centre, 443-451 Castle Peak Road, Kwai Chung, New Territories, Hong Kong.

Following the transfer of the Business, the Transferee intends to carry on the Business principally at the same address, under the name of totes Isotoner Corporation.

At the expiration of one month after the date of the last publication of this Notice pursuant to Section 5 of the Transfer of Businesses (Protection of Creditors) Ordinance, the liabilities of the Transferee (if any) for all the debts and obligations arising out of the carrying on of the Business by the Transferor under that Ordinance shall cease by virtue of that Ordinance unless proceedings are instituted prior to such expiration.

Dated the 6th of October, 2006

ES Asiacom Limited
*Transferor*

totes Isotoner Corporation
*Transferee*

Room 1204, Start Centre, 443-451 Castle Peak Road, Kwai Chung, New Territories, Hong Kong

9655 International Boulevard
Cincinnati, Ohio 45246
U.S.A.

HF 824949v.6 #11380/0001

# EXHIBIT C



Steven Siesser
Member of the Firm
Tel  212 204 8688
Fax  973 597 2507
ssiesser@lowenstein.com

December 19, 2007

VIA FACSIMILE, E-MAIL AND FEDERAL EXPRESS

Mr. Doug Gernert
totes Isotoner Corporation
9655 International Boulevard
Cincinnati, Ohio  45246

**Re:    E.S. Originals, Inc.**

Dear Mr. Gernert:

We represent E.S. Originals, Inc. (the "Seller"). We refer to that certain Asset Purchase
Agreement, by and between the Seller and totes Isotoner Corporation (the "Buyer"), dated as of
October 6, 2006 (the "Agreement"). All capitalized terms used in this letter but not otherwise
defined herein shall have the meanings ascribed to them in the Agreement, and all references to
sections shall refer to sections in the Agreement.

On or about November 7, 2007, the Buyer personally delivered to the Seller a Net Sales
Statement with respect to the Earn-out Period ending on September 30, 2007 (the "Statement").
Please be advised that the Seller hereby disputes the Statement, and this letter shall constitute
notice thereof to the Buyer as contemplated by Section 2.7(c). Our client has reviewed the
Statement and has determined there are certain omissions from the Statement, and certain items
are incorrectly reflected therein.

The Seller has sought the Buyer's cooperation, and has attempted to gain access from the Buyer
to information, records, invoices, data and other items, in connection with the Seller's analysis of
the Statement. To date, such cooperation and access have been quite limited, thereby depriving
the Seller from being able to provide the detail in this notice that is contemplated by Section
2.7(c). As you know, pursuant to Section 2.7(e), our client is entitled to receive cooperation
from the Seller and the Seller's Accountants, and be afforded reasonable access to, among other
things, all information, records, invoices and data, as may be required in connection with its
analysis of the Statement. Upon receipt of such cooperation and review of the accessed items, the
Seller should have the information necessary to be able to provide the Buyer with detail of the
items in dispute.

The Seller will coordinate with you directly in order to arrange the necessary review by its
Accountants. In light of the 20 Business Day period under Section 2.7(c) that is initiated by this
notice, the Seller has confirmed that its Accountants are available to conduct their review next
week. In order to facilitate this process, the Seller's Accountants will provide a list of the
information they would like to have available to them when they arrive. If the upcoming

Mr. Doug Gernert
December 19, 2007
Page 2 of 2

holidays present logistical challenges for the Buyer, then depending on the level of cooperation, we may need to consider an extension of this 20-Business Day time period.

Notwithstanding the formal tone of this letter, our client's strong desire is to work with the Buyer to resolve the items in dispute amicably. The Seller trusts that it can count on the Buyer's compliance with its obligations to provide the required cooperation and access, so that the parties may work together to resolve the disputed items in a timely manner. The Seller reserves all, and does not waive any, rights with respect to the matters raised herein.

If you have any questions, please have your counsel contact me.

Sincerely,

Steven Siesser

cc:    R. Craig Smith, Esq. (via Facsimile and email)
       E.S. Originals, Inc.

