UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

E. S. ORIGINALS INC.,                                 :     **ECF CASE**
                                                      :
                               Plaintiff,             :
                                                      :
                                                      :     Civil Action No. 08 CV 1945 (PKL)
                - v -                                  :
                                                      :
                                                      :
TOTES ISOTONER CORPORATION,                           :
                                                      :
                               Defendant.             :
                                                      :
------------------------------------------------------------------ x


**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO
DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, TO STAY THE
<u>ACTION PENDING ARBITRATION</u>**

## Table of Contents

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .....................................................................................3

    The Agreement Provides For Earn-Out Payments If Thresholds Are Met And Establishes A Binding Arbitration Procedure For Any Disputes .........................3

    ESO Did Not Notify totes As Required Under The Agreement.............................6

    ESO Brings This Action Regarding The Potential Earn-Out Payments ................8

ARGUMENT.........................................................................................................8

I.    The Court Should Dismiss This Action For Lack Of Jurisdiction .........................8

    A.    Legal Standard.............................................................................................8

    B.    The Court Should Dismiss The Complaint As Moot Because All The Causes Of Action Are Premised On ESO's Purported Claims To Potential Earn-Out Payments That Have Been Finally, Bindingly And Conclusively Determined ....................................................................................................9

II.    Even Assuming The Court Had Jurisdiction, It Should Stay This Action Pending Arbitration ..............................................................................................12

    A.    Legal Standards .........................................................................................12

    B.    Even Assuming The Complaint Were Not Moot, The Present Dispute Would Be Subject To The Agreement's Arbitration Clause.............................13

III.    In The Alternative, The Court Should Dismiss Each Cause Of Action For Failing To State A Claim.....................................................................................15

    A.    ESO's Breach Of Contract Claim Should Be Dismissed Because ESO Has Not Adequately Alleged That It Is Entitled To Specific Performance Or Damages ...............................................................................................16

        1.    ESO Has Not Alleged A Claim That Entitles It To An Equitable Decree Of Specific Performance ................................................................16

        2.    ESO Has Not Plead Damages For Its Breach Of Contract Claim ................18

    B.    ESO's Implied Covenant Of Good Faith And Fair Dealing Claim Should Be Dismissed Because It Is Redundant Of The Breach Of Contract Claim And Because It Fails To Plead The Alleged "Manipulation" With Particularity .....19

    C.    ESO's Indemnification Claim Should Be Dismissed Because It Is Derivative Of ESO's Meritless First Cause Of Action And Because Potential Earn-Out Payment Disputes Are Governed By Section 2.7.............21

CONCLUSION ..................................................................................................22

## Table of Authorities

### Cases

*Achtman v. Kirby, McInerney & Squire, LLP,*
   464 F.3d 328 (2d Cir. 2006) ....................................................................................9, 18

*Acito v. IMCERA Group, Inc.,*
   47 F.3d 47 (2d Cir. 1995) .............................................................................................20

*Acquaire v. Canada Dry Bottling,*
   906 F. Supp. 819 (E.D.N.Y. 1995) ..............................................................................14

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.,*
   351 F. Supp. 2d 79 (S.D.N.Y. 2004) ...........................................................................20

*ATSI Commc's., Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007) ...........................................................................................20

*Blue Tee Corp. v. Koehring Co.,*
   999 F.2d 633 (2d Cir. 1993) .........................................................................................13

*Broder v. Cablevision Sys. Corp.,*
   418 F.3d 187 (2d Cir. 2005) ...........................................................................................9

*Brower v. Nydic, Inc.,*
   1 F. Supp. 2d 325 (S.D.N.Y. 1998) .............................................................................20

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002) ...........................................................................................7

*Chill v. General Elec. Co.,*
   101 F.3d 263 (2d Cir. 1996) .........................................................................................20

*Collins & Aikman Products Co., v. Building Sys., Inc.,*
   58 F.3d 16 (2d Cir. 1995) .............................................................................................14

*Computech Int'l, Inc. v. Compaq Computer Corp.,*
   No. 02 Civ. 2628(RWS), 2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002).....................19

*Cortec Indus., Inc. v. Sum Holding, L.P.,*
   949 F.2d 42 (2d Cir. 1991) .............................................................................................3

*Dean Witter Reynolds Inc. v. Byrd,*
   470 U.S. 213 (1985) ..........................................................................................12-13, 14

*Deloitte Noraudit A/S v. Deloitte Haskins & Sells,*
   9 F.3d 1060 (2d Cir. 1993) ...........................................................................................12

*DiVittorio v. Equidyne Extractive Indus., Inc.,*
    822 F.2d 1242 (2d Cir. 1987) ..................................................................................21

*Energy Transport, Ltd. v. M.V. San Sebastian,*
    348 F. Supp. 2d 186 (S.D.N.Y. 2004) ......................................................................13

*F.D. Imp. & Exp. Corp. v. M/V Reefer Sun,*
    248 F. Supp. 2d 240 (S.D.N.Y. 2002) ......................................................................14

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro,*
    961 F.2d 1052 (2d Cir. 1992) ..................................................................................19

*Genesco, Inc. v. T. Kakiuchi & Co.,*
    815 F.2d 840 (2d Cir. 1987) ....................................................................................14

*Green v. Mazzucca,*
    377 F.3d 182 (2d Cir. 2004) ....................................................................................10

*Gulbenkian v. Gulbenkian,*
    147 F.2d 173 (2d Cir. 1945) ....................................................................................17

*Hartford Accident and Indem. Co. v. Swiss Reinsurance Am. Corp.,*
    46 F.3d 219 (2d Cir. 2001) ......................................................................................13

*Hoeft v. MVL Group, Inc.,*
    343 F.3d 57 (2d Cir. 2003) ......................................................................................13

*Howsam v. Dean Witter Reynolds, Inc.,*
    537 U.S. 79 (2002) ..................................................................................................15

*Iqbal v. Hasty,*
    490 F.3d 143 (2d Cir. 2007) ..............................................................................9, 18-19

*Isaacs v. Westchester Wood Works, Inc.,*
    278 A.D.2d 184, 718 N.Y.S.2d 338 (1st Dep't 2000) ...........................................16, 22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................................8

*McCarthy v. Dun & Bradstreet Corp.,*
    482 F.3d 184 (2d Cir. 2007) ....................................................................................8-9

*Moore v. Interacciones Global, Inc.,*
    No. 94 Civ. 4789(RWS), 1995 WL 33650 (S.D.N.Y. Jan. 27, 1995) ........................14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*
    460 U.S. 1 (1983) ....................................................................................................14

*Muhammad v. City of New York Dept. of Corrections*,
   126 F.3d 119 (2d Cir. 1997) ....................................................................................10

*Netherby Ltd. v. Jones Apparel Group, Inc.*,
   No. 04 Civ. 7028(GEL), 2007 WL 1041648 (S.D.N.Y. April 5, 2007).................17, 18

*O'Hearn v. Bodyonics, Ltd.*,
   22 F. Supp. 2d 7 (E.D.N.Y. 1998) ..............................................................................19

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999) .......................................................................................................8

*Revson v. Cinque & Cinque, P.C.*,
   221 F.3d 59 (2d Cir. 2000) .............................................................................................9

*Ross v. Am. Express Co.*,
   478 F.3d 96 (2d Cir. 2007) ...........................................................................................12

*Stena Line (U.K.) Ltd. v. Sea Containers Ltd.*,
   758 F. Supp. 934 (S.D.N.Y. 1991) ................................................................11, 12, 13

*Swierkiewicz v. Sorema N.A.*,
   534 U.S. 506 (2002) .....................................................................................................19

*Thayer v. Dial Indus. Sales, Inc.*,
   85 F. Supp. 2d 263 (S.D.N.Y. 2000) .............................................................................9

*Town Cove Jersey City Urban Renewal, Inc. v. Procida Const. Corp.*,
   No. 96 Civ. 2551 (PKL), 1996 WL 337293 (S.D.N.Y. June 19, 1996) .......................15

*Wolff v. Rare Medium, Inc.*,
   171 F. Supp. 2d 354 (S.D.N.Y. 2001) .........................................................................19

## **Other Authorities**

Restatement (Second) of Contracts § 362 (1981)...............................................................17

Restatement (Second) of Contracts § 366 (1981)...............................................................17

## **Rules**

Fed. R. Civ. P. 9(b)............................................................................................................20

Defendant totes Isotoner Corporation ("totes") submits this memorandum of law in support of its motion to dismiss Plaintiff E.S. Original, Inc.'s ("ESO") Complaint[1] with prejudice or, in the alternative, to stay this action pending arbitration.

## PRELIMINARY STATEMENT

This action is a back-door attempt by Plaintiff ESO to obtain additional "earn-out" payments from Defendant totes under an asset purchase agreement between the parties despite (1) ESO's admission in its Complaint that it failed to preserve its right to seek those payments under the agreement and (2) the agreement's express provision that an independent accounting firm would arbitrate any dispute over the potential earn-out payments.

In October 2006, totes purchased certain businesses from ESO and paid more than $20 million.  totes and ESO agreed that ESO could also receive "earn-out" payments if net sales after the closing exceeded the thresholds set in various formulas established by the parties.  The parties explicitly set out the process by which the potential earn-out payments would be determined.  First, totes would prepare a statement detailing net sales for the relevant time period according to GAAP accounting principles.  Then, ESO had 45 days to notify totes in writing of disputed items, specifying the amount in dispute and setting forth in reasonable detail the basis for the dispute.  If ESO failed to provide the required detailed notice within 45 days, then totes's statement would be "final, binding and conclusive" with regard to the calculation of potential earn-out payments; if ESO provided the required detailed notice and the parties failed to resolve their disputes within 20 business days, then those disputes would be submitted to an independent accounting firm to resolve.  The net sales statement demonstrated that the thresholds were not

---

[1]    All citations to exhibits in this Memorandum are to the exhibits attached to the Affirmation of Daniel H. Tabak, dated April 18, 2008, in Support of Defendant's Motion to Dismiss to the Complaint or, in the Alternative, to Stay the Action Pending Arbitration.

met for two of the potential earn-out payments. ESO admits in its Complaint that it failed to provide an appropriate dispute notice within 45 days of receiving the net sales statement, as required under the terms of the contract. This Court should therefore find that the net sales statement is "final, binding and conclusive" as a matter of law and that ESO's claims in this action are moot. The Court therefore lacks Article III jurisdiction and cannot proceed further.

Second, even assuming the Court had jurisdiction, the action should be stayed pending arbitration before the independent accounting firm – the very process the parties agreed upon to resolve disputes over the potential earn-out payments.

In the alternative, the Court should dismiss each cause of action in the Complaint for failure to state a claim. ESO's first claim, for breach of contract, seeks a decree of specific performance requiring totes to comply with a contract provision requiring that totes "reasonably cooperate" with and provide "reasonable access" to ESO's accountants. This claim fails to state a cause of action because these provisions are too vague to be the subject of a court decree of specific performance. ESO also is not entitled to money damages for this claim because it does not and cannot allege that it suffered monetary damages.

ESO's second cause of action, for breach of the implied duty of good faith and fair dealing, alleges "on information and belief" that totes "manipulated" its books and records so that the thresholds for the earn-out payments would not be met. The Court should dismiss this claim with prejudice because (1) under governing New York law a party cannot make an independent claim for breach of the duty of good faith and fair dealing alleging the same facts as a breach of contract claim and (2) the claim sounds in fraud but ESO does not even make any effort to plead the claim with particularity.

2

Finally, the Court should dismiss with prejudice ESO's third cause of action for indemnification of its expenses incurred as a result of totes's alleged withholding of information because it is derivative of ESO's flawed first cause of action and the relevant access provision mandates that ESO pay its own expenses.

## STATEMENT OF FACTS[2]

totes is a marketer of umbrellas, gloves, rainwear, rubber overshoes and other weather-related accessories. Ex. A (Complaint, or "Comp.") ¶ 3. ESO imports footwear for sale primarily to department stores, mass merchants and specialty footwear retailers. *Id.* ¶ 2. Pursuant to an Asset Purchase Agreement dated October 6, 2006 (the "Agreement"), totes purchased ESO's private label and ESNY™ branded businesses. Ex. A (Comp.) ¶ 6; Ex. B (Agreement), § 2.1 & 1st Whereas Clause.[3]

### The Agreement Provides For Earn-Out Payments If Thresholds Are Met And Establishes A Binding Arbitration Procedure For Any Disputes

Under the Agreement, totes made payments to ESO in excess of $20 million for the assets. Ex. A (Comp.) ¶ 7. ESO also could receive "earn-out" payments if the acquired businesses met certain net sales thresholds. *Id.* ¶¶ 7-15. The Agreement provides for three types of potential earn-out payments: (a) the First Earn-Out Payment, (b) a Federated Earn-Out Payment and (c) a Direct Import Earn-Out (collectively the "Potential Earn-Out Payments"). *Id.* ¶ 8.

---

[2]     totes assumes as true the facts alleged in the Complaint solely for purposes of this motion.

[3]     The Court may consider the Agreement on this motion. *See,* e.g. *Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint, the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because the plaintiff should not so easily be allowed to escape the consequences of its own failure.").

The First Earn-Out Payment and the Direct Import Earn-Out were both based on complicated formulas that provided for the payments if and only if *both* of the following two conditions were met:  (i) "Net Sales" of the purchased businesses were not less than $60,800,000 and (ii) "Landed Net Sales" of the purchased businesses were not less than $29,200,000.[4]  Ex. A (Comp.) ¶¶ 9, 15; Ex. B (Agreement) at 4.  The Federated Earn-Out Payment equals 5% of the "Net Sales" to Federated Department Stores, Inc.  Ex. A (Comp.) ¶ 14.  The parties expressly agreed that there were "no guaranteed minimum" Potential Earn-Out Payments due to ESO and that totes had "no fiduciary duty or other obligation whatsoever to act in any manner in an attempt to maximize all or any" Potential Earn-Out Payments to ESO.  Ex. B (Agreement), § 2.7(h).

Section 2.7 of the Agreement establishes a binding set of procedures for determining whether the Potential Earn-Out Payment triggers were met.  Ex. A (Comp.) ¶¶ 16-17.  First, totes would deliver to ESO a "Net Sales Statement" presenting totes' calculation of Net Sales.  *Id.* ¶ 16; Ex. B (Agreement), § 2.7(a).  The Agreement makes clear that the determination of Net Sales is an accounting question and must be done "in accordance with GAAP applied consistently with [totes'] financial statements."  *Id.*  totes agreed that it would "reasonably cooperate" with ESO and provide "reasonable access to all information, records, invoices, data and auditors' working papers of [totes] and [its] [a]ccountants as may be required in connection with the analysis of any

---

[4]    "Net Sales" is defined to include Landed Net Sales and Direct Import Net Sales.  "Landed Net Sales" is defined as "Gross Sales from Subject Products both (i) sold to customer other than Federated and (ii) imported into the United States by Buyer [*i.e.*, totes] as the importer of record, less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns, and allowances."  "Direct Import Net Sales" is defined to include "Gross Sales from Subject Products sold to each of the Direct Import Customers less cash amounts or Customer Charge-backs paid, credited, or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."  Ex. B (Agreement) at 3, 6 (emphasis in original).

Net Sales Statement," calculation of any Potential Earn-Out Payment or resolution of any dispute about such payment. *Id.*, § 2.7(e); Ex. A (Comp.) ¶ 21-22.[5]

The parties further agreed that:

> unless Seller [*i.e., ESO*] shall have notified Buyer [*i.e., totes*] in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within forty-five (45) days of Seller's [sic] delivery of the Net Sales Statement to Seller, the Net Sales Statement shall final, binding, and conclusive.

Ex. B (Agreement), § 2.7(c); Ex. A (Comp.) ¶ 18.

If ESO provided the required detailed dispute statement, then the parties would have twenty business days to resolve their disputes. Ex. A (Comp.) ¶ 19; Ex. B (Agreement), § 2.7(c). If the reconciliation process failed, the parties would then:

> submit the item(s) remaining in dispute for resolution to the Independent Accounting Firm,[6] which shall within thirty (30) Business Days after such submission, determine and report to Seller and Buyer upon such remaining disputed item(s), and such report shall be final, binding and conclusive on the parties hereto, absent manifest error . . .

Ex. A (Comp.) ¶ 19; Ex. B (Agreement), § 2.7(c). The Agreement explicitly provides that each party is responsible for the fees and disbursements of its respective accountants with regard to all the procedures described in Section 2.7 (including the document review provisions). *Id.* Separately, Article XI of the Agreement provides for indemnification between the parties for, *inter alia*, breaches of obligations under the Agreement.

---

[5]    The Agreement also contains a general provision obligating each party to provide reasonable access to books and records "retained and remaining in existence after the Closing" as necessary or useful for litigation, tax inquiry, audit or like purposes. The requesting party bears all out-of-pocket costs and expenses, including attorneys' fees, under this provision. Ex. B (Agreement), § 9.1(a).

[6]    The Independent Accounting Firm is Deloitte & Touche LLP or, if it declines, then "another independent accounting firm mutually acceptable to" totes and ESO. Ex. B (Agreement), § 2.6(c).

**ESO Did Not Notify totes As Required Under The Agreement**

On or about November 7, 2007, totes delivered to ESO the first required Net Sales Statement. Ex. A (Comp.) ¶ 24. The Net Sales Statement established that while "Net Sales" had exceeded $60,800,000 (satisfying the first criteria of the earn-out formulas), "Landed Net Sales" failed to equal or exceed $29,200,000. *Id.* Instead, "Landed Net Sales" were $27,650,450. *Id.* As a result, the thresholds for the First Earn-Out Payment and the Direct Import Earn-Out Payment were not met. *Id.* ¶ 25.

In accordance with Section 2.7 of the Agreement, ESO's accountants, Weiser, LLP ("Weiser") made requests for access to specific documents, records and other information maintained by totes. *Id.* ¶ 29. According to the Complaint, Weiser then spent the week of December 10-14, 2007 making additional specific requests and poring over "documents and information, including with respect to [totes's] operations, account balances, and accounting procedures" relevant to the Net Sales Statement and the unachieved Potential Earn-Out Payments. *Id.*

On December 19, 2007, just before the expiration of the 45-day period for ESO to provide a detailed notice of dispute, ESO sent a letter to totes regarding the Net Sales Statement. *Id.* ¶ 28; Ex. C (Letter dated December 19, 2007 from Steven Seisser, or "Dec. 19, 2007 Letter"). The Complaint cannot and does not allege that ESO made any complaints whatsoever regarding totes's compliance with its obligations under Section 2.7(c) prior to this letter. Despite the requirement of Section 2.7(c) that any dispute letter specify the amount of each disputed item and set forth in reasonable detail the basis of the dispute, Ex. B (Agreement), § 2.7(c), ESO's December 19, 2007 letter said only that "there are certain omissions from the [Net Sales Statement], and certain items are incorrectly reflected therein." Ex. C (Dec. 19, 2007 Letter) at

1.[7] Indeed, ESO admitted in the letter that ESO had failed "to provide the detail in this notice that is contemplated by Section 2.7(c)," *id.*, and the Complaint likewise acknowledges this indisputable conclusion. Ex. A (Comp.) ¶ 28.

Neither the letter nor the Complaint identifies any specific incident, act or omission that purportedly did not comply with totes's obligations under the Agreement. Instead, the letter simply alleges without any further detail or color that "cooperation and access have been quite limited." Ex. C (Dec. 19, 2007 Letter) at 1; *see also* Ex. A (Comp.) ¶ 28 (alleging without detail totes's purported "failure to cooperate with ESO and [totes's] disregard of its contractual obligations"). The letter does not identify any specific documents or categories of documents to which ESO or Weiser had not received access. Instead, the letter notes that Weiser would later provide a list of the additional information it would like to review. Ex. C (Dec. 19, 2007 Letter) at 1.

Even though ESO admitted that its December 19, 2007 letter did not comply with the requirements of Section 2.7(c), ESO did not take any legal steps either in court or with the Independent Accounting Firm to obtain additional documents from totes prior to the expiration of the 45-day dispute period or to toll the 45-day dispute period prior to its expiration. Instead, ESO let the dispute period end without sending a satisfactory dispute notice and, according to the terms of the Agreement, the Net Sales Statement therefore became "final, binding and conclusive." Ex. B (Agreement), § 2.7(c). At no point did ESO seek to refer the matter to the Independent Accounting Firm.

---

[7]     The Court can consider this document on the motion to dismiss because it is incorporated by reference in the Complaint, *see, e.g.* Ex. A (Comp.) ¶ 28, and because ESO relies on its terms and effect in bringing this action. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002) (explaining that on motions to dismiss courts may consider both documents incorporated by reference and documents on whose terms and effect plaintiff relied in drafting complaint (citation omitted)).

