**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ECF CASE

E. S. ORIGINALS, INC.,

Plaintiff,

-v-

Civil Action No. 08-CV-1945 (PKL)

TOTES ISOTONER CORPORATION,

Defendant.

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR STAY

---

**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
T: 212.262.6700
F: 212.262.7402
Attorneys for Plaintiff,
E.S. Originals, Inc.

Of Counsel:  Jeffrey J. Wild, Esq.
             Steven M. Hecht, Esq.

On the Brief: Sally J. Mulligan, Esq.
              Khizar A. Sheikh, Esq.

## TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF FACTS.................................................................................. 4

    A.   The Asset Purchase Agreement ...................................................................4

    B.   The Earn-Out Payments .............................................................................4

    C.   Procedures For Disputing The Items of TIC'S "Net Sales Statement" ...........5

    D.   ESO's Contractual Rights to Information About The Post-Sale Business ......6

    E.   TIC Delivers an Inaccurate Net Sales Statement and ESO Endeavors
        to Exercise Its Rights Under the Agreement to Access Information ...............7

    F.   ESO's Accounting Firm Uncovers Discrepancies and Issues Regarding
        TIC's Books and Records Relating to the Net Sales Statement .....................8

    G.   TIC Continues to Refuse to Cooperate With ESO .........................................9

ARGUMENT....................................................................................................10

POINT I

ESO'S CLAIMS ARE NOT MOOT AND THEREFORE TIC'S
MOTION FOR LACK OF SUBJECT MATTER JURISDICTION
SHOULD BE DENIED ..................................................................................... 10

    A.   ESO Did Not "Admit" That Its Dispute Notice Was Insufficient ..................10

    B.   Whether ESO's Dispute Notice Was "Reasonable" is a Fact Issue That Cannot Be
        Resolved on a Motion to Dismiss ...............................................................12

POINT II

THIS COURT SHOULD NOT STAY THIS ACTION PENDING
ARBITRATION BECAUSE THE LIMITED ARBITRATION CLAUSE
IN THE AGREEMENT DOES NOT COVER THE CLAIMS AT ISSUE
IN THIS LAWSUIT .......................................................................................... 14

A.   TIC Is Attempting to Re-Write the Contract by Expanding the Scope of the Limited Arbitration Provision ................................................................14

## TABLE OF CONTENTS (cont'd)

PAGE

B. ESO's Right to Access Information to Analyze the Net Sales Statement is an Independent and Substantive Issue That Should Be Decided By This Court ...............17

POINT III

TIC'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM SHOULD BE DENIED ............................................................................... 18

A. Standard of Review .....................................................................................18

B. ESO Has Adequately Alleged That It Is Entitled to a Decree of Specific Performance ....................................................................................................19

C. ESO Has Adequately Pled Damages For Its Breach of Contract Claim ........................20

D. ESO Has Adequately Pled A Claim For Breach Of The Implied Covenent Of Good Faith & Fair Dealing ......................................................................20

E. ESO Has Adequately Pled Its Indemnification Claim ...................................................23

CONCLUSION............................................................................................................................24

## TABLE OF AUTHORITIES

PAGES

CASES

*Am. Express Bank Ltd. v. Uniroyal, Inc.*,
  164 A.D.2d 275 (1st Dep't 1990) ........................................................................13

*ATSI Commc's., Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) .................................................................................24

*Banks v. Corr. Servs. Corp.*,
  475 F. Supp. 2d 189 (E.D.N.Y. 2007) ..............................................................14

*Bell Atl. Corp. v. Twombly*,
  127 S.Ct. 1955 (2007) .........................................................................................19

*Burke v. Steinman*,
  No. 03 Civ. 1390 (GEL), 2003 WL 21507490 (S.D.N.Y. June 30, 2002) ...........14

*Chelsea Square Textiles v. Bombay Dyeing and Mfg. Co. Ltd.*,
  189 F.3d 289 (2d Cir. 1999).............................................................................14

*Computech Int'l, Inc. v. Compaq Computer Corp.*,
  No. 02 Civ. 2628 (RWS), 2002 WL 31398933 (S.D.N.Y. Oct. 24, 2002) ...........22

*Cooper v. Pate*,
  378 U.S. 546 (1964)............................................................................................19

*Curry Road Ltd. v. K Mart Corp.*,
  893 F.2d 509 (2d Cir. 1990).............................................................................13

*Erickson v. Pardus*,
  127 S.Ct. 2197 (2007).........................................................................................19

*Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*,
  961 F.2d 1052 (2d Cir. 1992)............................................................................22

*GEICO Corp. v. Pa. Power & Light Co.*,
  669 F.Supp. 590 (S.D.N.Y. 1987) .....................................................................16

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)..............................................................................................18

*Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*,
  223 F. Supp. 2d 435 (S.D.N.Y. 2001)...............................................................19

<u>**TABLE OF AUTHORITIES (cont'd)**</u>

**PAGES**

C<span style="font-variant:small-caps">ASES</span>

*McAllister Bros., Inc. v. A & S Transp. Co.,*
   621 F.2d 519 (2d Cir. 1980)..................................................................15

*McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,*
   858 F.2d 825 (2d Cir. 1988)........................................................15, 16, 17

*Miller v. Wolpoff & Abramson, LLP,*
   321 F.3d 292 (2d Cir. 2003)..................................................................19

*N. Ferry Co., Inc. v. Local 333,*
   338 F. Supp. 2d 430 (E.D.N.Y. 2004) ....................................................14

*Nowak v. Ironworkers Local 6 Pension Fund,*
   81 F.3d 1182 (2d Cir. 1996)..................................................................13

*O'Hearn v. Bodyonics, Ltd.,*
   22 F. Supp. 2d 7 (E.D.N.Y. 1998) .........................................................22

*Patane v. Clark,*
   508 F.3d 106 (2d Cir. 2007)..................................................................19

*Pearce v. Manhattan Ensemble Theater, Inc.,*
   528 F. Supp. 2d 175 (S.D.N.Y. 2007).................................................21, 22

*Prima Paint v. Flood & Conklin Mfg. Co.,*
   388 U.S. 395 (1967)...........................................................................15

*RCA Serv. Co. v. City of New York,*
   21 A.D.2d 760 (1st Dep't 1964) .............................................................13

*Rockland County v. Primiano Constr. Co., Inc.,*
   409 N.E.2d 951 (N.Y. 1980)..................................................................18

*Stena Line (U.K.) Ltd v. Sea Containers Ltd.,*
   758 F.Supp. 934 (S.D.N.Y 1991) .......................................................11, 12

*Universal Marine Med. Supply Inc. v. Lovecchio,*
   8 F. Supp. 2d 214 (E.D.N.Y. 1998) ........................................................14

*Wolff v. Rare Medium, Inc.,*
   171 F. Supp. 2d 354 (S.D.N.Y. 2001).....................................................22

*XL Capital, Ltd. v. Kronenberg,*
   145 Fed. Appx. 384 (2d Cir. 2005).....................................................15, 17

## TABLE OF AUTHORITIES (cont'd)

**PAGES**

**RULES**

Fed. R. Civ. P. 8 ..................................................................................................19

Fed. R. Civ. P. 9 ..................................................................................................19

Fed. R. Civ. P. 12(b)(6) ..........................................................................11, 12, 19

Plaintiff E.S. Originals, Inc. ("Plaintiff" or "ESO") respectfully submits this memorandum of law in opposition to the motion to dismiss or stay Plaintiff's Complaint dated February 27, 2008 (the "Complaint") filed by defendant totes Isotoner Corporation ("Defendant" or "TIC").

