UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

E. S. ORIGINALS INC.,

                Plaintiff,

        - v -

TOTES ISOTONER CORPORATION,

               Defendant.

------------------------------------------------------------x

**ECF CASE**

Civil Action No. 08 CV 1945 (PKL)

# DEFENDANT'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT OR, IN THE ALTERNATIVE, TO STAY THE ACTION PENDING ARBITRATION

**Table of Contents**

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT............................................................................................................................. 2

I.    ESO's Claims Are Moot ........................................................................................ 2

II.   Even Assuming Jurisdiction Is Proper, This Action Must Be Stayed Pending
      Arbitration............................................................................................................... 4

      A.   ESO's Claims Fall Within The Arbitration Clause ........................................ 4

      B.   The Arbitrator Should Decide Whether The Access Provisions Are A Condition
           Precedent And Whether They Have Been Met................................................ 7

III.  ESO's Complaint Must Be Dismissed For Failure To State A Cognizable Claim............. 8

      A.   ESO's Breach Of Contract Claim Must Be Dismissed Because ESO Has Failed To
           Adequately Allege That It Has A Remedy ..................................................... 8

      B.   ESO's Implied Covenant Of Good Faith Claim Is Redundant Of Its Breach Of
           Contract Claim And Fails To Plead Manipulation With Particularity............................ 9

      C.   ESO's Indemnification Claim Is Derivative of ESO's Meritless Contract Claim
           And Is Barred By Section 2.7(c) Of The Agreement ................................... 10

CONCLUSION.......................................................................................................................... 10

# Table of Authorities

## Cases

*Bridgeport Music, Inc. v. Universal Music Group, Inc.*,
  440 F. Supp. 2d 342 (S.D.N.Y. 2006) ......................................................... 9

*Chiarella v. Vetta Sports, Inc.*,
  No. 94 Civ. 5933 (PKL), 1994 WL 557114 (S.D.N.Y. October 7, 1994) ......................... 4, 5-6

*Collins & Aikman Prods. Co. v. Building Sys., Inc.*,
  58 F.3d 16 (2d Cir. 1995) ........................................................................ 5

*Great-West Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002)............................................................................... 4

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79 (2002)............................................................................. 6, 8

*John Wiley & Sons, Inc. v. Livingston*,
  376 U.S. 543 (1964)........................................................................... 7, 8

*Lamotte v. Beiter*,
  34 A.D.3d 356, 826 N.Y.S.2d 6 (1st Dep't 2006) ...................................... 7

*McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*,
  858 F.2d 825 (2d Cir. 1988) ..................................................................... 6

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
  460 U.S. 1 (1983)............................................................................... 4, 7

*Pace v. DiGuglielmo*,
  544 U.S. 408 (2005)............................................................................... 4

*Roan/Meyers Assocs., L.P. v. CT Holdings, Inc.*,
  26 A.D.3d 295, 810 N.Y.S.2d 67 (1st Dep't 2006) ...................................... 7

*Rockland County v. Primiano Constr. Co., Inc.*,
  409 N.E.2d 951 (N.Y. 1980)..................................................................... 8

*Sayers v. Rochester Telephone Corp. Supplemental Mgmt Pension Plan*,
  7 F.3d 1091 (2d Cir. 1993) ....................................................................... 5

*Stena Line (U.K) Ltd v. Sea Containers Ltd.*,
  758 F. Supp. 934 (S.D.N.Y. 1991) ............................................................ 3

*Stewart Org., Inc. v. Ricoh Corp.*,
  487 U.S. 22 (1988)................................................................................. 7

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.*,
    894 F.2d 516 (2d Cir. 1990) ...................................................................................... 4

*XL Capital, Ltd. v. Kronenberg*,
    145 Fed. Appx. 384 (2d Cir. 2005)............................................................................. 7

Defendant totes Isotoner Corporation respectfully submits this reply memorandum of law in support of its motion to dismiss Plaintiff E.S. Original, Inc.'s Complaint with prejudice or, in the alternative, to stay this action pending arbitration.[1]

## PRELIMINARY STATEMENT

The parties agree that this case is moot and the Court lacks subject matter jurisdiction if ESO failed to send totes a proper dispute notice challenging the Net Sales Statement that determines whether ESO is entitled to "earn-out payments" under the parties' agreement. A proper dispute notice under the agreement must contain <u>each</u> of three things: (1) identification of "each disputed item," (2) specification of "the amount thereof in dispute" and (3) a description with "reasonable detail [of] the basis for such dispute." <u>ESO does not dispute that it failed to meet both of the first two requirements</u>. The Court should dismiss the case on this basis alone.

As to the third notice requirement, ESO admitted at the time that its purported notice letter "failed to provide the detail in this notice that is contemplated by Section 2.7(c)." In fact, ESO's notice had no detail whatsoever. While ESO argues its notice was deficient because it did not have access to all the information it wanted, this excuse does not survive ESO's Complaint, which alleges that flaws in the Net Sales Statement were "immediately apparent," nor is it a valid excuse under New York law, which strictly enforces contractual time limits. The Court should therefore dismiss this action as moot because ESO cannot challenge the Net Sales Statement.

Even if this action were not moot, it should be stayed pending arbitration before an independent accounting firm – the process the parties chose for the fair and expeditious resolution of earn-out payment disputes. ESO seeks to avoid arbitration by contending that the arbitration clause applies only to "amounts" in dispute. But the arbitration clause provides for

---

[1]    All citations to exhibits are to the exhibits attached to the Affirmation of Daniel H. Tabak, dated April 18, 2008. In addition, terms defined in Defendant's Memorandum of Law in Support of its Motion to Dismiss, *et al* ("totes Memo") have the same meanings here.

the arbitrator to resolve not just "amounts" in dispute but any "disputed item(s)" regarding the Net Sales Statement. It therefore encompasses ESO's claims in this action and would allow this dispute to be resolved in one forum, not two.

The accounting arbitration clause covers ESO's first cause of action, which seeks a decree of specific performance mandating that totes provide "reasonable access" to information "as may be required in connection with the analysis of any Net Sales Statement . . . and resolution of any dispute covered by" the accounting arbitration clause. The independent accounting firm serving as arbitrator is in the best position to determine what information is required under this access provision to analyze the Net Sales Statement under GAAP and to resolve the arbitrable dispute. ESO does not dispute that its third cause of action is derivative of this claim and would therefore be sent to arbitration as well.