**ESO Brings This Action Regarding The Potential Earn-Out Payments**

ESO filed this action on or about February 27, 2008, more than two months after the expiration of the 45-day dispute period. ESO's complaint asserts three causes of action, all of which are directly related to ESO's claim for Potential Earn-Out Payments under the Agreement. First, ESO asserts a claim for breach of contract, contending that totes failed to comply with its obligation to provide ESO with access to information necessary to analyze the Net Sales Statement and the Potential Earn-Out Payment calculations. Ex. A (Comp.) ¶ 49. ESO claims its only remedy is specific performance, *id.* ¶ 53, but seeks unspecified damages in the alternative. *Id.* ¶ 54. Second, ESO asserts a claim for breach of the implied covenant of good faith and fair dealing, alleging on information and belief that totes "manipulated" its books and records "for the purpose of precluding ESO from receiving" its Potential Earn-Out Payments. *Id.* ¶ 58. Finally, ESO claims it is entitled to indemnification under the Agreement as a result of totes's alleged breach of contract described in the first cause of action. *Id.* ¶ 63.

## ARGUMENT

I.    **The Court Should Dismiss This Action For Lack Of Jurisdiction**

A.    Legal Standard

The Court must first decide whether it has subject matter jurisdiction before proceeding to the merits of a claim. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) ("Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits."). The "party invoking federal jurisdiction bears the burden of establishing" it. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007)

8

(citation omitted).  At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted).  A court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."  Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original).

Under New York law, the meaning of a contract that is unambiguous is a question of law for the court to decide.  *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000); *see also Thayer v. Dial Indus. Sales, Inc.*, 85 F. Supp. 2d 263, 269 (S.D.N.Y. 2000)  ("'[I]ssues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss.'" (citation omitted)).[8]  The court is not required to accept allegations in the complaint that are contradicted by documents incorporated into, or integral to, the complaint.  *See Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005) (explaining that court need not accept description of terms of agreement in the complaint, but may "look to the agreement itself").

> B.    <u>The Court Should Dismiss The Complaint As Moot Because All The Causes Of Action Are Premised On ESO's Purported Claims To Potential Earn-Out Payments That Have Been Finally, Bindingly And Conclusively Determined</u>

As described above, each of ESO's causes of action is based on its effort to contest the Net Sales Statement in order to obtain Potential Earn-Out Payments.  Under the Agreement, ESO has the right to contest the Net Sales Statement provided by totes,

> provided, however, that unless Seller [*i.e.*, ESO] shall have notified Buyer [*i.e.*, totes] in writing of ***each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute***, within forty-five (45)

---

[8]    New York law governs the Agreement and disputes between the parties. Ex. B (Agreement), § 12.14.

days of Seller's [sic] delivery of the Net Sales Statement to Seller, the Net Sales Statement shall be **final, binding, and conclusive**.

Ex. B (Agreement), § 2.7(c) (underlining in original; bold and italic added). ESO admits in its Complaint that it failed to meet this requirement. Ex. A (Comp.) ¶ 28. Its December 19, 2007 letter also expressly admits this failure, noting that ESO did not "provide the detail in this notice that is contemplated by Section 2.7(c)." As a result, under the unambiguous terms of the Agreement, the Net Sales Statement is "final, binding, and conclusive."

All three causes of action in the Complaint presuppose that ESO can challenge the Net Sales Statement. The first cause of action, asserting that totes failed to provide ESO with access to information necessary to analyze the Net Sales Statement and the calculation of the Potential Earn-Out Payments, Ex. A (Comp.) ¶ 49, would provide ESO with relief only insofar as ESO could use that information to challenge the Net Sales Statement. The second cause of action, which alleges that totes "manipulated" the books and records underlying the Net Sales Statement "for the purpose of precluding ESO from receiving" the Potential Earn-Out Payments, *id.* ¶ 58, also affords ESO relief only if correcting the purported manipulation results in a new Net Sales Statement. Finally, the third cause of action, for indemnification of ESO's expenses in prosecuting the first cause of action, *id.* ¶ 63, presupposes that the first cause of action can provide ESO with relief. Yet, because ESO failed to file the required notice under the Agreement, it cannot contest the Net Sales Statement. Thus, the claims in the Complaint are moot because the relief ESO seeks would not "make a difference to the legal interests of the parties." *See Green v. Mazzucca*, 377 F.3d 182, 183 (2d Cir. 2004) (citation omitted). As a result, the Court should dismiss this case for lack of jurisdiction. *Muhammad v. City of New York Dept. of Corrections*, 126 F.3d 119, 122-23 (2d Cir. 1997).

This Court has already decided a similar claim. In *Stena Line (U.K.) Ltd. v. Sea Containers Limited*, 758 F. Supp. 934 (S.D.N.Y. 1991) (Leisure, J.), the parties had agreed to "retain an independent firm of certified public accountants of national standing and reputation in the United Kingdom (the 'Independent Firm') for the purpose of resolving . . . all remaining unresolved issues with respect to the December 31 Balance Sheet or the March 31 Balance Sheet," which determined the post-closing adjustment or adjustments following a stock purchase agreement. *Id.* at 936 n.2. Under the parties' agreement, the "party receiving each balance sheet was given sixty days after receipt to advise the opposing party in writing of the amounts and descriptions of any adjustments that the receiving party felt were necessary." *Id.* After receiving the December 31 Balance Sheet, the petitioner, Stena, informed the respondent, Holdings, of its "belief that the December 31 balance sheet was not prepared in accordance with the terms of the [parties' agreement], but Stena did not dispute the matter formally at that time," – that is, Stena did not properly challenge the balance sheet under the requirements of the governing contract. *Id.* After Holdings properly disputed the March 31 Balance Sheet, Stena sought an order compelling arbitration and Holdings contended that the petitioner had waived any dispute as to the validity of the December 31 Balance Sheet by its failure to object within the contractual sixty day period. *Id.* at 937. Holdings asked the Court to "direct the arbitrator to accept as binding the December Balance Sheet" and to resolve the dispute as to the March 31 Balance Sheet in accordance with the arbitrator's policies. *Id.*

This Court found that Holdings was "correct in asserting that the December balance sheet is not arbitrable at this point. The procedures set out in the [parties' agreement] were not satisfied in regard to the December balance sheet." *Id.* at 938. The Court further explained that "to the extent [Stena] may have attempted to preserve the right to contest the validity of the

11

December balance sheet," it had failed to do so properly under the terms of the parties' agreement. *Id.* at 938 n.3. The Court therefore granted the "petition to compel arbitration concerning the March 31 balance sheet, with the restriction that the arbitrator cannot alter the results of the December 31 balance sheet without the consent of all parties." *Id.* at 939.

The same reasoning requires the dismissal of the Complaint here. ESO failed to dispute the Net Sales Statement properly under the Agreement. As a result, the Net Sales Statement is no longer arbitrable, but instead is "final, binding and conclusive." ESO's claims all seek to alter the results of the Net Sales Statement, so those claims are now moot and the Complaint should be dismissed with prejudice for lack of jurisdiction.

## II.   Even Assuming The Court Had Jurisdiction, It Should Stay This Action Pending Arbitration

Even assuming this case were not moot and the Court had jurisdiction, the Court should stay this lawsuit pending arbitration.

### A.   Legal Standards

"The Federal Arbitration Act . . . requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1063 (2d Cir. 1993). Section 3 of the Federal Arbitration Act ("FAA") mandates that courts, "upon being satisfied that the issue involved in [a] suit or proceeding is referable to arbitration under . . . an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." *Ross v. Am. Express Co.*, 478 F.3d 96, 98 (2d Cir. 2007) (quoting 9 U.S.C. § 3). "The Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which

12

an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

    B.    <u>Even Assuming The Complaint Were Not Moot, The Present Dispute Would Be Subject To The Agreement's Arbitration Clause</u>

Even assuming the case were not moot, the Court should stay this action in favor of arbitration. When faced with a request for a stay under the FAA, a court must determine "(1) whether there exists a valid agreement to arbitrate at all under the contract in question . . . and if so, (2) whether the particular disputes sought to be arbitrated fall within the scope of the arbitration agreement." *Hartford Accident and Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001) (citation omitted); *accord Energy Transport, Ltd. v. M.V. San Sebastian*, 348 F. Supp. 186, 202 (S.D.N.Y. 2004) (Leisure, J.).

Both elements are satisfied here. First, the Agreement's referral of any dispute on the Potential Earn-Out Provisions to the Independent Accounting Firm for a "final, binding and conclusive" resolution is an arbitration clause within the meaning of the FAA. *See, e.g., Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 60 (2d Cir. 2003) (treating provision of asset purchase agreement directing a Certified Public Accountant to resolve any dispute concerning calculation of EBITDA as arbitration clause); *Blue Tee Corp. v. Koehring Co.*, 999 F.2d 633, 635 (2d Cir. 1993) (finding that referral of accounting disagreement to accounting firm for conclusive and binding resolution was arbitration clause under FAA); *Stena Line (U.K.) Ltd. v. Sea Containers Ltd.,* 758 F.Supp. 934, 936 (S.D.N.Y. 1991) (Leisure, J.) (treating clause providing that "unresolved differences" were "to be submitted to an independent accountant of national standing in England" as arbitration clause under FAA).

Second, the claims in the Complaint fall within the scope of the arbitration clause. "In determining whether a particular claim falls within the scope of the parties' arbitration

agreement, [courts] focus on the allegations in the complaint rather than the legal causes of action asserted. *If the allegations underlying the claims 'touch matters' covered by the parties' ... agreements*, then those claims must be arbitrated, whatever the legal labels attached to them." *Collins & Aikman Products Co., v. Building Sys., Inc.*, 58 F.3d 16, 20-21 (2d Cir. 1995) (citation omitted). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

As described above, each of the claims in this action is based on a dispute over whether the Net Sales Statement is correct and whether the Potential Earn-Out Payment thresholds have been met. The claims plainly touch upon the resolution of disputes over Potential Earn-Out Payments in the arbitration clause, Ex. B (Agreement), § 2.7(c), and the claims therefore should be stayed pending arbitration.[9] *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987) (explaining that FAA "leaves no place for the exercise of discretion by a district court") (quoting *Dean Witter Reynolds Inc.*, 470 U.S. at 218).

ESO recognizes in its Complaint that it is required "to reconcile its disputes with [totes] as contemplated by the Agreement or to submit them to an 'Independent Accounting Firm.'" Ex. A (Comp.) ¶ 46. ESO alleges, however, that it failed to do so "because a necessary condition

---

[9]      Even if one of the claims were not arbitrable, "[w]hen there is a combination of arbitrable and non-arbitrable issues, a court has discretion to stay the non-arbitrable issues pending arbitration." *F.D. Imp. & Exp. Corp. v. M/V Reefer Sun*, 248 F. Supp. 2d 240, 250-51 (S.D.N.Y. 2002); *see also Moore v. Interacciones Global, Inc.*, No. 94 Civ. 4789(RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995) (staying all claims where underlying facts of claims were similar and arbitration could potentially dispose of claims while avoiding the risk of inconsistent results and unnecessary duplication). Indeed, "[b]road stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit," *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 856 (2d Cir. 1987), or the stay "'would promote judicial economy, avoidance of confusion and possible inconsistent results and would not work undue hardship or prejudice' against plaintiffs." *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995) (citation omitted).

precedent – *i.e.*, access to [totes's] books and records – has not been satisfied by" totes. *Id.* ESO's attempt to justify its failure to abide by the explicit terms of the Agreement requiring arbitration of Potential Earn-Out Payment disputes misreads the Agreement by inserting in it a non-existent condition precedent and ignores controlling law that assigns to the arbitrator the question of whether a condition precedent has been fulfilled. The Complaint does not refer to anything in the Agreement that suggests that referral to arbitration is subject to any condition precedent. Indeed, there is none. Even if access to totes's books and records were a condition precedent, it would be up to the Independent Accounting Firm to decide whether that condition precedent was met by the seven days Weiser spent "accessing and reviewing various documents and information, including with respect to [totes's] operations, account balances, and accounting procedures." Ex. A (Comp.) ¶ 29; *see Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84-85 (2002) ("[A]n arbitrator shall decide whether a condition precedent to arbitrability has been fulfilled") (citations omitted); *Town Cove Jersey City Urban Renewal, Inc. v. Procida Const. Corp.*, No. 96 Civ. 2551 (PKL), 1996 WL 337293, at *2 (S.D.N.Y. June 19, 1996) (Leisure, J.) ("Whether or not a condition precedent to arbitration has been satisfied is a procedural matter for the arbitrator to decide."). Accordingly, if the Court does not dismiss the action for lack of jurisdiction it should stay the action pending arbitration.

**III. In The Alternative, The Court Should Dismiss Each Cause Of Action For Failing To State A Claim**

In the event the Court declines to dismiss the entire Complaint because the Net Sales Statement is final, binding and conclusive or to stay this action pending arbitration, the Court should dismiss each cause of action for failing to state a claim.

A.    ESO's Breach Of Contract Claim Should Be Dismissed Because ESO Has Not
       Adequately Alleged That It Is Entitled To Specific Performance Or Damages

ESO's first cause of action alleges that totes breached the Agreement by failing to

provide ESO with access to the books, records and other information necessary for ESO to

analyze the Net Sales Statement and the calculation of the Potential Earn-Out Payments. ESO

seeks either "specific performance of [totes's] duties and obligations under the Agreement" or

unspecified damages. Ex. A (Comp.) ¶¶ 53-54. This claim fails to state a cause of action

because (1) a decree of specific performance would be both unclear and unduly burdensome on

the Court and (2) ESO has no plausible claim to damages for a books and records breach.

1.    *ESO Has Not Alleged A Claim That Entitles It To An Equitable Decree Of
       Specific Performance*

ESO asks this Court to order "specific performance of [totes's] duties and obligations

under the Agreement." Ex. A (Comp.) ¶ 53. The relevant provision of the Agreement is Section

2.7(e),[10] which provides that:

> For purposes of complying with the terms and conditions set forth
> in this Section 2.7, Buyer [*i.e.*, totes] shall, and shall cause its
> Affiliates and Buyers' Accountants [*i.e.* the Cincinnati, Ohio office
> of PricewaterhouseCoopers LLP] to, reasonably cooperate with
> Seller [*i.e.*, ESO] and Seller's Accountants [*i.e.* Weiser] and afford
> reasonable access to all information, records, invoices, data and
> auditors' working papers of Buyer and Buyer's Accountants as
> may be required in connection with the analysis of any Net Sales

---

[10]    To the extent ESO is asserting rights under the general books and records provision of Section
9.1(a), *see* Ex. A (Comp.) ¶ 23, that provision is inapplicable here. First, totes's access obligations with
respect to the Potential Earn-Out Payments are governed by the specific provisions of Section 2.7(e),
which controls over the general provision in Section 9.1(a). *See Isaacs v. Westchester Wood Works, Inc.,*
278 A.D.2d 184, 185, 718 N.Y.S.2d 338, 339 (1st Dep't 2000) (explaining that specific contractual clause
takes precedence over general clause in contract). The scope of Section 9.1(a) further confirms that it is
not applicable to the Potential Earn-Out Payments because it applies only to books and records "retained
and remaining in existence after the Closing" [*i.e.* October 6, 2006], Ex. B (Agreement), §§ 3.1, 9.1(a),
while the First Earn-Out Period ran from September 30, 2006 to September 30, 2007. Ex. A (Comp.) ¶ 8.
Thus, only 6-days' worth of documents subject to Section 9.1(a) could even be relevant to the Potential
Earn-Out Payments.

> Statement, and/or [Potential Earn-Out Payment], and resolution of
> any dispute covered by section 2.7(c).

Ex. B (Agreement), § 2.7(e). A decree of specific performance that orders totes to comply with

this provision would be improper because such an order would be impermissibly vague and

would result in an undue burden on this Court of monitoring disputes relating to compliance.

"It is well settled that for the granting of specific performance the contract must be

sufficiently certain in its terms to permit the decree to state with some exactness what the

defendant must do." *Gulbenkian v. Gulbenkian*, 147 F.2d 173, 175 (2d Cir. 1945). This is not

merely an academic requirement; instead, "[i]f specific performance or an injunction is to be

granted, it is important that the terms of the contract are sufficiently certain to enable the order to

be drafted with precision because of the availability of the contempt power for disobedience."

Restatement (Second) of Contracts § 362, cmt. b (1981); *see also Netherby Ltd. v. Jones Apparel*

*Group, Inc.*, No. 04 Civ. 7028(GEL), 2007 WL 1041648, at *20 (S.D.N.Y. April 5, 2007)

("Specific performance is not appropriate where the terms of the contract to be enforced are not

'certain enough to permit the [C]ourt to frame an order of specific performance . . . and to

determine whether resulting performance is in accord with what has been ordered.'" (citation

omitted)). A decree of specific performance also should be denied if "the burdens on the court to

enforce the order would outweigh any benefits to be gained." *Netherby*, 2007 WL 1041648, at

*20; Restatement (Second) of Contracts § 366 (1981) ("A promise will not be specifically

enforced if the character and magnitude of the performance would impose on the court burdens

in enforcement or supervision that are disproportionate to the advantages to be gained from

enforcement and to the harm to be suffered from its denial.").

A decree ordering specific performance of totes's "duties and obligations under the

Agreement," Ex. A (Comp.) ¶ 53, would of course be far from "sufficiently certain." Even a

decree ordering compliance with Section 2.7(e) would be improper because Section 2.7(e) does not speak in certainties but instead requires nuanced consideration of the terms "reasonably cooperate" and "reasonable access" as well as a determination of what information is "required in connection with the analysis of any Net Sales Statement, calculation of any [Potential Earn-Out Payment], and resolution of any dispute covered by Section 2.7(c)." Ex. B (Agreement), § 2.7(e); *cf. Netherby*, 2007 WL 1041648, at \*20 (refusing to award "specific performance of defendant's obligation to keep plaintiff 'generally informed' of licensees' activities" because the term "generally informed" provided "no meaningful guidance to the Court in framing an order or ensuring compliance."). In effect, ESO is seeking not specific performance but a discovery monitor for its arbitrable dispute. That monitor should be the Independent Accounting Firm. The burden on this Court of refereeing discovery for a dispute the parties agreed to arbitrate would far outweigh the benefits since resolution of the access issues would not even resolve the underlying dispute regarding the Net Sales Statement, even assuming that the dispute was not moot.

## 2.   *ESO Has Not Plead Damages For Its Breach Of Contract Claim*

ESO argues in the alternative that it is entitled to damages as a result of totes' alleged failure to comply with the access and cooperation provisions of Section 2.7(c). Ex. A (Comp.) ¶ 54. The only allegation of damages in the Complaint resulting from this purported breach is that "as a direct and proximate result of the conduct of [totes], ESO has been damaged, and continues to be damaged." *Id.* This is precisely the sort of "conclusory allegation[] or legal conclusion[] masquerading as [a] factual conclusion[] [that] will not suffice to [defeat] a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (citation omitted). The Complaint simply does not make a plausible allegation of monetary damages to ESO from a lack of access to unspecified books and records. *Cf. Iqbal v. Hasty*, 490 F.3d 143,

157-58 (2d Cir. 2007) (A court must apply a "flexible 'plausibility standard,' which obliges a

pleader to amplify a claim with some factual allegations in those contexts where such

amplification is needed to render the claim *plausible*.") (emphasis in original).

B.  ESO's Implied Covenant Of Good Faith And Fair Dealing Claim Should Be
    Dismissed Because It Is Redundant Of The Breach Of Contract Claim And
    Because It Fails To Plead The Alleged "Manipulation" With Particularity

ESO's second cause of action contends that totes breached an implied covenant of good

faith and fair dealing by failing to provide ESO with the documents ESO requested and, "on

information and belief," because totes "manipulated" its books and records "for the purpose of

precluding ESO from receiving" the Potential Earn-Out Payments.[11]  This claim fails to state a

cause of action because (1) New York law does not recognize a good faith and fair dealing claim

as an independent cause of action and (2) the substance of ESO's claim is that totes defrauded it,

but ESO does not plead the purported "manipulation" with particularity.

"Under New York law, parties to an express contract are bound by an implied duty of

good faith, 'but breach of that duty is merely a breach of the underlying contract.'" *Fasolino*

*Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (citation

omitted).  As a result, courts routinely dismiss claims for breach of the implied duty of good faith

and fair dealing as duplicative of breach of contract claims.  *See, e.g.*, *Computech Int'l, Inc. v.*

*Compaq Computer Corp.*, No. 02 Civ. 2628(RWS), 2002 WL 31398933, at *4 (S.D.N.Y. Oct.

24, 2002); *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354 (S.D.N.Y. 2001); *O'Hearn v.*

*Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 11 (E.D.N.Y. 1998).  The Court should therefore dismiss

---

[11]     Paragraph 57 of the Complaint alleges that "by virtue of the conduct described above, [totes] has acted in bad faith and in willful disregard of the rights of ESO under the Agreement."  This allegation fails to meet even the most lenient reading of Federal Rule of Civil Procedure 8(a) because it fails to identify what conduct allegedly was in bad faith.  *Cf. Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" (citation omitted)).  For purposes of this motion, totes will assume the conduct described in Paragraph 57 is the conduct underlying ESO's first cause of action.