## PRELIMINARY STATEMENT

This case arises out of an Asset Purchase Agreement between Plaintiff and Defendant dated October 6, 2006 (the "Agreement"). Under the Agreement, Defendant bought Plaintiff's business, and promised (among other things) that after the sale, Defendant would:

- Give Plaintiff access to "*all books and records, tax returns and records, Contracts, information and employees* . . . retained and remaining in existence after the Closing . . . which are *necessary or useful in connection with any litigation . . . or dispute*, or *any other matter requiring any such books and records, information or employees for any reasonable business purpose relating to the Subject Business*" [Agreement, § 9.1(a), emphasis added];

- Give Plaintiff access to "*all information, records, invoices, data and auditors' working papers of Buyer [Defendant] and Buyer's Accountants* as may be required in connection with the analysis of *any* Net Sales Statement" or "calculation of any Earn-Out Payment" [Agreement, § 2.7(e), emphasis added]; and

- Submit, "*exclusively* in the United States District Court for the Southern District of New York," "*any* legal action, suit or proceeding . . . *arising out of or in connection with* this Agreement or the transactions contemplated hereby *or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise)*" [Agreement, § 12.15, emphasis added].

The sole exception from the exclusive jurisdiction of this Court is related to disagreements about one limited accounting matter: the computation of the "amounts" of the "items" in just one document: a "Net Sales Statement." Defendant was required to provide the "Net Sales Statement" to determine the proper amount of Plaintiff's earn-outs: the payments to which Plaintiff is entitled based on the amount of sales made by Defendant after the sale.

In short, the parties agreed that an "Independent Accounting Firm" (the "Accountants")

could do what accountants do best:  determine the correct dollar amount of the "items" in one document (here, the Net Sales Statement).   All other matters -- including all claims "for breach of contract" -- were left "exclusively" to this Court.

The parties may disagree about many things, but there can be no dispute that Plaintiff is alleging breaches of contract.  The Complaint alleges that Defendant has tried to cheat Plaintiff out of its contractual right to earn-outs in two different ways.  First, the Complaint alleges (in the First Cause of Action) that Defendant breached Sections 9.1(a) and 2.7(e) of the Agreement by withholding documents and information in violation of the Agreement.  Second, the Complaint alleges (in ¶¶ 33-34 and the Second Cause of Action) that Defendant intentionally delayed sales for the sole purpose of defeating Plaintiff's earn-out rights under the Agreement.

Ironically, Defendant's motion before this Court -- to dismiss or stay -- is now a third way in which Defendant is trying to prevent Plaintiff from getting the earn-outs.  According to Defendant, Plaintiff should be blocked from ever enforcing the Agreement because Plaintiff (supposedly) did not dispute Defendant's Net Sales Statement with "reasonable detail."   In the alternative, according to Defendant, the net-sales determinations should be made by the Accountants now -- before Plaintiff has the documents and information within Defendant's exclusive control, in breach of the Agreement over which this Court has exclusive jurisdiction.

But both of Defendant's arguments are classic examples of circular logic.  If there were any required "details" missing from Plaintiff's objection letter (the one disputing the accuracy of Defendant's Net Sales Statement), it was because Defendant itself made those details "missing" -- by breaching the Agreement and blocking access to documents and information about the sold business within Defendant's control.  That is why Plaintiff is entitled to enforce the Agreement and get the documents and information to which Plaintiff is contractually entitled.  Moreover, the question of what detail it was "reasonable" for Plaintiff to give Defendant here -- when Defendant was blocking access to the details -- is at a minimum a fact issue, not any issue of law. Thus, Defendant's motion to dismiss the Complaint is frivolous and must be denied.

Defendant's alternative request -- to stay this case -- likewise depends on circular logic.

The whole point of those sections of the Agreement entitling Plaintiff to get all documents and information relating to the sold business was to put the parties on a level playing field, and allow Plaintiff to get to the truth about what sales Defendant did -- or did not -- sell during the earn-out period.   And only through this action can Plaintiff find out whether Defendant intentionally delayed shipments for the sole purpose of keeping those sales out of the earn-out period, and thereby frustrating Plaintiff's contractual rights.    If this action were stayed (as Defendant proposes), Plaintiff would be left in an unjust "Catch-22":  being sent to the Accountants for their determination about the Net Sales Statement (a very limited arbitration, at best), but <u>without</u> Plaintiff having the benefit of the documents and information for which Plaintiff bargained. Defendant, in short, wants to send Plaintiff to the Accountants blind.

For all these reasons, Defendant's motion is meritless and should be denied.   Plaintiff brought this action to get to the truth about what Defendants have been hiding since they bought Plaintiff's business.   Plaintiff is entitled to get to that truth, and entitled to sue for breach of contract.   The determinations for the Accountants -- computations about items in the Net Sales Statement -- can and should go to the Accountants.   But Defendant has no right to do an end-run around this Court's exclusive jurisdiction over all claims for breach of contract "arising out of" or "in connection with" the Agreement.

## STATEMENT OF FACTS

**A.     The Asset Purchase Agreement**

Plaintiff ESO is the largest privately held footwear importer in the world and sells footwear on a wholesale basis, primarily to department stores, mass merchants and specialty footwear retailers.  (Compl. ¶ 2.)   TIC describes itself as the world's largest marketer of umbrellas, gloves, rainwear, rubber overshoes and other weather-related accessories.  (Compl. ¶ 3.)  On October 6, 2006, ESO and TIC entered into the Agreement whereby ESO agreed to sell, and TIC agreed to buy, certain of ESO's business and proprietary assets, goodwill and other rights.  (Compl. ¶ 6.)  ESO promised to pay TIC not only cash at closing, but also various post-sale "earn-out" payments. (Compl. ¶ 7.)

**B.     The Earn-Out Payments**

Under the Agreement, after the closing, the first set of possible earn-out payments by TIC was to be based on the financial performance of the business during the one-year period from September 30, 2006 to September 30, 2007 (the "First Earn-Out Period").  Three possible types of earn-out payments could be due ESO for this period:  (1) the First Earn-Out Payment; (2) a Federated Earn-Out Payment; and (3) a Direct Import Earn-Out Payment.  (Compl. ¶ 8.)