ESO's second cause of action is based on ESO's allegations that numerous "discrepancies and issues," including totes's use of accrual accounting under GAAP, "call into dispute the accuracy of the Net Sales Statement in its entirety" and impact earn-out payment calculations "by in excess [of] *$1.6 million*." These accounting disputes plainly fit within any interpretation of the accounting arbitration clause, and ESO does not seriously contend otherwise.

In the alternative, the Court should dismiss the Complaint because each count in the Complaint fails to state a cause of action.

## ARGUMENT

### I.    ESO's Claims Are Moot

ESO does not dispute that this case is moot and the Court lacks subject matter jurisdiction if ESO's December 19, 2007 letter to totes failed to meet the notice requirements of Section 2.7(c) of the Agreement. That provision contains three substantive requirements:  ESO must (1)

identify "*each disputed item*, [2] specifying the *amount thereof* in dispute and [3] setting forth,

in reasonable detail, the *basis for such dispute* . . ." Ex. B (Agreement), § 2.7(c) (emphasis

added). ESO cannot and does not contend that its notice letter met the first two requirements

because it did not identify <u>any</u> disputed items or amounts thereof. *See* Ex. C (Dec. 19, 2007

letter). The Court should therefore dismiss this case as moot on this basis alone.[2]

With regard to the third requirement, that ESO provide reasonable detail on the basis for

each dispute, ESO argues that this Court cannot determine whether its notice was reasonable on a

motion to dismiss. ESO is mistaken. Whatever level of detail might be reasonable in another

hypothetical dispute is not relevant here because ESO provided <u>no</u> detail whatsoever in its

notice. *See id.* at 1 (claiming only that "there are certain omissions from the [Net Sales

Statement], and certain items are incorrectly reflected therein"). Indeed, ESO itself admitted in

its letter that it failed "to provide the detail in this notice that is contemplated by Section 2.7(c)."

*Id.* This admission precludes ESO from contending otherwise now.

ESO suggests without citing any authority that its failure to provide reasonable detail can

be excused due to totes's alleged refusal to cooperate with ESO. ESO Memo at 11-12. ESO's

own Complaint belies this theory. According to the Complaint, "various omissions,

inaccuracies, and miscalculations" in the Net Sales Statement were "immediately" apparent. Ex.

A (Comp.) ¶ 26. In addition, the Complaint alleges that ESO's accountants reviewed files at

totes's offices the week before ESO sent its notice. *Id.* ¶ 29. Nevertheless, ESO did not provide

any detail on the "immediately apparent" disputes or anything its accountants reviewed.

---

[2]    ESO attempts to distinguish this Court's decision in *Stena Line (U.K) Ltd v. Sea Containers Ltd.*, 758 F. Supp. 934 (S.D.N.Y. 1991), by asserting that the plaintiff in *Stena* "never contested the matter at issue." Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss or Stay, dated June 20, 2008 ("ESO Memo") at 11. However, the petitioner in *Stena* <u>did</u> contest the calculations at issue. *Id.* at 936 (explaining that petitioner "informed [respondent] by telex of their belief that the December balance sheet was not prepared in accordance with the terms of the Agreement" and did "not agree or in any way concede that the December 31 Balance Sheet was prepared in accordance with the terms of [the Agreement]"). This Court concluded that the petitioner had not preserved its right to contest the validity of the balance sheet at issue because, as here, it had failed to dispute the calculations in accordance with "the procedures set out in the [parties' agreement]." *Id.* at 938-39.

Regardless, ESO cannot avoid the consequences of its failure to provide an adequate dispute notice by blaming totes. "New York law requires that contract provisions specifying dates for performance be strictly enforced in a contract action at law." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990). ESO could obtain the Potential Earn-Out Payments only in a contract action at law,[3] so the Court should strictly enforce the 45-day time limit, which contains no exception for purported non-cooperation by totes. While ESO effectively seeks an equitable tolling of the 45-day period, its failure to seek provisional relief before the expiration of that period precludes it from doing so now. *See, e.g., Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) ("Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights *diligently*, and (2) that some *extraordinary circumstance* stood in his way." (emphasis added)).

## II.    Even Assuming Jurisdiction Is Proper, This Action Must Be Stayed Pending Arbitration

### A.    ESO's Claims Fall Within The Arbitration Clause

ESO does not dispute that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Even where a contract contains a narrow arbitration provision, "a federal court engages in a consciously biased inquiry. . . . [F]or a given dispute to be excluded from arbitration, there must be 'clear and unambiguous' or 'unmistakably clear' language stating that such a dispute is excluded." *Chiarella v. Vetta Sports, Inc.*, No. 94 Civ. 5933 (PKL), 1994 WL 557114, at *4 (S.D.N.Y. October 7, 1994) (Leisure, J.) (citations omitted).

ESO seeks to escape the accounting arbitration provision by arguing that "the parties only agreed that Accountants would do the computation to resolve the 'amounts'" of disputed items

---

[3]    *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214 & n.2 (2002) (explaining that claim for money damages is at law rather than in equity unless it seeks restoration of particular funds or is accounting for profits from use of particular property held in constructive trust).

and that its claims do not require a determination of "the correct amount of the 'items' in the Net Sales Statement," because they "are for breach of contract, express and implied, and for equitable relief and damages." ESO Memo at 15-16.  ESO's argument fails for three reasons.

First, the arbitration provision, by its own terms, is not limited to "amounts" in dispute. Instead, it requires that the parties "shall submit the item(s) remaining in dispute for resolution to the . . . Independent Accounting Firm." Ex. B (Agreement) § 2.7(c) (emphasis added).  The Court should not disregard the parties' choice to refer "disputed items," rather than simply "disputed amounts," to the arbitrator. *See Sayers v. Rochester Telephone Corp. Supplemental Mgmt Pension Plan*, 7 F.3d 1091, 1094 (2d Cir. 1993) ("The primary objective in contract interpretation is to give effect to the intent of the contracting parties 'as revealed by the language they choose to use.'" (citation omitted)).  Likewise, the Court should not ignore that the parties established an allocation of expenses that applies only to Section 2.7 and set strict deadlines in Section 2.7 for a final determination of whether ESO is entitled to Potential Earn-Out Payments but set no time limits for resolving any other disputes. Ex. B (Agreement) § 2.7(c) (providing for each party to pay its own expenses under Section 2.7); *id.* § 2.7 (setting 60-day limit for creation of Net Sales Statement, 45-day limit for dispute letter, 20-day limit for reconciliation of disputes and 30-day limit for arbitration).  Permitting ESO to proceed with its claims regarding Potential Earn-Out Payments in federal court without time limits would defeat these contractual choices and result in piecemeal litigation, with discovery issues considered in federal court and the amounts in dispute resolved in arbitration.