ESO's second cause of action, which rests on the same factual premise as its first cause of action. *See* Ex. A (Comp.) ¶ 55 (incorporating prior allegations), ¶ 57 (basing claim on "the conduct described above"), ¶ 58 (describing manipulation of books and records for purposes of Net Sales Statement as particularized allegation of conduct previously alleged).

The second cause of action also fails to state a claim because the Complaint does not allege with particularity that totes "manipulated [its] books, records, and other information . . . for the purpose of precluding ESO from receiving" the Potential Earn-Out Payments. Ex. A (Comp.) ¶ 58 (emphasis added). Allegations of manipulating records to avoid making payments sound in fraud. *See, e.g., Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 100-101 (S.D.N.Y. 2004) (requiring claim that firm "manipulated" corporate restructuring and related transactions to be plead with sufficient particularity); *Brower v. Nydic, Inc.*, 1 F. Supp. 2d 325, 327 (S.D.N.Y. 1998) (reviewing under Rule 9(b) allegations that defendant "manipulated" records in order to avoid paying bonus). "When the complaint contains allegations of fraud, Fed.R.Civ.P. 9(b) requires that the 'circumstances constituting fraud...be stated with *particularity*.'" *Chill v. General Elec. Co.*, 101 F.3d 263, 266 (2d Cir. 1996) (italics in original); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995) (dismissing complaint for failure to plead with sufficient particularity and stating that allegations of fraud cannot be based upon "speculation and conclusory allegations") (citation omitted).

"[A] manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants. General allegations not tied to the defendants or resting upon speculation are insufficient." *ATSI Commc's., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) (citations omitted). ESO's claim fails to meet this standard because it offers only a single conclusory allegation – made on information and belief – that totes

"manipulated [its] books, records, and other information . . . for the purpose of precluding ESO

from receiving the entirety of the amounts to which" ESO believes it is entitled.  Ex. A (Comp.)

¶ 58.  It is black letter law in the Second Circuit that "Rule 9(b) pleadings cannot be based upon

information and belief [except] as to facts peculiarly within the opposing party's knowledge, in

which event the allegations must be accompanied by a statement of facts upon which the belief is

based."  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)

(citation omitted).  The Complaint cannot and does not plead that totes had exclusive information

on sales figures, particularly since ESO's accountants spent seven days reviewing totes's books

and records, Ex. A (Comp.) ¶ 29, nor does it allege even a single fact that would serve as a basis

to believe that totes "manipulated" its books and records rather than simply gave those records

an accounting treatment under GAAP that ESO disputed.  Indeed, the Complaint fails to allege

any details whatsoever with regard to: (1) who "manipulated" books and records; (2) which

books and records were "manipulated;" or (3) the manner in which the documents were

"manipulated."  As a result, the Court should dismiss the second cause of action under Rule 9(b).

      C.    ESO's Indemnification Claim Should Be Dismissed Because It Is Derivative Of
             ESO's Meritless First Cause Of Action And Because Potential Earn-Out Payment
             Disputes Are Governed By Section 2.7

ESO's third cause of action seeks indemnification under Article XI of the Agreement for

any expenses ESO incurred as a result of totes' alleged breach of its books and records

obligations under Section 2.7 of the Agreement.  Ex. A (Comp.) ¶¶ 62-64.  This claim exists

solely as a derivative claim for the first cause of action in the Complaint.  The Court can

therefore dismiss this cause of action because the first cause of action does not state a claim, as

described above.  *See* Section III.A *supra*.

In addition, this claim is meritless because Section 2.7(c) of the Agreement expressly

provides that the "fees and disbursements of Seller's Accountants incurred in connection with

Seller's activities pursuant to this Section 2.7 shall be the obligation of Seller." Ex. B (Agreement), § 2.7(c). This specific provision governing costs under Section 2.7 controls over the general indemnification provisions in article XI of the Agreement. *See Isaacs v. Westchester Wood Works, Inc.*, 278 A.D.2d 184, 185, 718 N.Y.S.2d 338, 339 (1st Dep't 2000). As a result, the indemnification claim fails to state a cause of action as a matter of law.

## CONCLUSION

For the foregoing reasons, totes respectfully requests that this Court dismiss the Complaint with prejudice or, in the alternative, stay this action pending arbitration.

Dated: New York, New York
April 18, 2008

**COHEN & GRESSER LLP**

By:      _____/s/_____

Mark S. Cohen (mcohen@cohengresser.com)
Daniel H. Tabak (dtabak@cohengresser.com)
Oliver Haker (ohaker@cohengresser.com)
100 Park Avenue, 23rd Floor
New York, New York 10017
Telephone: (212) 957-7600

*Attorneys for Defendant totes Isotoner Corporation*

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)**

Page 1

**H**Computech Intern., Inc. v. Compaq Computer
Corp.
S.D.N.Y.,2002.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
COMPUTECH INTERNATIONAL, INC., Plaintiff,
v.
COMPAQ COMPUTER CORPORATION,
Defendant.
**No. 02 Civ. 2628(RWS).**

Oct. 24, 2002.

In action by reseller of computer equipment and
software against computer manufacturer alleging
breach of an oral agreement and of covenant of good
faith and fair dealing, fraud, negligent
misrepresentation, and trade libel, manufacturer
moved to dismiss the complaint and reseller cross-
moved for leave to file an amended complaint. The
District Court, Sweet, J., held that: (1) reseller failed
to state a cause of action for breach of an oral
agreement; (2) cause of action was also precluded by
statute of frauds; (3) claim for breach of the implied
covenant of good faith and fair dealing did not
provide a separate cause of action; (4) fraud cause of
action and claim of negligent misrepresentation failed
to provide the necessary particulars; (5) motion for
leave to serve an amended complaint to allege
necessary particulars of fraud cause of action would
be allowed; (6) reseller stated a claim for reputational
injury; and (7) written contract precluded quantum
meruit claim.

Motions granted.

West Headnotes

**[1] Contracts 95 ☞333(1)**

95 Contracts
    95VI Actions for Breach
        95k331 Pleading
            95k333 Allegation or Statement of Contract
or Promise
                95k333(1) k. In General. Most Cited
Cases

Reseller of computer equipment failed to state a
cause of action against computer manufacturer for
breach of an oral agreement to permit reseller to sell
manufacturer's products to other resellers at special,
discounted pricing, where the complaint failed to
allege the quantity, the level of discounted pricing,
the duration of the agreement, and other essential
terms.

**[2] Contracts 95 ☞25**

95 Contracts
    95I Requisites and Validity
        95I(B) Parties, Proposals, and Acceptance
            95k25 k. Agreement to Make Contract in
Future. Most Cited Cases
Alleged promise to enter into a written agreement
was not a binding obligation under New York law.

**[3] Frauds, Statute Of 185 ☞44(4)**

185 Frauds, Statute Of
    185V Agreements Not to Be Performed Within
One Year or During Lifetime
        185k44 Nature and Subject-Matter
            185k44(4) k. Contracts of Sale, Leasing, or
Hiring. Most Cited Cases

**Frauds, Statute Of 185 ☞85**

185 Frauds, Statute Of
    185VII Sales of Personal Property
        185VII(A) Contracts Within Statute
            185k85 k. Nature and Amount of Price.
Most Cited Cases
New York statute of frauds precluded cause of action
for breach of oral contract which necessarily involved
the purchase of more than $500 of goods and which
by its terms could not be performed within one year
of its creation. McKinney's N.Y. U.C.C. §§ 2-106(1),
2-201; McKinney's N.Y. Gen.Oblig.Law § 5-
701(a)(1).

**[4] Contracts 95 ☞326**

95 Contracts
    95VI Actions for Breach

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

95k326 k. Grounds of Action. Most Cited Cases

**Federal Civil Procedure 170A** ☜675.1

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(B) Complaint
            170AVII(B)1 In General
                170Ak675 Alternate, Hypothetical and Inconsistent Claims
                    170Ak675.1 k. In General. Most Cited Cases
Under New York law, a claim for breach of the implied covenant of good faith and fair dealing did not provide a cause of action separate from the breach of contract claim, and it had to be dismissed as a matter of law as redundant.

**[5] Fraud 184** ☜13(3)

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k8 Fraudulent Representations
            184k13 Falsity and Knowledge Thereof
                184k13(3) k. Statements Recklessly Made; Negligent Misrepresentation. Most Cited Cases
Fraud cause of action and claim of negligent misrepresentation by computer reseller against manufacturer failed to provide the necessary particulars, since the special relationship required by New York law for such an action in connection with an alleged breach of contract was not set forth in the complaint, nor was one apparent.

**[6] Federal Civil Procedure 170A** ☜840

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak839 Complaint
                170Ak840 k. Time for Amendment. Most Cited Cases
Motion for leave to serve an amended complaint to allege necessary particulars of fraud cause of action would be allowed, where motion was filed at the early stages of the litigation and no discovery had been had. Fed.Rules Civ.Proc. Rules 9(b), 15(a), 28 U.S.C.A.

**[7] Libel and Slander 237** ☜33

237 Libel and Slander
    237I Words and Acts Actionable, and Liability Therefor
        237k31 Injury from Defamation
            237k33 k. Presumption as to Damage. Most Cited Cases

**Libel and Slander 237** ☜135

237 Libel and Slander
    237V Slander of Property or Title
        237k135 k. Injury from Slander. Most Cited Cases
Claim for trade libel, based on e-mail from computer manufacturer to resellers which labelled plaintiff as a broker of grey market for manufacturer's products, which was alleged to be false, was dismissable under New York law where the complaint failed to plead special damages, but a fair reading showed that this was a claim for reputational injury, as to which special damages need not be alleged.

**[8] Federal Civil Procedure 170A** ☜851

170A Federal Civil Procedure
    170AVII Pleadings and Motions
        170AVII(E) Amendments
            170Ak851 k. Form and Sufficiency of Amendment. Most Cited Cases
Leave to amend to plead an additional cause of action would be denied where the proposed claim was legally insufficient on its face. Fed.Rules Civ.Proc. Rule 15, 28 U.S.C.A.

**[9] Implied and Constructive Contracts 205H** ☜55

205H Implied and Constructive Contracts
    205HI Nature and Grounds of Obligation
        205HI(D) Effect of Express Contract
            205Hk55 k. In General. Most Cited Cases
Written contract which formed the basis of cause of action for breach of contract precluded quantum meruit claim, under New York law.

Ochs & Goldberg, LLP, New York, NY, By:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

Mitchell D. Goldberg, for Plaintiff, of counsel.
Brobeck Phleger & Harrison, New York, NY, By:
Kenneth J. King, Aaron M. Zeisler, for Defendant, of
counsel.

### OPINION

SWEET, J.
*1 Defendant Compaq Computer Corporation
("Compaq") has moved under Rule 12(b)6,
Fed.R.Civ.P., to dismiss the complaint of plaintiff
Computech International, Inc. ("CTI") which has
cross-moved under Rule 15(a), Fed.R.Civ.P., for
leave to file an amended complaint. For the reasons
set forth below, both motions are granted.

### The Parties

Compaq, a Delaware corporation, is a manufacturer
of computer hardware and systems. CTI, a New York
corporation, is a reseller of computer equipment and
software with particular experience in the video
editing market.

### Prior Proceedings

In April 2002, CTI filed its complaint alleging that as
an inducement for CTI to assist Compaq in entering
the video editing market, Compaq offered CTI
special discounted pricing for sale of Compaq
equipment to other resellers, (Compl.¶ 5), and that
"Compaq represented to CTI that it would prepare an
agreement with CTI which would memorialize its
intention to offer special, discounted pricing to CTI
across the board on sales of all Compaq product,"
since "[h]eretofore, special discounted pricing,
referred to by Compaq as a 'TOSS' discount was only
offered by Compaq to resellers for sale to designated
end-users."(Compl.¶  6). The complaint alleges
further that Compaq and CTI entered into an oral
agreement to permit CTI to sell Compaq products to
other resellers at special, discounted pricing referred
to by Compaq as the "TOSS" discount (the
"Agreement") (Compl.¶ 15), and that "[d]uring the
period from March 2000 through June 2001, CTI
invested substantial time, effort and expense in,
*interalia,* integrating Pinnacle Systems hardware or
Matrox hardware, Adobe software with Compaq
desktop in order to create a 'turnkey' product for an
end-user in the video production marketplace,"
(Compl.¶ 7), that it was "pressured by Compaq

salespeople" to sell Compaq product, including
storage, networks and servers, with assurances that
CTI would receive "special, discounted pricing on
Compaq product" (Compl.¶ 9), and that it did, in fact,
receive the special, discounted pricing on Compaq
product it sold. (Compl.¶ 10).

The complaint also alleges that even though
representatives of Compaq were aware that CTI was
a reseller of computer products, "and therefore was
not subject to any restrictions on the sale of Compaq
products" (Compl.¶ 12), in May 2001, CTI was
"advised by a sales representative that Compaq was
discontinuing the special discounted pricing due to
Compaq's belief that CTI was competing with
Compaq in the sale of Compaq product," (Compl.¶
11), and that Compaq, in violation of the Agreement,
discontinued the TOSS discount given to CTI and has
refused to sell Compaq product to CTI, resulting in
no less than $750,000 in damages.

The complaint also alleges that Compaq committed
fraud and negligent misrepresentation when it
"represented to and stated to CTI that it would enter
into a written agreement with CTI which would
include special, discounted pricing," (Compl.¶¶ 24,
33), even though Compaq had no intention of
entering into such a written agreement and knew its
representations to CTI were false. (Compl.¶¶ 25, 26,
36). With respect to its fraudulent misrepresentation
claim, CTI alleges that Compaq's fraud "evidences a
high degree of moral turpitude" and "wanton
dishonesty" warranting the imposition of punitive
damages, (Compl.¶ 30).

*2 The complaint also alleges that "[i]n or about
June, 2001, Compaq sent a 'blast' e-mail to
authorized resellers of Compaq product whereby it
labeled CTI as a 'broker' of 'grey market' Compaq
product and barred authorized resellers from
purchasing Compaq product from CTI (Compl.¶ 13),
thus committing trade libel because recipients of the
e-mail refused to purchase Compaq products from
CTI, damaging it in an amount not less than
$1,000,000, as well as an award of punitive damages.
(Compl.¶¶ 44-46).

The complaint thus alleged five causes of action, a
breach of an oral agreement, of good faith and fair
dealing, fraud, negligent misrepresentation and trade
libel.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

The amended complaint which CTI seeks leave to file adds details to the fraud cause of action, adds a sixth cause of action for *quantummeruit,* and a seventh cause of action for breach of contract.

The motions were heard and marked submitted on June 19, 2002.

*The Causes Of Action For Breach Of An Oral Contract And Good Faith And Fair Dealing Are Dismissed*

"The doctrine of definiteness or certainty is well established in contract law. In short, it means that a court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to.... If an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract."*166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp., 78 N.Y.2d 88, 91, 575 N.E.2d 104, 571 N.Y.S.2d 686, 687 (1991)* (internal quotations and citations omitted). A claim for breach of contract, "must, at a minimum, allege the terms of the contract, each element of the alleged breach and the resultant damages in a plain and simple fashion."*Zaro Licensing, Inc. v. Cinmar, Inc., 779 F.Supp. 276, 286 (S.D.N.Y.1991).*

[1] In the oral contract set forth in the complaint, the essential terms are left open. CTI has alleged only that "Compaq and CTI entered into an oral agreement to permit CTI to sell Compaq products to other resellers at special, discounted pricing referred to by Compaq as the 'TOSS' discount. (Compl.¶ 15). Quantity, the level of "discounted pricing," the duration of the agreement nor any other terms are alleged. See*Huntington Dental v. Minnesota Mining, 1998 WL 60954, at *3 (Feb. 13, S.D.N.Y.); Zaro Licensing, 779 F.Supp. at 286.*

[2] CTI has also alleged that Compaq promised to enter into a written agreement with it, or in other words, that the parties "agreed to agree." Such promises are not recognized as binding obligations under New York law. See*Miller v. Tawil, 165 F.Supp.2d 487, 492 (S.D.N.Y.2001)* ("There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents.")

(internal citations and quotations omitted); *N.F.L. Ins. Ltd. by Lines v. B & B Holdings, Inc., 874 F.Supp. 606, 614 (S.D.N.Y.1995)* (finding that an "agreement" which is contingent on future consent of the parties is not binding but rather an unenforceable "agreement to agree."). As a result, CTI's claim that it had an agreement with Compaq should be dismissed.

*3[3] Even if CTI had adequately pled the terms and conditions of the alleged contract, its breach of oral contract claim fails for lack of a writing. The Statute of Frauds was "intended to prevent fraud in the proving of certain legal transactions particularly susceptible to deception, mistake and perjury ..."*D & N Boening, Inc. v. Kirsch Beverages, Inc., 63 N.Y.2d 449, 453, 472 N.E.2d 992, 993, 483 N.Y.S.2d 164, 165 (1984),* and to "ensure the existence of a valid agreement...."*Shaftel v. Dadras, 39 F.Supp.2d 217, 228 (E.D.N.Y.1999).* As explained below, enforcement of the alleged oral agreement between CTI and Compaq is precisely the type of situation that the Statute of Frauds was intended to prevent, and the alleged agreement is barred by both the New York General Obligations Law and its Uniform Commercial Code ("U.C.C.") Statute of Frauds.

A contract for the sale of goods in excess of $500 falls within the ambit of the U.C.C.'s Statute of Frauds and therefore must be in writing to be enforceable. N.Y.U.C.C. § 2-201. A sale is broadly defined by the U.C.C. as "the passing of title from the seller to the buyer for a price."N.Y.U.C.C. § 2-106(1).

Under New York law, U.C.C. § 2-201 applies to distribution agreements which necessarily involve the purchase of more than $500 of goods, and courts have dismissed plaintiffs' claims for breach of oral contracts when not evidenced by a writing. See*Huntington Dental, 1998 WL 60954, at *4* (barring enforcement of an oral contract under U.C.C. § 2-201 where a defendant was to supply its dental and medical products to plaintiff because the complaint necessarily involved more than $500 in goods); *Wallach Marine Corp. v. Donzi Marine Corp., 675 F.Supp. 838, 840 (S.D.N.Y.1987)* (dismissing cause of action for breach of alleged oral dealership agreement under U.C.C. § 2-201 where the complaint indicated that products to be purchased by plaintiff were in excess of $500); *United Beer Distributing Co. v. Hiram Walker, Inc., 163 A.D.2d*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

Page 5

79, 80, 557 N.Y.S.2d 336, 337 (1st Dep't 1990) (finding plaintiff beer distributor's claim for breach of oral contract barred by the U .C.C. Statute of Frauds because the alleged agreement involved the sale of more than $500 of beer).

Under the Statute of Frauds, an agreement that by its terms cannot be performed within one year of its creation is void unless it is in writing.N.Y.Gen.Oblig.Law § 5-701(a)(1) (McKinney 1993). Under New York law, contracts of indefinite duration are deemed to be incapable of being performed within a year, and thus fall within the ambit of the Statute of Frauds. See Huntington Dental, 1998 WL 60954, at *3-4 (finding that General Obligations Law § 507-1 barred an alleged oral agreement for defendant to supply its dental and medical products to plaintiff because the complaint "contains no allegations of ... the contract's duration and scope" and a contract of indefinite duration cannot be performed within a year); United Beer Distributing, 163 A.D.2d at 81, 557 N.Y.S.2d at 338 (finding plaintiff beverage distributor's claim for breach of oral contract to be barred because the alleged agreement "called for performance of an indefinite duration and could only be terminated within one year by its breach during that period, [and was thus] not one which by its terms could be performed within one year."); D & N Boening, Inc., 63 N.Y.2d at 457, 472 N.E.2d at 995, 483 N.Y.S.2d at 167 (oral agreement that plaintiff alleged was to continue for as long as plaintiff distributed Yoo-Hoo chocolate beverage satisfactorily was of indefinite duration, and as such, void under the Statute of Frauds).

*4[4] New York law does not recognize a cause of action for breach of an implied covenant independent of a claim for breach of the underlying contract. "Under New York law, parties to an express contract are bound by an implied duty of good faith, 'but breach of that duty is merely a breach of the underlying contract.' " Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro, 961 F.2d 1052, 1056 (2d Cir.1992) (quoting Geler v. National Westminister Bank USA, 770 F.Supp. 210, 215 (S.D.N.Y.1991)).

Since a claim for breach of the implied covenant of good faith and fair dealing does not provide a cause of action separate from a breach of contract claim, it must be dismissed as a matter of law as redundant.