The First Earn-Out Payment was to be in the amount of $3,375,000, and was payable to ESO by November 29, 2007 if two criteria were met:  (a) "Net Sales" for the First Earn-Out Period equaled or exceeded $60,800,000, and (b) "Landed Net Sales" for that same period equaled or exceeded $29,200,000.[1]  (Compl. ¶ 9.)  The second type of earn-out payment that

---

[1] For purposes of the Agreement and the First Earn-Out Payment, "Net Sales" means, "with respect to any Earn-Out Period covered by a Net Sales Statement, the Landed Net Sales and Direct Import Net Sales."  "Landed Net Sales" means "Gross Sales from the Subject Products both (i) sold to customers other than Federated and (ii) imported back into the United States by buyer as the importer of record, less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."  "Direct Import Net Sales" is defined in the Agreement as: "Gross Sales from the Subject Products sold to each of the Direct Import Customers less cash amounts or Customer Charge-backs paid, credited or accepted in the ordinary course of business of Buyer on account of damaged goods, returns and allowances."  Thus, under the terms of the Agreement, for the purpose of calculating both Net Sales and Landed Net Sales (both of which are elements of the

ESO could receive was the Federated Earn-Out Payment -- a payment of 5% of the Net Sales to one of ESO's customers, Federated Department Stores, Inc. -- for the First Earn-Out Period. (Compl. ¶ 14.) Like the First Earn-Out Payment, the Federated Earn-Out Payment was payable to ESO by November 29, 2007. (Compl. ¶ 14.) The third type of earn-out payment that ESO stood to receive was the Direct Import Earn-Out Payment. (Compl. ¶ 15.) The Direct Import Earn-Out Payment was to be 3% of certain sales to specific customers specified in the Agreement (and was conditioned upon satisfaction of the criteria for payment by TIC of the First Earn-Out Payment).

### C.    Procedures For Disputing The Items of TIC'S "Net Sales Statement"

Under the Agreement, TIC was required to deliver a "Net Sales Statement" to ESO within 60 days following the last day of the First Earn-Out Period. (Compl. ¶ 15.) The Net Sales Statement was supposed to set forth TIC's calculation of Net Sales for the First Earn-Out Period, as well as "a reasonably detailed calculation" of other sales figures that would be used for calculating ESO's eligibility for the various other earn-out payments. (Compl. ¶ 16.)

Section 2.7(c) of the Agreement set forth a procedure for ESO to dispute the sales figures represented by TIC in the Net Sales Statement. (Comp. ¶ 17.) Under Section 2.7(c), to the extent that any dispute could reasonably be expected to affect the calculation of Net Sales by more than $250,000, ESO was entitled to deliver written notice to TIC of any disputes with TIC's Net Sales Statement (hereafter, the "Dispute Notice") within 45 days of ESO's receipt of the Net Sales Statement. (Compl. ¶ 18.) The Agreement also required that the Dispute Notice set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute." (Comp. ¶ 18.)

Upon ESO's delivery of the Dispute Notice to TIC disputing any items in the Net Sales Statement, the parties were to attempt to resolve their disputes over a period of 20 business days.

---

First Earn-Out Payment), "Customer Charge-backs" (as that term is defined in the Agreement) can only be deducted to the extent that they have been "paid, credited or accepted in the ordinary course of business" of TIC on account of damaged goods, returns and allowances. (Compl. ¶¶ 10-13.)

(Compl. ¶ 19.) If the parties had a dispute about the "items" in one single document, TIC's Net Sales Statement, any such dispute -- and no other issues -- would be submitted for resolution by an independent accounting firm. (Compl. ¶ 19.) The parties specifically agreed that all other disputes of any kind "arising out of or in connection with this Agreement or the transactions contemplated hereby or disputes relating hereto (whether for breach of contract, tortious conduct or otherwise)" would be resolved by a court -- this Court. *See* Agreement, § 12.15) (jurisdiction for any breach-of-contract or other claims "arising out of or in connection with this Agreement" shall be "*exclusively* in the United States District Court for the Southern District of New York . . . .") (emphasis added.)

### D.    ESO's Contractual Rights to Information About The Post-Sale Business

After ESO's business and assets were sold to TIC, ESO no longer had any direct access to the underlying books, records, and information of the sold business. However, ESO needed access to these items for different purposes, including (but not limited to) having the documents and facts -- otherwise within TIC's control -- that would show whether ESO was entitled to receive the earn-out payments provided for in the Agreement. Without all the documents and facts, ESO would be unable to verify or dispute any amounts reflected in TIC's Net Sales Statement -- let alone set forth "each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute," as required by the Agreement. (Compl. ¶ 20.) Accordingly, ESO bargained for, and TIC agreed to, certain contractual protections that were critical to ESO's enforcement of its rights after the business had been sold.

One of ESO's contract rights was set forth in Section 9.1(a) of the Agreement. That provision stated that during the five-year period following the sale of the subject business, each party shall "cooperate with and make available" to the other party, "upon reasonable advance notice and during normal business hours, reasonable access to all books and records, tax returns and records, Contracts, information and employees (without substantial disruption of employment) . . . which are necessary and useful in connection with any litigation, insurance

-6-

matter, financial reporting requirement or obligation, Tax inquiry, audit, investigation or dispute, or any other matter requiring any such books and records, information or employees for any reasonable business purpose relating to the Subject Business or the Ancillary Business, as the case may be." (Compl. ¶ 23.)  Significantly, these broad rights did not just include access to documents, but also TIC's "information and employees."

ESO also acquired other contract rights relating to TIC's post-closing business.  Pursuant to Section 2.7(e) of the Agreement, the parties agreed as follows:

> For purposes of complying with the terms and conditions set forth in this Section 2.7, Buyer shall, and shall cause its Affiliates and Buyer's Accountants to, reasonably cooperate with Seller and Seller's Accountants and afford reasonable access to *all information, records, invoices, data and auditors' working papers of Buyer and Buyer's Accountants as may be required* in connection with the analysis of any Net Sales Statement, calculation of any Earn-Out Payment, Direct Import Earn-Out Payment and/or Federated Earn-Out Payment, and resolution of any dispute covered by Section 2.7(c).

(Compl. ¶ 22) (emphasis added.)

### E.    TIC Delivers an Inaccurate Net Sales Statement and ESO Endeavors to Exercise Its Rights Under the Agreement to Access Information

On or about November 7, 2007, TIC delivered a Net Sales Statement to ESO.  (Compl. ¶ 24.)  Based upon ESO's initial review of this Net Sales Statement, there appeared to be various omissions, inaccuracies, and miscalculations in TIC's favor that would have prevented ESO from receiving certain earn-out payments.  (Compl. ¶ 26.)  ESO therefore endeavored to exercise its rights under the Agreement, and get the access to document, information and employees needed to analyze and, if appropriate, dispute the accuracy of the Net Sales Statement.  (Compl. ¶ 26.)