Second, the titles of ESO's causes of action are irrelevant. *See Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 20-21 (2d Cir. 1995) ("In determining whether a particular claim falls within the scope of the parties' arbitration agreement, [courts] focus on the allegations in the complaint rather than the legal causes of action" (citation omitted)); *see also Chiarella*,

1994 WL 557114, at *5 (finding claims for fraud and misrepresentation fell within "narrow"

arbitration provision covering calculation of "losses").

Third, ESO's claims fall well within the arbitration clause here:

- ESO's first claim seeks a decree of specific performance requiring totes to comply with Section 2.7(e) of the Agreement, which requires totes to provide "reasonable access" to information "as may be required in connection with the analysis of any Net Sales Statement . . . and resolution of any dispute covered by Section 2.7(c)," the accounting arbitration clause. This access provision is integrated into the overall dispute procedure of Section 2.7; indeed, ESO admits in its Complaint that it is "critical to ESO's rights in connection with the earn-out payments." Ex. A (Comp.) ¶ 21. Whether ESO had all the access to information it wanted is a question the Independent Accounting Firm has the best expertise to resolve, and it is subsumed into the question of whether the Net Sales Statement is accurate – a question explicitly reserved for the Independent Accounting Firm. *See Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002) ("[F]or the law to assume an expectation that aligns (1) decision-maker with (2) comparative expertise will help better to secure a fair and expeditious resolution of the underlying controversy - a goal of arbitration systems and judicial systems alike.").

- ESO's second claim rests on allegations that there are numerous "discrepancies and issues," including totes's use of GAAP accounting, that "call into dispute the accuracy of the Net Sales Statement in its entirety" and impacted Potential Earn-Out Payment calculations "by in excess [of] *$1.6 million.*" ESO Memo at 22-23 (quoting Complaint, ¶¶ 34, 36-38 (italics in original)). ESO does not seriously dispute that these accounting disputes fit within the accounting arbitration clause.

- ESO's third claim concededly is derivative of its first claim. It is therefore equally subject to the arbitration provision as ESO's first claim.

ESO's reliance upon *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*,

858 F.2d 825 (2d Cir. 1988), is misplaced. In that case, the arbitration clause was "limited to tax

law questions and to the computation of the amount of any indemnity payments that the utility

might owe its shareholders as a result of changes in the tax law." 858 F.2d at 833. The Second

Circuit held that the narrow arbitration clause did not cover a dispute completely unrelated to tax

law about whether the corporation acted in good faith in redeeming preferred stock. *Id.* at 832-

833. By contrast, this case involves an accounting arbitration provision and disputes over what

documents are necessary to resolve an accounting dispute, including whether GAAP applies, and whether the accounting was manipulated.[4]

ESO's claims therefore fall within the Agreement's accounting arbitration clause.

B.     The Arbitrator Should Decide Whether The Access Provisions Are A Condition Precedent And Whether They Have Been Met

ESO also argues that it can escape arbitration because it alleged that totes's cooperation was a condition precedent to arbitration. Under New York law, a "contractual duty ordinarily will not be construed as a condition precedent absent clear language that it was so intended." *Roan/Meyers Assocs., L.P. v. CT Holdings, Inc.*, 26 A.D.3d 295, 296, 810 N.Y.S.2d 67, 68 (1st Dep't 2006). The Agreement does not define totes's cooperation as a condition precedent to arbitration, and ESO offers no basis for believing that it was other than ESO's bald legal conclusion. ESO Memo at 17. The Court should therefore disregard this conclusion. *See also Lamotte v. Beiter*, 34 A.D.3d 356, 826 N.Y.S.2d 6 (1st Dep't 2006) (rejecting effort to stay arbitration because no language in the parties' agreement expressly provided that valuation procedures were conditions precedent to arbitration).

Having failed to establish that totes's cooperation is a condition precedent at all, ESO then argues it is a substantive condition precedent for a court to decide rather than a procedural condition precedent reserved for the arbitrator. ESO Memo at 18. The Supreme Court in *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543 (1964), addressed a nearly identical question. In that case, arbitration was the third step of a grievance procedure whose first two steps had not

---

[4]     *XL Capital, Ltd. v. Kronenberg*, 145 Fed. Appx. 384 (2d Cir. 2005), cited by ESO, is an unpublished decision and therefore has no precedential effect. United States Court of Appeals for the Second Circuit, Rules Relating to the Organization of the Court, Interim § 0.23(b); *id.* Interim § 0.23(c) ("Citation to summary orders filed prior to January 1, 2007, is not permitted in this or any other court . . ."); *XL Capital*, 145 Fed. Appx. at 385 (warning that its "conclusion is dependent on the specific situation described in this order" ). Regardless, to the extent the facts in *XL Capital* can be discerned, the dispute involved a conflict between two arbitration provisions, each of which are subject to the strong federal policy favoring arbitration of disputes embodied in the Federal Arbitration Act, *Moses H. Cone*, 460 U.S. at 24, unlike forum-selection clauses, like Section 12.15 of the Agreement, which are not favored by federal statute and can be overcome under applicable circumstances. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988).

been met. As a result, the appellant argued that the courts should find arbitration was inappropriate. The Supreme Court disagreed, explaining:

> Doubt . . . whether the unexcused failure to follow [grievance procedures] avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. . . . It would be a curious rule which required that intertwined issues of 'substance' and 'procedure' growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of public policy compel such a result.

376 U.S. at 557. The same logic applies here and requires the arbitrator to decide whether totes failed to meet a condition precedent, if there is one.[5]

## III. ESO's Complaint Must Be Dismissed For Failure To State A Cognizable Claim

### A. ESO's Breach of Contract Claim Must Be Dismissed Because ESO Has Failed To Adequately Allege That It Has A Remedy

ESO's breach of contract claim must be dismissed as (1) its requested equitable remedy would be unduly burdensome and (2) ESO has not alleged any damages.