See Alter v. Bogoricin, No. 97 Civ. 0662, 1997 WL 691332, at *7 (S.D.N.Y. Nov. 6, 1997) (dismissing breach of implied covenant of good faith and fair dealing claim because" ... the covenant of good faith and fair dealing is not distinct from the underlying contract, and therefore, as a general rule, the cause of action alleging breach of good faith is duplicative of a cause of action alleging breach of contract") (citations and internal quotation marks omitted); Village on Canon v. Bankers Trust Co., 920 F.Supp. 520, 534 (S.D.N.Y.1996) ( "The implied covenant ... does not create any new contractual rights, nor does it provide an independent basis for recovery.") (citations and internal quotation marks omitted); Fruitco S.A. de C.V. v. Bankers Trust Co., 833 F.Supp. 288, 300 (S.D.N.Y.1993) (finding that plaintiffs' breach of the implied covenant of good faith and fair dealing claim "necessarily fails because it is derivative of the Plaintiffs' cause of action for breach of contract."); O'Hearn v. Bodyonics, Ltd., 22 F.Supp.2d 7, 11-12 (E.D.N.Y.1998) (dismissing breach of implied covenant of good faith claims as a matter of law because they are duplicative of breach of contract claims); Canstar v. J.A. Jones Constr. Co., 212 A.D.2d 452, 453, 622 N.Y.S.2d 730, 731 (1st Dep't 1995) (finding a claim for a breach of an implied covenant of good faith and fair dealing to be "redundant" since it "is intrinsically tied to the damages allegedly resulting from a breach of the contract.").

CTI in its opposition to Compaq's motion does not seriously challenge the propositions of law referred to above and the first and second causes of action are dismissed.

*The Fraud And Negligent Misrepresentation Causes Of Action Are Dismissed*

[5] The initial attack launched by Compaq against the complaint was based on Rule 9(b), Fed.R.Civ.P., and the failure of CTI to provide sufficient particulars of the alleged fraud claim. In opposition, CTI has inappropriately submitted an affidavit of Eli Zvi (the "Zvi Affidavit"), the director of sales and marketing of CTI, to supply the missing details which are also incorporated in the amended complaint.

For the reasons set forth by Compaq, the fraud cause of action and the claim of negligent misrepresentation as set forth in the complaint are dismissed as failing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

to provide the necessary particulars. These are, however, supplied in the proposed amended complaint.

*5 New York law provides that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated."_Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.,_ 70 N.Y.2d 382, 389, 516 N.E.2d 190, 193, 521 N.Y.S.2d 653, 656 (1987) (citation omitted); _Fort Ann Central School Dist. v. Hogan,_ 206 A.D.2d 723, 725, 614 N.Y.S.2d 803, 805 (3d Dep't 1994) (the "lack of [a] separate relationship distinct from the contract precludes a claim of negligent misrepresentation").

"Under New York law, there is no action for negligent misrepresentation of a promise of future conduct unless there is a special relationship between the parties."_Village on Canon,_ 920 F.Supp. at 531 (citing_American Protein Corp. v. AB Volvo,_ 844 F.2d 56, 63-64 (2d Cir.), _cert. denied,_488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988)). As previously stated by this Court:

In order to state a claim for negligent misrepresentation, [defendant] must have misrepresented a fact. Because a negligent promissory misrepresentation is not a misrepresentation of a fact, a special relationship must exist between the parties in order for promissory misrepresentation to give rise to a justiciable claim.

_Fruitco,_ 833 F.Supp. at 300 (internal citations omitted). No such special relationship is set forth in the complaint and nor is one apparent. See_Bell Sports, Inc. v. System Software Associates, Inc.,_ 45 F.Supp.2d 220, 229 (E.D.N.Y.1999) (no "special relationship exists between a software purchaser and the reseller"; it "cannot be said that the technical nature of computers and computer software imposes a special relationship and/or duty upon the software vendor who enters into a contract with a large, highly skilled company") (citations omitted).

_Leave To File An Amended Complaint Is Granted_

[6] However, leave is granted to file an amended complaint with its restated fraud cause of action.

Federal Rule 15(a) provides that leave to amend a complaint shall be "... freely given when justice so requires.""In the absence of 'undue delay, bad faith, or dilatory motive on the part of the movant,' permission to amend should be granted unless it would unduly prejudice the opposing party."_Communication Workers of America, AFL-CIO v. NYNEX Corp.,_ 1998 WL 85323, at 1 (S.D.N.Y. February 26, 1998); citing_Foman v. Davis,_ 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). CTI has moved for leave to serve an amended complaint at the early stages of this litigation, no discovery has been had, and it is appropriate to grant leave file an amended complaint.

_The Motion To Dismiss The Libel Claim Is Denied_

[7] CTI has alleged a libel arising out of the e-mail sent by Compaq to other resellers. Compaq has noted the failure of the complaint to allege special damages, a required element for trade libel.

Under New York law, "[t]he tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business or property."_Nevin v. Citibank, N.A.,_ 107 F.Supp.2d 333 (S.D.N.Y.2000) (internal quotation and citation omitted)."The phrase 'produce disparagement' refers to words or conduct which tend to disparage or reflect negatively on the quality, condition or value of product or property."_Kirby v. Wildenstein,_ 784 F.Supp. 1112, 1115 (S.D.N.Y.1992). CTI must establish therefore "four essential elements to prevail on its claim of disparagement of goods: (1) the falsity of the alleged statements; (2) publication to a third person; (3) malice; and (4) special damages."_Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,_ 75 F.Supp.2d 235, 239 (S.D.N.Y.1999).

*6 However, CTI has only pled three of the four elements required to state a claim for trade libel. While CTI has alleged that the e-mail was false, that it was sent to other resellers and that it was done with malice (Compl.¶¶ 43-43, 46), CTI has failed to plead the fourth requirement-special damages-and thus a claim for trade libel is dismissable. "The requirement of pleading and ultimately proving special damages 'goes to the cause of an action itself and not merely to the recovery.'...Courts considering product

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

disparagement claims have therefore applied this requirement strictly, granting motions to dismiss or for summary judgment for failure to allege special damages with the requisite specificity."_Kirby, 784 F.Supp. at 1116._ "[I]f the special damage was a loss of customers ... the persons who ceased to be customers, or who refused to purchase, must be named ... [I]f they are not named, no cause of action is stated."_Drug Research Corp. v. Curtis Publ'g Co., 7 N.Y.2d 435, 441, 166 N.E.2d 319, 322, 1999 N.Y.S.2d 33, 37 (1960)_ (internal citation and quotation omitted).

CTI has replied to this failure by recharacterizing its complaint, stating:

Although the Fifth Cause of Action uses the phrase "trade libel," a review of the claim reveals that it is, in reality, a claim for reputational injury to Plaintiff's business. "Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties."_Van-Go Transport Co., Inc.,_ 971 F.Supp. at 98. Because statements impugning a business reputation constitute libel _perse,_ special damages need not be pled. _See,e .g.,Ruder & Finn, Inc. v. Seaboard Sur. Co.,_ 52 N.Y.2d 663, 422 N.E.2d 518, 439 N.Y.S.2d 858 (1981).

Plaintiff's Memo, p. 13.

The complaint alleged in paragraphs 13, 42 and 43 that the Compaq e-mail labelled CTI as a broker of grey market for Compaq products, a statement alleged to be false. Although Compaq does not abandon its position that the e-mail as pled disparaged product and thereby constituted trade libel requiring an allegation of special damages, a fair reading shows that it was CTI's status as a grey market broker that was the subject of the e-mail. Because it is a claim for reputational injury, special damages need not be alleged. _SeeProctor & Gamble Co. v. Quality King Distributors, Inc.,_ 974 F.Supp. 190, 196 (E.D.N.Y.1999) ("Because statement impugning a business reputation is libel _perse,_ special damages need not be pled"); _Drug Research Corp. v. Curtis Publishing Co.,_ 7 N.Y.2d 435, 166 N.E.2d 319, 199 N.Y.S.2d 33 (1960).

The motion to dismiss the libel claim is denied.

*The Quantum Meruit Claim Is Dismissed*

In its proposed amended complaint, CTI has added two additional causes of action, the sixth claim for _quantummeruit_ arising out of the work performed by Compaq's benefit and the seventh cause of action alleging a breach of the reseller agreement entered into by the parties on March 2, 2000.

*7[8]"Although Rule 15 provides that leave to amend shall be granted freely, leave need not be granted to permit an amendment embodying plainly defective claims."_Valdan Sportswear v. Montgomery Ward & Co.,_ 591 F.Supp. 1188, 1190 (S.D.N.Y.1984)."Denial of amendment may be proper where the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face."_Schare v. Six Flags Theme Park,_ 1998 WL 24361, *4 (Jan. 23, 1998 S.D.N.Y.) (internal citation and quotation marks omitted).

[9] The written contract which forms the basis of the seventh cause of action precludes CTI's _quantummeruit_ claim. CTI states that it signed a Compaq-authorized reseller agreement (the "Reseller Agreement") on March 2, 2002, pursuant to which "CTI became an authorized reseller of Compaq products."(Am.Compl.¶ 67). This Reseller Agreement concerned the purchase and sale of Compaq products. In addition, the final sentence of Section 3 of the Reseller Agreement, entitled "Terms and Conditions," requires that the Compaq Authorized Reseller, CTI, will "exert best efforts to market, advertise, promote, sell and service (if applicable) Compaq products.""The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."_Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co.,_ 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 656, 516 N.E.2d 190 (1987); see_alsoAviv Const., Inc. v. Antiquarium, Ltd.,_ 259 A.D.2d 445, 687 N.Y.S.2d 344, 345 (1st Dep't 1999) ("The existence of a valid and enforceable written contract precludes a quantum meruit claim."). Moreover, it is a valid written contract, regardless of whether or not it was the operative agreement, that forecloses a _quantummeruit_ claim. _Aniero Concrete Co. v. New York City Constr. Auth.,_ No. 94 Civ. 3506, 2000 WL 863208, at *2 (S.D.N.Y. June 27,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 31398933 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2002 WL 31398933)

2000).

Although Compaq has resisted the breach of the
Reseller Agreement by maintaining it was not
terminated, breach has been appropriately alleged,
and CTI is granted leave to file its amended
complaint alleging breach of contract but not
*quantummeruit.*

*Conclusion*

In accordance with the determinations above, CTI is
granted leave to file an amended complaint alleging
fraud, libel, and breach of contract. The motion of
Compaq to dismiss the causes of action based on oral
contract, the breach of good faith and fair dealing,
fraud and negligent misrepresentation in the initial
complaint is granted.

It is so ordered.

S.D.N.Y.,2002.
Computech Intern., Inc. v. Compaq Computer Corp.
Not Reported in F.Supp.2d, 2002 WL 31398933
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 33650)

Page 1

▷Moore v. Interacciones Global, Inc.
S.D.N.Y.,1995.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Suzanne Rinfret MOORE, Plaintiff,
v.
INTERACCIONES GLOBAL, INC., Grupo
Financiero Interacciones, S.A. De C.V., Lee Kimmell
and Jose Andrade, Defendants.
No. 94 Civ. 4789(RWS).

Jan. 27, 1995.

Law Offices of David S. Abramson, New York City
(Laurie S. Greenberg, Laurence D. Pittinsky, of
counsel), for plaintiff.
Cleary, Gottlieb, Steen & Hamilton, New York City
(Jonathan I. Blackman, Michael R. Chayet, of
counsel), for defendants.

*OPINION*

SWEET, District Judge.
*1    Defendants    Interacciones    Global,    Inc.
("Interacciones"), Lee Kimmell ("Kimmell"), José
Andrade ("Andrade") and Interacciones Casa de
Bolsa S.A. de C.V. (sued herein as Grupo Financiero
Interacciones S.A. de C.V.) ("Grupo") (collectively
the "Defendants") have moved to stay this Title VII
action brought by the Plaintiff, Suzanne Rinfret
Moore ("Moore"), pending arbitration pursuant to 9
U.S.C. § 3. For the reasons discussed below the
motion is granted, and the action is dismissed with
leave to renew.

*Parties*

Moore was employed by Interacciones from February
1993 to February 28, 1994 in the area of fixed
income securities.

Interacciones is Delaware corporation with its
principal place of business in New York City.
Interacciones is a wholly owned subsidiary or
affiliate of Grupo, a corporation located in Mexico
City, Mexico that does business in New York.

Kimmell is the president and chief executive officer
of Interacciones and an employee and the Executive
Director of Grupo. During the period that Moore was
employed by Interacciones, Kimmell was her direct
supervisor.

Andrade is, and was during the period Moore was
employed by Interacciones, an employee and the vice
president of sales at Interacciones and reports directly
to Kimmell.

*Prior Proceedings*

Moore filed a complaint with the Equal Employment
Opportunity Commission ("EEOC") and received
notice of her right to sue in a letter from the EEOC
dated April 21, 1994.

On June 30, 1994, Moore filed the present action.
Her complaint alleges various incidents of verbal and
physical conduct that Moore describes as violative of
her right to be free from sexual harassment and
sexual discrimination. Her complaint alleges
violations of Title VII, 42 U.S.C. § 20003-3(a),
claims of discrimination under state and local law
and intentional infliction of emotional distress by
virtue of Defendants unprivledged, intentional,
extreme and outrageous conduct.

The present motion to stay proceedings pending
arbitration was heard on November 2, 1994. Further
submissions were received and it was considered
fully submitted as of January 5, 1995.

*Facts*

The complaint alleges the facts as follows:

Moore was employed at defendant Interacciones
from February 15, 1993 through to February 28, 1994
when she was fired.

On May 14, 1993 Moore signed a U-4 form.[FN1] The
Form provided, among other things, the following
provision:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 33650)

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 [in this case, National Association of Stock Dealers ("NASD") ] as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

At the time Moore signed the U-4, the NASD Code of Arbitration ("NASD Code") part I, section 1, entitled "Matters Eligible for Submission" stated, in pertinent part, the following:

*2 This Code of Arbitration is prescribed * * * for the arbitration of any dispute, claim or controversy arising out of or in connection with the business of any member of the Association, with the exception of disputes involving the insurance business of any member which is also an insurance company:

(1) between or among members;

(2) between or among members and public customers, or others; and

(3) between or among members, registered clearing agencies ...

At the time Moore signed the U-4, part II, section 8(a) of the NASD Code stated, in pertinent part, the following:

Any dispute, claim or controversy eligible for submission under Part I of this Code between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), shall be arbitrated under this Code, at the instance of:

(1) a member against another member;

(2) a member against a person associated with a member or a person associated with a member against a member; and

(3) a person associated with a member against a person associated with a member.

Effective October 1, 1993, § 1 of the NASD Code was amended to include "arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, *or arising out of the employment or termination of employment of associated person(s) with any member...*". Subsection (2) of § 1 was amended to include disputes "between or among members and associated person(s)".

Effective October 1, 1993, § 8 of the NASD Code was amended to include disputes. "... arising out of the employment or termination of employment of such associated person(s) by and with such member."

Moore was fired by Interacciones on February 28, 1994.

*Discussion*

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., was enacted in 1925 at least partly as a declaration of a liberal federal policy favoring arbitration and to counteract the traditional hostility of the courts to arbitration. *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Moses H. Cone Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24 (1983).

Under the FAA, a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the proceeding. *McMahan Securities Co. v. Forum Capital Mkts., L.P.*, 35 F.3d 82, 86 (2d Cir.1994); *See* 9 U.S.C. § 3. However, the FAA only makes a contract to arbitrate as enforceable as any other contract, not more so; therefore, if there was never any agreement to arbitrate, the parties cannot be compelled to do so. *Warnes Inter., Ltd. v. Harvic* 1993 WL 228028 (S.D.N.Y.) at *2.

In determining whether a claim is covered by the NASD Code, the Court of Appeals has stated that it must be "mindful that the 'federal policy favoring arbitration requires (courts) to construe arbitration clauses as broadly as possible' and that 'arbitration should be ordered unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 33650)

Page 3

" *McMahan Sec.*, 35 F.3d at 88, quoting *S.A. Mineraco Da Trindade-Samatri v. Utah Int'l Inc.*, 745 F.2d 190, 194-95 (2d Cir.1984). That is not the case in this instance.

**\*3** The NASD Code, which is incorporated into the U-4 form signed by Moore in May 1993, was amended effective October 1, 1993 (hereinafter referred to as the "Amended Code"). Had the amended code been in place at the time Moore signed the U-4, this dispute would have to be arbitrated. However, according to Moore, she did not sign the U-4 form at a time when her employment disputes were covered by the Code and the addition in October 1993 of employment disputes substantively changed her rights and were not the sort of amendment that the U-4 language contemplated. She also contends that if she is bound by the amendments, they should not be applied retroactively; thus claims relating to the pre-October 1, 1993 actions of Defendants need not be arbitrated.

*Moore is Bound by the NASD Code as Amended*

Moore executed an agreement "to arbitrate any dispute, claim or controversy that may arise between me and my firm ... or any other person ... that is required to be arbitrated under the rules, constitutions, or by-laws of the [NASD] *as may be amended from time to time.*" Form U-4 ¶ 5 (emphasis added). This unambiguous arbitration clause requires her to arbitrate disputes that arise between her and Interacciones under the NASD Code as it is amended "from time to time", not simply as it existed at the moment she signed the Form U-4.

Equally unambiguously, in paragraph 2 of her Form U-4, Moore agreed in "apply [ing] for registration with [the NASD]", to comply with all provisions, conditions and covenants of the statutes, constitutions, certificates of incorporation, by-laws and rules and regulations of [the NASD] *as they are or may be adopted or amended from time to time.* Form U-4 ¶ 2 (emphasis added).

Thus Moore has obligated herself to abide by the Code as it is in effect when a dispute arises between her and her firm.

The Court of Appeals has not addressed the issue of whether or not the amended Code language added on October 1, 1993, "or arising out of the employment or termination of employment of associated person(s) with any member ...", so substantively changes the agreement that it cannot be incorporated into the U-4 without altering the intention of the parties who signed the contract pre-Amendments. The Eleventh Circuit has held that it did not. See *Kidd v. Equitable Life Assurance Soc'y of the U.S.*, 32 F.3d 516, 518 (11th Cir.1994). The Seventh Circuit concluded that it did. See *Farrand v. Lutheran Bhd.*, 993 F.2d 1253 (7th Cir.1993).

*Kidd*, which was on appeal at the time that Sections 1 and 8 of the NASD Code were amended, held that the pre-Amendment Code required an associated member to arbitrate disputes or claims against his employer. Kidd's claims were brought under Title VII for race discrimination.

In *Farrand*, an age discrimination suit, decided by the Seventh Circuit before the 1993 amendments to the NASD Code, the Court found that associated persons who were registered with the NASD did not have to arbitrate disputes between themselves and a member of the NASD. The Court argued that the language of section 8 requiring that "any dispute ... eligible for submission under Section 1" can only require arbitration of disputes covered by section one. While § 8 makes reference to associated persons, the fact that § 1 does not authorize disputes of associated persons, means that they cannot be required by § 8. The Court concluded that "§ 1 of the NASD's Code does not authorize, and § 8 therefore does not require, the arbitration of an employment dispute between a member of the NASD and one of the member's registered representatives." *Farrand*, 993 F.2d 1253 at 1255. In thus concluding, the Court refused to read associated persons into the "or others" language in subsection 2 of § 1. Such a reading would have allowed the dispute in question to be read into § 8. While the Court states that "the language of the NASD's rules could be stretched to cover such disputes, we [conclude] that this was not the most natural reading of the Code." *Id.*

**\*4** *Kidd* offered another interpretation of the relationship between §§ 1 and 8 of the pre-Amendment Code. First, the three subsections in § 1 were read to modify the language relating only to the insurance disputes. Thus the Court finds that "§ 1 requires arbitration for any dispute connected to an

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 33650)

NASD member's business, except for disputes involving the insurance business of an NASD member that are (1) between or among members or to (2) between NASD members and public customers or others." *Kidd,* 32 F.3d at 519. Second, it concluded this reading was more in accord with the Supreme Court's statement in *Moses H. Cone Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983) that "[q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration.... The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration ..."*Kidd,* 32 F.3d at 519.

Finally, *Kidd* states and this Court agrees that:

[T]his reading of § 1 eliminates tensions in the NASD Code that occur under *Farrand.* Section 8 of the pre-Amendment NASD Code requires a person associated with a member to arbitrate disputes or claims against his employer, the NASD member, By holding that an employee is not an "other" within the scope of § 1, *Farrand* eliminates § 8's requirement that employees arbitrate disputes with their employers. In contrast, because we find that "others" applies only to the insurance exception, § 8 retains full effect. Moreover, our reading also gives full effect to the language of the U-4 forms obligating [employees] to arbitrate "any dispute, claim, or controversy between me and my firm ... that is required to be arbitrated under the rules ... of the [NASD]. To hold otherwise would result in the strange situation wherein [employees] signed U-4 forms promising to arbitrate any disputes with their employer required to be arbitrated by the NASD rules at a time when the NASD rules did not require employees to arbitrate disputes with their employer. If the NASD did not mandate arbitration of employer-employee disputes, there would be no reason to require [employees] to sign U-4 forms promising to arbitrate such disputes.

*Kidd,* 32 F.3d at 519-20.