ESO sought TIC's cooperation with respect to accessing the books, records, and other information necessary to analyze the Net Sales Statement and its right to receive certain earn-out payments as required by the Agreement.  (Compl. ¶ 27.)  TIC, however, was uncooperative.  By letter dated December 19, 2007, ESO sent TIC a Dispute Notice that was as detailed as possible

given the lack of information provided by TIC.  (Compl. ¶ 27.)  This Dispute Notice was given

by ESO within the 45-day period for such notices, and the Dispute Notice notified TIC that ESO

disputed TIC's Net Sales Statement, as well as TIC's position regarding earn-out payments.

(Compl. ¶ 27.)  In that same Dispute Notice, ESO demanded that TIC immediately comply with

its contractual obligations and provide ESO with access to the documents and information

needed to properly analyze the Net Sales Statement further so that it could identify the disputed

items in further detail.  (Compl. ¶ 28.)

F.     **ESO's Accounting Firm Uncovers Discrepancies and Issues Regarding TIC's
       Books and Records Relating to the Net Sales Statement**

Although TIC went through the motions of purporting to cooperate with ESO, TIC

blocked ESO's access to the documents and information that were critical to a proper analysis of

the Net Sales Statement.  In an empty gesture of cooperation, TIC permitted representatives of

ESO's accounting firm, Weiser, LLP ("Weiser"), to visit TIC's offices on December 10-14, 2007

and on January 3-4, 2008.  (Compl. ¶ 29.)   In advance of and during Weiser's visits to TIC's

offices, Weiser made several specific requests to TIC for access to particular documents, records,

and other information maintained by TIC that were critical to a complete analysis of the Net

Sales Statement.  (Compl. ¶ 29.)  Far from complying with its obligations, however, TIC made

Weiser's initial review and analysis as difficult and burdensome as possible.  (Comp. ¶ 31.)

Indeed, TIC required Weiser to execute a confidentiality agreement before allowing them to

access any documents at all -- a precondition nowhere to be found in the Agreement -- but then

still refused to allow Weiser to copy any documents, making any meaningful analysis of the New

Sales Statement or earn out issues extremely difficult.  (Compl. ¶¶ 31-32.)  TIC also flat-out

refused to provide Weiser with access to several categories of requested documents that were

necessary for Weiser to conduct a complete analysis.  (Compl. ¶ 33.)

Nevertheless, based upon its initial review of the limited documents provided, Weiser

identified numerous, unexplained discrepancies and issues regarding TIC's books and records

relating to the Net Sales Statement and the earn-out payments.  (Compl. ¶ 34.)  For example,

Weiser identified several discrepancies in TIC's records suggesting that the ship dates for customer purchases (or at least the records of the ship dates for the purchases) were <u>intentionally</u> delayed, so that the corresponding sales would not be included in determining ESO's right to one of the earn-out payments. (Compl. ¶ 35.) Moreover, TIC improperly calculated customer charge-backs -- the subject of Section 2.7(g) of the Agreement -- again, in an apparent effort to deprive ESO of certain earn-out payments. (Compl. ¶ 36.)

All told, even with Weiser's blocked access, the discrepancies in the Net Sales Statement appeared to impact Net Sales and Landed Net Sales by in excess of <u>$1.6 million</u>, meaning that the criteria for certain of the earn-out payments would have been easily satisfied -- and ESO would be entitled to receive earn-out payments in excess of $3,375,000. (Compl. ¶ 37.)

### G.    TIC Continues to Refuse to Cooperate With ESO

In light of the issues identified in connection with Weiser's initial, limited review of the information underlying the Net Sales Statement, ESO again wrote to TIC on January 18, 2008 in order to further detail and expand upon its disputes with the Net Sales Statement. (Compl. ¶ 39.) Again, ESO requested that TIC comply with its obligations under the Agreement to provide ESO with access to the outstanding information it had previously requested that was necessary to complete its analysis of the Net Sales Statement, but which had not been provided. (Compl. ¶ 39.) However, in several letters that went back and forth between the parties, TIC persisted in its general denials of ESO's disputes with the Net Sales Statement, but offered no support for its position in the form of existing, contemporaneous records maintained by TIC in the ordinary course of business. (Compl. ¶¶ 39-44.) Moreover, TIC flip-flopped on its position about whether certain information requested by ESO actually existed, and refused outright to provide ESO with other requested information. (Compl. ¶¶ 39-44.) Thus, TIC's conduct has prevented ESO from getting access to all of the documents and information necessary to properly evaluate the Net Sales Statement. ESO has thus been precluded from engaging in any meaningful efforts to reconcile its disputes with TIC as contemplated by the Agreement.

**ARGUMENT**

**POINT I**

**ESO'S CLAIMS ARE NOT MOOT AND THEREFORE TIC'S MOTION FOR LACK OF
SUBJECT MATTER JURISDICTION SHOULD BE DENIED**

TIC argues that ESO supposedly "admitted" in its Complaint that its Dispute Notice did
not provide sufficient detail regarding ESO's disputes with TIC's Net Sales Statement -- and that
ESO purportedly is barred from contesting the accuracy of the Net Sales Statement. Thus,
according to TIC, all of ESO's claims in the Complaint are "moot," and the Court should dismiss
this case "for lack of jurisdiction." (Def. Br. 8-12.)

This is nothing more than wishful thinking by TIC. First of all, ESO never admitted in
the Complaint that its Dispute Notice was deficient. To the contrary, ESO alleged that it was
prevented from providing more detail in its Dispute Notice because of TIC's failure to live up to
its contractual obligations. Moreover, the determination of whether ESO's Dispute Notice
contained "reasonable" detail is a fact issue that cannot possibly be resolved on a motion to
dismiss.

A.     **ESO Did Not "Admit" That Its Dispute Notice Was Insufficient**

TIC argues that ESO admitted in the Complaint that its Dispute Notice did not provide
the requisite detail, and therefore ESO is barred from contesting the propriety of the Net Sales
Statement under the terms of Section 2.7(c) of the Agreement. (Def. Br. 9-12.) This argument is
disingenuous, at best.