ESO does not dispute that it can obtain specific performance only if doing so would not be unduly burdensome on the Court. *See* totes Memo at 16-18. Proceeding to such a judgment would require this Court to conduct a trial on the reasonableness of totes's cooperation and whether specific documents and records are required to resolve an underlying claim that this Court cannot decide because both sides agree it is subject to arbitration. ESO does not try to argue that this burden on the Court is reasonable.

ESO has also failed to allege that totes's alleged breach caused ESO any money damages. *See* totes Memo at 18-19. Should this Court rule in ESO's favor on its breach of contract claim, ESO would not be entitled to a single cent as damages, a required element of a breach of contract

---

[5]    *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79 (2002), cited by ESO, confirms that courts decide only substantive "question[s] of arbitrability" such as "whether the parties are bound by a given arbitration clause" and "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy." *Id.* at 84. All "other conditions precedent to an obligation to arbitrate . . . are for arbitrators to decide." *Id.* at 85 (citation omitted). *Rockland County v. Primiano Constr. Co., Inc.*, 409 N.E.2d 951, 954 (N.Y. 1980), also cited by ESO, is neither binding on this Court nor good law to the extent it is inconsistent with *Howsam*.

ESO would not be entitled to a single cent as damages, a required element of a breach of contract

claim. *See, e.g., Bridgeport Music, Inc. v. Universal Music Group, Inc.*, 440 F. Supp. 2d 342, 344-45 (S.D.N.Y. 2006). The Court should therefore dismiss ESO's breach of contract claim.

B.    ESO's Implied Covenant Of Good Faith Claim Is Redundant Of Its Breach Of Contract Claim And Fails To Plead Manipulation With Particularity

ESO does not dispute that it cannot bring a claim for breach of the implied covenant of good faith that is based on the same conduct as a breach of contract action. ESO also does not dispute that its implied covenant of good faith claim is based on the conduct described prior to paragraph 57 of the Complaint. *See* totes Memo at 19-20. ESO now suggests its claim is only based on the manipulation of books and records. ESO Memo at 21 (citing Complaint, ¶ 58). But ESO defends the pleading of its claim by relying in part on document access issues that underlie ESO's breach of contract claim. *See* ESO Memo at 22 (contending that totes's alleged failure to "provide access to several requested categories of documents and information" supports ESO's second claim). As ESO cannot even decide the basis for its second cause of action, the claim fails to provide totes fair notice and must be dismissed. *See* totes Memo at 19 n.11.

In addition, ESO concedes it must plead its second claim with particularity. ESO also concedes that a failure to plead with particularity can be excused only if the supporting facts are peculiarly within totes's knowledge. ESO made no such allegation in its Complaint because its accountants reviewed totes's books and records for seven days. Ex. B (Complaint), ¶ 29. Instead, ESO simply restates its allegations that there were "discrepancies" in totes's books and records and that totes used GAAP accounting, but ESO does not explain how these allegations demonstrate with particularity the nature of the alleged fraudulent conduct or which books and records were manipulated. *See* ESO Memo at 22-23. ESO even fails to allege a single detail – even a date or customer name – supporting its allegation that certain customer ship dates were intentionally delayed. In sum, the Court should dismiss ESO's second claim because ESO had

access to relevant facts but did not allege anything supporting a claim of "manipulation" as opposed to an accounting treatment under GAAP that ESO disputes.

C.   ESO's Indemnification Claim Is Derivative of ESO's Meritless Contract Claim And Is Barred By Section 2.7(c) Of The Agreement

ESO does not dispute that its indemnification claim is derivative of its breach of contract claim. The Court should therefore dismiss this claim if it dismisses the breach of contract claim. In addition, ESO concedes it cannot obtain indemnification under Section 2.7(c) of the Agreement, which applies to the access provisions of Section 2.7(e) that are the basis of ESO's breach of contract claim.[6] ESO Memo at 24. Instead, ESO apparently argues that Section 11.1 of the Agreement somehow overrides Section 2.7(c). *Id.* But it is black letter law that a specific provision like Section 2.7(c) controls over a general provision like Section 11.1, *see* totes Memo at 22, and ESO offers no basis for disregarding this rule of construction.

## CONCLUSION

For the foregoing reasons, totes respectfully requests that this Court dismiss the Complaint with prejudice or, in the alternative, stay this action pending arbitration.

Dated: New York, New York
July 18, 2008

COHEN & GRESSER LLP

By:     _____/s/_____
        Mark S. Cohen (mcohen@cohengresser.com)
        Daniel H. Tabak (dtabak@cohengresser.com)
        Oliver Haker (ohaker@cohengresser.com)
        100 Park Avenue, 23rd Floor
        New York, New York 10017
        Telephone:  (212) 957-7600

*Attorneys for Defendant totes Isotoner Corporation*

---

[6]     Although ESO references the access provisions of Section 9.1 of the Agreement, it does not try to rebut totes's argument that Section 9.1 is not applicable here. *See* totes Memo at 16 n.10.

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

CChiarella v. Vetta Sports, Inc.
S.D.N.Y.,1994.
Only the Westlaw citation is currently
available.
United States District Court, S.D. New
York.
Marie-Therese CHIARELLA, Joel Davis,
Giuseppe Bigolin, Arkea, S.A., and Jova,
Inc., Plaintiffs,
v.
VETTA SPORTS, INC., The Orleander
Group, Inc., TOG Acquisition Co., and
Citibank, N.A., Defendants.
**No. 94 CIV. 5933 (PKL).**

Oct. 7, 1994.

Parker Chapin Flattau & Klimpl New York
City (Katherine C. Ash, Aurora Cassirer, of
counsel), for plaintiffs.
Shereff, Friedman, Hoffman & Goodman,
New York City (Andrew J. Levander, Sheri
Steinberg, of counsel), for defendants.