The *Farrand* interpretation allows this apparent contradiction. Specifically, it requires that employees sign a binding arbitration provision that binds them to arbitrate nothing.

In addition, it appears that these provisions of the

Code reflect amendments effective October 1, 1993 that were specifically intended to clarify that "employment disputes are arbitrable" under the Code. NASD Notice to Members 93-64; *see also F.N. Wolf & Co. v. Bowles,* 610 N.Y.S.2d 757 (Sup.Ct.N.Y.Co.1994). The Court of Appeals acknowledged this issue, but took no position on it, in its recent opinion in *McMahan Sec. Co., L.P. v. Forum Capital Mkts. L.P.* 35 F.3d 82, 88 (2d Cir.1994).

**\*5** Courts have also found that employment disputes were arbitrable under the language of the Code as it existed prior to the October 1993 amendments. *See Kidd v. Equitable Life Assurance Soc'y of the U.S.,* 32 F.3d 516 (11th Cir.1994); *Chisolm v. Kidder, Peabody Asset Management, Inc.,* 810 F.Supp. 479, 480 n. 2 (S.D.N.Y.1992); *Foley v. Presbyterian Ministers' Fund,* 1992 WL 63269 (E.D.Pa.1992); *Gardner v. Benefits Communications Corp.,* 1991 WL 294564 (D.D.C.1991).

In *Kidd,* 32 F.3d at 519, the Eleventh Circuit concluded that:

... ample evidence exists showing that the pre-amendment NASD Code required arbitration of employment disputes. In dismissing a 1982 challenge to the inclusion of mandatory arbitration provisions in the U-4 forms, Judge, now Justice, Ruth Bader Ginsburg, noted that 'compulsory arbitration became a feature of the Code of the NASD ... before ... 1975. Judge Ginsburg further stated that "NASD rules mandate arbitration of employer-employee disputes, and did so, to the same extent, as they do now, before the development of [U-4 forms].... Moreover, in 1987, the NASD expressly stated that employment disputes between NASD members and their "registered representatives," ... were subject to mandatory arbitration.

This is in accord with a recent opinion rendered by the Honorable Deborah A. Batts in this District, *See Scher v. Equitable Life Assurance Soc. of the United States,* 866 F.Supp. 776 (S.D.N.Y.1994) in which she held that a Title VII claim filed by a manager employed by Equitable Life must comply with the NASD Code as it existed at the time she commenced the action. In that case, as in this one, the plaintiff had signed the U-4 form prior to the NASD amendments.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1995 WL 33650)**

Page 5

*Application of the Amended Code Does Not Raise Issues of Retroactivity*

Moore is bound to arbitrate disputes that arose between herself and Interacciones. The dispute at issue here is in the form of a civil action filed on June 30, 1994. While the allegations in the complaint describe events prior to the effective date of the Amendments, the case was filed after the amendments' October 1, 1993 effective date. Moore agreed to arbitrate disputes. This dispute arose on June 30, 1994.

In addition, in light of the above discussion indicating that the employment disputes were always covered by the NASD Code, it is not necessary to divide the allegations in this case into two separate proceedings.

Moore has cited numerous cases dealing with the very different issue of statutory retroactivity. Those cases do not cover the contractual issue here. More to the point, but also distinguishable, are cases involving the retroactivity of the modified NASD rules as discussed by several New York State trial courts and the Seventh Circuit Court of Appeals.

In *F.N. Wolf & Co. v. Brothers,* 613 N.Y.S.2d 319, 322 (Sup.Ct.N.Y.Co.1994), and *F.N. Wolf & Co. v. Carter,* N.Y.L.J., February 15, 1994, at 24, col. 2 (Sup.Ct.N.Y.Co.), the courts held that the NASD amendments should not be applied retroactively. However, since the plaintiffs in those cases, unlike Moore, had apparently agreed to abide by the Code and *not* to the Code as "amended from time to time", both of these cases are distinguishable. Parties did not cite cases in higher New York courts that addressed this issue.

\*6 In *F.N. Wolf & Co. v. Franek,* N.Y.L.J., February 15, 1994, at 24, col. 5 (Sup.Ct.N.Y.Co.), the Supreme Court judge, upheld the parties agreement to waive arbitration even after a subsequent NASD amendment to a resolution passed by the NASD Board of Governor's stating the "strong national policy favoring arbitration. The court held that "any resolution or amendment passed by NASD in 1991 obviously could not retroactively nullify contractual provisions which were entered into years before." *Id.*

While the Court made reference to the "as amended from time to time" language, and agreed with *Farrand,* that employment disputes with associated persons were not covered by the pre-Amendment Code, it did not decide the retroactivity of the amendment that clarified the position that employment disputes were subject to mandatory arbitration.

The final, non-statutory case, cited by Moore on this point, is *Kresock v. Bankers Trust Company,* 21 F.3d 176, 179 (7th Cir.1994) a case that decided the amended Code should not be applied retroactively to a case filed almost a year before the amendments took effect.

Because this case was filed nine months after the amendments' effective date and because, consistent with the discussion above, the amendments did not change the substantive rights of the parties, the issue of retroactivity need not be addressed further.

*Claims against all Defendants are Stayed Pending Arbitration*

While Moore's employer was Interacciones, her claims against all four Defendants in this action should be stayed. Messrs. Kimmell and Andrade, as Interacciones employees, are each "associated persons" of Interacciones under the NASD Code. *See* NASD By-laws, Art. 1(m) ("associated person" means "any natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by such [NASD] member."). The Code's requirement for arbitration of all disputes "between or among members and associated persons", Code §§ 1(2), 8(a), covers her claims against these two individuals. *See Brener v. Becker Paribas Inc.,* 628 F.Supp. 442, 451 (S.D.N.Y.1985) (customer's agreement to arbitrate claims against broker-dealer includes claims against broker-dealer's employee).[FN2]

The inclusion of Grupo in this suit does dictate another result. "An arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." *Moses H. Cone,* 460 U.S. at 20. Since the claims against Interacciones, Kimmell and Andrade must be arbitrated, the claims against Grupo, which arise out

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1995 WL 33650)

of exactly the same facts, should also be stayed pursuant to the Court's inherent power, under these circumstances, "to control the disposition of the cases on its docket, with economy of time and effort for itself, for counsel, and for litigants." *Hikers Indus. v. William Stuart Indus.*, 640 F.Supp. 175, 177 (S.D.N.Y.1986), quoting *Landis v. North American Co.*, 299 U.S. 248, 254-55 (1936).

*7 It is well-settled that claims are appropriately stayed when they involve common issues of fact and law with those subject to arbitration or when the arbitration is likely to dispose of issues common to claims against both arbitrating and non-arbitrating defendants. *McCowan v. Sears, Roebuck & Co.*, 908 F.2d 1099, 1106-07 (2d Cir.), cert. denied,498 U.S. 897 (1990); *Ainbinder v. Wall Street Clearing Co.*, 1993 WL 106408, at *7 (S.D.N.Y.1993)*Hikers Indus.*, 640 F.Supp. at 177-78;*Dale Metals Corp. v. Kiwa Chem. Indus. Co.*, 442 F.Supp. 78, 81-82 (S.D.N.Y.1977); *Lawson Fabrics, Inc. v. Akzona, Inc.*, 355 F.Supp. 1146, 1151 (S.D.N.Y.), aff'd,486 F.2d 1394 (2d Cir.1973).

In this case, the facts underlying the claims against all Defendants are quite similar. In fact, since the complaint does not allege any separate facts as against Grupo, which is sued solely because it is Interacciones' parent corporation, arbitration will potentially dispose of all of Plaintiff's claims, and should be allowed to go forward without the unnecessary duplication and risk of inconsistent results that might ensue if claims against Grupo are not stayed. See *Ainbinder*, 1993 WL 106408, at 18-20 (staying suit against parent corporation of principal defendant); *Hikers Indus.*, 640 F.Supp. at 178-79.

*Conclusion*

Mindful of the Supreme Court's statement that "any doubts concerning the scope of arbitratable issues should be resolved in favor of arbitration,"*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), and for the reasons set forth above, Defendants motion to stay these proceedings pending arbitration is granted.

It is so ordered.

FN1. Moore alleges that prior to signing the U-4, she inquired of Interacciones' Chief

Financial Officer, David Caruso, whether or not employment discrimination claims were required to be arbitrated pursuant to the Form U-4 and the NASD Code of Arbitration and that he said they were not. Mr. Caruso denied that this conversation ever took place. There are no specific allegations of fraud nor is Mr. Caruso named as a defendant in this action. The issues surrounding her signing of the U-4, if relevant at all, can be reviewed by the arbitrator.

FN2. As an affiliated corporation of Interacciones, Casa de Bolsa also may be entitled to enforce Moore's agreement to arbitrate under agency principles. See *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith*, 7 F.3d 1110, 1121-22 (3d Cir.1993). In any event, the claims against it should be stayed, because they are wholly intertwined with, and dependent on, the claims against Interacciones and the other defendants.

S.D.N.Y.,1995.
Moore v. Interacciones Global, Inc.
Not Reported in F.Supp., 1995 WL 33650 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 1

**H**Netherby Ltd. v. Jones Apparel Group, Inc.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
NETHERBY LIMITED, Plaintiff,
v.
JONES APPAREL GROUP, INC., and Jones
Investment Group, Inc., Defendants.
No. 04 Civ. 7028(GEL).

April 5, 2007.

Thomas J. Hall, Melissa J. LaRocca and JaeYoun Kim, Chadbourne & Parke LLP, New York, NY, for plaintiff.
Karen S. Frieman and Francine N. Nisim, Duane Morris LLP, New York, NY, for defendants.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.
*1 Plaintiff Netherby Limited brought suit against Jones Apparel Group, Inc. and Jones Investment Co., Inc., alleging breach of contract. The case was tried before the Court without a jury from June 26 to June 29, 2006. This Opinion sets forth the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). To the extent any Finding of Fact reflects a legal conclusion, it shall be to that extent deemed a Conclusion of Law, and vice versa.

**BACKGROUND**

*Findings of Fact*

**I. The Parties**

1. Plaintiff Netherby ("plaintiff" or "Netherby") is a corporation organized under the laws of Jersey, Channel Islands, with its principal place of business in Jersey, Channel Islands.

2. Defendant Jones Apparel Group, Inc. ("JAG") is a Pennsylvania corporation with its principal place of business in Bristol, Pennsylvania.

3. Defendant Jones Investment Co., Inc. ("JICO"; collectively with JAG, "defendants") is a Delaware corporation with its principal place of business in Wilmington, Delaware. JICO is wholly owned by JAG.

4. This dispute involves the "Gloria Vanderbilt" trademark, which has been used on designer jeans and other apparel since 1975. In 1980, Gloria Vanderbilt Cooper transferred the rights to her trademark to Netherby. (Mohan Murjani Decl. ¶ 3; P.Ex. 1.) Pursuant to a contract signed in 1988 (the "1988 contract"), plaintiff, through Murjani Worldwide B.V., sold to G.V. Gitano, JICO's predecessor-in-interest, the rights to the Gloria Vanderbilt trademarks in five countries, namely, the United States, Canada, Brazil, New Zealand and Australia (the "Five Countries").

5. Since 1988, the rights and duties of the contract have been assigned to various parties. For purposes of the present case, it is undisputed that Netherby holds the rights and obligations belonging to Murjani Worldwide B.V. under the 1988 contract. The Court therefore will refer collectively in this Opinion to Netherby and any of its subsidiaries and/or predecessors-in-interest under the contract as "Netherby" or "plaintiff."

6. Despite over a year of discovery and several days of trial, there remains uncertainty with respect to whether JICO or JAG has assumed the rights and obligations originally belonging to G.V. Gitano under the 1988 contract. (*See, e.g.,* P. Post-Trial Mem. 40; *see also* P. Proposed Findings of Fact and Conclusions of Law ("P. Proposed Findings") ¶ 4 ("Either [JICO] or [JAG] is currently the owner of the rights to the Gloria Vanderbilt Marks in the Five Countries.").) Defendants insist that only JICO assumed the contract, an assertion which plaintiff has questioned at various points during the case. The Court need not dwell on this issue, however, because plaintiff has now effectively accepted defendants' position; plaintiff's post-trial brief states that plaintiff "would take no issue with a conclusion that [JICO] is the proper party against whom the judgment should be entered."(*Id.*) Thus, for purposes of the instant

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 2

dispute, the Court will treat JICO, not JAG, as the successor-in-interest to G.V. Gitano under the 1988 contract. However, because (1) JAG owns JICO, (2) both JAG and JICO have been involved in the events relevant to this litigation, and (3) both JAG and JICO have been named as defendants, the Court will, for the sake of simplicity, refer collectively in this Opinion to JAG and JICO, as well as any of JICO's predecessors-in-interest under the contract, as "defendants." This should not be taken as a finding that any entity other than JICO (and Netherby) is bound by the contract or the amendments thereto; nor should it be taken as an indication that the Court's Opinion renders judgment against any party other than JICO.

**\*2** 7. Though the Court uses the term "defendants" to refer to JAG, JICO and their predecessors under the contract, it is worth noting that defendants and their witnesses frequently referred collectively to these entities, certain divisions thereof, and their predecessors as the "Gloria Vanderbilt Company," despite the fact that no company with that name actually exists or has ever existed during the time period relevant to this litigation. So far as the Court is aware, the closest any company has come to that name is the "Gloria Vanderbilt Apparel Corporation," which manufactured and marketed the Gloria Vanderbilt brand from the mid-1990s through 2002. (*See* Dabah Decl. ¶ 2.) Jack Gross testified that "Gloria Vanderbilt ... is a division, a company.... It's basically a company within the group."(Tr. 453.)

8. The confusion is exacerbated by defendants' inconsistent explanations of the relationship between the Gloria Vanderbilt company and/or divisions, on the one hand, and the Glo division and/or brand, on the other. Defendants' Proposed Findings of Fact and Conclusions of Law ("D. Proposed Findings") state that the Gloria Vanderbilt division, which is "a division of an indirect subsidiary of [JAG]," manufactures and markets clothing bearing the Gloria Vanderbilt, Glo, and Glo Jeans trademarks. (D. Proposed Findings ¶¶ 73-74.) At trial, however, Jack Gross testified that the Gloria Vanderbilt division manufactured the Gloria Vanderbilt brand and Glo Girl brand, but not the Glo brand or Glo Jeans brand. (Tr. 471.) In his sworn declaration, he testified that Glo and Gloria Vanderbilt are each their own "division[ ]" of the "company." (Gross Decl. ¶ 20.) Another defense witness employed by defendants

agreed that there is a "GLO Division" of the company, but indicated that this division forms part of the "Gloria Vanderbilt Division." (Brown Decl. ¶ 2.) A third defense witness suggested that, at least at one time, there was a "Gloria Vanderbilt division of GLO." (Dabah Decl. ¶ 2.) The witness identifying himself as the "President of the Gloria Vanderbilt Division," meanwhile, testified that he does not now have and has never had "any involvement with the GLO business."(Brisman Decl. ¶ 2.)

9. A determination of the exact structure of defendants' Gloria-Vanderbilt-related business entities is unnecessary for disposition of the case, though defendants' use of the phrase "Gloria Vanderbilt company" and their failure to provide clarity on the issue will be relevant to part of the Court's legal analysis below.

## II. The 1988 Contract

10. Under the 1988 contract, defendants agreed to pay to plaintiff, for a limited time, a percentage of revenues that defendants or their "affiliates" [FN1] earned from the exploitation-through sales and licensing royalties-of the contractually defined Gloria Vanderbilt "Marks." (P.Ex. 3 ¶ 3.)

> FN1. The contract defines "affiliate" as "any other Person that, directly or indirectly, controls or is controlled by that Person, or is under common control with that Person."(P.Ex. 3 ¶ 1.)

11. The contract prohibits defendants from selling products bearing the "Marks" to any entity that defendants know or should know will resell or distribute the product outside of the Five Countries. (*Id.* ¶ 12.2.)In other words, plaintiff retains the right to the Marks outside those countries.

**\*3** 12. The 1988 contract defined the trademarks (or "Marks") at issue as follows:

"Marks"-(a) the name "Gloria Vanderbilt" both in stylized signature form and all other manner of representation, (b) the initials "GV" both in stylized signature form and all other manner of representation, (c) all registrations of Seller or its Affiliates [for] representations of swan designs, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 3

all representations of swan designs used at any time by Seller or its Affiliates or their respective licensees, (d) the stylized signature of Gloria Vanderbilt in a rectangular box, (e) any and all variations of any of the foregoing, including, without limitation, "Vanderbilt," "Gloria" and any other manner of representation to the extent that Seller or its Affiliates or their respective licensees have or subsequently obtain a right thereto, (f) *any other mark associated with Gloria Vanderbilt,* (g) all logos and distinctive configurations used in connection with any of the foregoing, (h) any copyright (common law or statutory) bearing any of the Marks, and (i) all registrations for and applications for registration of any of the foregoing ...

(*Id.* ¶ 1 (emphasis added).)

13. Netherby's right to receive Contingent Payments in each of the Five Countries lasts only for a limited period of time, the length of which is determined by certain conditions enumerated in the contract. The relevant period with respect to the United States expired in 1997 or 1998, and will expire with respect to Canada in 2009. The period for Contingent Payments has not yet begun to run in Australia, Brazil or New Zealand, as defendants have not yet sold in those countries any products covered by the contract.

### III. The 1995 Modification

14. In a 1995 amendment (the "1995 Modification"), the parties added § 15.11 to the 1988 contract. The new section provides:

Buyer shall use its best efforts to provide to Seller, at no cost to Seller, one set of samples of Gloria Vanderbilt designs and products within 30 days after such samples are available to Buyer. Additional samples shall be supplied by Buyer, at a cost to Seller of no more than the Buyer's actual cost, if requested by Seller. Buyer further agrees to use its best efforts to keep Seller generally informed of the activities of Buyer's licensees, including providing Seller with copies of such licenses presently in existence and licenses that are executed in the future.

(P.Ex. 4 ¶ 8.)

15. Plaintiff claims that it negotiated for this clause

so that it would be able to pursue international licensing opportunities for the Gloria Vanderbilt trademark:

To attract and secure quality licenses with advantageous licensing agreements, Netherby needed to provide potential licensees with a Licensing Package for each season .... This Licensing Package [includes] samples of other licensees' activities as they relate to the brand (e.g. information on brand management, colors, fit, logos, signage, photos, line plans, trends, etc.) and designs and sample products of the different lines. This Licensing Package is provided to licensees to aid them in developing, marketing and selling items bearing the licensed marks....

*4 ... Because Netherby did not have the substantial, surplus funds necessary to develop the Licensing Package on its own, and because Netherby felt that [defendants] could comfortably provide the same, it negotiated for the receipt of the Licensing Package ... as part of the 1995 [Modification].

(P. Proposed Findings ¶¶ 61-64; *see also* Tr. 116.)

### IV. The Current Litigation

16. Plaintiff filed suit against defendants in this Court on September 1, 2004, alleging breach of the 1998 contract, as amended by the 1995 Modification. The dispute between the parties concerns two distinct subject matters. First, plaintiff contends that under the terms of the 1988 contract, defendants owe, and have failed to make, Contingent Payments on sales of clothing bearing the trademark "Glo," which plaintiff contends is a "mark associated with Gloria Vanderbilt" within the meaning of the contract's definition of "mark." (P.Ex. 3 ¶ 1.) Second, plaintiff contends that defendants failed to comply with its obligations under § 15.11 of the 1995 Modification to provide samples and to keep plaintiff generally informed of the activities of its licensees.

17. More specifically, the Amended Complaint asserted nine causes of action, two of which have since been resolved in full or in part by the parties. The remaining causes of action consist of (1) contract claims-seeking damages and specific performance-based on defendants' alleged breach of the "samples" clause and the "generally informed" clause of §

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 4

15.11; (2) a request for a declaratory judgment that the Glo trademarks are encompassed in the contract's definition of "Marks," that defendants have breached the contract by registering Glo marks outside of the Five Countries, and that defendants' sales of Glo products outside the Five Countries would constitute a breach of contract; (3) a contract claim seeking damages for defendants' failure to pay royalties on the Glo sales; (4) a request for a permanent injunction enjoining Jones from registering or using Glo marks outside the Five Countries; and (5) attorneys' fees.

18. Defendants assert two counterclaims. The first requests various declaratory judgments regarding defendants' right to use and register the Glo trademark. The second counterclaim seeks attorneys' fees.

19. The Court referred the parties to mediation in 2004, which was unsuccessful. In 2005, the parties were referred to a magistrate judge for settlement talks, which were also unsuccessful. In January 2006, the Court denied motions for partial summary judgment submitted by both sides. A bench trial was held from June 26 to June 29, 2006.

20. Because the two distinct disputes between the parties involve distinct factual predicates, each will be addressed separately, with distinct Findings of Fact and Conclusions of Law relating to each.