Indeed, the Dispute Notice provided by ESO to TIC on December 19, 2007 explicitly
stated that "[ESO] hereby disputes the Statement, and this letter shall constitute notice thereof to
[TIC] as contemplated by Section 2.7(c). [ESO has] reviewed the Statement and has determined
that there are certain omissions from the Statement, and certain items are incorrectly reflected
therein." (Tabak Aff., Ex. C.) ESO then goes on in the Notice to state that:

> The Seller has sought the Buyer's cooperation, and has attempted
> to gain access from the Buyer to information, records, invoices,
> data, and other items, in connection with the Seller's analysis of the

Statement. To date, such cooperation and access have been quite limited, *thereby depriving the Seller from being able to* provide the detail in this notice that is contemplated by Section 2.7(c) . . . . *Upon receipt of such cooperation and review of the accessed items, the Seller should have the information necessary to be able to provide the Buyer with detail of the items in dispute.*

(Tabak Aff. Ex. C) (emphasis added.) Thus, ESO makes clear in the notice itself that it was not able to provide additional detail because of TIC's refusal to cooperate. Likewise, ESO plainly alleges in the Complaint that "TIC's failure to cooperate with ESO and TIC's disregard of its contractual obligations had prevented ESO" from providing further detail regarding the disputed items. [Compl. ¶ 28; *see also* Compl. ¶ 46 ("TIC's conduct has also prevented ESO from getting all the documents and information relating to ESO's disputes regarding the [Net Sales] Statement.")]. Thus, ESO never "admits" in the Complaint that its notice was insufficient, but rather alleges that TIC was responsible for any purported deficiencies in the notice.

TIC's view of the world, moreover, would lead to an absurd result. If TIC's "interpretation" of the contract were correct, TIC could -- as it did -- withhold the facts that ESO needs to provide reasonable detail in its Dispute Notice, and then reject the Dispute Notice as ineffective. Thus, ESO would be caught in a Catch-22 -- and one of TIC's own creation. It is axiomatic that the courts will not construe a contract in a way that would lead to an absurd result -- and certainly not on a motion to dismiss.

TIC's reliance on this Court's decision in *Stena Line (U.K.) Ltd v. Sea Containers Ltd.*, 758 F.Supp. 934 (S.D.N.Y 1991), is badly misplaced. The decision in *Stena Line* is readily distinguishable from this case because the plaintiff in *Stena Line* -- unlike the Plaintiff here -- never contested the matter at issue. *See* 758 F. Supp. at 936. In sharp contrast to the situation here, the plaintiff in *Stena Line* explicitly indicated that it was not objecting to the calculations made by the defendant. *See id.* ("The purpose of this letter is to advise you that we do not object to the net equity . . . ."). In *Stena Line*, the Court found that the procedures set out in the parties' agreement were not satisfied because all that the plaintiff did was "attempt[] to preserve the right to contest the validity of [a] December balance sheet" -- a procedure not contemplated in any

-11-

agreement between the parties. *See id.* at 938 n.3. Here, ESO did not simply preserve its rights, but affirmatively objected -- based on the limited information TIC had provided at that time -- to TIC's Net Sales Statement.

TIC's own actions, moreover, belie any claim that it believed ESO had waived its right to dispute the Net Sales Statement. If TIC actually believed that ESO's December 19, 2007 Dispute Notice had already waived ESO's rights, then why did TIC later agree to allow ESO's accountants at Weiser to come and see additional documents after that date? It is undisputed that TIC permitted ESO's accounts to have access to limited documents and information in January of 2008. Thus, TIC's own conduct is totally inconsistent with the argument (an apparent litigation afterthought) that TIC now makes.

### B.    Whether ESO's Dispute Notice Was "Reasonable" is a Fact Issue That Cannot Be Resolved on a Motion to Dismiss

TIC also tries to argue that the language in Section 2.7(c) is unambiguous and therefore that this Court can determine -- as a matter of law -- that ESO's notice did not give "reasonable" detail under Section 2.7(c). (Def. Br. 8-9.)    Whether a document is "reasonable," however -- particularly one document submitted by one side without evidence about the circumstances at the time of that document -- is a fact issue, and certainly nothing that could be resolved under Rule 12(b)(6).

Section 2.7(c) of the Agreement provides that, after receipt of the Net Sales Statement, ESO may contest the Net Sales Statement by notifying TIC "in writing of each disputed item, specifying the amount thereof in dispute and setting forth, <u>in reasonable detail,</u> the basis for such dispute, within forty-five (45) days of [TIC's] delivery of the Net Sales Statement to [ESO]." (Tabak Aff. Ex. B, § 2.7(c)) (emphasis added.)    TIC argues that this language is unambiguous. (Def. Br. 9-10.)    TIC's argument fails.

Under New York law, a contract term is only unambiguous when it has "a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion." *Nowak v.*

*Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1192 (2d Cir. 1996) (citation omitted). An ambiguous term, on the other hand, is:

> capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement *and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.*

*Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 511 (2d Cir. 1990) (emphasis added). Moreover, "if it is necessary to refer to extrinsic facts, which may be in conflict, to determine the intent of the parties, there is a question of fact." *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (1st Dep't 1990).

The word "reasonable" can certainly have different meanings to different people. Indeed, TIC admits as much in its own brief. In arguing that ESO (supposedly) is not entitled to specific performance, TIC <u>itself</u> quotes a portion of the agreement referring to "reasonable" access -- then argues that this is "impermissibly vague" and "not sufficiently certain." (Def. Br. 18.) If "reasonable" is "vague" for one portion of the Agreement, it cannot be "unambiguous" for another. TIC cannot have it both ways. Moreover, it is well established that what is "reasonable" is an issue of fact, not an issue of law. *See, e.g., RCA Serv. Co. v. City of New York*, 21 A.D.2d 760, 761 (1st Dep't 1964) ("The term 'reasonable' time is in itself an ambiguous term and could mean any length of time depending on the facts. We conclude there is present an issue of fact in respect of reasonable time.").

Here, TIC does not deny ESO delivered the Dispute Notice within 45 days of TIC's delivery of its Net Sales Statement. Had ESO not even <u>alleged</u> that it served a Dispute Notice within the 45-day period, perhaps some issue could be resolved on a motion to dismiss. Here, however, TIC merely argues that the Dispute Notice did not provide "reasonable" detail. Whether the Dispute Notice contained sufficient detail, however, is plainly a fact issue and thus inappropriate to resolve on a motion to dismiss. *See Banks v. Corr. Servs. Corp.*, 475 F. Supp. 2d 189, 195 (E.D.N.Y. 2007) ("The Court's task 'is merely to assess the legal feasibility of the

-13-

complaint, not to assay the weight of the evidence which might be offered in support thereof.'"); *Burke v. Steinman*, No. 03 Civ. 1390 (GEL), 2003 WL 21507490, at *2-3 (S.D.N.Y. June 30, 2002) (denying the defendants' motion to dismiss the plaintiff's breach of contract claim because there "appear[ed] to be factual disputes as to whether plaintiff will be able to prove that claim"); *Universal Marine Med. Supply Inc. v. Lovecchio*, 8 F. Supp. 2d 214, 221 (E.D.N.Y. 1998) (refusing to decide on a motion to dismiss whether a breach of a purported contract occurred).[2]

## POINT II

### <u>THIS COURT SHOULD NOT STAY THIS ACTION PENDING ARBITRATION BECAUSE THE LIMITED ARBITRATION CLAUSE IN THE AGREEMENT DOES NOT COVER THE CLAIMS AT ISSUE IN THIS LAWSUIT</u>

In the alternative, TIC argues that the Court should stay this action pending arbitration. However, TIC's arguments fail because the purported arbitration clause at issue is extremely limited -- and does not cover any of ESO's claims against TIC.