*OPINION AND ORDER*

LEISURE, District Judge:
**\*1** This is an action brought by Marie-
Therese Chiarella, Joel Davis, Giuseppe
Bigolin, Arkea, S.A. and Jova, Inc. against
Vetta Sports, Inc., p/k/a The Orleander
Group, Inc., also p/k/a TOG Acquisition
Co., and Citibank, N.A. seeking to compel
arbitration. Citibank is named as a defendant
only because it currently holds a large
portion of the money at issue. Plaintiffs
assert that certain agreements entered into
by plaintiffs and defendants provide for
arbitration to be the mechanism for dispute
resolution. Defendants, on the other hand,
contend that the arbitration clause provided
in the agreements is a narrow one, not
applicable to the matters currently in
dispute. Parties also dispute the length of
time appropriate for 2,000,000 Swiss Francs,
at issue in this case, to remain in escrow. For
the reasons stated below, plaintiffs' motion
is granted, and the 2,000,000 Swiss Francs
shall remain in escrow, subject to court
order, pending a final determination on the
merits of the issues to be arbitrated.

**BACKGROUND**

Defendant, TOG Acquisition Co. ("TOG"),
purchased substantially all of the assets of
two corporations, Orleander, S.A. and
Orleander U.S.A., Inc., of which plaintiffs,
Marie-Therese Chiarella and Joel Davis,
were the shareholders. TOG also purchased
all of the stock of Vetta S.r.L., an Italian
Corporation whose stock was owned by
plaintiffs Bigolin and Orleander, S.A. TOG
subsequently changed its name to Vetta
Sports, Inc. ("Vetta").

The companies which TOG, now Vetta,
purchased are in the business of distributing
bicycle parts and accessories. The Asset
Purchase Agreement ("Agreement") entered
into by the parties provided for payment of
the purchase price with payments made as
follows: at closing; in 3 later installments;
and in smaller payments, to be paid semi-
annually. Affidavit of Aurora Cassirer
("Cassirer aff."), sworn to on August 16,
1994, Exh. 7. The first two installment
payments, totalling 5,000,000 Swiss Francs,
were made. The current controversy,
however, involves the third installment of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 2
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

2,000,000 Swiss Francs and the various other smaller payments, including a 244,908 Swiss Francs payment that came due on April 28, 1994.

The 2,000,000 Swiss Francs were paid into an escrow account in Switzerland, but then were withdrawn by defendant pursuant to the Agreement. Plaintiffs have brought this cause of action based on defendants' failure to comply with their obligation to restore the money to the escrow agent by June 31, 1994. Defendants, instead, kept the money in a Citibank account in the U.S. contending that they should be able to keep the money until the Court decides on their claims against plaintiffs.

This matter originally came before the Court by way of an order to show cause for a temporary restraining order ("TRO") and a preliminary injunction seeking an order: (1) restraining defendants from transferring or encumbering the 2,000,000 Swiss Francs held in Citibank, (2) directing defendants to pay the money to an escrow agent, (3) directing defendants to make payments of all amounts due and owing to plaintiffs to the escrow agent, (4) directing defendants to make, as they came due, all future payments of disputed amounts due and owing to the plaintiffs to the escrow agent, and (5) directing defendants to submit to arbitration any claims asserted by them against plaintiffs. Judge Loretta A. Presca, sitting as the Part I Judge, granted defendants' motion and issued a TRO requiring the 2,000,000 Swiss Francs to be kept in an escrow account at Citibank under the control of plaintiffs' law firm, Parker Chapin, acting as escrow agent.

**\*2** Subsequently, at a hearing on the motion

for preliminary injunction, the parties indicated their willingness to stipulate that the 2,000,000 Swiss Francs remain in the escrow account pending a final determination of the matter. The parties later proved unable to draft a mutually agreeable stipulation. On the record in open court, however, this Court indicated that it would reach a final decision on the arbitration issue.

Federal Rules of Civil Procedure 65(A)(2) provides "[b]efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application." It has long been recognized that an accelerated decision on the merits often is appropriate when a preliminary injunction has been requested. Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2950 (1969). "The urgency that is characteristic of cases involving preliminary injunction applications makes a rapid determination of the merits especially important." *Id.* The trial court can transform a preliminary injunction hearing into a consolidated hearing on the merits at any time and may do so *sua sponte. Id.* The Court, however, should give the litigants fair notice and an opportunity to be heard prior to a disposition of the case. *Id.* Neither party having objected to this Court's decision to rule on the merits of the action, and both parties having fully briefed the relevant issues, this Court now renders its decision as to whether this dispute should be submitted for arbitration or should be litigated.

**DISCUSSION**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

Plaintiffs contend that defendants should be compelled to enter arbitration. Plaintiffs base their application on language in the Indemnification Agreement ("Indemnification Agreement") entered into between the parties, which states that if a dispute arises concerning indemnification by plaintiffs, "either party may submit the dispute to the American Arbitration Association ("AAA") in New York City for resolution before a single arbitrator chosen by the AAA." Cassirer aff. at Exh. 6, § 1.3. Defendants oppose plaintiffs' motion on the grounds that the agreement between the parties provides that arbitration is purely optional, the arbitration clause does not encompass the parties' disputes, arbitration is premature, and arbitration should be stayed pending resolution of the action currently before this Court.

"The Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. (1988), requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation." *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1063 (2d Cir.1993). "In determining the arbitrability of a particular dispute, a court must decide 'whether the parties agreed to arbitrate, and, if so, whether the scope of that agreement encompasses the asserted claims.' " *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional de Venezuela*, 991 F.2d 42, 45 (2d Cir.1993) (quoting *David Threlkeld & Co. v. Metallgesellschaft Ltd.*, 923 F.2d, 245 249 (2d Cir.1993)). Further, " ' "[t]he Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as

to which an arbitration agreement has been signed." ' " *McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir.1988) (emphasis in original) (quoting *Genesco, Inc. v. T. Kakiuchi & Co.* 815 F.2d 840, 844 (2d Cir.1987) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985))).

**\*3** Courts will not force parties into arbitration when it was clearly not their intention to put a given matter under the province of an arbitration agreement. *See Chevron U.S.A., Inc. v. Consolidated Edison Co.* 872 F.2d 534, 537 (2d Cir.1989). This Court has stated that "[i]t is fundamental that arbitration agreements are creatures of contract law." *Scher v. Bear Stearns and Co.*, 723 F.Supp. 211, 214 (S.D.N.Y.1989). Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute.... [A]s with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

Once a court has determined that an arbitration clause exists, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983). In fact, "[t]he existence of an arbitration clause in [an agreement] raises a presumption of arbitrability that can be overcome only if 'it may be said with positive assurance that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 4
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " *Associated Brick Mason Contractors, Inc. v. Harrington,* 820 F.2d 31, 35 (2d Cir.1987) (quoting *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650 (1986); *see also Kerr-McGee Refining Corp. v. M/T Triumph,* 924 F.2d 467, 469 (2d Cir.1991).