## THE GLO TRADEMARK

### *Findings of Fact*

1. In the mid-1990s, defendants developed the "Glo by Gloria Vanderbilt" brand for a children's line of clothing.[FN2] The "Glo by Gloria Vanderbilt" trademark was registered with the United States Patent and Trademark Office ("USPTO") on January 22, 1996. (P.Ex. 14.)

> FN2. Because the word "brand" is not a legal term of art, *see* J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 4:18 (4th ed.2000), the Court uses the term in its ordinary sense to refer to "a product, line of products, or service" that bears a widely recognized "word name, symbol, etc., esp[ecially] one legally

registered as a trademark.... used by a manufacturer or merchant to identify its products distinctively."*Webster's New Universal Unabridged Dictionary* 254 (2003). "Brand" as used in ordinary English may also serve as a synonym of "trademark," *id.,* and in some cases may serve as a "corporate identifier." 1 McCarthy on Trademarks and Unfair Competition § 4:18. In this case, however, the parties and their witnesses did not use the term "brand" as a synonym for "company"; rather, they used the word "brand" to mean "trademark" or "line of products bearing a particular trademark."Defendants, for example, emphasized the difference between the concept of a "brand" and the concept of a "company" by insisting that their 2001 press releases associated Glo only with the *company* Gloria Vanderbilt, and not with the *brand* Gloria Vanderbilt.

*5 2. Belk Stores, a retail chain, agreed to carry defendants' Glo by Gloria Vanderbilt children's line in 1996. Belk sold Glo by Gloria Vanderbilt products to consumers for approximately nine to ten months, but the products were unsuccessful and the line discontinued. (D. Post-Trial Mem. 13 n. 10; P. Post-Trial Mem. 4-5; Gross Decl. ¶¶ 14-15; Gross Dep. at 30:5-7.) JICO made Contingent Payments to Netherby based on Glo by Gloria Vanderbilt sales. (Tr. 466.)

3. In 1998, defendants licensed several trademarks to Hudson's Bay Company, the owner of "Zellers" retail stores, for use in the manufacturing, sale, and marketing of women's apparel in Canada. The licensed marks included "GLORIA VANDERBILT," "AMERICAN ROYAL BY GLORIA VANDERBILT," and "GLO GLORIA VANDERBILT." (P.Ex. 68; *see also* P.Ex. 70.)

4. Glo has not been used in a trademark in combination with Gloria Vanderbilt on any consumer products since at least 2000. (Gross Decl. ¶ 18.)

5. In January 2001, defendants launched a "Glo" brand without the words "Gloria Vanderbilt" in the trademark's name. Like the Gloria Vanderbilt line of clothing, the Glo brand consists primarily of denim

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 5

apparel. (P. Exs.205-14.) Defendants filed a trademark application with the USPTO in April of that year; they had filed an application for Glo Jeans the year before. (*See* P. Exs. 15-16; *see also* P.Ex. 17.)

6. Defendants' marketing and publicity of the new Glo brand has linked Glo to the Gloria Vanderbilt mark, brand and person in numerous ways. In January 2001, for example, defendants organized a party to which they invited all of their Gloria Vanderbilt brand customers. (Tr. 7-8, 581-83.) Isaac Dabah, formerly the CEO of defendants' predecessor under the 1988 contract, explained at trial that one of the company's goals in holding the party was to make its Gloria Vanderbilt customers "aware" that the company was "going to be launching a new brand called Glo to serve the younger customer ."(Tr. 583.) Photos from the Glo advertising campaign were unveiled at the party (Gross Dep. 105), and guests were shown a videotape of "vintage advertising" of the Gloria Vanderbilt brand. (Tr. 584.)

7. Glo and Gloria Vanderbilt were also linked in press releases touting the new Glo brand. "This spring," a 2001 press release began, *"Gloria Vanderbilt* adds a spark to the hot junior market with the launch of its new line, GLO."The press release's concluding paragraph stated that *"Gloria Vanderbilt* has made its mark as one of America's first mega brands in designer jeans. In 2001, GLO will add a youthful, sassy and carefree look for a young audience .... 'It's what you'd expect from Gloria Vanderbilt.' " (P.Ex. 45 (emphasis in original); *see also* P. Exs. 44, 46-47.) Jack Gross, JAG's then-CEO who was involved in Glo's 2001 launch, conceded that he attempted through the press releases to "key back into the good will" that the Gloria Vanderbilt brand had enjoyed since the 1970s. (Tr. 460.)

*6 8. A JAG press release regarding its acquisition of two of its predecessor companies, Gloria Vanderbilt Apparel Corp. and Gloria Vanderbilt Trademark B.V., noted that the acquired companies' "brands" included "Gloria Vanderbilt and junior product marketed under the GLO brand name."(P.Ex. 38.)

9. In 2000, an investment group prepared a presentation on behalf of defendants' predecessor that was aimed at attracting potential buyers of the company. The presentation noted that "Gloria

Vanderbilt is currently in the process of developing brand extensions such as GLO by Gloria Vanderbilt for juniors .... GLO will be launched in August 2000 ...." (P.Ex. 135 at 8.)

10. A webpage created by defendants placed the words "Glo jeans" side-by-side with "Gloria Vanderbilt jeans," all under the heading "GLORIA VANDERBILT." (P.Ex. 36.) This website existed for approximately five years, ending in 2005. (Tr. 461.) Though defendants suggested at trial that the webpage was intended for members of the trade, as opposed to consumers, this assertion is belied by the fact that the webpage included prominent links directed to consumers such as "Where to Buy" and "Customer Service." (P.Ex. 36.)

11. Regardless of defendants' intent in creating all these connections, the links they drew between Glo and the Gloria Vanderbilt name and brand were parroted by various trade publications, as well as mainstream publications. A 2002 Womens Wear Daily article, for example, referred to Glo as the "junior line" of "denim brand Gloria Vanderbilt." (P.Ex. 48.) Other publications referred to "Glo by Gloria Vanderbilt" and "Glo jeans by Gloria Vanderbilt." (*See, e.g.,* P. Exs. 53, 56.)

12. Despite many connections between Glo and Gloria Vanderbilt, these trademarks-and the lines of apparel on which they are used-are by no means interchangeable. Glo clothing is targeted to women 17 to 21 years old, while Gloria Vanderbilt clothing is targeted to women over 27. Concerned that their targeted young consumers associate the name "Gloria Vanderbilt" with clothing of an older and less "hip" generation, defendants have, at least in recent years, sold and marketed Glo clothing separately from Gloria Vanderbilt clothing. Defendants' witnesses explained that they have established a separate division of their company to conduct the design, sale and marketing activities for the Glo brand. (Dabah Decl. ¶ 3; Gross Decl. ¶ 6.) Defendants also emphasized that Glo can carry independent meanings to consumers, such as "light" or "coolness." (Tr. 581.)

13. Defendants contend that they have *always* sought to prevent young women from associating Glo and Gloria Vanderbilt, because "it would be detrimental to sales of the junior brand to tie it in any way to the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

GLORIA VANDERBILT brand."(Dabah Decl. ¶ 4; *see also id.* ¶ 13 ("I never considered GLO to be related in any way to the GLORIA VANDERBILT brand.").) The sale of "GLO by GLORIA VANDERBILT" clothing in Belk Stores in the mid-1990s, defendants argue, did not implicate this concern because the mark was used on clothing for younger children who did not make their own purchasing decisions. (Dabah Decl. ¶ 9.) However, the evidence before the Court-including the press releases and Gloria Vanderbilt webpage-requires the rejection of defendants' contention, particularly when viewed in light of the fact that Glo consists of the first three letters of "Gloria Vanderbilt."

*7 14. Defendants' witnesses, moreover, testified inconsistently on this point. While Dabah asserted that tying Gloria Vanderbilt to Glo "in any way" would be detrimental (Dabah Decl. ¶ 4), Gross testified that there was no harm in linking the brands in the eyes of retailers, and conceded at trial that connections drawn between the marks had been deliberate. (Tr. 455-57, 460.)

### Conclusions of Law

15. In this diversity action for breach of contract, the parties' agreement contains a choice of law provision providing that New York law will govern any dispute under the contract. (P.Ex. 3 ¶ 15.10 .) The provision is enforceable, *see Terwilliger v. Terwilliger,* 206 F.3d 240, 245 (2d Cir.2000), and New York law will therefore govern this case.

16. To prevail on a contract claim under New York law, a plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."*Id.* at 245-46 (citation and internal quotation marks omitted).

17. Courts must interpret contracts so as to give effect to the parties' intention "as expressed in the unequivocal language they have employed."*Id.* at 245.The court cannot rewrite a contract "under the guise of interpretation" when the terms are clear and unambiguous; nor may the Court rewrite the contract in accordance with "its instinct for the dispensation of equity upon the facts of a given case."*Id.; see also Trio Asbestos Removal Corp. v. Marinelli,* 829 N.Y.S.2d 594, 595 (2d Dep't 2007).

18. The 1988 contract defines "Marks" to include, inter alia, "any ... mark associated with Gloria Vanderbilt.""Associated" is typically understood to mean "connect[ed]," "[brought] into relation," "unite[d]" and/or "combine[d]." *Webster's New Universal Unabridged Dictionary* 126 (2003).

19. Though trademarks are typically governed by federal law, Netherby's cause of action arises out of a contract governed by New York state law. (*See, e.g.,* P.Ex. 3. ¶ 15. 10.) *Cf.* J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition, § 18:43 (4th ed. 2000) ("Trademark license contract disputes are governed by the general rules of contract interpretation.") Nevertheless, federal law may govern the construction of the contract to the extent the "contracting parties use[d] terms and concepts that are firmly rooted in federal law."*Hugo Boss Fashions, Inc. v. Federal Ins. Co.,* 252 F.3d 608, 618 (2d Cir.2001).

20. At the close of trial, the Court invited the parties to address in their post-trial briefing whether the word "associated" has an established meaning in federal trademark law. Neither party has brought to the Court's attention any legal source indicating that the word has special meaning in the trademark context; nor has the Court's research uncovered any such special meaning.

21. Defendants' post-trial brief states that "under traditional notions of trademark law, the term 'associated with' is understood in the context of a likelihood of confusion analysis."(D. Post-Trial Mem. 6.) Defendants do not, however, provide a citation to any legal source that supports this assertion. They cite instead to the testimony of Jeffrey M. Samuels, one of their expert witnesses, whose testimony on this question undermines rather than supports defendants' position. Samuels stated: "[I]n trademark law the term associated is usually used in the context of an analysis of whether or not there is a likelihood of confusion .... That is how, at least I think, most trademark lawyers would interpret the term associated."(Tr. 336.) Samuels added: "Whether that is how the parties intended the term associated to be interpreted in this contract, I can't speak to. It's at best ambiguous."(*Id.*) When asked whether "the Glo mark [is] associated with the Gloria Vanderbilt trademark," he responded, "Yes." (*Id.* 337.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 7

*8 22. Though defendants do not cite any law suggesting that "associated" carries a special meaning in the trademark context, the argument in their post-trial brief is premised on the assumption that the Court can deem a mark to be "associated" with another mark for purposes of the 1988 contract only if the marks are "confusingly similar" for purposes of federal trademark law. Defendants argue, for example, that because plaintiff "failed to sustain its burden at trial to demonstrate ... a likelihood of confusion between the GLO and GLORIA VANDERBILT Trademarks by an appreciable number of reasonable consumers," plaintiff has "failed to demonstrate that GLO is encompassed by the 1988 Agreement."(D. Post-Trial Mem. 7; *see also id.* at 16 (arguing that "[i]n the absence of sufficient evidence of confusion between the GLO Trademarks and the GLORIA VANDERBILT Trademarks, it simply cannot be found that the right to create GLO was conveyed by the 1988 Agreement")).) There is nothing in trademark law or in the terms of the parties' contract, however, that justifies defendants' narrow interpretation of "associat[ed]." The question of confusing similarity is certainly crucial in resolving issues of trademark infringement under the federal Lanham Act, but it requires several leaps of logic to conclude on this basis alone that the confusing-similarity inquiry must also be crucial in defining the word "associated" for purposes of a contract pertaining to trademark rights. The mere fact that a contract pertains to a subject matter generally governed under federal law does not justify setting aside the specific language chosen by the contracting parties and replacing it with federal court interpretations of terms that do not actually appear in the parties' contract.

23. This conclusion is bolstered by the fact that the Lanham Act includes a definition of "trademark" that is much narrower in scope than the parties' definition of "Marks" in the contract:

The term "trademark" includes any word, name, symbol, or device, or any combination thereof-

(1) used by a person, or

(2) which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

15 U.S.C. § 1127; *see also id.*(defining "service mark," "collective mark" and "certification mark," and including all of these terms, together with "trademark," in the definition of "mark").

24. This is not to say that trademark principles should be ignored in interpreting the contract's terms. The subject matter and context of a contract are always relevant to its interpretation. *See, e.g., Terwilliger,* 206 F.3d at 245;*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC,* 811 N.Y.S.2d 47, 53 (1st Dep't 2006). An appreciation of the contract's context, however, does not justify a disregard of the ordinary meaning of "associated." *Madison Ave. Leasehold, LLC,* 811 N.Y.S.2d at 53 (explaining that courts interpreting contracts should consider both the "common meaning of the language employed" and the "factual context" in which the contract was made).

*9 25. The various subclauses accompanying subparagraph (f) of the "Marks" definition provide additional confirmation that the parties intended their agreement to govern the use of marks that would not be protected under trademark infringement law alone. The contract defines "Marks," for example, to include "any and all variations" of "Gloria Vanderbilt," "all manner of representation" of "Gloria Vanderbilt," and "any and all variations" on any "manner of representation" of "Gloria Vanderbilt." (P.Ex. 3.) This language plainly sweeps more broadly than the Lanham Act's trademark infringement provisions, which restrict the use of marks that are "likely to cause confusion, or to cause mistake, or to deceive."15 U.S.C. § 1114(a). Regardless of whether Glo itself falls under any of the terms cited in this paragraph, the terms evidence a general intent to create a definition of "Marks" that is not confined by trademark rules of confusing similarity.

26. Defendants' Glo mark, including such variations as Glo Jeans and Glo Girl, is "associated with" Gloria Vanderbilt for purposes of the 1988 contract. The Court rests this conclusion on a combination of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 8

various factors, including (i) the fact that Glo consists of the first three letters of Gloria Vanderbilt; (ii) defendants' registration and use of the mark "Glo by Gloria Vanderbilt"; (iii) the press releases announcing the launch of the Glo line in 2001, in which defendants unambiguously linked Glo to the Gloria Vanderbilt trademark, brand and person; (iv) the close pairing of Glo jeans and Gloria Vanderbilt jeans on the Gloria Vanderbilt website for several years; (v) the connections drawn between Glo and the Gloria Vanderbilt brand in both trade and mainstream publications; and (vi) concessions by Jack Gross at trial that his company sought to capitalize on the recognition of the Gloria Vanderbilt brand name in launching the Glo line in 2001.

27. Defendants' deliberate linking of Glo to Gloria Vanderbilt undermines their claim that they have *always* sought to keep the marks separate in the eyes of the young consumer. Even if defendants had consistently endeavored to maintain a clear distinction between the marks at the consumer level, moreover, they conceded at trial that they have done precisely the opposite at the trade and retailer level, particularly during the initial launch of the mark. This alone weighs heavily in favor of finding "association," as nothing in the contract suggests that the parties intended subparagraph (f)'s broad language to refer only to association *by consumers.*This conclusion is consistent with principles of trademark infringement, under which courts take into account the impressions of retailers as well as the impressions of purchasers at the consumer level. See *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 397 (2d Cir.1995); *Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 105 (2d Cir.1985); *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.,* 724 F.2d 357, 361 (2d Cir.1983); *see also Syndicate Sales, Inc. v. Hampshire Paper Corp.,* 192 F.3d 633, 636 (7th Cir.1999).

*10 28. At various points during trial and in the briefs, defendants have insisted that any public associations of the Glo mark with Gloria Vanderbilt have been associations with Gloria Vanderbilt the company and not Gloria Vanderbilt the trademark or brand. (See, e .g., Tr. 445.) This distinction is crucial, according to defendants, because the 1988 agreement cannot fairly be read to govern associations with the company. If the agreement were read so broadly, they argue, then any brand marketed by the company

would necessarily be encompassed within the definition of "Marks"-a result clearly not intended by the contracting parties.

29. Defendants' position is unpersuasive. As an initial matter, despite their frequent references to the "Gloria Vanderbilt Company," defendants have not established that a company by that name-or simply by the name "Gloria Vanderbilt"-even exists. More importantly, some of the Glo-related press releases refer explicitly to Gloria Vanderbilt's success as a person and as a "brand," as Jack Gross acknowledged at trial. (*See, e.g.,* P. Exs. 44-46; Tr. 457-58.) Gross conceded that the connection to the brand was deliberate. It is implausible, therefore, that defendants' references to "Gloria Vanderbilt" in public communications such as their website and the 2001 Glo press releases were merely intended to identify the name of a company.

30. Even if one ignores defendants' references to the brand and assumes that they intended only to create an association with the Gloria Vanderbilt Company (whatever that is), this intention would not save them from a finding that the Glo mark is "associated" with the Gloria Vanderbilt trademark and brand. It is simply an unavoidable fact that by including the words "Gloria Vanderbilt" in the name of a company or division that markets a product with a name reminiscent of "Gloria," and publicizing the Glo brand in ways that further cement the association with the Gloria Vanderbilt line, defendants have helped create an association between certain of their products, including Glo jeans, and the Gloria Vanderbilt trademark and brand.

31. Defendants argue that this reasoning leads to absurd and unintended results, by bringing all of their products within the scope of the contract, and by punishing them for the legitimate use of Gloria Vanderbilt in their company's name. These objections are misguided. First of all, the Court does not hold that *any* product produced by a company or division named "Gloria Vanderbilt" will necessarily fall within the 1988 contract's definition of Marks. The name of the company or division is merely one contributing factor in the creation of an association. As clearly set forth above, it is a combination of many factors-including the fact that Glo consists of the first three letters of Gloria Vanderbilt, and the cited aspects of defendants' Glo marketing-that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

creates the association for purposes of subparagraph (f) in this case.

*11 32. Second, while defendants may find it unfair or unreasonable that the legitimate inclusion of the words "Gloria Vanderbilt" in their company (or division) name has in effect limited their choice of trademark names, they themselves created this limitation by agreeing to the broad definition of "Marks." The potential disadvantages of the limitation were entirely foreseeable-in fact, they were conspicuous-at the time of the contract's formation. The predecessor of defendants that signed the contract, after all, was named "G.V. Gitano," but nevertheless agreed to explicit restrictions on its use of the initials "GV" and "any and all variations" thereof. It may have been costly, or even unwise, to consent to such terms, but that does not permit the Court to re-write the party's agreement. *See RM 14 FK Corp. v. Bank One Trust Co.*, 831 N.Y.S.2d 120, 2007 WL 473704, at *2 (1st Dep't Feb. 15, 2007).

33. Finally, defendants argue that because the name Gloria Vanderbilt does not appear in quotation marks in subparagraph (f), it must refer to the *person* Gloria Vanderbilt and not to the trademark or brand. This is flatly inconsistent with defendants' interpretation of the term Gloria Vanderbilt (also appearing without quotation marks) in § 15.11, a section which now forms part of the same contract. (*See, e.g.,* D. Post-Trial Mem. 24-26.) Even if defendants were correct, however, that the use of the name Gloria Vanderbilt in subparagraph (f) of the Marks refers only to the person Gloria Vanderbilt, defendants have still created an association. As plaintiff points out, defendants' press releases expressly associated Glo not only with Gloria Vanderbilt the company, but with Gloria Vanderbilt the person. (*See, e.g.,* P.Ex. 44.) Moreover, even if the press releases had referred to a corporate entity, the fact that the corporate entity is called "Gloria Vanderbilt" inevitably contributes heavily to an association with Gloria Vanderbilt the person.

34. In addition to relying on the word "associated," plaintiff claims that Glo is a "variation" or "manner of representation" of "Gloria Vanderbilt" for purposes of the 1988 contract. (P.Ex. 3.¶ 1.) As the Court finds that Glo is "associated" with Gloria Vanderbilt, it need not consider plaintiff's alternative theory.

35. As there is no dispute that defendants have not made Contingent Payments on the sale of Glo products, there is no question that they have breached the 1988 contract. The Court need not address the issue of damages, because the parties have agreed to the amount due on Glo sales in the event the Court finds it plaintiff's favor. Judgment will be entered in plaintiff's favor in the agreed amount.

36. Plaintiff seeks a declaratory judgment (1) that the Glo marks are encompassed in the 1988 contract's definition of "Marks" and (2) that defendants' sale of Glo products outside the Five Countries would breach the 1988 agreement. The first of these issues has already been explicitly resolved by the above analysis of the breach-of-contract claim, and a declaratory judgment will be granted. While the second issue has implicitly been resolved, since its resolution depends entirely on the decision of the first issue, the Court declines to issue a declaratory judgment as to the legal status of hypothetical future actions of the parties. The request for a permanent injunction with respect to the Glo products will be denied, because there has been no showing of the inadequacy of money damages to remedy any sale of Glo products outside the Five Countries, and because there is no reason to anticipate that defendants will engage in future conduct violative of the contract, now that its contours have been adjudicated.