### A.    TIC Is Attempting to Re-Write the Contract by Expanding the Scope of the Limited Arbitration Provision

As the Second Circuit has made clear, a court faced with a request to stay or compel arbitration must address two questions: (1) whether the parties have agreed to arbitrate and, if so, (2) whether the scope of the agreement to arbitrate encompasses all the claims asserted. *Chelsea Square Textiles v. Bombay Dyeing and Mfg. Co. Ltd.*, 189 F.3d 289, 294 (2d Cir. 1999); *N. Ferry Co., Inc. v. Local 333,* 338 F. Supp. 2d 430, 433 (E.D.N.Y. 2004). In determining the scope of arbitration provisions, courts have distinguished between so-called "broad" clauses -- ones that purport to refer to all disputes arising out of a contract to arbitration -- and "narrow" clauses, which limit arbitration to specific types of disputes. *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.,* 858 F.2d 825, 832 (2d Cir. 1988). When "dealing with a narrower arbitration clause . . . it will be proper to consider whether the conduct in issue is on its face within the purview of the clause." *McAllister Bros., Inc. v. A & S Transp. Co.,* 621 F.2d 519,

---

[2] Of course, when it answers ESO's Complaint, TIC is free to assert this affirmative defense if it wishes.

522 (2d Cir. 1980). Thus, while arbitration is sometimes favored, the Second Circuit has warned that "federal policy alone cannot be enough to extend the application of an arbitration clause far beyond its intended scope." A court is not free to disregard the explicit boundaries set by the agreement between the parties. This is because "the purpose of the Federal Arbitration Act 'was to make arbitration agreements as enforceable as other contracts, *but not more so.*'" *McDonnell Douglas Fin. Corp. v. Pa. Power & Light Co.*, 858 F.2d at 831 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). An arbitration agreement must be interpreted "to reflect the reasonable expectations of the parties to the contract." *XL Capital, Ltd. v. Kronenberg*, 145 Fed. Appx. 384, 385 (2d Cir. 2005).

Here, Section 2.7(c) of the Agreement provides that "[i]f Seller and Buyer are unable to reach a resolution with respect to one or more disputed amounts . . . Seller and Buyer shall submit the item(s) remaining in dispute for resolution to the Independent Accounting Firm . . . ." (Tabak Aff. Ex. B, § 2.7(c).) TIC argues that this clause should be interpreted to mean that <u>any</u> dispute between the parties that in any way relates to Section 2.7 should be submitted to an independent accounting firm. (Def. Br. 13-14.) This interpretation of the contract is unsupportable.

ESO agrees that Section 2.7(c) of the Agreement contains a very "narrow" arbitration clause, as that term has been used by the Second Circuit. Here, however, the parties only agreed that Accountants would do the computation to resolve the "amounts" of the "items" in just one document: a "Net Sales Statement." Yet, in vivid contrast, Section 12.15 of the Agreement contains a broad, general and <u>exclusive</u> jurisdiction clause, which provides that "any legal action, suit or proceeding . . . arising out of or in connection with this Agreement or the transaction contemplated hereby or disputes relating hereto (whether for breach of contract, tortuous conduct or otherwise) shall be brought exclusively in the United States District Court for the Southern District of New York." (Tabak Aff. Ex. B, § 12.15.)

<u>None</u> of ESO's claims in its Complaint ask this Court to determine the correct amount of the "items" in the Net Sales Statement TIC prepared. Rather, <u>all</u> of ESO's claims in the

-15-

Complaint are for breach of contract, express and implied, and for equitable relief and damages. All of these breach-of-contract claims fall squarely within the exclusive jurisdiction of this Court.

The Second Circuit, moreover, has made it clear how to deal with "mixed" contracts that contain a limited arbitration clause, particularly one that appoints a specialist (as opposed to a general arbitrator) to deal with a limited issue. As the cases make clear, the proper course is <u>not</u> to stay any proceedings because of a limited arbitration clause unless there was "a clear, explicit statement" of the parties of their intent to submit such the claim to binding arbitration. *See McDonnell Douglas Fin. Corp.,* 858 F.2d at 829, *quoting GEICO Corp. v. Pa. Power & Light Co.,* 669 F.Supp. 590, 591 (S.D.N.Y. 1987).

For example, in *McDonnell Douglas,* the contract at issue (as here) contained a limited arbitration clause delegating a specific issue to a specialist -- there, a tax specialist who was to resolve any disagreement as to the computation of a required indemnity payment. 858 F.2d at 832. Defendant moved to stay the court case pending the outcome of the limited arbitration. The trial court in the Southern District of New York (Conner, J.) denied the motion and the Second Circuit affirmed. *Id.* at 829-34.

As the Second Circuit held, with "narrower" arbitration clauses, a court must "consider whether the [question at] issue is on its face within the purview of the clause." *Id.* at 832 (citation omitted). There, the Court held that the allegations in the Complaint that plaintiff had filed -- there, just like here, allegations of breach of contract and bad-faith actions by the defendant corporation -- were within the jurisdiction of the court, not the specialist arbitrator. *Id.* at 829-34.

Likewise, in *XL Capital,* 145 Fed. Appx. at 384, the Second Circuit was confronted with -- like here -- a limited arbitration directing that an accounting firm resolve certain "disputed" accounting items. As the Second Circuit held, the fact that the chosen arbitrator was an accounting firm "verifies the import of the plain language: that the scope of the clause is limited to those issues closely related to accounting." *Id.* at 385. Again, in *XL Capital,* the Southern

District of New York (Rakoff, J.) denied a motion to stay and send the matter to the limited arbitrator. Again, the Second Circuit affirmed. And again, breach-of-contract claims -- including, like here, claims that defendant had failed to provide required documents (there, certain worksheets) -- were found to be outside the scope of the parties' agreement as to the limited issue they agreed the limited arbitrator would decide.

The Agreement at issue here, moreover, contains, a broad, general and <u>exclusive</u> forum-selection clause for all breach-of-contract claims arising out of the agreement. Thus, this case presents an even more compelling case than *McDonnell Douglas* or *XL Capital* -- both of which cases are already controlling -- for denying TIC's request for a stay.