### 1. *Arbitration Clause Is Not Illusory*

With these tenets in mind, this Court now addresses defendants' objections to arbitration. Defendants' first assert that arbitration is purely optional and point out that the express language of the arbitration clause provides that "either party *may* submit the dispute to the American Arbitration Association." Cassirer aff. at Exh. 6, § 1.3. (Emphasis added.) Defendants also direct attention to other provisions in the Asset Purchase, Indemnification and Escrow Agreements that indicate that the parties contemplated that indemnification claims could be either litigated or arbitrated. Lastly, defendants support their claim that the arbitration clause is wholly optional by referring to the numerous times that the parties used the word "shall" rather than the word "may" when they wanted to indicate that a certain provision was mandatory.

This Court finds defendants' contention that arbitration is purely optional to be unpersuasive. Although the parties provided that indemnification claims could be either litigated or arbitrated and used "shall" to indicate the mandatory nature of certain provisions, this does not render the arbitration provision optional. Instead, the

proper interpretation is that the arbitration provision did not have to be invoked, but once raised by one party, it became mandatory with respect to the other party. A plain reading of the clause supports such an interpretation. If the clause were wholly optional, as defendants contend, it would serve no purpose. Parties can always submit disputes to arbitration if they both agree to do so, therefore, there would be no reason to include such a provision. *See, e.g., Garza v. Marine Transp. Lines, Inc.,* 861 F.2d 23, 27 (2d Cir.1988) (an "interpretation of the contract ... [that has] the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.") It follows that the word "may" was used to mandate arbitration at the insistence of any one party to the agreement, but to indicate that arbitration was not mandatory absent the invocation of the provision by one of the parties.

### 2. *Arbitration Clause Encompasses this Dispute*

**\*4** Defendants next contend that the arbitration clause does not encompass the parties disputes. Specifically, defendants make a number of counterclaims against plaintiffs that they argue are outside the scope of the arbitration clause. In trying to determine the scope of arbitration provisions, courts have distinguished between "narrow" and "broad" arbitration clauses. Broad clauses purport to refer to arbitration all disputes arising out of a contract, while narrow clauses limit arbitration to a specific type of dispute. *See McDonnell Douglas Finance Corp. v. Pennsylvania Power and Light Co.,* 858 F.2d 825, 832 (2d Cir.1988). "With narrower clauses ... a court considering the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                         Page 5
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

appropriate range of arbitrable issues must 'consider whether the [question at] issue is on its face within the purview of the clause.' " *Id.* at 832 (quoting *Rochdale Village, Inc. v. Public Service Employees Union,* 605 F.2d 1290, 1295 (2d Cir.1979)).

The Court finds that the arbitration arrangement entered into by the parties in this case is a narrow one. The arbitration clause does not purport to cover all disputes arising out of the agreements among the parties. Instead, it covers only a subset of conflicts. This Court, however, finds that the present controversy is encompassed within the arbitration arrangement.

As this Court has previously noted:

In interpreting the breadth of an agreement to arbitrate, ... a federal court engages in a consciously biased inquiry.... Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.... Accordingly, for a given dispute to be excluded from arbitration, there must be "clear and unambiguous" or "unmistakably clear" language stating that such a dispute is excluded.

*Givenchy S.A. v. William Stuart Industries (Far East) Ltd.,* No. 85 Civ. 9911 (PKL), slip op. at 3 (S.D.N.Y. March 10, 1986) (citations omitted). *See also McMahon Securities Co. L.P. v. Forum Capital Markets L.P.,* No. 94-7087 (2d Cir. September 9, 1994) (federal policy requires court to construe as broadly as possible, and arbitration should be ordered unless clause is not susceptible of an interpretation that covers the asserted dispute). Consequently, this Court applies a "conscious bias" in favor of arbitration when interpreting the

arbitration provision at issue herein.

Section 1.3 of the Indemnification Agreement provides that "TOG shall be entitled to reduce the amount of any payments to be made ... after the Closing ... by the amount of Losses, if any, imposed upon or incurred by any TOG Indemnified Party." Cassirer aff. at Exh. 6, § 1.3. "Losses" are defined in Section 1.1 of the Indemnification Agreement to include:

each and every claim, loss, liability, damage, cost and expense ... (excluding (i) consequential damages except in the event that such consequential damages arose out of the intentional misrepresentations of any one of the sellers ... (ii) punitive damages, except in the event that punitive damages arose out of the intentional misrepresentations of any of the sellers ...) imposed upon or incurred by the TOG Indemnified Party, resulting from or arising out of (i) any breach of or inaccuracy in any representation, warranty, covenant or agreement of any of the [plaintiffs] contained in any of [the agreements], (ii) the ownership of the Orleander Assets and the business associated therewith.

*\*5Id.* at § 1.1.

Finally, Section 1.3 of the Indemnification Agreement provides that "if [one of the plaintiffs] objects to any such reduction [made by one of the defendants] [and they] are unable to resolve the matter ... either party may submit the dispute to the American Arbitration Association." In sum, defendants can subtract from the amount that they pay plaintiffs any "Losses" suffered, and "Losses" are very broadly defined to include any loss to defendants

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

from misrepresentations by plaintiffs. If plaintiffs object to the reductions made by defendants, they may submit such dispute for arbitration, and by virtue § 1.3 of the Indemnification Agreement, defendants are compelled to arbitrate.

Defendants' first six counterclaims in this action arise out of purported misrepresentations and other frauds committed by plaintiffs. As such, they fit squarely within the "Losses" contemplated by the parties for which defendants could deduct from the amount paid to plaintiffs under the agreements. They further fall precisely within those reductions about which plaintiffs can object and can then submit for arbitration. Consequently, this Court finds that, although the arbitration provision employed by the parties was narrow, it encompasses the dispute presently before this Court. Accordingly, all of plaintiffs' claims and the first six of defendants' counterclaims are appropriate for arbitration. Only those claims by defendants that exceed the entire amount not yet received by plaintiffs, which includes the 2,000,000 Swiss Francs being held in escrow, and defendants' claims for rescission and for breach of plaintiff Davis' employment agreement fall outside of the arbitration provision.