*12 37. Plaintiff also seeks a declaratory judgment that defendants' registration of the Glo marks outside the Five Countries is a breach of the 1988 contract. Plaintiff is unable, however, to point to any language in the contract that prohibits registrations. Accordingly, the request for declaratory relief on this issue will be denied.

38. Defendants seek declaratory relief on the same issues for which plaintiff seeks such relief. For reasons made clear in the preceding discussion, a declaratory judgment in favor of defendants on these issues would be superfluous, unnecessary, or unsupported by law, and the request will therefore be denied.

### SECTION 15.11

**I. Providing Samples**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 10

### *Findings of Fact*

1. Plaintiff alleges that defendants failed to provide samples of products and designs as required by § 15.11 of the contract. The validity of § 15.11 is not in dispute; nor do defendants argue that plaintiff has failed to perform its duties in any way. The issues are only (1) the scope of the obligations created by the provision, (2) defendants' alleged breach, and (3) damages and other remedies, if any.

2. Because resolution of the dispute is contingent on the Court's interpretation of § 15.11, to the extent the Court has considered extrinsic evidence necessary to resolve ambiguities in the contract, it is making findings of fact, but to the extent any of its interpretations are more akin to conclusions of law based on the plain meaning of the contract's terms, they should be treated as conclusions of law.

3. There are several disputed issues regarding the scope of § 15.11's "samples" provision, including: (i) whether the "best efforts" language requires defendants actively to pursue samples from licensees; (ii) the significance of the word "available"; (iii) whether § 15.11 requires defendants to provide a full "Licensing Package"; (iv) whether § 15.11 includes an obligation to provide product and design samples from defendants' licensees, in addition to samples manufactured by defendants themselves; (v) what kinds of product and design samples must be provided; (vi) whether "samples of ... designs" refers to something separate and distinct from "samples of ... products"; and (vii) whether the obligation to provide samples of "Gloria Vanderbilt designs and products" includes samples of all products that bear trademarks falling into the contract's definition of "Marks."

4. With respect to the issue of "best efforts" and the significance of the word "available," the Court finds that § 15.11 only requires defendants to exercise "best efforts" to supply plaintiff with samples (not to acquire them or create them) and that this obligation arises only after the samples become available. The duty to "acquire," "procure," "solicit," "obtain," or "create" simply does not appear in the sentence at issue, making it unlikely that "best efforts" was intended, as plaintiff suggests, to create an obligation to engage in such activity.[FN3]

FN3. With respect to the word "provide," the Court rejects defendants' suggestion that merely making samples available for viewing is equivalent to "provid[ing]" them to plaintiff.

> With respect to the term "best efforts," the Court need not dwell on its precise meaning. The only disagreement between the parties on that term's meaning relates to whether it referred to the acquisition of samples in addition to the provision of those samples. The Court having resolved that issue in favor of defendants, there is no other "best efforts" issue to consider. The Court notes, however, that the term has been defined to mean, inter alia, "pursue all reasonable methods," *Town of Roxbury v. Rodrigues,* 277 A.D.2d 866, 867 (3d Dep't 2000) (citation and internal quotation marks omitted), and "active exploitation in good faith," *Western Geophysical Co. of America, v. Bolt Assocs., Inc.,* 584 F.2d 1164, 1171 (2d Cir.1978) (internal quotation marks omitted).

*13 5. "Available" samples are those that are "readily obtainable" or accessible by defendants, *see Webster's New Universal Unabridged Dictionary* 142 (2003), including those readily accessible from licensees. A sample is not readily accessible, however, merely because it *should* be readily accessible under defendants' agreements with their licensees.[FN4]

FN4. Section 15.11 also provides: "Additional samples shall be supplied by Buyer, at a cost to Seller of no more than Buyer's actual cost, if requested by Seller."Plaintiff's claim under § 15.11 pays scant attention to this additional clause, presumably because plaintiff seeks samples free of cost.

6. These interpretations of § 15.11's terms conform best to the terms' ordinary meaning, and are bolstered by extrinsic evidence. Plaintiff, for instance, introduced numerous licensing contracts which, according to one of plaintiff's expert witnesses,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 11

reflect general "industry practice" with respect to the exchange of samples between companies. (Murjani Expert Rep. at 8.) Though plaintiff introduced this evidence to support its own reading of § 15.11, the evidence in fact weighs heavily in favor of defendants, because it demonstrates that a company seeking to protect its right to obtain samples will do so through unconditional and unambiguous contractual language. In one contract on which plaintiff relies, for instance, the licensee agrees to "provide free of charge to Licensor, at least one (1) week prior to any and all of Licensor's market shows, one (1) complete collection of all units of articles."(P.Ex. 116 ¶ 3.7; Murjani Expert Rep. 8.) In another contract cited by plaintiff, the licensee agrees to "submit to Licensor ... samples, including prototypes, final pre-productions samples, and upon Licensor's request, random production samples, of all Articles or Packaging Materials, and any all items or components used ... in the manufacture ... of Articles and Packaging materials."(P.Ex. 123 ¶ 3.6(a).) A third contract on which plaintiff relies contains a nearly identical provision. (P.Ex. 126 ¶ 3.6(a); see Murjani Expert Rep. at 8.) If, as plaintiff's expert contends, these expansive clauses reflect industry practice, § 15.11's much more modest language is best understood to create much more limited obligations.

7. Plaintiff's contracts with its own licensees similarly support a narrow reading of § 15.11's requirements. A 1998 form "License Agreement" written by plaintiff, for example, provides:

Prior to manufacture and/or marketing and/or sale of any Licensed Products pursuant hereto, Licensee shall submit to Licensor [Netherby] ... the concept, rough art, final artwork, and one (1) prototype of each of the Licensed Products to be sold, and of the labels, tags and package design .... Licensee shall also submit production samples, 1 of each color and print, of first run .... Licensee shall also submit to Licensor ... copies of all proposed advertising and promotional materials for the Licensed Products.

(D. Ex. ZZZZZ ¶ 5(b).) In 2004, plaintiff included identical language in a licensing agreement with Pura Moda, S.A. (D. Ex. HHHHHH ¶ 9(b).) Plaintiff did not insist on such expansive language in § 15.11, despite the fact that plaintiff had on at least some prior occasions considered such language to be

standard. This omission strongly suggests that plaintiff did not originally expect what it is now demanding under § 15.11.[FN5]

> FN5. The contracts in evidence containing requirements for the provision of samples to a licensor are different from the parties' contract, in that they are licensing agreements that require the licensee to get approval of its designs. They nevertheless provide powerful evidence for the general proposition that an apparel company seeking to protect its unconditional right to receive samples will do so through language more expansive and explicit than the language in § 15.11.

*14 8. For similar reasons, the Court rejects plaintiff's suggestion that § 15.11 requires the provision of a full "Licensing Package," including "designs, product samples, advertising images, promotional material, seasonal direction of the brand, labels and packaging material."(Murjani Expert Rep. at 10.) The plain language of § 15.11 simply does not create such a requirement, and the evidence of plaintiff's prior practice and of general industry practice demonstrates that companies that contract for full "Licensing Packages" do so in detailed, unambiguous language.

9. Because the word "mark" does not appear in § 15.11, the Court does not interpret the provision to incorporate the broad definition of Marks in the contract. Rather, § 15.11 is best interpreted to require the provision of design and product samples only with respect to defendants' Gloria Vanderbilt line of clothing. This includes any products defendants or their licensees publicly identify as Gloria Vanderbilt clothing, and any clothing bearing the actual trademark "Gloria Vanderbilt," but it does not include products-such as Glo jeans-that are merely "associated with" the Gloria Vanderbilt trademark, name and company. If the contracting parties intended to incorporate the contract's broad definition of marks in § 15.11, they could have easily done so.

10. The Court interprets § 15.11 to include samples from licensees, in addition to defendants' own samples, for two principal reasons. The first reason is simply that this conforms to the most natural reading of the clause, which contains no language limiting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

defendants' obligations to clothing they produce themselves. Licensees create "Gloria Vanderbilt designs and products" just as defendants do; if they did not, they would not need a license.

11. The second reason for including licensees is § 15.11's requirement that the samples be provided within 30 days of becoming "available" to defendants. The word "available," which means "accessible" or "readily obtainable," *see Webster's New Universal Unabridged Dictionary* 142 (2003), suggests that defendants will be accessing or obtaining at least some of the samples from other parties.

12. The record indicates evidence regarding various types of product samples utilized in the industry, including "prototype" samples, which are made early in the production process from preliminary designs; "salesman samples," which are the final samples shown to retailers who may be interested in carrying the products; and "production samples," which are samples of what actually ends up in stores. (*See, e.g.,* Tr. 252-55, 379-80, 539; Sarabia Decl. ¶¶ 16-17.) Though the parties appeared to disagree at trial with respect to the kind of product samples required by § 15.11, the post-trial briefing eliminates that disagreement. Plaintiff's brief emphasizes the importance of obtaining salesman samples, but does not present any argument as to why "samples ... of products" should be interpreted to include prototype samples. (P. Post-Trial Mem. 19-20.) Defendants argue that prototype samples are not required, and that § 15.11 "should be understood to refer only to the final product being sold by Jones to its accounts (salesman samples) or examples [of] actual product[s] being sold at retail."(D. Post-Trial Mem. 27-28.) Because plaintiff only demands a kind of sample that defendants now acknowledge the contract requires them to provide, there is no dispute on this issue for the Court to resolve.[FN6]

> FN6. The Court finds that parties seeking to require the provision of prototype samples would likely include more specific language than that present here, in view of the fact that such samples may be expensive to provide and may not represent what actually appears in stores for sale to consumers.

**\*15** 13. Section 15.11 not only calls for the provision

of product samples, but also for "samples of ... designs." Defendants urge the Court to disregard this provision, arguing that it is "merely a reiteration of the idea of 'samples of products.' " (*Id.* at 28.)Under New York law, however, courts must not construe any contract term to be "superfluous or meaningless" if another reasonable interpretation of the term is available. *Galli v. Metz,* 973 F.2d 145, 150 (2d Cir.1992); *see Conzo v. City of New York,* 438 F.Supp.2d 432, 435 (S.D.N.Y.2006); *Solutia Inc. v. FMC Corp.,* 385 F.Supp.2d 324, 337 (S.D.N.Y.2005). Here, the term "samples of ... designs" in § 15.11 can be reasonably interpreted to refer to "line books" or "line plans" (*see, e.g.,* P.Ex. 206), which contain a full set of pictures and descriptions for a given line of clothing. (*See* Tr. 28-29; Disner Dep. 148; P.Ex. 206.) Indeed, defendants note that if the word "designs" must be given any meaning at all, the "most plausible interpretation" is that it refers to line books. (D. Post-Trial Mem. 28.)

14. Putting all of this together, the Court concludes that § 15.11 of the contract requires defendants to use their best efforts to provide to plaintiff one set of salesman samples and line books for any products forming part of the Gloria Vanderbilt line of clothing and/or products bearing the trademark "Gloria Vanderbilt" (including products manufactured or sold by defendants' licensees), to the extent such samples and line books are actually readily accessible by defendants.

15. Turning to the question of breach, the record clearly establishes that Gloria Vanderbilt samples were often available to defendants, and that defendants provided samples to plaintiff on only two occasions. (*See, e.g.* Tr. 443, 576.) Defendants make no effort in their post-trial brief to argue that they ever provided samples of its licensees' products to plaintiff. Defendants also concede that they did not send samples to Netherby every season since the 1995 Modification. (D. Post-Trial Mem. 34-35.)

16. At trial, when the Court expressed skepticism that defendants had complied with § 15.11, defense counsel conceded the point: "Obviously I am not going to stand here and say, yessiree, we packed up every season our line and we shipped it right over to Netherby."(Tr. 107.)

17. There is no question, therefore, that defendants

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

breached their obligations under § 15.11. It is unnecessary to determine the precise extent of the breach, however, because plaintiff has not established actual damages, as explained below.

18. Plaintiff alleges that defendants' failure to provide samples in accordance with § 15.11 made it impossible for plaintiff to "effectively ... pursue quality licensees with advantageous licensing opportunities in the countries in which it owns the Gloria Marks."(Amended Complaint ¶ 33.) However, while the record contains evidence of the general importance of samples in soliciting licensees, plaintiff has provided no meaningful evidence that defendants' breach of § 15.11 directly and proximately caused plaintiff to lose any potential business with any prospective licensees. Plaintiff's post-trial brief cites to Murjani's testimony to support the damages claim, but the cited testimony consists merely of Murjani's unsupported and conclusory statement that the lack of designs and samples was "very much" a cause of plaintiff's failure to successfully solicit licensees. (Tr. 29-30.)

*16 19. Plaintiff cites limited documentary evidence that it lost at least one prospective licensee due to its inability to provide a "licensing package." (P.Ex. 244.) Murjani testified, moreover, that prospective licensees would not be interested in signing a contract if plaintiff could not provide "advertising material, samples, the designs and everything else."(Tr. 35.) As discussed above, however, defendants were never under any obligation to provide a "licensing package" (as defined by plaintiff's witnesses), advertising materials, or the undefined "everything else." There is no evidence that any prospective licensee would have signed a contract with plaintiff had defendants complied with their limited obligations under § 15.11 to provide "available" salesman samples and line books.

20. Plaintiff alternatively argues that defendants' breach of § 15.11 forced plaintiff to take on the business of developing samples itself. "As a result of not receiving the sample products and designs from Jones," plaintiff explains, "Netherby attempted to launch the Vanderbilt line" in Europe in 1999 and 2000. (P. Post-Trial Mem. 39.) The business venture was unsuccessful, allegedly costing plaintiff $2,358,947. (*Id.*)

21. This theory of damages fails for numerous reasons. Most importantly, plaintiff's theory rests on the assumption that § 15.11 required much more of defendants than the provision actually requires, and there is no evidence to support the notion that defendants' compliance with § 15.11's actual (limited) requirements would have reduced costs or eliminated the need to attempt the Vanderbilt venture.

22. Furthermore, Murjani's testimony, taken as a whole, does not support plaintiff's claim that it created the Vanderbilt line as a result of defendants' breach. When asked at his deposition whether the effort to launch a European Vanderbilt brand was a result of defendants' failure to provide a licensing package, Murjani responded: "There were other aspects." (Murjani Dep. 108-09.) He confirmed the accuracy of this deposition testimony at trial. (Tr. 122.)

23. Arguing that it is entitled to recover "what it would have cost to procure substitute performance" of defendants' obligations, plaintiff presents an elaborate calculation of what it would cost to hire "an independent design company to provide samples of ... designs and products for each Gloria Vanderbilt product line, on an annual basis."(Disner Rep. ¶ 8.) According to one of plaintiff's expert witnesses, Patti Disner, this would cost $2.1 million dollars per year. (Disner Rep. 9.)

24. Disner's proposed estimate is flawed for numerous reasons, many of which are set forth in defendants' post-trial brief. (*See* D. Post-Trial Mem. 38-46.) Disner testified at trial that she had never undertaken a project as large as that envisioned by her estimate, that the costs described in her estimate could be lowered-perhaps substantially-by working with companies in the Far East, and that Murjani had previously declined to work with her because of her high prices. (Tr. 290-91; *see also* P. Post-Trial Mem. 37-38.) She also conceded that in preparing her expert opinion she did not do any market research about the Gloria Vanderbilt brand, did not review any Gloria Vanderbilt line books or advertisements, and made no efforts to see what categories of Gloria Vanderbilt product were sold at retail. (Tr. 277-78.)

*17 25. Perhaps the most significant defect in the proposed estimate, however, is that it does not reflect

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 14

the value of defendants' Gloria Vanderbilt sample products and designs, but rather the purported value of sample products and designs created *independently.*Plaintiff contracted specifically for the former, not the latter; that is, plaintiff contracted for the provision of samples of the products and designs actually manufactured by defendants and their licensees. (P.Ex. 4 ¶ 8 ("Buyer shall use its best efforts to provide to Seller ... samples of Gloria Vanderbilt designs and products.").) Plaintiff sought the samples so that its licensees could "duplicate" the Gloria Vanderbilt clothing actually to be sold in the United States and Canada. (P. Post-Trial Mem. 17 (citation and internal quotation marks omitted).) According to plaintiff, it was also essential that the samples received be of Gloria Vanderbilt clothing that had not yet appeared-but that would soon appear-in stores.

26. Murjani's testimony on these points was unambiguous and emphatic. He stated, for example:

"[I]t's exceptionally important that whatever is produced under your brand is exactly the same no matter which part of the world you go [to] .... [T]he whole concept is [that] everything that is produced anywhere in the world is exactly the same ...." (Tr. 20.)

"[W]hat I wanted to do was to ensure ... that everything that happened around the world was similar to what was going on in the United States as well, even though we are two different owners but it was still one brand."(*Id.* 22.)

"They actually gave us samples that were already at retail or goods that had already shipped. So they were really of little or no use to us.... [I]t's particularly important that the garments or the samples that we receive are fashion forward, in other words, in time."(*Id.* 32-33.)

"[Y]ou couldn't really build a business on using or always having last year's merchandise .... No one wants last year's merchandise."(*Id.* 34-35.)

"[G]oods they had already shipped to the stores three months ago ... have no relevance ...." (*Id.* 39.)

"[T]he whole object of the exercise" was to allow

licensees to "reproduce the same kind of garments produced here."(*Id.* 105)

27. In view of all of this, it is clear that hiring an independent design company to produce, from scratch, samples never used and never to be used by defendants or their licensees would not, under plaintiff's theory of the case, provide plaintiff with a remotely suitable replacement of goods specified in the contract. If actual Gloria Vanderbilt samples from defendants are not suitable if they arrive a few months late, then independently created samples based only in part on old Gloria Vanderbilt samples, which could hardly be created in a timely manner in view of the complexity of the project contemplated by the Disner testimony, cannot be suitable either. The Disner calculation is thus premised on an exercise that is extremely expensive and, in plaintiff's own view, worthless. It does not represent an appropriate measure of any damage to plaintiff.

**\*18** 28. The only other damages plaintiff might plausibly claim would be based on an argument that the missing samples themselves were of value, regardless of whether they were necessary to solicit licensees. Under plaintiff's theory of the case, however, the samples standing alone were worthless; their only value was in their potential to assist in attracting licensees. In any event, plaintiff has not offered evidence of the samples' market value, but has provided instead a measure of what it might cost to create comparable samples from scratch. This is not an appropriate measure of what a willing buyer would pay a willing seller for Gloria Vanderbilt samples.[FN7]*See United States v. Boccagna,* 450 F.3d 107, 115 (2d Cir.2006).

> FN7. The Court cannot assume that the samples would be worth the amount that a consumer would pay in a store, because it is industry practice to deliver product samples in slightly damaged condition. (*See, e.g.,* Tr. 412.)

### Conclusions of Law

29. Defendants have breached the contract by failing to comply with their obligation under § 15.11 to "use [their] best efforts to provide to [plaintiff], at no cost to [plaintiff], one set of samples of Gloria Vanderbilt designs and products within 30 days after such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 15

samples become available to [them]."

30. "Under New York law, '[n]ominal damages are always available in breach of contract actions.' " *Semi-Tech Litig., LLC v. Bankers Trust Co.,* 353 F.Supp.2d 460, 488 (S.D.N.Y.2005), quoting *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 95 (1993). To be entitled to compensatory damages, however, a plaintiff "must prove that [the] defendant's breach *directly and proximately caused* [the] damages." *Nat'l Market Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir.2004) (emphasis in original). There must be at least a "reasonable evidentiary foundation" for an estimate of these damages, though the plaintiff does not need to prove damages with "mathematical precision." *Exodus Partners, LLC v. Cooke,* No. 04 Civ. 10239, 2007 WL 120053, at *14 (Jan. 17, 2007); *see Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 391-92 (2d Cir.2006); *see also ESPN, Inc. v. Office of Comm'r of Baseball,* 76 F.Supp.2d 416, 418 (S.D .N.Y.1999) ("It is well-settled under New York law that [a] plaintiff seeking compensatory damages has the burden of proof and should present to the court a proper basis for ascertaining the damages [it] seeks to recover." (citation and internal quotation marks omitted)); *Borne Chemical Co. v. Dictrow,* 85 A.D.2d 646, 651 (2d Dep't 1981) ("A person violating his contract should not be permitted entirely to escape liability because the amount of damages which he has caused is uncertain. In that event, the trier of the facts ... [may] award such damages as may be *reasonably calculated* to be the result of the defendant's breach." (emphasis added) (citations omitted)).

31. Because plaintiff has not provided any method of estimating damages, and because the Court does not find any manner of doing so independently on the present record, plaintiff is entitled to only $1.00 in nominal damages.