**B.      ESO's Right to Access Information to Analyze the Net Sales Statement is an Independent and Substantive Issue That Should Be Decided By This Court**

In its Complaint, ESO refers to receipt of the information and documents as a "condition precedent." *See* Compl. ¶ 46 ("TIC's conduct has also prevented ESO from getting all the documents and information relating to ESO's disputes regarding the [Net Sales] Statement. ESO has thus been precluded from engaging in any meaningful efforts to reconcile its disputes with TIC as contemplated by the Agreement or to submit them to 'Independent Accounting Firm.' This is all because a necessary condition precedent -- *i.e.*, access to TIC's books and records -- has not been satisfied by TIC.").

 TIC argues that the question of whether a condition precedent has been fulfilled is a question for an arbitrator (Def. Br. 15), but TIC is incorrect. While it is true that *procedural* conditions precedent are normally to be decided by an arbitrator, the question of whether there are *substantive* conditions precedent are to be decided by courts. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84-85 (2002) ("issues of substantive arbitrability . . . are for a court to decide and issues of procedural arbitrability, *i.e.*, whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, are for the arbitrators to decide") (citation omitted). As the New York Court of Appeals summarized:

> It is recognized that both conditions precedent to access to arbitral
> forum (falling within the judicial ambit) and procedural regulations
> or conditions in the arbitration proceedings (falling to the
> arbitrator) may be verbally referred to indiscriminately as
> "conditions precedent" to arbitration. Such loose description,
> however, obscures analysis and clarity. Whether the particular
> requirement falls within the jurisdiction of the courts or of the
> arbitrators depends on its substance and the function it is properly
> perceived as playing - whether it is in essence a prerequisite to
> entry into the arbitration process or a procedural prescription for
> management of that process.

*Rockland County v. Primiano Constr. Co., Inc.*, 409 N.E.2d 951, 954 (N.Y. 1980).

Here, there is no question that the issue of whether TIC breached the Agreement (by not providing access to documents and information) is an issue of substance, not procedure. That contract issue is one for the Court, not the Accountants. For all of the reasons discussed above, TIC's motion to stay this case must be denied.

## POINT III

### TIC'S MOTION TO DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM SHOULD BE DENIED

#### A.    Standard of Review

TIC has also moved to dismiss ESO's Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may granted. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Absent applicability of a heightened pleading requirement such as that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party.

*Cooper v. Pate,* 378 U.S. 546, 546 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir. 2003). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "but whether the claimant is entitled to offer evidence to support the claims." *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974; *see also Patane v. Clark,* 508 F.3d 106, 111-12, (2d Cir. 2007) ("In order to withstand a motion to dismiss, a complaint must plead 'enough facts to state a claim for relief that is plausible on its face.' ") (quoting *Twombly*).

### B. ESO Has Adequately Alleged That It Is Entitled to a Decree of Specific Performance

TIC argues that ESO has failed to allege a claim that entitles it to a decree of specific performance because the relevant provision at issue in the Agreement -- Section 2.7(e) -- supposedly is not certain enough to enable the Court to frame a precise order. (Def. Br. 17-18.) Contrary to TIC's assertions, this Court could easily draft an order directing TIC to comply with its obligations under Section 2.7(e). Section 2.7(e) is not a complicated provision. It merely requires that TIC cooperate with ESO and provide ESO access to "all information, records, invoices, date and auditors' working papers of Buyer . . . as may be required in connection with the analysis of any Net Sales Statement . . . . "

Indeed, specific performance may be the best way for ESO to get the access to which it is contractually entitled. If ESO prevails on its claims against TIC for breach of contract, ESO can submit a proposed form of order as to precisely how TIC should give ESO access to its documents, records and employees, as the Agreement requires. This Court is certainly capable of crafting an order that would direct TIC to meet its contractual obligations.

-19-

### C.    ESO Has Adequately Pled Damages For Its Breach of Contract Claim

TIC argues that ESO fails to state a claim for breach of contract because the Complaint does not make a plausible allegation of monetary damages.  (Def. Br. 18.)  This argument is contradicted by the plain language of the Complaint.

In the very first paragraph of the Complaint, ESO alleges that it has been "denied access to information concerning its right to receive 'earn-out payments' under the Agreement that total in excess of $3,375,000."  (Compl. ¶ 1.)  Moreover, paragraph 37 of the Complaint provides that:

> [t]hese discrepancies and issues associated with the November Statement impacted the calculation of Net Sales and Landed Net Sales by in excess *$1.6 million* -- meaning that the criteria associated with the First Earn-Out Payment and Direct Import Earn-Out Payment would have been easily satisfied, and ESO would be entitled to receive the First Earn-Out Payment of $3,375,000 plus the Direct Import Earn-Out Payment.

(Compl. ¶ 36.)  These are not conclusory allegations, but rather set forth in detail the results of TIC's breach of the Agreement.  Significantly, TIC fails to cite to a single case where a court dismissed a party's breach-of-contract claim for failing to plead damages with sufficient particularity.

### D.    ESO Has Adequately Pled A Claim For Breach Of The Implied Covenant Of Good Faith & Fair Dealing

TIC argues that this Court must dismiss ESO's claim for breach of the implied covenant of good faith and fair dealing claim because (i) New York law does not recognizes a good faith and fair dealing claim as an independent cause of action, and (ii) ESO does not plead its claim with particularity.  (Def. Br. 19-21.)  TIC's arguments fail because TIC misinterprets the law, and ESO has pled its claim with sufficient particularity.

First, contrary to TIC's assertion, there are instances where a good faith and fair dealing claim may exist as an independent cause of action in New York.  Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of contract performance.  *Pearce v. Manhattan Ensemble Theater, Inc.*, 528 F. Supp. 2d 175, 180 (S.D.N.Y. 2007).  The covenant encompasses any promises which a reasonable person in the position of the

promisee would be justified in understanding were included. *Id.* However, breach of the implied covenant of good faith is merely a breach of the underlying contract, meaning as a matter of law that allegations of the breach of the implied covenant are irrelevant to recovery *unless they are based on conduct different from conduct that constitutes the alleged breach of contract. Id.* In other words, "such a claim may be brought, if at all, only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain." *Id.* at 180-81 (citation omitted).

Here, ESO's allegations of breach of the implied covenant of good faith and fair dealing are based on conduct different from the conduct that constitutes its claim for breach of contract. ESO's breach of contract claim involves TIC's failure to provide access to information and documents. (Compl. ¶ 49.) On the other hand, ESO's breach of the implied covenant of good faith and fair dealing claim revolves around TIC's bad-faith manipulation of records and shipment dates in order to defraud ESO out of certain earn-out payments. Specifically, the Complaint alleges that TIC breached the implied covenant of good faith and fair dealing when: "TIC, among other things, manipulated TIC's books, records, and other information relative to the [Net Sales] Statement, [and certain earn-out payments] for the purpose of precluding ESO from receiving the entirety of the amounts to which it is entitled under the Agreement. (Compl. ¶ 58.) These manipulations were not *per se* a violation of the Agreement, but "nonetheless deprived [ESO] of the benefit of its bargain."[3] *Pearce*, 528 F. Supp. 2d at 180-81.