This Court's conclusion regarding the breadth of the arbitration clause is supported by a letter sent by defendants to plaintiffs on June 28, 1994. Cassirer aff., Exh. 7. In that letter, defendants assert that

[p]ursuant to Section 1.1 of the Indemnification Agreement, the Sellers agreed to indemnify [Vetta] from and against each and every claim, loss, liability,

damage, cost and expense, resulting from or arising from any breach of or inaccuracy in any representation or warranty contained in the Asset Purchase Agreement ... including consequential and punitive damages to the extent such damages arise from intentional misrepresentations.

*Id.* This letter shows that defendants consider the harm caused by plaintiffs' alleged misrepresentations to fall within the "Losses" established by the Indemnification Agreement. Further, defendants' claims that arbitrators will not be able to adequately compensate them for the losses suffered as a result of plaintiffs' misrepresentations have a hollow ring in light of defendants' acknowledgement of the broad range of injuries for which plaintiffs can be held accountable by the arbitrators.

### 3. *Issue is Ripe for Arbitration*

Defendants third contention is that arbitration is premature because the payment of 2,000,000 Swiss Francs is not scheduled to be distributed until November 29, 1994. This Court rejects defendants' contention and notes that there is an issue presently ripe for arbitration. Defendants have refused to deposit the 2,000,000 Swiss Francs in escrow in Switzerland as required under the agreements and have also refused to submit other payments alleged by the plaintiffs to be due and owing. The claims made by defendants and their repudiation of all obligations to make further payments to plaintiffs render the present controversy ripe for arbitration.

### 4. *Arbitration Should not be Stayed*

**\*6** Defendants' last assertion is that any

Not Reported in F.Supp.                                                        Page 7
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

arbitration should be stayed pending the outcome of this litigation. This Court rejects defendants' assertion. Since the relief that plaintiffs request and much of what defendants seek in their counterclaims can be granted by arbitrators under the terms of the Indemnification Agreement, this Court will await the outcome of such arbitration. A determination by the arbitrators with respect to defendants' counterclaims and an assessment of appropriate relief will facilitate and expedite the litigation of any remaining issues. This Court notes that although defendants have alleged that plaintiffs committed fraud and made material misrepresentations with respect to the agreements entered into among the parties, defendants do not allege that the arbitration provision itself was entered into as a result of fraud. Where no claim is made that a party has been fraudulently induced to enter into the arbitration agreement, allegations of fraud concerning the entire contract can proceed to arbitration. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967).*

5. *Scope of Arbitration*

Having determined that arbitration is appropriate, this Court turns to the appropriate scope of arbitration. Plaintiffs' claims, in their entirety, shall be submitted for arbitration. Defendants shall submit for arbitration its own defenses and its first six counterclaims, and the arbitrator is empowered to decide on these claims and to award appropriate monetary relief. The arbitrator shall not, however, rescind the agreements reached between the parties including the Asset Purchase Agreement, the Escrow Agreement and the Indemnification Agreement. The arbitrator also shall not

award monetary relief to either party to a greater extent than allowed in the arbitration clause. Such amount shall not exceed the entire amount withheld by defendants, including the 2,000,000 Swiss Francs being held in escrow. Additionally, defendants' counterclaims numbered 7 through 12 concerning Davis' Employment Agreement are not covered in the parties' arbitration clause and shall not be arbitrated. Arbitration shall take place in New York City, New York before a single arbitrator chosen by the American Arbitration Association.

6. *Period of Escrow*

Parties agreed in principle in court, contingent upon client acceptance, that the 2,000,000 Swiss Francs would be placed in escrow subject to court order. Parties have been able to agree that the 2,000,000 Swiss Francs should remain in escrow pending a final determination on the merits of plaintiffs' claims and defendants' first six counterclaims. Defendants, however, desire the money to remain in escrow pending the resolution of all of their counterclaims. Defendants' last six counterclaims allege misconduct, particularly by plaintiff Davis. These counterclaims specifically relate to the employment agreement entered into between plaintiff Davis and defendants.

**\*7** Although the claims asserted against plaintiff Davis arise, in part, out of the same facts that give rise to defendants' other counterclaims, such claims should be treated differently. This Court acts to enforce the mechanism for dispute resolution entered into by the parties. As part of that mechanism, the parties provided that when certain disputes arose, the amount of money

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 8
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.))**

contested by the parties would be placed in escrow and arbitration could be employed to resolve the disagreement. Those claims asserted by plaintiffs and counterclaims asserted by defendants (that this Court has required submitted for arbitration) constitute the types of disagreements that the dispute resolution mechanism described above was designated to manage. Conflicts arising out of plaintiff Davis' employment agreement, however, were not designated to be handled by such a mechanism. The Indemnification Agreement does not even incorporate Davis' employment agreement. This Court will not place defendants in a better position than they bargained for by requiring that the 2,000,000 Swiss Francs remain in escrow pending the resolution of all of defendants' counterclaims.

Instead, the 2,000,000 Swiss Francs need only remain in escrow until the matters (that the parties previously agreed should be settled through the escrow and arbitration arrangement) are resolved. Accordingly, the 2,000,000 Swiss Francs shall only remain in escrow until there is a final determination on the merits of the issues that the parties are required by this Court to arbitrate.

### CONCLUSION

For the reasons set forth above, this Court grants plaintiffs' motion to compel arbitration, and hereby orders defendants to promptly submit to the arbitration of plaintiffs' claims and defendants' first six counterclaims. This Court also orders that the 2,000,000 Swiss Francs shall remain in escrow, subject to court order, until the matters required to be submitted for arbitration are resolved. This Court further orders that the current action is stayed and

that, upon the completion of arbitration, the parties shall return to this Court, if necessary, for the purpose of resolving any remaining unsettled claims by plaintiffs or counterclaims by defendants.

**SO ORDERED.**

S.D.N.Y.,1994.
Chiarella v. Vetta Sports, Inc.
Not Reported in F.Supp., 1994 WL 557114 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

145 Fed.Appx. 384                                                    Page 1
145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.))
**(Cite as: 145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.)))**

**H**XL Capital, Ltd. v. Kronenberg
C.A.2 (N.Y.),2005.
This case was not selected for publication in
the Federal Reporter.
United States Court of Appeals,Second
Circuit.
XL CAPITAL, LTD., Petitioner-Appellant,
v.
William KRONENBERG III, Frank A.
Piliero and David M. Rosenberg,
Respondents-Appellees.
**Docket No. 04-5774.**

Aug. 18, 2005.