## II. Keeping Plaintiff Generally Informed

### *Findings of Fact*

*19 32. Defendants agreed under the 1995 modification to keep plaintiff "generally informed of the activities of [defendants'] licensees, including providing Seller with copies of such licenses presently in existence and licenses that are executed in the future." Plaintiff claims that this requires

defendants to inform plaintiff of "contracts, amendments, payments, brand management, colors, fit, logos, signage, photos, binders, line plans, trends, etc." of defendants' licensees. (P. Proposed Findings ¶ 68.) Defendants respond that the provision only requires them to provide, at most, information about major events, such as the execution or termination of licenses, as well as financial information regarding royalties and sales, new licenses and changes in royalty rates. (D. Post-Trial Mem. 33.)

33. As the Court already indicated at the close of trial, plaintiff's interpretation of defendants' obligations reads more into the contract than its words can bear. (Tr. 612-13.) "[G]enerally" only means "with respect to the larger part," "for the most part," and "without reference to ... particular persons, things, situations, etc., that may be an exception."*Webster's New Universal Unabridged Dictionary* 795 (2003). Plaintiff has not provided any sufficient basis to believe that the word should carry a different meaning here. Accordingly, the Court agrees with defendants that the "generally informed" language requires only basic information about finances, royalties, and major events. A failure to provide information on a particular occasion or with respect to a particular transaction, moreover, would not necessarily give rise to a breach, so long as defendants "for the most part" inform plaintiff of the licensees' activities. Plaintiff has not proven any acts or omissions by defendants that would amount to a breach under this standard.

34. The clause specifically requiring copies of licenses, of course, imposes a more concrete obligation on defendants; that language, moreover, is not qualified by a word like "generally." (This clause also demonstrates that the parties knew how to draft a clause requiring the provision of specific information when that was their intention.)

### *Conclusion of Law*

35. Plaintiffs have not established a breach of the provision of § 15.11 requiring defendants' to keep plaintiff "generally informed ." Plaintiff has demonstrated that defendants breached the clause regarding copies of licenses by failing to provide the copies in a reasonably timely manner. (*See, e.g.,* P. Exs. 142-52.) However, because plaintiff does not "suggest[ ] it suffered any demonstrable damages

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

Page 16

caused by [defendants'] failure to provide licenses" (P. Post-Trial Mem. 28), the Court will award only nominal damages of $1.00 for the breach.

## SPECIFIC PERFORMANCE

### *Conclusions of Law*

1. In addition to seeking actual nominal damages for defendants' breach of § 15.11, plaintiff asks the Court to order specific performance. Such an order may be appropriate, at the trial court's discretion, where (1) there is a valid contract; (2) the plaintiff has substantially performed its part of the contract; and (3) the parties are each able to continue performing their parts of the agreement. *See Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.,* 992 F.2d 430, 433 (2d Cir.1993); *La Mirada Prods. Co., Inc. v. Wassall PLC,* 823 F.Supp. 138, 140-41 (S.D.N.Y.1993). A plaintiff seeking specific performance must demonstrate the lack of an adequate remedy at law. *Nemer Jeep-Eagle, Inc.,* 992 F.2d at 433. Legal remedies may be found inadequate where any calculation of damages would be speculative, *id.; Payroll Express Corp. v. Aetna Casualty and Sur. Co.,* 659 F.2d 285, 292 (2d Cir.1981); *La Mirada Prods. Co.,* 823 F.Supp. at 141, or where the contract involves goods that are "unique in kind, quality or personal association," *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.,* No. 04 Civ. 10014, 2006 WL 1493132, at *8 (S.D.N.Y. May 31, 2006) (citation and internal quotation marks omitted). "Doubts concerning the adequacy of money damages should be resolved in favor of granting specific performance." *Nemer Jeep-Eagle, Inc.,* 992 F.2d at 436.

**\*20** 2. Specific performance is not appropriate where the terms of the contract to be enforced are not "certain enough to permit the [C]ourt to frame an order of specific performance ... and to determine whether resulting performance is in accord with what has been ordered." Restatement (Second) of Contracts § 362 cmt. a; *see Corti v. Cont'l Copper & Steel Export Corp.,* 223 F.Supp. 503, 510 (S.D.N.Y.1963); *see also Brookhaven Housing Coalition v. Solomon,* 583 F.2d 584, 593-94 (2d Cir.1978). A contract may be too indefinite to justify an order of specific performance even though it is definite enough to sustain an action for damages. *See Corti,* 223 F.Supp. at 510, citing *Gulbenkian v. Gulbenkian,* 147 F.2d 173 (2d Cir.1945). Specific performance is also inappropriate where the burdens on the court to enforce the order would outweigh any benefits to be gained. Restatement (Second) of Contracts § 366; *see Litho Prestige, Div. of Unimedia Group, Inc. v. News Am. Pub., Inc.,* 652 F.Supp. 804, 809-10 (S.D.N.Y.1986).

3. The requirements for an order requiring specific performance are satisfied here. The record sufficiently establishes the inadequacy of legal remedies for defendants' breach of § 15.11. Any calculation of damages for a breach would likely be speculative, and the contract involves samples that are unique in kind and personal association. In addition, the parties' contract includes a provision stipulating that "no adequate remedy of law would be available for breach of this Agreement."(P.Ex. 3 ¶ 15.5.) While not dispositive, this provision weighs in favor of plaintiff. *See Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir.1999); *Alpha Capital Aktiengesellschaft v. Advanced Viral Res. Corp.,* No. 02 Civ. 10237, 2003 WL 328302, at *5 (S.D.N.Y. Feb. 11, 2003). Moreover, to the extent here relevant, the provisions of the contract are sufficiently definite to permit enforcement.

4. The Court will therefore grant the request for an order for specific performance. However, as explained below, certain requirements of § 15.11 are too indefinite and their enforcement too difficult-to warrant an order of specific performance.

5. The requirement that defendants provide "copies of such licenses presently in existence and licenses that are executed in the future" does not present difficulties of application or enforcement that would preclude an order of specific performance, and plaintiff's request for an order in that respect will be granted. It may be argued that the term "available" is too unspecific to permit an order enforcing the provision of § 15.11 with respect to the provision of samples. With respect to samples created by defendants themselves, however, "available" is clearly sufficiently definite to allow for specific performance, and enforcement would not impose undue burdens on the Court. If defendants create salesman samples or line books for Gloria Vanderbilt products, those books and product samples are unquestionably "available" upon their creation and must be provided to plaintiff.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)

**\*21** 6. With respect to the requirement that defendants provide plaintiff with licensees' samples, the question is closer. It might well be unduly burdensome on the Court to become embroiled in disputes over whether particular salesman samples and linebooks are actually readily accessible from licensees, particularly because the availability of such samples is likely to vary significantly depending on defendants' relationship with a particular licensee. However, to the extent that the term "available" is construed, as the Court believes it should be, to mean samples that are actually provided to defendants, there is no obstacle to specific enforcement. The word "available" is used in § 15.11 with respect to all samples, both those produced by defendants and those provided by licensees. While it would be theoretically possible to consider samples "available" whenever defendants have a contractual right to obtain them, because "available" merely means "readily obtainable," that would make little sense with respect to defendants' own samples, which defendants always have a right to create, but which are only "available" once manufactured and in defendants' possession or control. The same must be true, therefore, of licensees' samples: the samples are "available" once created and accessible to defendants. Samples that do not exist or are never provided to defendants are not available to them.

7. The Court declines to order specific performance of defendant's obligation to keep plaintiff "generally informed" of licensees' activities, except to the extent it specifically requires defendants to provide copies of licenses. "Generally informed" provides no meaningful guidance to the Court in framing an order or ensuring compliance. In any event, as plaintiff has not established a breach of this provision, there is no basis for injunctive relief.

8. There is some dispute regarding the duration of § 15.11's requirements. Defendants contend that the obligations terminate in October 2009, with a possibility of extensions if certain conditions are met. Plaintiff's post-trial brief does not address the issue, though according to defendants, plaintiff has previously insisted that § 15.11's obligations extend until the last payment period for the last of the Five Countries has started and terminated. For present purposes, it is sufficient to hold that the requirements last at least through October 2009. A determination

of the parties' rights after that date is premature, particularly in view of the limited briefing on the issue and the possibility that the issue will be resolved without the assistance of the Court sometime before November 2009. Resolution will hopefully be facilitated by the Court's resolution of the dispute surrounding § 15.11's scope.

### ATTORNEYS' FEES

#### *Conclusion of Law*

1. Both parties seek attorneys' fees. At the close of trial, the Court indicated that the issue of attorneys' fees would be addressed at a later date in order to "economize" the post-trial briefing on the merits. (Tr. 598.) Defendants' post-trial brief barely touches on the issue, and plaintiff has indicated that it intends to submit more papers. (P. Post-Trial Mem. 48.) Accordingly, the Court will defer ruling on the attorneys' fees issue pending additional briefing. The parties are encouraged to confer regarding this matter with a view to reaching agreement.

### CONCLUSION

**\*22** For the foregoing reasons, the Court (1) finds that defendants' use of the Glo marks without making Contingent Payments breached the 1988 contract; (2) awards damages in the amount agreed to by the parties in consequence of that breach; (3) grants in part and denies in part plaintiff's demand for declaratory or permanent injunctive relief with respect to the Glo marks; (4) finds that defendants breached their obligations with respect to both that portion of the "generally informed" clause requiring provision of copies of licenses and the "samples" clause of § 15.11 of the Agreement; (5) awards plaintiff nominal damages in the total amount of $2.00 for the breaches of § 15.11; and (6) orders defendants to specifically perform its obligations under § 15.11 through October 2009 with respect to the provision of product and design samples and with respect to the obligation to provide copies of licenses.

Plaintiff is directed to submit an appropriate form of judgment no later than April 16, 2007. Plaintiff shall submit any supplemental briefing with respect to its motion for attorneys' fees no later than April 30, 2007. Defendants shall file any response thereto no later than May 25, 2007.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 1041648 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2007 WL 1041648)**

SO ORDERED.

S.D.N.Y.,2007.
Netherby Ltd. v. Jones Apparel Group, Inc.
Not Reported in F.Supp.2d, 2007 WL 1041648
(S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 337293 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 337293)**

Page 1

**C**Town Cove Jersey City Urban Renewal, Inc. v.
Procida Const. Corp.
S.D.N.Y.,1996.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
TOWN COVE JERSEY CITY URBAN RENEWAL,
INC., Petitioner,
v.
PROCIDA CONSTRUCTION CORP., Respondent.
**No. 96 CIV. 2551 (PKL), 96 CIV. 2668 (PKL).**

June 19, 1996.

Michael F. Maschio, Cowan, Liebowitz & Latman,
P.C., New York City.
Laurence E. Deutsch, Deutsch & Spring, New York
City

*MEMORANDUM ORDER*

LEISURE, District Judge:
**\*1** Before the Court is a petition to compel arbitration
pursuant to § 4 of the United States Arbitration Act.
*See*9 U.S.C. §§ 1*et seq.* Respondent argues that the
petition should be denied and the demand for
arbitration should be vacated. Respondent also
demands a jury trial pursuant to 9 U.S.C. § 4. For the
reasons stated below, the entirety of the dispute is
referred to the arbitrator, including the question of
which claims are immediately arbitrable on the
merits. Respondent's demand for a jury trial is
denied.

BACKGROUND

On August 8, 1995, petitioner, Town Cove Jersey
City Urban Renewal, Inc. ("Town Cove"), contracted
with respondent, Procida Construction Corp.
("Procida"), for the construction of an apartment
complex project. As alleged in the complaint, third
parties, not present in this action, filed "mechanic's
liens" against the project. These types of liens are
typically filed by subcontractors, or suppliers of
material, who are concerned about receiving payment
from the primary contractor. The liens attach not only
to construction work performed on a particular
property, but to the property itself as well. Thus, if

the third parties did not receive the funds which they
were due, they would have been entitled to
foreclosure and sale of Town Cove's land. It is
undisputed that after the filing of the liens Procida
did not provide Town Cove with information
regarding them, as required by contract.

Apparently in the context of disagreements pertaining
to these mechanic's liens, relations between the
parties broke down. Procida ceased construction and
Town Cove withheld payment, contending that
Procida failed to perform work in accordance with
the contract. These failures of Procida are alleged to
include: (1) not prosecuting the work in accordance
with the contract, (2) not performing the work within
the guaranteed price, (3) not providing evidence
about the price of completion, (4) not providing
evidence concerning mechanic's liens, and, (5)
abandoning the work.

On April 4, 1996, Town Cove began arbitration
proceedings against Procida with the American
Arbitration Association. Procida filed for a stay of
these proceedings on April 11, 1996, in the Supreme
Court of the State of New York, County of New
York. The very same day Town Cove filed in this
Court the instant petition to compel arbitration, and
five days later removed the state court action to this
Court as well. The two actions have been
consolidated here.

As part of its opposition to Town Cove's petition,
Procida contends that there is a disputed factual issue
regarding whether this is a dispute the parties have
agreed to arbitrate, and thus Procida demands an
evidentiary hearing in front of a jury pursuant to 9
U.S.C. § 4.[FN1]

DISCUSSION

*I. Whether the condition precedent has been satisfied
is a matter for the arbitrator to decide*

Federal policy strongly favors arbitration as a means
of dispute resolution. *See Rodriguez de Quijas v.
Shearson/American Express, Inc.,* 490 U.S. 477, 479-
481 (1989); *David L. Threlkeld & Co. v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 337293 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 337293)

*Metallgesellschaft Ltd.*, 923 F.2d 245, 248 (2d Cir. 1991). In keeping with this policy, a contractual provision which provides for arbitration must be interpreted broadly. If there is doubt whether a particular situation falls within such a provision, the doubt is resolved in favor of arbitration. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

*2 Nevertheless, whether or not arbitration is available is still a matter of contract. A party to an agreement "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). Thus in order to determine the status of the parties' claims herein, an examination of the contract is necessary.

According to § 4.3.1 of the contract, a "claim" includes disputes and matters in question arising out of or relating to the contract. In addition, § 4.5.1 indicates that all claims shall be settled by arbitration. However, as § 4.3.2 states, before arbitration is to begin the matter must both be referred to the project's architect and a decision of the architect must be obtained, unless one of five exceptions applies.[FN2] Four of these five exceptions pertain to difficulties in obtaining the architect's decision and are not relevant to this case. The fifth exception provides that a decision of the architect is not a condition precedent to arbitration when a claim "relates to a mechanic's lien."

Thus, in order to proceed to arbitration on the merits of those claims which do not fall within the mechanic's lien exception, Town Cove must satisfy the condition precedent of obtaining the architect's decision. It is not this Court's role formally to decide whether or not Town Cove has satisfied this condition.[FN3] Whether or not a condition precedent to arbitration has been satisfied is a procedural matter for the arbitrator to decide. *See Finkle and Ross v. A.G. Becker Paribas, Inc.*, 622 F.Supp. 1505, 1511 (S.D.N.Y. 1985). For example, in *Corporate Printing Co. v. New York Typographical Union*, 601 F. Supp. 323, 328 (S.D.N.Y. 1984), a contractual provision required disputes to go to a special committee before proceeding to arbitration. One of the parties contended that this condition precedent had not been met. The Court left the matter to the arbitrator,

stating, "[p]rocedural disputes such as this, because they often develop in the context of the actual dispute sought to be arbitrated, are best left to the arbitrator." *Id.* at 328.

II. *Which of Town Cove's claims are subject to the condition precedent is a matter for the arbitrator to decide*

In an effort to avoid the issue of whether the condition precedent has been satisfied, Town Cove also makes an argument that all of its claims relate to the mechanic's liens. If this were true, then all of its claims would be immediately arbitrable on the merits. However, this is not an issue for this Court to decide. The line between those claims which relate to a mechanic's lien and are therefore exempt from satisfying the condition precedent, and those which do not relate to a lien and are therefore subject to the condition, is a difficult one to draw. A dispute over the placement of this line is certainly one which will "develop in the context" of the dispute to be arbitrated and is "best left to the arbitrator." *Corporate Printing Co.*, 601 F.Supp. at 328.

*3 The soundness of this Court's conclusion that the arbitrator should decide the reach of the condition precedent is further revealed by restating the issue as one of timing requirements. The question is essentially whether a decision by the architect on certain claims must occur prior to their arbitration. Like the issue of whether the condition precedent has been satisfied, this is a procedural issue which is for the arbitrator to decide. *See Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 890 (2d Cir. 1982) (holding that contractual time limit on presenting grievances is a procedural issue for the arbitrator); *Corporate Printing Co.*, 601 F. Supp. at 328.

Since it is a matter for the arbitrator to decide, this Court does not rule on Town Cove's argument that all of its claims are related to the mechanic's liens. It should be noted, however, that while some claims may be related to the liens, it seems unlikely that the entire dispute can be so characterized. Even with a broad interpretation of the contractual language "relates to a mechanic's lien," it is difficult to see how this can encompass matters such as not performing work up to specifications or for a guaranteed price.

Thus, the arbitrator must first decide which of Town

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 337293 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp., 1996 WL 337293)

Cove's claims relate to the mechanic's liens, which are then immediately arbitrable on the merits. The remainder of the claims are subject to the condition precedent. If the arbitrator finds that the condition precedent has been satisfied, then arbitration may then proceed to the merits of these claims as well.

### III. *There is no factual issue for this Court to address*

Procida argues that at issue is a factual question of what claims the parties have contractually agreed to arbitrate. This is not so. Section 4.5.1 is part of a contractual agreement that permits essentially all claims to be decided in arbitration. What is at issue are procedural questions of whether or not certain claims must first pass through the architect, and did they do so.

As there is no factual issue in dispute with regards to the arbitration clause, Procida is not entitled to an evidentiary hearing under 9 U.S.C. § 4. A party to an arbitration agreement is not entitled to a jury trial upon demand unless there is a "triable issue concerning the existence or scope of the agreement."*Saturday Evening Post Co. v Rumbleseat Press, Inc.*, 816 F.2d 1191,1196 (7th Cir. 1987); *see also Moses H. Cone Memorial Hosp.*, 460 U.S. at 29. There is clearly no triable issue regarding the existence of the agreement. As to the scope of the agreement, virtually all claims are subject to arbitration under contract provision 4.5.1. This is not disputed. A jury's decision on the applicability of the condition precedent can only have the effect of forcing certain claims first to go to the architect, altering the time at which arbitration occurs. It cannot alter the scope of what claims are, in the end, within the scope of an arbitration proceeding.

*4 This Court is not insensitive to Procida's concern that it is not entirely consistent with the parties' intentions to submit to the arbitrator the question of whether there should be arbitration. However, Procida should realize that the arbitrator must first address the preliminary question of whether the condition precedent has been met before proceeding to the merits of the case. It is entirely possible that the arbitrator will hold that many of Town Cove's claims are not related to a mechanic's lien. It is also possible that the arbitrator will hold that the condition precedent of the Architect's decision has not been satisfied. In such an event the arbitrator cannot

immediately proceed to arbitrate on the merits a large portion of the case.

### CONCLUSION

For the reasons stated above, the entirety of the dispute is HEREBY REFERRED to the arbitrator. Respondent's demand for a jury trial pursuant to 9 U.S.C. § 4 is HEREBY DENIED.

SO ORDERED.

> FN1. Procida also asserts that Town Cove's petition is made by an attorney who does not have personal knowledge of the events in question. It claims that many allegations in the petition are thus hearsay and therefore should not be considered by this Court. Town Cove's reply papers includes affidavits of its Vice President as well as an attorney who filed for arbitration on its behalf with the American Arbitration Association. These additional affidavits, together with other documentation, provide sufficient evidence to support this Court's decision.

> FN2. The contract reads as follows:

> 4.3.2 Decision of Architect. Claims, including those alleging an error or omission by the Architect, shall be referred initially to the Architect for action .... A decision by the Architect ... shall be required as a condition precedent to arbitration .... The decision by the Architect in response to a Claim shall not be a condition precedent to arbitration or litigation in the event (1) the position of Architect is vacant, (2) the Architect has not received evidence or has failed to render a decision within agreed time limits, (3) the Architect has failed to take action ... within 30 days after the Claim is made, (4) 45 days have passed after the Claim has been referred to the Architect or (5) the Claim relates to a mechanic's lien.

> FN3. While not deciding the issue, this

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 337293 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1996 WL 337293)**

Court does address Town Cove's contention that its letter to the architect of April 16, 1996 satisfies the condition precedent for arbitration. It quotes the letter as stating it is a "response to Procida's objection [that no decision has been obtained]." This quote is out of context. The letter as a whole basically informs the architect about the dispute and states Town Cove's position that his decision is not necessary. This is not very persuasive evidence of having submitted claims for his decision.

S.D.N.Y.,1996.
Town Cove Jersey City Urban Renewal, Inc. v. Procida Const. Corp.
Not Reported in F.Supp., 1996 WL 337293 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.