---

[3] The string of cases relied upon by TIC at page 19 of its brief are inapposite and TIC's reliance thereon is misleading. *See Fasolino Foods Co., Inc. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992) (no underlying contract and therefore a breach of the implied covenant of good faith and fair dealing claim was improper); *Computech Int'l, Inc. v. Compaq Computer Corp.*, No. 02 Civ. 2628 (RWS), 2002 WL 31398933, at *2-4 (S.D.N.Y. Oct. 24, 2002) (no underlying contract and therefore a breach of the implied covenant of good faith and fair dealing claim was improper); *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001) (allegations underlying the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim were the same); *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 11-12 (E.D.N.Y. 1998) (allegations underlying the breach of contract claim and the breach of the implied covenant of good faith and fair dealing claim were the same).

Second, contrary to TIC's arguments, ESO pleads manipulation with sufficient particularity. ESO does not simply set forth a single conclusory allegation, as TIC would like this Court to believe, but rather sets forth numerous allegations relating to its accountants' discovery of numerous, unexplained discrepancies and issues relating to the limited documents that its accountants were able to review. Specifically, ESO alleges that:

- During Weiser's December 2007 and January 2008 visits, TIC did not provide access to several requested categories of documents and information that were necessary for Weiser to conduct a complete analysis of its sampling of TIC's books and records. (Compl. ¶ 33.)

- [B]ased upon its initial, limited review of TIC's books and records, Weiser identified numerous, unexplained discrepancies and issues regarding TIC's various books and records relating to the November Statement, the First Earn-Out Payment and the Direct Import Earn-Out Payment. (Compl. ¶ 34.)

- Weiser identified several discrepancies among TIC's records suggesting that the ship dates for customer purchases (or at least the records of the ship dates for the purchases) were *intentionally* delayed, so that the corresponding sales would not be included in determining ESO's right to the First Earn-Out Payment. (Compl. ¶ 35.)

- TIC improperly calculated Customer Charge-backs -- again, in an apparent effort to deprive ESO of its right to the First Earn-Out Payment and Direct Import Earn-Out Payment. As set forth above, under the Agreement, for the purpose of calculating Net Sales and Landed Net Sales in connection with the First Earn-Out Payment, Customer Charge-backs can only be deducted to the extent that they were *paid, credited or accepted* by TIC. TIC, however, disregarded the plain language of the Agreement and calculated Customer Charge-backs on an *accrual* basis, ostensibly due to GAAP. Thus, the amounts of the charge-backs were estimated and those estimated amounts were credited, instead of crediting the amounts that were actually "*paid, credited or accepted*" as required by the Agreement. (Compl. ¶ 36.)

- These discrepancies and issues associated with the [Net Sales] Statement impacted the calculation of Net Sales and Landed Net Sales by in excess *$1.6 million* -- meaning that the criteria associated with the First Earn-Out Payment and Direct Import Earn-Out Payment would have been easily satisfied, and ESO

would be entitled to receive the First Earn-Out Payment of $3,375,000 plus the Direct Import Earn-Out Payment. (Compl. ¶ 37.)

- Even the inconsistencies and inaccuracies identified in connection with Weiser's limited review so far were, at a minimum, sufficient to raise serious questions -- and call into dispute the accuracy of the Net Sales Statement in its entirety. Indeed, as set forth above, these $1.6 million in discrepancies were just based upon a limited sampling of TIC's books and records. (Compl. ¶ 38.)

Thus, contrary to TIC's assertions, these allegations certainly give TIC fair notice of who manipulated the books and records, which books and records were manipulated and the manner in which the documents were manipulated.

ESO's purported failure to plead further detail, moreover, is of TIC's own making. TIC's failure to provide access to information and documents is the reason why ESO does not yet have more information. As TIC itself admits in its brief, in such a situation, it is "black letter law in the Second Circuit" that pleadings can be based upon information and belief regarding acts that are peculiarly within the opposing party's knowledge. (Def. Br. 21.) *See also ATSI Commc's., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007) ("A claim of manipulation . . . can involve facts solely within the defendant's knowledge; therefore, at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim.").

**E.    ESO Has Adequately Pled Its Indemnification Claim**

ESO's third cause of action seeks indemnification under Article XI of the Agreement for any expenses ESO incurred as a result of TIC's alleged breach of its books and records obligations under Section 2.7(e) and its breach for failure to provide access to books and records under Section 9.1(a) of the Agreement.

First, TIC argues that this Court should dismiss ESO's indemnification claim because it is derivative of ESO's purportedly deficient breach of contract claim. (Def. Br. 21.) This argument is meritless. Because ESO has plainly stated a valid cause of action for breach of contract, ESO can assert -- and has asserted -- a valid indemnification claim under Article XI of the Agreement.

Second, TIC argues that ESO is barred from bringing a claim under the Agreement's indemnification provisions because Section 2.7(c) governs the payment of costs relating to disputes under Section 2.7. (Def. Br. 21-22.) This argument also fails. Section 2.7(c) merely provides that the "fees and disbursements of Seller's Accountants incurred in connection with Seller's activities pursuant to this Section 2.7 shall be the obligation of Seller." (Tabak Aff. Ex. B, § 2.7(c).) In contrast, Article XI permits ESO to recoup a much broader array of fees and expenses than simply its accountant fees. Indeed, Section 11.1 of the Agreement provides that ESO may recover "any and all claims, losses, damages, liabilities, obligations or expenses, including reasonable third-party legal fees and expenses and other professional and advisor fees and disbursements." Moreover, TIC provides no law to the contrary or in support of its position. The one case that TIC does cite, *Isaacs v. Westchester Wood Works, Inc.*, has nothing to do whatsoever with indemnification or indemnification clauses. *See* 278 A.D.2d 184 (1st Dep't 2000) (interpreting the interplay between an arbitration clause and judicial jurisdiction clause).

## CONCLUSION

For the reasons set forth above, ESO respectfully requests that this Court deny in its entirety TIC's Motion to Dismiss the Complaint or, in the Alternative, to Stay the Action Pending Arbitration.

Respectfully submitted,

**LOWENSTEIN SANDLER PC**

By: s/ Steven M. Hecht
    Steven M. Hecht, Esq.
    Jeffery J. Wild, Esq.

1251 Avenue of the Americas, 18th Floor
New York, New York 10020
T: 212.262.6700
F: 212.262.7402

Dated: June 20, 2008                    *Attorneys for Plaintiff, E.S. Originals, Inc.*