**Background:** In dispute arising from sale of
stock, the United States District Court for
the Southern District of New York, Rakoff,
J., denied purchaser's motions to stay
arbitration before American Arbitration
Association (AAA) and to compel referral of
the dispute to accounting firm for resolution.
Purchaser appealed.

**Holding:** The Court of Appeals held that
dispute was to be resolved by AAA,
pursuant to purchase agreement's arbitration
clause.
Affirmed.

West Headnotes

**Alternative   Dispute   Resolution   25T**
☞**143**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk142 Disputes and Matters
Arbitrable Under Agreement

        25Tk143 k. In General. Most
Cited Cases
    (Formerly 33k7.5 Arbitration)
Dispute arising from sale of stock, which
gave rise to claims of fraud and deceitful
conduct, negligent misrepresentation, breach
of contract, breach of the covenant of good
faith and fair dealing, was to be resolved by
American Arbitration Association (AAA),
pursuant to purchase agreement's arbitration
clause; agreement required arbitration of
pure accounting issues before accounting
firm and all other issues before AAA, and
claims assumed accurate calculation of final
earnout worksheets to make out causal
nexus to claimed damages.

**\*384** Appeal from the United States District
Court for the Southern District of New York
(Rakoff, J.).
David G. Januszewski, Cahill Gordon &
Reindel LLP, New York, NY, for
Appellants.
Harris N. Cogan (Stephen J. Meyer, on the
brief), Blank Rome LLP, New York, NY,
for Appellee.

Present: POOLER, SOTOMAYOR, Circuit
Judges, and KORMAN, Chief District
Judge.<sup>FN*</sup>

        FN* The Honorable Edward R.
        Korman, Chief Judge of the United
        States District Court for the Eastern
        District of New York, sitting by
        designation.

**SUMMARY ORDER**

**\*\*1ON CONSIDERATION WHEREOF,**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145 Fed.Appx. 384
145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.))
(Cite as: 145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.)))

Page 2

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of said District Court be and it hereby is **AFFIRMED.**

Petitioner-appellant XL Capital, Ltd. ("XL"), appeals from a judgment of the district court denying XL's motions to stay arbitration before the American Arbitration Association ("AAA") and to compel referral of the dispute to Ernst & Young LLP ("E&Y") for resolution. We assume the parties' familiarity with the facts, proceedings below, and specification of issues on appeal.

**\*385** We review a district court's determinations on the scope of an arbitration clause de novo, _Oldroyd v. Elmira Sav. Bank, FSB,_ 134 F.3d 72, 76 (2d Cir.1998), and findings of fact for clear error, _First Options of Chicago, Inc. v. Kaplan,_ 514 U.S. 938, 948, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). We interpret arbitration agreements to reflect the reasonable expectations of the parties to the contract, _Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,_ 67 F.3d 20, 28 (2d Cir.1995).

The contract at issue here is best interpreted to require E & Y arbitration of pure accounting issues, and AAA arbitration of all other issues. Section 8(a) applies to "all questions, issues or disputes arising under this Agreement," while Section 8(b) applies to "all questions, issues or disputes arising under this Agreement with respect to the calculations of the ... Earned Payout Amount." [A 66] We have previously held that an arbitration clause covering "computation" of the amount of indemnification for the effects of changes in tax law covered tax issues and did not extend to allegations of bad faith. _McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,_ 858 F.2d 825, 827, 832-33 (2d Cir.1988). The clause here is arguably broader, in that it includes issues "with respect to" calculations, rather than just calculations, but the language still requires a close relationship of the disputed issue to the process of arriving at the final earnout amount.

This conclusion is bolstered, as it was in _McDonnell,_ by the choice of a specialized arbitrator. In _McDonnell,_ the court cited the fact that the chosen arbitrator was a tax lawyer as compelling evidence that the scope of the clause was limited to tax issues. _Id._ at 832. Here, the fact that the chosen arbitrator is an accounting firm verifies the import of the plain language: that the scope of the clause is limited to those issues closely related to accounting. The district court's conclusions as to the scope of the arbitration clause were therefore correct.

XL nonetheless urges that the fraud, negligent misrepresentation, and breach of contract claims here are simply accounting issues in disguise, relying on the non-binding authority of _Ivax Corp. v. B. Braun of America, Inc.,_ 286 F.3d 1309 (11th Cir.2002). Unlike _Ivax,_ however, the claims here focus on the addition of the new line of business [SA 104-05], the misrepresentation that this new line would be excluded from the earnout calculation [SA 106-07], and the evasive failure to provide required Worksheets. [SA 107-10] In other words, the operative acts giving rise to the claimed cause of action are not the calculation errors themselves, as they were in _Ivax._ Similarly, the breach of contract and good faith claims

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

145 Fed.Appx. 384                                                                                    Page 3
145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.))
**(Cite as: 145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.)))**

are based on the failure to properly operate ECS and provide required Worksheets. [SA 118-21] Indeed, the gravamen of the claims before the AAA is that after the alleged fraud or breach, the Worksheets necessarily lead to a lower earnout payment. In that sense, the claims assume accurate *calculation* of the Worksheets in order to make out the causal nexus to the claimed damages.

**\*\*2** We therefore hold that the statement of claim filed with the AAA is, as drafted, properly within Section 8(a) of the contract and is properly before the AAA. However, we caution that our conclusion is dependent on the specific situation described in this order, and is not a back door permitting accounting issues to be brought before the AAA. The decision below draws this line as well, noting that pure accounting issues may remain even after the AAA **\*386** resolves the issues before it.[FN**] [SPA 6] We further clarify that any portion of the dispute currently before the AAA which turns on an objection to the Worksheet rather than an objection to acts that have changed the facts on which the Worksheet is based, must also be referred to E&Y for resolution.

> FN** For example, the appellees conceded, both before the district court and at oral argument, that the use of the Borheeter-Ferguson calculation method rather than the Cape Cod method, and the use of a calendar year rather than a policy year, were pure accounting issues intended for E&Y arbitration.

For the above reasons, we affirm the judgment of the district court.

C.A.2 (N.Y.),2005.
XL Capital, Ltd. v. Kronenberg
145 Fed.Appx. 384, 2005 WL 2001153 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.